# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 2:05-cv-443 |
| | § | |
| COMCAST CORPORATION, COMCAST | § | Judge T. John Ward |
| CABLE COMMUNICATIONS, LLC, and | § | Jury |
| COMCAST OF PLANO, LP | § | |

## DEFENDANTS' MOTION TO TRANSFER VENUE
## PURSUANT TO 28 U.S.C. § 1404(a)

Defendants Comcast Corp., Comcast Cable Communications, LLC ("Comcast Cable"), and Comcast of Plano, LP (collectively, "Comcast") move to transfer this case to the Eastern District of Pennsylvania, the judicial district in which the Plaintiff Rembrandt and all Defendants have their principal places of business. In fact, Rembrandt has its principal place of business a mere seven miles from Comcast's headquarters, which are, in turn, just a few blocks from the federal courthouse to which Comcast seeks to transfer this case. Public and private interests, as well as judicial efficiency, all favor transfer:

- Comcast's known potential engineering, marketing, and financial witnesses work in the Eastern District of Pennsylvania;

- all the parties' known potential sources of proof are located in the Eastern District of Pennsylvania;

- the Eastern District of Pennsylvania can exercise its subpoena power over key third-party witnesses, while this District cannot;

- the Eastern District of Texas has no interest in adjudicating this dispute between various Eastern District of Pennsylvania parties; and

- the average time to trial in the Eastern District of Pennsylvania is only two weeks longer than in this District.

# I.     FACTUAL BACKGROUND

**A.     Plaintiff Rembrandt**

Plaintiff, Rembrandt Technologies, LP ("Rembrandt") has no connection to the Eastern District of Texas.  Rembrandt has its principal place of business in Bala Cynwyd, Pennsylvania, near Philadelphia, in the Eastern District of Pennsylvania.  (Compl. ¶ 1.)  In addition, Rembrandt is organized under the laws of the State of New Jersey, which borders the Eastern District of Pennsylvania.  (Compl. ¶ 1.)  Rembrandt does not claim any offices or other facilities in the Eastern District of Texas.  Nor does Rembrandt appear to have any employees, property, or assets in the Eastern District of Texas.  In sum, Rembrandt apparently does no business in this District.

**B.     Comcast Defendants**

The Comcast defendants have their principal places of business in the Eastern District of Pennsylvania, only 6.8 miles away from Rembrandt.  (Declaration of Matthias A. Kamber ¶ 3 ("Kamber Decl.").)  Comcast Corp. is organized under the laws of Pennsylvania, Comcast Cable under the laws of nearby Delaware.  (Compl. ¶ 2.)  Both have their principal places of business in Philadelphia.  (Compl. ¶ 2.)  Notwithstanding its name, Comcast of Plano, LP also has its principal place of business in Philadelphia, the location of the general partner Comcast of Plano GP, LLP.  (Kamber Decl. ¶ 4.)  Comcast of Plano is organized under the laws of Delaware.  (Compl. ¶ 2.)

The Comcast defendants' likely witnesses, including engineering, marketing, and financial personnel, work in Philadelphia.  With respect to the allegations that Comcast's high-speed internet services infringe U.S. Patent No. 5,852,631 ("the '631 patent"), Comcast may rely upon the following witnesses:  (1) Greg Butz, Senior Vice President, Marketing and Business Development; (2) Cathy Avgiris, Senior Vice President, Finance and Administration; (3) Robert Faught, Senior Vice President, Sales; (4) Rick Gasloli, Vice President, Engineering; and (5) David Urban, Principal Engineer, Product Engineering & Deployments.  Further, as to Rembrandt's claims that Comcast's Digital Voice VoIP services infringe U.S. Patent Nos.

5,719,858 ("the '858 patent") and 4,937,819 ("the '819 patent"), Comcast may rely upon the following witnesses:  (1) Cameron Gough, Comcast's Vice President of Communications Engineering and head of Comcast's IP telephony services; (2) Jaime Jimenez, an engineer working on Comcast's IP telephony services; (3) Tom White, Comcast's Vice President of Marketing for Voice Services; and (4) Gary Rostick, Comcast's Vice President of Finance for Voice Services.  Finally, with respect to Rembrandt's allegations that Comcast's digital cable offerings infringe U.S. Patent No. 5,243,627 ("the '627 patent"), Comcast may rely upon the testimony of Kip Compton, Vice President, Advanced Engineering.  Comcast employs these potential witnesses—as well as most other potential witnesses—near the Eastern District of Pennsylvania courthouse in Philadelphia.

## C.    Third-Party Witnesses

### 1.    Inventors

The inventors of the asserted patents have no known connection to the Eastern District of Texas.  Joseph Bentley King, the inventor listed on the '819 patent, lives in Saint Petersburg, Florida.  (Kamber Decl. ¶ 5.)  William Lewis Betts and Edward Sigmund Zuranski, the inventors listed on the '627 patent, live, respectively, in Saint Petersburg and Largo, Florida.  (Kamber Decl. ¶¶ 6, 7.)  Wayne T. Moore, the inventor listed on the '858 patent, lives in New Port Richey, Florida.  (Kamber Decl. ¶ 8.)  And Robert Earl Scott, the inventor listed on the '631 patent, lives in Largo, Florida.  (Kamber Decl. ¶ 9.)

### 2.    Patent Prosecutors

Finally, the attorneys who prosecuted the asserted patents, who may appear as fact witnesses, have no known connection to the Eastern District of Texas.  The firm of Kane, Dalsimer, Kurucz, Levy, Eisele and Richard, LLP, which prosecuted the '819 patent, is located in New York, New York.  (Kamber Decl. ¶ 10.)  Ronald D. Slusky and Gerard A. deBlasi, who prosecuted the '627 patent, are located in New York, New York, and Neshanic Station, New Jersey, respectively.  (Kamber Decl. ¶¶ 11-12.)  And the firm of Thomas, Kayden, Horstmeyer & Risley, LLP, which prosecuted the '631 and '858 patents, is located in Atlanta, Georgia, with

another office in Huntsville, Alabama.  (Kamber Decl. ¶ 13.)

## II.    LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any district where it might have been brought."  28 U.S.C. § 1404(a).  Section 1404(a) therefore requires an analysis of two separate issues.  First, the Court must determine whether venue would be proper in the transferee forum, i.e., one where the plaintiff is competent to sue and there is personal jurisdiction over the defendants.  *Hoffman v. Blaski*, 363 U.S. 335, 344 (1960); *see also In re Horseshoe Entm't*, 337 F.3d 429, 433 (5th Cir. 2003), *cert. denied*, 124 S. Ct. 826 (2003).

Second, the Court must determine whether transfer would allow the litigation to proceed more conveniently and better serve the interests of justice.  As the Fifth Circuit has explained, "[t]he determination of 'convenience' turns on a number of private and public interest factors, none of which are given dispositive weight."  *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (citations omitted).  The private concerns include the cost of attendance for willing witnesses, the availability of compulsory process to secure the attendance of witnesses, and all other practical problems that make trial of a case "easy, expeditious and inexpensive."  *Id.*  The public concerns focus on the interest in having issues of localized interest decided locally, familiarity with the law to be applied, and administrative issues such as Court congestion.  *Id.*

## III.    ARGUMENT

### A.    Venue is Proper in the Eastern District of Pennsylvania

As discussed, in evaluating whether to transfer this case to the Eastern District of Pennsylvania, the Court must first determine whether Rembrandt could have initially brought this action there.  A plaintiff may bring a patent infringement suit "in [1] the judicial district where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."  28 U.S.C. § 1400(b).  Further, "[f]or purposes of venue . . . , a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."  *Id.* § 1391(c).

Thus, whether venue is proper in the Eastern District of Pennsylvania depends on whether that Court can exercise jurisdiction over the defendants.

The Eastern District of Pennsylvania is a forum where Rembrandt could have brought this case. Rembrandt and Comcast have their principal places of business in or near Philadelphia, in the Eastern District of Pennsylvania. Because all the defendants have their principal places of business in the Eastern District of Pennsylvania, that District can exercise personal jurisdiction over them. Accordingly, they all "reside" there for purposes of determining proper venue in accordance with 28 U.S.C. § 1391(c).

**B.    The Eastern District of Pennsylvania Provides a More Convenient Forum For the Parties and Witnesses and Transfer to That Forum Serves the Interest of Justice**

In accordance with section 1404(a), the Court should transfer this case to the Eastern District of Pennsylvania. First, the Court should not defer to Rembrandt's choice of forum because the action has no connection to this District. Second, the center of gravity of the alleged infringing activity is in the Eastern District of Pennsylvania. Third, transfer would serve the convenience of the parties and the interest of justice.

**1.    Rembrandt's Choice of Forum Is Not Entitled to Deference From This Court Because Rembrandt Has No Connection to This District**

Plaintiff's choice of forum can be relevant to deciding a section 1404(a) motion, but that choice is not determinative. *In re Horseshoe Entm't*, 337 F.3d 429, 434-35 (5th Cir. 2002). "Where the plaintiff's chosen forum has no factual nexus to the case, that choice carries little significance if other factors weigh in favor of transfer." *Shoemake v. Union Pac. R.R. Co.*, 233 F. Supp. 2d 828, 830-31 (E.D. Tex. 2002) (citing *Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 677 (E.D. Tex. 2001); *Robertson v. Kiamichi R.R. Co.*, 42 F. Supp. 2d 651, 656 (E.D. Tex. 1999)). "[T]he plaintiff's choice of forum will be given close scrutiny where, as here, the plaintiff does not live within the [District]." *Shoemake*, 233 F. Supp. 2d at 831 (citations omitted). While the burden is on the defendants to show that convenience and justice would be served by a transfer, "the usual deference accorded the plaintiff's choice of forum is of minimal

value when none of the parties reside in this division of this District." *Rock Bit Int'l v. Smith Int'l*, 957 F. Supp. 843, 844 (E.D. Tex. 1997).

In this case, neither the plaintiff nor the named inventors nor the patent prosecutors live in this District. In addition, neither the witnesses nor the sources of proof are located in the Eastern District of Texas. Given the absence of any connection to the Eastern District of Texas, the "choice of forum factor should not receive the deferential treatment" that a plaintiff might otherwise receive. *Shoemake*, 233 F. Supp. 2d at 832 (distinguishing situations where courts defer to a non-resident plaintiff's forum choice because their case has connections to the District). Thus, venue transfer analysis turns upon balancing the remaining public and private interest factors. That balance favors transfer for the reasons set forth below.

### 2. The Accused Infringing Activity Has Its Center of Gravity in the Eastern District of Pennsylvania

The preferred forum for patent cases is at the center of gravity of the accused activity. *Whistler Group v. PNI Corp.*, 2003 U.S. Dist. LEXIS 21968, *11 (N.D. Tex. 2003). "Indeed, 'the trier of fact ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production.'" *Id.* at *12 (quoting *Minka Lighting v. Trans Globe Imports, Inc.*, 2003 U.S. Dist. LEXIS 8862, *12 (N.D. Tex. 2003), and *S.C. Johnson & Son, Inc. v. Gillette Co.*, 571 F. Supp. 1185, 1188 (N.D. Ill. 1983)). "In finding that center of gravity, a district court should consider the location of a product's development, testing, research, and production." *Whistler*, 2003 U.S. Dist. LEXIS 21968 at *12. "The location of the alleged infringer's principal place of business, therefore, is often the critical and controlling consideration in adjudicating a motion to transfer venue." *Id.* (citing *Houston Trial Reports, Inc. v. LRP Publications, Inc.*, 85 F. Supp. 2d 663, 668 (S.D. Tex. 1999). As the court explained in *Houston Trial Reports*, "[c]ourts have observed that 'intellectual property infringement suits often focus on the activities of the alleged infringer, its employees, and its documents; therefore the location of the alleged infringer's principal place of business is often the critical and

controlling consideration' in adjudicating transfer of venue motions." 85 F. Supp. 2d at 668 (citations omitted).

Here all of the defendants' principal places of business are located in Philadelphia.  As explained above, the key employees with knowledge regarding the alleged infringing activity work there.  As the "critical and controlling consideration in adjudicating a motion to transfer venue," this connection to the Eastern District of Pennsylvania favors transfer to that district. *Whistler*,  2003 U.S. Dist. LEXIS 21968 at *12.  Furthermore, the center of gravity for any injury to Rembrandt from the alleged infringing activity would be in its principal place of business, also in the Eastern District of Pennsylvania.

### 3.    The Private Interest Factors Favor Transferring This Case

#### a.    A trial in this District would substantially increase the cost and burden of attendance for the parties and willing witnesses

A transfer will increase witness convenience for all parties.  In this case, seemingly all of Rembrandt's and Comcast's potential witnesses work or reside in the Eastern District of Pennsylvania.  As discussed, Rembrandt's principal—likely only—place of business is located in Bala Cynwyd, in the Eastern District of Pennsylvania.  This favors transfer.  *See Acco Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.*, No. 2:03-CV-425, slip. op. at 3 (E.D. Tex. July 23, 2004) (transferring under 1404(a) in part based on location of plaintiff's headquarters) ("*Acco*") (Kamber Decl., Ex. L).   For that reason, one also expects that the Eastern District of Pennsylvania provides the most convenience for Rembrandt's witnesses and therefore warrants transfer.  *See id.* (transferring under 1404(a) in part based on location of plaintiff's witnesses). Similarly, the Court should transfer this case because the Comcast defendants have their principal places of business in Philadelphia.  *See id.* (transferring under 1404(a) in part based on location of defendant's headquarters).  As a result, many of the Comcast witnesses live and work in that forum, which consequently offers the most convenience.  *See id.* (transferring under 1404(a) in part based on location of defendant's witnesses).

This is not a case where inconvenience would be shifted from one party to another. Here, the Eastern District of Pennsylvania's increased convenience applies equally to all and weighs wholly in favor of transfer.

> **b.** **No known witnesses reside within this Court's subpoena power, but key non-party witnesses may be subpoenaed by the transferee court**

The parties cannot compel a non-party witness outside this Court's subpoena power to testify at trial. Therefore the existence of non-party, out-of-state witnesses weighs strongly in favor of transfer to a venue that could exercise its subpoena power over them. *See Mohamed v. Mazda Motor Corp.*, 90 F. Supp. 2d 757, 775 (E.D. Tex. 2000). In this case, none of the potential identified witnesses, whether outside the control of a party or otherwise, live within the Eastern District of Texas's subpoena power. Particularly, neither the inventors of the patents-in-suit nor the related prosecuting attorneys/firms reside within the subpoena power of the Eastern District of Texas. These witnesses are not employees of any party, and thus cannot be compelled to testify in the Eastern District of Texas.

The Eastern District of Pennsylvania has greater ability to compel witnesses' appearance than this Court. The Eastern District of Pennsylvania may subpoena witnesses for trial who live within 100 miles of the courthouse. *See* Fed. R. Civ. P. 45(b)(2). This subpoena power would reach certain patent prosecuting attorneys and/or their firms. In particular, it could reach the firm of Kane, Dalsimer, Kurucz, Levy, Eisele and Richard, LLP, which prosecuted the '819 patent, in New York, New York. *See Core Leasing, Inv. v. Am. Airlines, Inc.*, 1990 U.S. Dist. LEXIS 8094 (E.D. Pa. July 2, 1990) (holding that New York City is situated within the subpoena power of the Eastern District of Pennsylvania).[1] It could also reach the attorneys listed as having prosecuted the '627 patent. Ronald D. Slusky is located in New York City and therefore subject to the Eastern District of Pennsylvania's subpoena power. *Id.* And Gerard A. deBlasi also resides within the Eastern District of Pennsylvania's 100-mile subpoena power. (Kamber Decl. ¶ 14.)

---

[1] S*ee also* David L. Grove, *One Hundred Miles, One Hundred Miles: For Subpoena Purposes, Just How Far Away is New York City, Anyway?*, The Legal Intelligencer (Aug. 14, 2000) (noting that GPS technology proves that all of New York City is within 100-mile subpoena power).

Because transferring this case to the Eastern District of Pennsylvania would increase the number of third-party witnesses over which the adjudicating court could exercise its subpoena power, with no corresponding loss of subpoena power resulting from the transfer out of the Eastern District of Texas, this factor favors transfer.  *See Acco*, slip op. at 3 (transferring under 1404(a) in part based on the court's power to subpoena third-party witnesses).

### c.     Overall practical considerations favor transferring this case

As noted above, a change of venue in this case will not shift inconveniences, but rather will increase convenience for all.  Overall practical considerations therefore favor transferring this case to the Eastern District of Pennsylvania.  This will not only ease the burden associated with discovery, it will also help coordinate witness availability at trial.  Indeed, all the convenience factors discussed above favor transfer.  And, in any event, practicality does not favor trying a case in a district whose connection "to this case appears non-existent."  *Hanby*, 144 F. Supp. 2d at 677.

Indeed, two defendants, Comcast Corp. and Comcast Cable, have few, if any, contacts with the Eastern District of Texas.  Those entities could have brought a motion to dismiss for lack of proper venue or a motion for transfer under 28 U.S.C. § 1406(a).  *See also* Fed. R. Civ. P. 12(b)(3).  But because such motions would not result in transfer of the entire case, Comcast Corp. and Comcast Cable have instead brought this motion for section 1404(a) transfer together with Comcast of Plano, LP.

### 4.     The Public Interest Factors Favor Transferring This Case

### a.     The Eastern District of Texas has no interest in deciding this controversy

This dispute involves an Eastern Pennsylvania plaintiff, Rembrandt, and Eastern Pennsylvania defendants, Comcast Corp. and Comcast Cable, whose Texas municipal franchisee—a limited partner in a partnership centered in the Eastern District of Pennsylvania— has been roped in for good measure.  The Eastern District of Pennsylvania has a strong interest in adjudicating this dispute between two local parties.  *Hanby*, 144 F. Supp. 2d at 679; *Robertson v.*

*Kiamichi Railroad Co*., L.L.C., 42 F. Supp. 2d 651, 659 (E.D. Tex. 1999). As the *Robertson* decision explains, "'both plaintiff and defendant are residents of Hugo, Oklahoma. These facts, coupled with plaintiff's allegation that his injuries occurred at the defendant's place of business in Hugo, Oklahoma clearly indicate a close nexus between the plaintiffs injury and the city of Hugo, Oklahoma. As such, the citizens of the Eastern District of Oklahoma have a strong local interest in resolving this controversy. There is no corresponding local interest in the Beaumont and Sherman divisions of the Eastern District of Texas.'" 42 F. Supp. 2d at 659. Similarly, the citizens of the Eastern District of Pennsylvania have a strong local interest in resolving this controversy between the resident plaintiff and resident defendants. Moreover, there is a strong nexus between Rembrandt's alleged injuries and the defendant's businesses in Philadelphia.

Because neither Rembrandt nor the Comcast defendants have a strong presence in the District, the burden and expense of added litigation and jury duty should not fall upon the people of the Eastern District of Texas.[2] In the case of *Morgan v. Illinois Central Railroad Co.*, 161 F. Supp. 119 (S.D. Tex. 1958), the burden of jury duty was not justified even by the "coincidence of plaintiff's residence and five of his medical witnesses in Houston with nothing more." *Id.* at 121. This Court recognized the same concerns in *Mortensen v. Maxwell House Coffee Co*., 879 F. Supp. 54, 56-57 (E.D. Tex. 1995): "Additionally, it is only fair that residents of the Southern District bear the burden of jury duty in this case since its residents have more of an interest in ensuring that Defendant conducts itself properly than would a resident of the Eastern District."

In the present case, there is no person damaged or threatened with harm in Texas, and therefore no reason to burden anyone in Texas with jury duty. "[T]he citizens of the Eastern District of Texas," who have "no factual connection with the events of this case," do not have "more of a localized interest in adjudicating this proceeding" than the citizens of the Eastern District of Pennsylvania. *Volkswagen*, 371 F.3d at 206. Quite the contrary; the citizens of the

---

[2] This is especially true because Comcast will soon have no operations in Texas. As part of Comcast Corp.'s acquisition of the assets of Adelphia Communications with Time Warner, Inc., Time Warner will acquire and operate Comcast-affiliated cable systems in Texas. *See* Public Notice *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-05-1591A1.pdf.

Eastern District of Pennsylvania have a "strong local interest in resolving this controversy," *Hanby*, 144 F. Supp. 2d at 679; *Robertson*, 42 F. Supp. 2d at 659, because both the plaintiff and the defendants have their principal places of business there.

### b.    The remaining public interest factors do not favor retaining this case

The remaining public interest factors neither favor nor disfavor transfer.  First, docket congestion considerations do not favor the Eastern District of Texas over the Eastern District of Pennsylvania.  Time to trial is roughly equal:  a weighted average of 15.4 months to trial in this District versus 16.0 months in the Eastern District of Pennsylvania—a difference of approximately two weeks.  (Kamber Decl., ¶ 16.)  Furthermore, all possible forum choices have equal knowledge about the applicable law—federal patent law.  *Shoemake*, 233 F. Supp. 2d at 835-836.  Finally, because these parties have no history of litigation between them, there is no forum more familiar with the issues than another forum.

## IV.    CONCLUSION

Comcast has demonstrated that a weighing of the relevant factors reveals that transfer would cause a substantial improvement in convenience for defendants and plaintiff and would favor the interests of justice, thus compelling the conclusion that this case should be transferred to the Eastern District of Pennsylvania.  Defendants therefore request this Court to transfer this action to the Eastern District of Pennsylvania.

Respectfully submitted,

_____/s/_____

Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN, LLP
6500 N. Summerhill Road, Suite 1A
P. O. Box 6227
Texarkana, TX 75505-6227
Telephone:  903-255-1000
Facsimile:  903-255-0800

Brian Ferral
Leo Lam
Asim M. Bhansali
Matthias A. Kamber
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-676-2235
Facsimile:  415-397-7188

**ATTORNEYS FOR DEFENDANTS
COMCAST CORPORATION,
COMCAST CABLE
COMMUNICATIONS, LLC, and
COMCAST OF PLANO, LP**

## CERTIFICATE OF CONFERENCE

I certify that on November 17, 2005, I spoke with Otis Carroll, Jr., counsel for Plaintiff,

who indicated that Plaintiff opposes this motion.

_____/s/_____
John P. Perkins

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in
compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who are
deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to FED. R.
CIV. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to
electronic service were served with a true and correct copy of the foregoing by certified mail,
return receipt requested, on this 17th day of November, 2005.

_____/s/_____
Jennifer Haltom Doan

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, LP,

                          Plaintiff,

     v.

COMCAST CORPORATION; COMCAST
CABLE COMMUNICATIONS, LLC; and
COMCAST OF PLANO, LP,

                         Defendants.

**Case No. 2:05-CV-443 (TJW) (JURY)**

Judge:          T. John Ward
Date Comp. Filed:  Sept. 16, 2005
Trial Date:

## DECLARATION OF MATTHIAS A. KAMBER IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)

I, MATTHIAS A. KAMBER, declare:

1.     I am over the age of 18 years and competent to make this declaration. Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration.

2.     I am a member of the bars of California, Massachusetts, New York, and the District of Columbia. My firm, Keker & Van Nest LLP, is counsel to defendants Comcast Corp., Comcast Cable Communications, LLC ("Comcast Cable"), and Comcast of Plano, LP (collectively, "Comcast") in this matter.

3.     Attached as Exhibit A is a report from the website http://maps.yahoo.com. The report indicates that the driving distance from 1500 Market Street, Philadelphia, Pennsylvania, the principal place of business of the Comcast defendants, to 401 City Avenue, Suite 528, Bala Cynwyd, Pennsylvania, is 6.8 miles.

4.     Attached as Exhibit B is a report from Lexis/Nexis.com retrieved on November 16, 2005. The report states that the general partner Comcast of Plano GP, LLC is located at 1500 Market Street, Philadelphia, PA 19102.

5.      Attached as Exhibit C is a report from Lexis/Nexis.com retrieved on November 17, 2005.  The report states that Joseph Bentley King has an address at 7310 14th Street, Saint Petersburg, FL 33702-4635.

6.      Attached as Exhibit D is a report retrieved from Lexis/Nexis.com on November 17, 2005.  The report states that William Lewis Betts has an address at 2016 Montana Avenue, Saint Petersburg, FL 33703-3450.

7.      Attached as Exhibit E is a report retrieved from Lexis/Nexis.com on November 17.  The report states that Edward Sigmund Zuranski has an address at 11401 9th Street N, Saint Petersburg, FL 33716.

8.      Attached as Exhibit F is a report retrieved from Lexis/Nexis.com on November 17.  The report states that Wayne T. Moore has an address at 11933 Tee Time Circle, New Port Richey, FL 34654-6220.

9.      Attached as Exhibit G is a report retrieved from Lexis/Nexis.com on November 17.  The report states that Robert Earl Scott has an address at 13101 113th Avenue, Largo, FL 33774-4653.

10.      Attached as Exhibit H is a report printed from the website http://www.markpatent.net retrieved on November 1, 2005.  The report states that Kane, Dalsimer, Kurucz, Levy, Eisele and Richard, LLP has an address at 711 Third, Ave., 20th Floor, New York, NY 10017-4014.

11.      Attached as Exhibit I is a report printed from the website http://uspto.gov retrieved on November 16, 2005.  The report states Ronald D. Slusky has an office at 353 West 56th Street, Suite 5L, New York, NY 10019-3775.

12.      Attached as Exhibit J is a report retrieved from Lexis/Nexis.com on November 16, 2005.  The report states that Gerard A. deBlasi has an address at 614 Sunrise Way, Neshanic Station (now Branchburg), NJ 08853-4109.

13.      Attached as Exhibit K is a report printed from the website http://www.tkhr.com retrieved on November 1, 2005.  The report states the locations of Thomas, Kayden, Horstmeyer

& Risley, LLP at 100 Galleria Parkway, N.W., Suite 1750, Atlanta, GA 30339, and 200 Clinton Avenue, Suite 402, Huntsville, AL 35801.

14. Attached as Exhibit L is a report from the website http://maps.yahoo.com. The report indicates that the driving distance from 900 Market Street in Philadelphia, Pennsylvania to the address shown in paragraph 12 above for Gerard A. deBlasi is 68.1 miles. I understand that 900 Market Street is the location of the Federal Courthouse in Philadelphia, Pennsylvania, which is the courthouse at which the trial of this matter would take place in the case of venue transfer.

15. Attached as Exhibit M is a true and correct copy of an Order dated July 23, 2004, from *Acco Brands v. PC Guardian Anti-Theft Prods., Inc.*, No. 2:03-CV-425 (E.D. Tex.).

16. Attached as Exhibit N are printouts of Court docket statistics from the website http://www.uscourts.gov, printed November 16, 2005.

I declare that the foregoing is true and correct under the penalty of perjury under the laws of the United States of America.


DATED: November 17, 2005


MATTHIAS A. KAMBER

362496.01

Yahoo! Driving Directions - Philadelphia, PA 19102-2100 to Bala ...    http://maps.yahoo.com/pdd?ed=i93uJ.V.wimZ2PzV6Oxrjm0B_M_...

**YAHOO!** LOCAL Maps  **Sign In** New User? Sign Up

# Yahoo! Driving Directions

**Starting from:** **A** 1500 Market St, Philadelphia, PA 19102-2100

**Arriving at:** **B** 401 E City Ave, Bala Cynwyd, PA 19004-1122

**Distance:** 6.8 miles  **Approximate Travel Time:** 11 mins

## Your Directions

| | |
|---|---|
| 1. | Start at **1500 MARKET ST, PHILADELPHIA** on **15TH ST** - go **0.1 mi** |
| 2. | Turn **R** on **RANSTEAD ST** - go **0.1 mi** |
| 3. | Turn **R** on **16TH ST** - go **0.5 mi** |
| 4. | Bear **R** onto **I-676 WEST** toward **VALLEY FORGE/INT'L AIRPORT** - go **1.2 mi** |
| 5. | Merge onto **I-76 WEST** - go **3.5 mi** |
| 6. | Take **L** exit **#339** onto **US-1 SOUTH** toward **CITY AVE** - go **1.0 mi** |
| 7. | Take **L** exit **#339/US-1 SOUTH** toward **CITY AVE** - go **0.2 mi** |
| 8. | Turn **R** on **CITY AVE EAST[US-1]** - go **0.2 mi** |
| 9. | Arrive at **401 E CITY AVE, BALA CYNWYD** |

When using any driving directions or map, it's a good idea to do a reality check and make sure the road still exists, watch out for construction, and follow all traffic safety precautions. This is only to be used as an aid in planning.

**Your Full Route**



**Your Destination**



**Address:**
401 E City Ave
Bala Cynwyd, PA 19004-1122



EXHIBIT

*A*

3 of 8 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

**CERTIFICATION CAN ONLY BE OBTAINED THROUGH THE ISSUING GOVERNMENT AGENCY**

TEXAS SECRETARY OF STATE

**Company Name:** COMCAST OF PLANO, LP

**DBA Name:** COMCAST CABLE OF PLANO, LP

**Business Address:**
C/O COMCAST CAPITAL CORPORATION
1201 MARKET STREET, SUITE 1405
WILMINGTON, DE 19801

**Type:** FOREIGN LIMITED PARTNERSHIP (LP)

**Status:** IN EXISTENCE

**Filing Date:** 1/16/2004

**Duration:** PERPETUAL

**State or Country of Incorporation:** DELAWARE

**Foreign Incorporation Date:** 12/31/2003

**Registered Agent:** C T CORPORATION SYSTEM

**Registered Office:**
350 NORTH ST. PAUL ST.
DALLAS, TX 75201

**Members, Managers, Partners:**
COMCAST OF PLANO GP, LLC
GENERAL PARTNER
1500 MARKET ST.
PHILADELPHIA, PA 19102

**Other Name Information:**
COMCAST CABLE OF PLANO, LP
Type: FICTITIOUS
Status: IN USE
Creation Date: 1/16/2004


COMCAST OF PLANO, LP
Type: LEGAL
Status: IN USE
Creation Date: 1/16/2004

EXHIBIT
B
tabbies

Case 1:07-cv-00398-GMS   Document 185-4   Filed 06/28/2007   Page 2 of 2
Case 2:05-cv-00443-TJW-CE   Document 10-4   Filed 11/17/2005   Page 2 of 2

Page 2

TEXAS SECRETARY OF STATE

**Federal Employer ID Number:** 54-1211246

**Filing Number:** 0800293695

**History:**
　File Date: 1/16/2004
　Transaction: REGISTRATION OF LIMITED PARTNERSHIP
　Microfilm Number: 051731470003

5 of 8 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

PERSON LOCATOR - P-TRAK

**Name:** KING, JOSEPH B

**Social Security Number:** 240-54-XXXX

**Address:**
7310 14TH ST
SAINT PETERSBURG, FL 33702-4635
Address Updated: 12/1/1992

**Previous Addresses:**
800 SNELL ISLE BLVD
SAINT PETERSBURG, FL 33704-3744
Address Updated: 2/1/1983

**Birthdate:** 12/1938

**Telephone:** 526-6634

**On File Since:** 5/1/1983

**EXHIBIT**

tabbies®

_C_

10 of 13 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

PERSON LOCATOR - P-TRAK

Name: BETTS, WILLIAM L

**Also Known As:**
 BETTS, WILLIAM; BETTS, WM

**Social Security Number:** 263-72-XXXX

**Address:**
 2016 MONTANA AVE
 SAINT PETERSBURG, FL 33703-3450
 Address Updated: 2/1/1993

**Birthdate:** 11/1943

**Telephone:** 528-1190

**On File Since:** 6/1/1983

EXHIBIT
D
tabbies

1 of 4 DOCUMENTS

THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY

PERSON LOCATOR - P-SRCH

**Name:** ZURANSKI, EDWARD S

**Social Security Number:** 097-44-XXXX

**Address:**
  11401 9TH ST N
  SAINT PETERSBURG, FL 33716
  Address Created: 8/1988

**Previous Addresses:**
  1313 CRESCENT DR
  LARGO, FL 33770
  Address Created: 3/1985


  830 117TH TER N
  SAINT PETERSBURG, FL 33716
  Address Created: 4/1985

**Birthdate:** 2/1953

EXHIBIT
tabbies®
E

11 of 16 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

PERSON LOCATOR - P-FIND

**Name:** MOORE, WAYNE T (MALE)

**Additional Names:**
  MOORE, ROSALIND G (FEMALE), 1/1949

**Consumer Name Last Updated:** 11/26/2003

**Address:**
  11933 TEE TIME CIR
  NEW PORT RICHEY, FL 34654-6220

**Birthdate:** 3/1949

**Date Vendor Record Last Updated:** 7/28/2005

EXHIBIT

F

tabbies

36 of 52 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

PERSON LOCATOR - P-TRAK

**Name:** SCOTT, ROBERT E

**Also Known As:**
  SCOTT, ROBERT; SCOTT, BOB

**Social Security Number:** 234-92-XXXX

**Address:**
  13101 113TH AVE
  LARGO, FL 33774-4653
  Address Updated: 7/1/1999

**Previous Addresses:**
  452 HARBOR DR
  INDIAN ROCKS BEACH, FL 33785-3115
  Address Updated: 5/1/1999


  640 BAYWAY BLVD APT. 204
  CLEARWATER BEACH, FL 33767-2604
  Address Updated: 11/13/2000


  2663 SABAL SPRINGS CIR APT. 202
  CLEARWATER, FL 33761-3106
  Address Updated: 7/18/2001

**Birthdate:** 11/1955

**Telephone:** 596-2091

**On File Since:** 5/1/1983

EXHIBIT
tabbies®
G

Kane, Dalsimer, Sullivan, Kurucz, Levy, Eisele and Richard, LLP, U...        http://www.markpatent.net/search/member2731.asp

## *GlobalNet of Intellectual Property Lawyers, Attorneys, Agents and Practitioners.*

### This site is developed by **markpatent.com**.

- Home
- Register
- View List
- Links
- FAQ
- Contact Us

Search:

[ Go ]

4004 members

### Kane, Dalsimer, Sullivan, Kurucz, Levy, Eisele and Richard, LLP

| | |
|---|---|
| Firm/Company Name: | Kane, Dalsimer, Sullivan, Kurucz, Levy, Eisele and Richard, LLP |
| Contact Person: | |
| Designation: | |
| Physical Address: | 711 Third Ave 20th Floor |
| Postal Address: | 711 Third Ave 20th Floor |
| City: | New York |
| State/Province: | |
| Zip Code: | 10017-4014 |
| Country: | United States of America |
| Telephone Number: | (+1-212) 687-6000 |
| Fax Number: | (+1-212) 682-3485 Or682-3435 |
| E-Mail: | kdskler@attmail.com |
| Web: | |
| Area of Practice: | Patent |
| Comments: | |
| **Back** | **Edit This Record (Member Password Required)** |

Globalnet of Intellectual Property Lawyers

EXHIBIT

H



## US Patent and Trademark Office

**HOME    SITE INDEX    SEARCH    INFO BY ORG    CONTACT US**

## Patent Attorneys and Agents Registered to Practice before the US Patent and Trademark Office

**Result of search for "Slusky":**

Slusky, Ronald
Law Office of Ronald D. Slusky
353 West 56th Street
Suite 5L
New York NY US 10019
212-246-4546
26585
Attorney

EXHIBIT

*I*

13 of 17 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

USFIND CONSUMER DOCUMENT

Name: DEBLASI, GERARD

**Address:**
 614 SUNRISE WAY
 NESHANIC STATION, NJ 08853-4109
 County: SOMERSET
 Address Type: STREET

**Telephone:** (908) 369-5032

EXHIBIT

J

TKHR

http://www.tkhr.com/locations.cfm



THOMAS, KAYDEN, HORSTEMEYER & RISLEY, LLP

location

contact form
location
careers

**Atlanta Office**
100 Galleria Parkway, N.W.
Suite 1750

Atlanta, GA 30339
770.933.9500
770.951.0933 (fax)
map
directions
area hotels



Atlanta, GA
Get the 10 day forecast
**61°F**
Mostly Cloudy
Vacation Planner
Airport Delays
Sporting Events
Feels Like: 61°F
Humidity:81%
Wind: NW at 6 mph
Enter city/zip    GO!
Download Desktop Weather

**Huntsville Office**
200 Clinton Avenue
Suite 402

Huntsville, AL 35801
256.704.3900
256.704.3905 (fax)
map
directions

Huntsville, AL
Get the 10 day forecast
**57°F**
Cloudy
Vacation Planner
Airport Delays
Sporting Events
Feels Like: 57°F
Humidity:81%
Wind: NNW at 9 mph
Enter city/zip    GO!
Download Desktop Weather

Home  |  About Us  |  Our services  |  Library  |  Contact us  |  Extranet
Copyright © 1997-2005 Thomas, Kayden, Horstemeyer & Risley, L.L.P. All Rights Reserved.

**EXHIBIT**
tabbies®
K

Yahoo! Driving Directions - Philadelphia, PA 19107-4228 to Branc...    http://maps.yahoo.com/pdd?ed=SpkvBOV.wik7p1PX9lcvCr8MCh...

Yahoo!  My Yahoo!  Mail   Make Yahoo your home page

**YAHOO!** LOCAL Maps  Sign In
New User? Sign Up

Search
the Web [_____] [ Search ]

Maps Home - Maps Beta - Help

# Yahoo! Driving Directions

**Starting from:** **A** 900 Market St, Philadelphia, PA 19107-4228

**Arriving at:** **B** 614 Sunrise Way, Branchburg, NJ 08853-4109

**Distance:** 68.1 miles **Approximate Travel Time:** 1 hour 49 mins

## Your Directions

| 1. | Start at **900 MARKET ST, PHILADELPHIA** on **N 9TH ST** going toward **FILBERT ST**- go **0.4** mi |
|----|----|
| 2. | Turn **R** on **VINE ST** - go **0.1** mi |
| 3. | Turn **L** on **N 7TH ST** - go **< 0.1** mi |
| 4. | Turn **L** onto **I-676 WEST** toward **I-676 W/CENTRAL PHILA** - go **1.9** mi |
| 5. | Merge onto **I-76 WEST** - go **12.1** mi |
| 6. | Take exit **#331B** onto **I-476 NORTH** toward **PLYMOUTH MTG** - go **4.3** mi |
| 7. | Take exit **#20** onto **I-276 EAST** toward **NEW JERSEY** - go **9.1** mi |
| 8. | Take exit **#343/PA-611** onto **EASTON RD[PA-611]** toward **DOYLESTOWN**- go **9.4** mi |
| 9. | Continue to follow **PA-611** - go **0.5** mi |
| 10. | Take ramp onto **DOYLESTOWN BYP[US-202]** toward **NEW HOPE** - go **2.3** mi |
| 11. | Continue to follow **US-202 NORTH**- go **26.8** mi |
| 12. | Turn **R** on **PLEASANT RUN RD** - go **1.0** mi |
| 13. | Turn **L** on **SUNRISE WAY** - go **0.2** mi |
| 14. | Arrive at **614 SUNRISE WAY, BRANCHBURG**, on the **R** |

When using any driving directions or map, it's a good idea to do a reality check and make sure the road still exists, watch out for construction, and follow all traffic safety precautions. This is only to be used as an aid in planning.

**Your Full Route**                                      **Your Destination**



EXHIBIT

tabbies®    L

Yahoo! Driving Directions - Philadelphia, PA 19107-4228 to Branc...    http://maps.yahoo.com/pdd?ed=SpkvBOV.wik7p1PX9lcvCr8MCh...





**Address:**
614 Sunrise Way
Branchburg, NJ 08853-4109

Copyright © 2005 Yahoo! Inc. All rights reserved.

Privacy Policy - Terms of Service - Copyright/IP Policy - Yahoo! Maps Terms of Use - Help - Ad Feedback

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

FILED-CLERK
U.S. DISTRICT COURT

04 JUL 23  AM II: 33

TX EASTERN-MARSHALL

BY_____

ACCO BRANDS, INC.                         §

Vs.                                       §          CIVIL ACTION NO. 2:03-CV-425

PC GUARDIAN ANTI-THEFT                    §
PRODUCTS, INC., ET AL.

## ORDER

The court grants the defendants' unopposed motion for leave to exceed page limit for

defendants' reply in support of motion to change venue (#9). The court grants the defendants'

motion to change venue (#5) and transfers this case to the Northern District of California for the

reasons expressed in this order.

The plaintiff filed a prior patent infringement case against PC Guardian in the Northern

District of California, and the case was assigned to Judge Illiston. In that case, the plaintiff claimed

that the PC Guardian locks infringed certain claims of U.S. Patent 5,502,989 ("the '989 patent").

Judge Illiston ultimately thought to the contrary. She construed the claims and granted a summary

judgment of noninfringement to the defendant. The Federal Circuit affirmed her claim construction

and summary judgment order.

The plaintiff then filed this case, asserting that the PC Guardian products, at least two of

which were involved in the prior California case, infringe a patent which issued in April, 2003.[1]

---

[1]          According to the Federal Circuit's decision, the accused PC Guardian devices in
the first case were the Notebook Guardian 2000 and Notebook Guardian 2001. *Acco Brands,
Inc. v. Micro Security Devices, Inc.*, 346 F.3d 1075, 107 (Fed. Cir. 2003). The response to the

EXHIBIT

_m_

That patent, U.S. Patent No. 6, 553, 794 ("the '794 patent"), also relates to a device for inhibiting the theft of electronic devices. The plaintiff has joined as an additional defendant a re-seller, Fellows, Inc.. Fellows buys locks from PC Guardian and sells them under the Fellows brand name.

The plaintiff and PC Guardian are headquartered in the Northern District of California. Defendant Fellows is based in Itasca, Illinois. The plaintiff's witnesses and PC Guardian's witnesses live and work in the Northern District of California. In addition, William H. Murray, Stewart Carl, and Arthur H. Zarnowitz, material third-party witnesses, also live in California. Finally, documentary evidence is located in California, and several of the parties' consultants and experts live there. Based on these facts, the defendants have filed a motion to change venue to the Northern District of California.

When faced with a motion to transfer venue, the court must first determine whether the proposed transferee forum would have been a court of proper venue. *In re Horseshoe Entertainment*, 337 F.3d 429, 434 (5th Cir. 2003). Here, the Northern District of California is a court of proper venue. PC Guardian is headquartered there, and Fellows purchases products there from PC Guardian which are accused of infringement.

Having established that the Northern District of California is a venue in which the case might have been brought, the court now turns to the merits of the motion to transfer. The plaintiff's choice of forum is entitled to deference. *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966). In light of that deference, the court must consider the various private and public interest factors to determine whether a transfer is warranted. *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947). Here, the court is

---

motion to transfer seeks to maintain venue in this court based in part on purchases of those same devices in the Eastern District of Texas, through PC Guardian's website.

2

satisfied that the defendants have carried their burden to show that the court should transfer venue.

The private interest factors examine the advantages and the inconveniences to the parties and their witnesses by having the suit proceed in the plaintiff's chosen forum. The court weighs those advantages and the inconveniences against those that would exist in the proposed transferee forum. In this case, the factors support a transfer to the Northern District of California. Both the plaintiff and the manufacturer of the accused devices are headquartered in the Northern District of California. The important witnesses for these parties are also located there. As set forth in the defendants' motion, material third party witnesses and experts are also located in the Northern District of California.

The plaintiff notes that Fellows is located in Illinois and argues that Fellows would be equally inconvenienced in either Marshall or the Northern District of California. The court rejects this argument. More convenient to most is better than inconvenient to all. It is simply asking too much to think that the primary infringement and invalidity witnesses will be other than those identified by PC Guardian.

The plaintiff also urges that the accused devices are sold in the Eastern District of Texas. That the products are sold here might justify a finding that here is a *proper* venue. But it doesn't aid the plaintiff in its effort to rebut the argument that here is an *inconvenient* venue under § 1404(a). An examination of the private interest factors reveals that it would be more convenient for the parties and the witnesses to try this patent case in the Northern District of California.

More so even than the private interest factors, the public interest factors support a transfer to the Northern District of California. The plaintiff filed a prior suit against PC Guardian, and the case was assigned to Judge Illiston. Judge Illiston has substantial experience with these parties and

3

the accused device.  No claim is made that the technology disclosed in the patent in suit is substantially different than that disclosed in the '989 patent–a patent previously litigated by these same parties in Judge Illiston's court. On balance, even given the plaintiff's position that the median time to trial in the Northern District of California is longer, this case involves a dispute between two California companies and ought to be heard in the court most familiar with the parties and the accused devices. The public interest factors support a transfer of venue. They, together with the private interest factors, warrant a transfer to the Northern District of California.

The defendants' motion to transfer venue (#5) is granted. This case is transferred to the Northern District of California for assignment in accordance with that court's practices.

So ORDERED and SIGNED this 23ʳᵈ day of July, 2004.

_T. John Ward_

T. JOHN WARD
UNITED STATES DISTRICT JUDGE

4

Judicial Caseload Profile Report                                    http://www.uscourts.gov/cgi-bin/cmsd2004.pl

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **PENNSYLVANIA EASTERN** | | | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | | |
| | | Filings* | 16,198 | 12,173 | 13,447 | 8,109 | 9,255 | 8,484 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | | Terminations | 12,754 | 12,862 | 14,034 | 9,087 | 7,754 | 8,764 | | |
| | | Pending | 9,930 | 6,422 | 7,143 | 7,693 | 8,661 | 7,134 | | |
| | % Change in Total Filings | Over Last Year | | 33.1 | | | | | 4 | 1 |
| | | Over Earlier Years | | | 20.5 | 99.8 | 75.0 | 90.9 | 3 | 1 |
| Number of Judgeships | | | 22 | 22 | 22 | 22 | 22 | 22 | | |
| Vacant Judgeship Months** | | | 34.6 | 6.6 | 40.7 | 38.5 | 71.6 | 59.2 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 737 | 553 | 610 | 369 | 421 | 386 | 6 | 1 |
| | | Civil | 694 | 512 | 575 | 339 | 389 | 354 | 4 | 1 |
| | | Criminal Felony | 32 | 31 | 30 | 30 | 32 | 32 | 88 | 5 |
| | | Supervised Release Hearings** | 11 | 10 | 5 | - | - | - | 79 | 1 |
| | Pending Cases | | 451 | 292 | 325 | 350 | 394 | 324 | 32 | 3 |
| | Weighted Filings** | | 495 | 408 | 461 | 386 | 385 | 387 | 48 | 4 |
| | Terminations | | 580 | 585 | 638 | 413 | 352 | 398 | 16 | 1 |
| | Trials Completed | | 12 | 11 | 11 | 14 | 14 | 14 | 80 | 5 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 11.6 | 10.6 | 10.6 | 9.6 | 8.5 | 8.6 | 86 | 6 |
| | | Civil** | 1.0 | 2.7 | 2.2 | 8.0 | 7.8 | 8.1 | 1 | 1 |
| | From Filing to Trial** (Civil Only) | | 16.0 | 19.0 | 17.3 | 15.2 | 15.3 | 14.3 | 8 | 1 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 292 | 332 | 623 | 521 | 138 | 66 | | |
| | | Percentage | 3.3 | 6.0 | 10.0 | 7.7 | 1.8 | 1.0 | 42 | 2 |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.5 | 1.6 | 1.6 | 1.6 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 74.08 | 73.11 | 75.23 | 67.20 | 60.24 | 54.74 | | |
| | | Percent Not Selected or Challenged | 43.9 | 44.3 | 50.3 | 44.1 | 41.4 | 39.8 | | |

| 2004 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 15263 | 477 | 9 | 1250 | 47 | 61 | 441 | 955 | 9363 | 441 | 1344 | 45 | 830 |
| Criminal* | 696 | 55 | 21 | 197 | 2 | 14 | 153 | ** | 12 | 136 | 5 | 38 | 63 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\** See "Explanation of Selected Terms."

EXHIBIT
N

1 of 1

Case 1:07-cv-00398-GMS   Document 185-16   Filed 06/28/2007   Page 2 of 2
Case 2:05-cv-00443-TJW-CE   Document 10-16   Filed 11/17/2005   Page 2 of 2

Judicial Caseload Profile Report                                    http://www.uscourts.gov/cgi-bin/cmsd2004.pl

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| TEXAS EASTERN | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 3,860 | 4,072 | 3,610 | 3,452 | 3,604 | 5,807 | | |
| | Terminations | 4,243 | 3,487 | 4,458 | 4,819 | 4,568 | 5,957 | | |
| | Pending | 2,983 | 3,358 | 2,825 | 3,706 | 5,076 | 5,975 | | |
| | % Change in Total Filings — Over Last Year | | -5.2 | | | | | 71 | 5 |
| | % Change in Total Filings — Over Earlier Years | | | 6.9 | 11.8 | 7.1 | -33.5 | 92 | 9 |
| Number of Judgeships | | 8 | 8 | 7 | 7 | 7 | 7 | | |
| Vacant Judgeship Months** | | 9.1 | 4.2 | 19.3 | 10.0 | .0 | 11.8 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 483 | 509 | 515 | 493 | 515 | 830 | 40 | 6 |
| | FILINGS — Civil | 411 | 431 | 444 | 427 | 447 | 762 | 31 | 5 |
| | FILINGS — Criminal Felony | 71 | 77 | 70 | 66 | 68 | 68 | 47 | 3 |
| | FILINGS — Supervised Release Hearings** | 1 | 1 | 1 | - | - | - | 93 | 9 |
| | Pending Cases | 373 | 420 | 404 | 529 | 725 | 854 | 58 | 8 |
| | Weighted Filings** | 518 | 529 | 492 | 492 | 503 | 485 | 36 | 6 |
| | Terminations | 530 | 436 | 637 | 688 | 653 | 851 | 28 | 5 |
| | Trials Completed | 21 | 26 | 22 | 22 | 28 | 23 | 37 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 8.4 | 7.5 | 8.9 | 8.0 | 6.9 | 6.9 | 55 | 8 |
| | From Filing to Disposition — Civil** | 6.5 | 10.9 | 15.0 | 30.9 | 24.3 | 5.9 | 6 | 1 |
| | From Filing to Trial** (Civil Only) | 15.4 | 17.0 | 14.0 | 15.9 | 15.7 | 14.7 | 6 | 1 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 47 | 41 | 58 | 881 | 1,878 | 508 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 1.9 | 1.4 | 2.4 | 26.1 | 39.6 | 8.9 | 23 | 5 |
| | Average Number of Felony Defendants Filed Per Case | 1.7 | 1.7 | 1.4 | 1.7 | 1.6 | 1.4 | | |
| | Jurors — Avg. Present for Jury Selection | 33.92 | 32.49 | 32.40 | 32.25 | 35.12 | 29.93 | | |
| | Jurors — Percent Not Selected or Challenged | 32.5 | 33.5 | 33.3 | 35.6 | 35.2 | 34.4 | | |

| 2004 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3285 | 168 | 9 | 1279 | 23 | 15 | 101 | 246 | 865 | 141 | 242 | 8 | 188 |
| Criminal* | 562 | 66 | 4 | 138 | 12 | 18 | 157 | ** | 10 | 61 | 14 | 10 | 72 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 2:05-cv-443 |
| | § | |
| COMCAST CORPORATION, COMCAST | § | Judge T. John Ward |
| CABLE COMMUNICATIONS, LLC, and | § | Jury |
| COMCAST OF PLANO, LP | § | |

## ORDER

Defendants Comcast Corp., Comcast Cable Communications, LLC ("Comcast Cable"), and Comcast of Plano, LP (collectively, "Comcast") have filed a motion to transfer venue to the Eastern District of Pennsylvania. The Court, being well and sufficiently advised in the premises, finds that the motion is well taken and should be and hereby is **GRANTED**.

Accordingly, **IT IS ORDERED** that the clerk of the Court is hereby directed to transfer this case to the United States District Court for the Eastern District of Pennsylvania.

ORDER – Solo Page

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP | |
| Plaintiff, | Civil Action No. 2:05-CV-443 |
| v. | Judge T. John Ward |
| COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC and COMCAST OF PLANO, LP | Jury Demanded |
| Defendants. | |

**NOTICE OF APPEARANCE**

Notice is hereby given that attorney Robert M. Parker enters his appearance in this matter as additional counsel for Plaintiff, Rembrandt Technologies, LP, for the purpose of receiving notices from the Court.

Respectfully submitted,

/s/ Robert M. Parker
Robert M. Parker
State Bar No. 15498000
PARKER & BUNT, P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Tel: 903-531-3535
Fax: 903-533-9687
E-mail: rmparker@cox-internet.com

Otis Carroll – *Attorney in Charge*
State Bar No. 03895700
IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703
Tel: (903) 561-1600
Fax: (903) 581-1071
E-mail: Fedserve@icklaw.com

1

OF COUNSEL:

Frank E. Scherkenbach
Lawrence K. Kolodney
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, Massachusetts 02110
Tel: (617) 542-5070
Fax: (617) 542-8906

Alan D. Albright
State Bar No. 00973650
FISH & RICHARDSON, P.C.
One Congress Plaza, 4th Floor
111 Congress Avenue
Austin, Texas 78701
Tel: (512) 391-4930
Fax: (512) 391-6837

Timothy Devlin
FISH & RICHARDSON, P.C.
919 Market Street, Suite 1100
P.O. Box 1114
Wilmington, Delaware 19899
Tel: (302) 652-5070
Fax: (302) 652-0607

Franklin Jones, Jr.
State Bar No. 00000055
JONES & JONES, INC., P.C.
201 West Houston Street, Drawer 1249
Marshall, Texas 75671-1249
Tel: 903-938-4395
Fax: 903-938-3360
E-mail: maizieh@millerlawfirm.com

S. Calvin Capshaw, III
State Bar No. 03783900
BROWN MCCARROLL, L.L.P.
1127 Judson Road, Suite 220, P.O. Box 3999
Longview, Texas 75601-5157
Tel: 903-236-9800
Fax: 903-236-8787
E-mail: ccapshaw@bmcmail.com

Robert Christopher Bunt
State Bar No.  00787165
PARKER & BUNT, P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Tel: 903/531-3535
Fax: 903/533-9687
E-mail:  cbunt@cox-internet.com

Attorneys for Plaintiff
REMBRANDT TECHNOLOGIES, LP.

## CERTIFICATE OF SERVICE

I hereby certify that the all counsel of record, who are deemed to have consented to electronic service are being served this 21st day of November, 2005, with a copy of this document via the Court's CM/ECF system per Local Rule CD-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

*/s/ Robert M. Parker*
Robert M. Parker

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP | |
| Plaintiff, | Civil Action No. 2:05-CV-443 |
| v. | Judge T. John Ward |
| COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC and COMCAST OF PLANO, LP | Jury Demanded |
| Defendants. | |

## NOTICE OF APPEARANCE

Notice is hereby given that attorney Robert Christopher Bunt enters his appearance in this matter as additional counsel for Plaintiff, Rembrandt Technologies, LP, for the purpose of receiving notices from the Court.

Respectfully submitted,

*/s/ Robert Christopher Bunt*
Robert Christopher Bunt
State Bar No.  00787165
**PARKER & BUNT, P.C.**
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Tel: 903/531-3535
Fax: 903/533-9687
E-mail:  cbunt@cox-internet.com

Otis Carroll – *Attorney in Charge*
State Bar No. 03895700
IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703
Tel: (903) 561-1600
Fax: (903) 581-1071
E-mail: Fedserve@icklaw.com

OF COUNSEL:

Frank E. Scherkenbach
Lawrence K. Kolodney
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, Massachusetts 02110
Tel: (617) 542-5070
Fax: (617) 542-8906

Alan D. Albright
State Bar No. 00973650
FISH & RICHARDSON, P.C.
One Congress Plaza, 4th Floor
111 Congress Avenue
Austin, Texas 78701
Tel: (512) 391-4930
Fax: (512) 391-6837

Timothy Devlin
FISH & RICHARDSON, P.C.
919 Market Street, Suite 1100
P.O. Box 1114
Wilmington, Delaware 19899
Tel: (302) 652-5070
Fax: (302) 652-0607

Franklin Jones, Jr.
State Bar No. 00000055
JONES & JONES, INC., P.C.
201 West Houston Street, Drawer 1249
Marshall, Texas 75671-1249
Tel: 903-938-4395
Fax: 903-938-3360
E-mail: maizieh@millerlawfirm.com

S. Calvin Capshaw, III
State Bar No. 03783900
BROWN MCCARROLL, L.L.P.
1127 Judson Road, Suite 220, P.O. Box 3999
Longview, Texas 75601-5157
Tel: 903-236-9800
Fax: 903-236-8787
E-mail: ccapshaw@bmcmail.com

2

Robert M. Parker
State Bar No. 15498000
PARKER & BUNT, P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas  75702
Tel: 903-531-3535
Fax: 903-533-9687
E-mail: rmparker@cox-internet.com

Attorneys for Plaintiff
REMBRANDT TECHNOLOGIES, LP.


## CERTIFICATE OF SERVICE

I hereby certify that the all counsel of record, who are deemed to have consented to electronic service are being served this 21st day of November, 2005, with a copy of this document via the Court's CM/ECF system per Local Rule CD-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

*/s/ Robert Christopher Bunt*
Robert Christopher Bunt

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT VISION TECHNOLOGIES, L.P., | § § § | |
| PLAINTIFF, | § § | Case No. 2:05-CV-443 |
| V. | § § | Honorable T. John Ward |
| COMCAST CORPORATION; COMCAST CABLE COMMUNICATIONS, LLC; and COMCAST OF PLANO, LP | § § § § | JURY TRIAL DEMANDED |
| DEFENDANTS | § § | |

<u>NOTICE OF APPEARANCE</u>

NOTICE is hereby given that Franklin Jones, Jr. is entering his appearance as counsel for

Plaintiff, Rembrandt Technologies, LP, for purposes of receiving notices from the Court.

Dated this 21st day of November, 2005.

BY: <u>/s/ Franklin Jones, Jr.</u>

State Bar No.  00000055
JONES & JONES, Inc.
P. O. Drawer 1249
Marshall, Texas 75671-1249
Telephone: (903)938-43395
Facsimile: (903) 938-3360
Email: maizieh@millerfirm.com

Otis Carroll, Attorney-in-Charge
State Bar No. 03895700
Wesley Hill
State Bar No. 24032294

1

IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703
Tel: (903) 561-1600
Facsimile: (903) 581-1071
Email: fedserv@icklaw.com

Frank E. Scherkenbach
Lawrence K. Kolodney
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110
Tel: (617)542-5070
Facsimile: (617) 542-8906

Alan D. Albright
State Bar No. 00973650
FISH & RICHARDSON P.C.
One Congress Plaza, 4th Floor
111 Congress Avenue
Austin, Texas 78701
Tel: (512)391-4930
Facsimile: (512) 391-6837

Timothy Devlin
FISH & RICHARDSON, P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, Delaware 19899
Tel: (302) 652-5070
Facsimile: (302) 652-0607

S. Calvin Capshaw, III
State Bar No. 03783900
BROWN MCCARROLL, L.L.P.
1127 Judson Road, Suite 220
Longview, Texas 75601-5157
Tel: (903) 236-9800
Facsimile: (903) 236-8787

Robert M. Parker
State Bar No. 15498000
100 E. Ferguson, Suite 1114
Tyler, Texas 75702

Tel: (903) 533-9288
Facsimile: (903) 53 3-9687

Attorneys for Plaintiff
REMBRANDT TECHNOLOGIES, LP.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of November, 2005, a true and correct copy of the foregoing document was sent to all counsel of record via the Court's electronic filing system.

<u>/s/ Franklin Jones, Jr.</u>
Franklin Jones, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP,<br><br>        Plaintiff(s),<br><br>v.<br><br>COMCAST CORPORATION, COMCAST<br>CABLE COMMUNICATIONS, LLC, and<br>COMCAST OF PLANO, LP,<br><br>        Defendant(s). | Case No. 2:05-CV-443-TJW |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER

## I.  INTRODUCTION

While barely paying lip service to the heavy burden defendants must carry to overturn a plaintiff's choice of forum, *see Z-TEL Comms., Inc. v. SBC Comms., Inc.*, 331 F. Supp. 2d 567, 570 (E.D. Tex. 2004), Defendants' Motion to Transfer Venue (Docket No. 10) seeks to deprive Plaintiff of its chosen venue with virtually no countervailing increase in efficiency or convenience to the public or to the parties.  Comcast's Motion ignores controlling case law, and presents an incomplete and contradictory picture of the facts.  For example, Comcast Corporation denies in its Answer that this Court has jurisdiction over it, and suggests in its Motion that it could properly move to dismiss, but Comcast Corporation admitted that it is subject to the jurisdiction of this Court in another recent lawsuit.

Even the bullet-pointed arguments Comcast highlights in the introduction to its Motion are incorrect, or contradict statements Comcast itself has made to courts in other recent cases:

- Comcast suggests that this Court should consider the location of its employee witnesses, but Comcast has argued recently that the location of a party's own witnesses is entitled to "***no weight***" deciding motion to transfer;[1]

---

[1] Unless otherwise noted, emphasis in this Brief has been added.

- Comcast's statement that all the parties' "known potential sources of proof" are in the Eastern District of Pennsylvania is belied by Comcast's admission that all inventors of the patents in suit reside in Florida;

- Comcast asserts that "key third-party witnesses" are within the subpoena power of the Pennsylvania court, but in fact only a subset of prosecuting attorneys are within that power, while Comcast ignores all inventors of the patents in suit or suppliers of Comcast's infringing equipment;

- contrary to Comcast's suggestion, this District has an interest in adjudicating a dispute involving an entity providing services within this District;

- Comcast's statistics regarding time to trial in *all* civil cases a) show that the time to trial is *shorter* in this District than in Comcast's preferred venue, and b) ignore the special complexities inherent in *patent* trials, with which this Court has substantial experience.

In light of the "great weight" owed to Plaintiff's choice of forum, *HolyAnne Corp. v. TFT, Inc.,* 199 F.3d 1304, 1307 n. 2 (Fed.Cir.1999), the interest of the Eastern District of Texas in "enforcing United States patent laws in its jurisdiction," *Source, Inc. v. Rewards Network, Inc.*, No. 2:04-CV-347, 2005 WL 2367562 (E.D. Tex. Sept. 27, 2005) at *3, the public and private interest in securing a just adjudication of this dispute in a court with intimate familiarity with patent law, *id.*, and Defendants' failure to carry their burden of showing that the balance of conveniences *strongly* favors transfer, *see Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947), this Court should deny Defendants' motion, and retain jurisdiction over this case.

## II.     FACTUAL BACKGROUND

### A.     The Facts Demonstrate a Nexus of Infringement Within this District

On September 16, 2005, Plaintiff Rembrandt Technologies, LP ("Plaintiff" or "Rembrandt") brought this action against Defendants Comcast Corp., Comcast Cable Communications, LLC, and Comcast of Plano, LP (collectively "Defendants" or "Comcast") to enforce Rembrandt's rights under U.S. Patent Nos. 4,937,819, 5,719,858, 5,852,631, 5,243,627

2

(the "patents-in-suit").  These patents generally relate to the transmission or receipt of digital data.

Comcast's business includes providing high-speed interactive data services, such as Internet connectivity, over its cable network.  (*See* http://www.comcast.com/LocalHomePage/default.asp?LocResult&&Zip=75023, attached as Ex. A; Comcast Corp. 2004 Form 10-K Annual Report ("Form 10-K"), attached as Ex. B at 8.)[2]  Comcast, like other cable companies, also receives digital terrestrial broadcast signals (for example, signals for local television stations in a given geographic area), for the purpose of retransmitting the signals over its cable network. (*See generally* Federal Communications Commission, "FCC Adopts Rules for Cable Carriage of Digital TV Signals," January 22, 2001, attached as Ex. C.)

Although Comcast directly infringes Rembrandt's patents, it does so through the use of third-party devices, including cable modems and cable modem head-end systems.  (*See* http://www.comcast.net/help/faq/index.jsp?faq=ConnectionCable_Modems17652, attached as Ex. D (showing a partial list of cable modems used on the Comcast cable network).)  Comcast does not manufacture these systems; instead, it purchases them from third-party manufacturers located throughout the United States, such as Motorola and Scientific-Atlanta.  (*See id.*) Motorola is located in Illinois (*see* Hoovers, *Motorola, Inc. Fact Sheet,* attached as Ex. E); and Scientific-Atlanta is located in Georgia (*see* Hoovers, *Scientific-Atlanta Fact Sheet*, attached as Ex. F).

There can be no dispute that the Comcast family of corporations and related entities has a substantial nationwide presence.  Comcast is the "largest cable operator in the United States," serving "21.5 million subscribers in thirty-five states."  (Ex. B, Form 10-K, at 6.)  Comcast

---

[2] Unless otherwise noted, Exhibits cited in this Brief are attached to the co-filed Declaration of Timothy Devlin in Support of Plaintiff's Opposition to Defendants' Motion to Transfer.

provides digital cable service to 8.7 million subscribers, and high-speed Internet service to 7.0
million subscribers. (*Id.*)

      Comcast also provides these services within the Eastern District of Texas. This
infringing activity is substantial and widespread. Defendant Comcast of Plano, LP operates
directly in the Eastern District of Texas. (*See* Defendants' Answer at ¶ 6.) Defendant Comcast
Corp. takes part in a joint venture with Time Warner, Inc. to operate Texas Cable Partners, an
entity that provides cable service in the Eastern District of Texas, including Beaumont. (See
Mavis Scanlon, "Houston Yields a Digital Sub Gusher," Cable World (June 9, 2003), *available
at* http://findarticles.com/p/articles/mi_m0DIZ/is_23_15/ai_102900855/print, attached as Ex. G.)
As set forth in Rembrandt's Complaint, in performing activities within this District and
elsewhere, Defendants commit acts of patent infringement here with respect to the patents-in-
suit. (*See* Complaint (Docket No. 1) at ¶¶ 11, 17, 23 & 29.)

      Rembrandt has substantial business connections within this District. Rembrandt's
business requires enforcement of its intellectual property, and in this regard Rembrandt has
retained counsel from numerous firms within this District (a number of which are identified
below and in Rembrandt's Complaint). Rembrandt is also involved in another litigation in this
District through a related entity, involving many of the same counsel. (*See* Complaint styled
*Rembrandt Vision Technologies, L.P. v. Bausch & Lomb Inc. et al.*, Case No. 2:05 CV 491,
attached as Ex. H.) Transfer to another district would force Rembrandt to hire separate counsel,
causing inefficiency and greater expense to Rembrandt.

    **B.**    **Comcast's Arguments Are Directly Contradicted by Statements It Has Made
in Other Litigations**

      Comcast makes a number of statements in its Motion that directly contradict statements it
recently made to this Court and other courts in litigation. For example, Comcast denies in its

Answer that this Court has personal jurisdiction over Comcast Corporation. (*See* Defendants' Answer and Counterclaims (Docket No. 9) ("Defendants' Answer") at ¶ 5.) Comcast makes the related argument in its Motion that Comcast Corporation and another Defendant "could have brought a motion to dismiss for lack of proper venue." (Motion at 9.)

In direct contrast, less than three months ago Comcast Corporation **admitted** in a separate litigation that it is subject to the jurisdiction of this Court: "Comcast admits that it does business in the state of Texas and that this Court has personal jurisdiction over it." (*See* Defendant Comcast Corporation's Answer and Counterclaims, *Caritas Techs., Inc. v. Comcast Corp.*, No. 2:05-CV-339-DF (E.D. Tex., Docket No. 11, September 16, 2005), attached as Ex. I ("Comcast's Caritas Answer") at ¶ 3.) The name "Comcast" in the Caritas Answer is defined to mean "Comcast Corporation." (*Id.* at ¶ 1.)

Similarly, Comcast made arguments in another litigation that contrast with its arguments in the present Motion. In that litigation, *Comcast Cable Comm., LLC v. Acacia Media Techs. Corp.*, No. 04-372-GMS (D. Del.), Comcast opposed a motion to transfer from the District of Delaware filed by Acacia. Many of the arguments presented by Comcast in its Motion here are flatly contradicted by statements made in its brief opposing Acacia's Motion. ("Comcast's Acacia Opposition," attached as Ex. J.)

For example, Comcast's Motion details the location of its own witnesses, and suggests that this somehow is relevant to its Motion. In its Acacia Opposition, however, Comcast correctly asserted that the "convenience of witnesses who are employees of a party is entitled to no weight." (Ex. J at 16.) Likewise, Comcast seeks to argue here that other "sources of proof" are also located within Pennsylvania (Motion at 1), and that transfer will "ease the burden associated with discovery" (*id.* at 9). These statements not only ignore other sources of evidence

in this case (discussed below), but ignore Comcast's earlier statement that the location of

document production has little relevance: "document discovery will be equally convenient in

Delaware as in California." (*Id.* at 20.)

## III.    ARGUMENT

### A.    Legal Standards

A plaintiff's choice of forum is entitled to great deference.  This rule has been affirmed

by the United States Supreme Court, the United States Court of Appeals for the Federal Circuit,

the Court of Appeals for the Fifth Circuit, and this Court.  *See Gulf Oil Corp.*, 330 U.S. at 508

(1947) ("unless the balance is *strongly* in favor of the defendant, the plaintiff's choice of forum

should *rarely* be disturbed"); *HolyAnne Corp.,* 199 F.3d at 1307 n. 2 ("A transfer of venue for

the convenience of the parties normally requires that the court give great weight to the plaintiff's

choice of forum and then weigh the convenience of both parties."); *Marbury-Pattillo Const. Co.,*

*Inc. v. Bayside Warehouse Co.,* 490 F.2d 155, 158 (5th Cir. 1974); *Source, Inc.*, 2005 WL

2367562 at *1.

### B.    Defendants' Cited Case Law Is Inapplicable; the Facts and Law Weigh Against Transfer

#### 1.    Plaintiff's Choice of Venue Is Entitled to Substantial Deference

In their Motion, Defendants seek to undermine the substantial deference due to Plaintiff's

choice of venue.  *See Gulf Oil*, 330 U.S. at 508; *HolyAnne Corp.,* 199 F.3d at 1307 n. 2;

*Marbury-Pattillo Const. Co., Inc. v. Bayside Warehouse Co.,* 490 F.2d 155, 158 (5th Cir. 1974);

*Source, Inc.*, 2005 WL 2367562 at *1.

Defendants' argument seeking to undermine deference to Rembrandt's choice of forum

has been definitively rejected by this Court.  "The time has come to lay this ungrounded,

'disappearing deference' proposition to rest; and this Court does so today.  In this Court,

deference to the Plaintiff's choice of forum *never* 'disappears' under *any* circumstances."

6

*Mohamed v. Mazda Motor Corp.*, 90 F.Supp.2d 757, 774 (E.D. Tex. 2000) (emphasis in original).  This deference to a Plaintiff's chosen forum is a factor Comcast itself recognized without limitation in its Acacia Opposition, stating that a plaintiff's choice of venue "is a paramount consideration that should not be lightly disturbed." (Ex. J at 9.)

Defendants' attempt to rely on *ShoeMake v. Union Pac. R.R. Co.*, 233 F. Supp. 2d 828, 830-31 (E.D. Tex. 2002) for the proposition that transfer may be warranted where "the plaintiff's chosen forum has no factual nexus to the case."  (Motion at 5.)  *ShoeMake* is not a patent case, but instead involved the Federal Employer's Liability Act (FELA).  As Comcast concedes, the Court found that the plaintiff's choice of venue was outweighed by other factors in part because **no nexus existed** between the facts alleged in the case and the Eastern District of Texas.  *See id.* at 831 (distinguishing *Mohamed* on this ground).

In this case, it is indisputable that Comcast carries out infringing activity in the Eastern District of Texas.  For example, Comcast of Plano provides both cable and internet services within the Eastern District of Texas, namely in Plano.  (*See* Ex. A, showing the services Comcast provides in Plano, Texas.)  Likewise, Comcast Corp. is a partner in Texas Cable Partners, a business venture that provides cable service in areas in the Eastern District including Beaumont. (*See* Ex. G.)  Comcast of Plano makes no assertion that it does not provide services within this District.  Indeed, Comcast of Plano, LP "admits that this Court has personal jurisdiction, and therefore admits that venue is proper." (Defendants' Answer at ¶ 6.)

These facts alone distinguish Comcast's cited case law, and further supports the strong weight to which Plaintiff's choice of forum is entitled.  *See Source, Inc.*, 2005 WL 2367562 at *2 (finding that "operative facts are alleged to have occurred in the Eastern District of Texas" and holding "the plaintiff's choice of forum is a factor that weighs strongly against transfer").  The

7

*Source, Inc.* case also distinguished *Robertson v. Kiamichi R.R. Co., L.L.C.,* 42 F.Supp.2d 651, 655 (E.D.Tex.1999), a FELA case cited in *ShoeMake*, on the basis that no nexus was alleged in *Robertson.  See Source, Inc.*, 2005 WL 2367562 at *2.  Plaintiff's choice of forum should be accorded substantial deference under any circumstances, *Mohamed v. Mazda*, 90 F.Supp.2d at 774.  Such deference is particularly applicable here, where Rembrandt's allegations are tied at least in part to activities occurring in the Eastern District of Texas.

Comcast further asserts that, due to a proposed arrangement with Time Warner Cable, Comcast will soon offer no services in Texas.  (Motion at 10, n. 2.)  Even if this Court were to accept Comcast's speculation as correct, this presumption would have no bearing on any factor relevant to a transfer-of-venue analysis, as set forth below.  *See In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004).

Comcast's future plans are also wholly speculative, and should not be entitled any weight.  Comcast has not indicated whether the Federal Communications Commission has approved the application to transfer its licenses in Texas, nor has Comcast demonstrated when the transfer is likely to take place.  Furthermore, Comcast Corp.'s co-CFO has indicated that the final outcome arising out of its deal is uncertain, with one likely result involving Comcast's retention of certain Texas affiliates.  (*See* http://kansascity.bizjournals.com/kansascity/ stories/2005/05/09/daily25.html?t=printable, attached as Ex. K.)  Moreover, sale of Comcast's equipment and other assets related to its infringing activity could constitute an act of infringement.  *See* 35 U.S.C. § 271.  Comcast's suggestion that it can somehow cut and run from its infringing activity and avoid justice in this District is not credible.

8

Comcast has committed, and continues to commit, acts of patent infringement in the Eastern District of Texas. Rather than support any motion to transfer, these facts and law weigh heavily against Defendants' Motion.

> **2.** **Defendants' Cases Regarding the "Hub" of Activity and a Party's Principal Place of Business Do Not Support Transfer In this Case**

Defendants' contention that a patent infringement case should be heard "as close as possible to the milieu of the infringing device and the hub of activity centered around its production," (Defendants' Motion at 6), does not support their argument for transfer. First, this proposition only holds to the extent it does not conflict with the deference to which the Plaintiff's choice of forum is entitled. *Mohamed v. Mazda*, 90 F.Supp.2d at 774. Moreover, Defendants' collective infringement occurs ***nationwide***. If any single locale could be deemed the "center of gravity" here, it is the Eastern District of Texas, since one of the Defendants, Comcast of Plano, provides services largely within this District.

Defendants cite to *Whistler Group v. PNI Corp.*, 2003 U.S. Dist. LEXIS 21968, *11 (N.D. Tex. 2003) in support of this argument, but that case is further distinguishable for another reason: Defendants do not manufacture much or all of the equipment they use in infringing the patents-in-suit. The products are designed and manufactured in various locations throughout the United States or overseas. (*See* Exs. D, E, & F.) Thus, even if the case were transferred, a Pennsylvania jury would be no closer to the "milieu of the infringing device" than a Texas jury would be.

Defendants also cite inapposite case law suggesting that "the location of the alleged infringer's principal place of business is often the critical and controlling consideration in adjudicating transfer of venue motions." (Motion at 6-7, quoting *Houston Trial Reports, Inc. v. LRP Publications, Inc.*, 85 F. Supp. 2d 663, 668 (S.D. Tex. 1999) (internal quotation marks

omitted).) *Houston Trial Reports* was not a patent case involving a national corporation with national or international suppliers of relevant equipment. Instead, *Houston Trial Reports* centered around a particular, localized act of alleged misappropriation: "defendants' alleged misappropriation of information in plaintiffs' database." *Id.* Thus, in that case, most of the evidence would have been located at defendants' primary place of business.

In contrast, there is no single locale here that would contain such a collection of documents and other evidence. Relevant witnesses are located throughout the country. Because Comcast's infringement is nationwide, there is no reason to believe that relevant liability documents exist exclusively at Comcast's principal place of business, as opposed to other locations around the country where Comcast commits infringing activities, including this District. Moreover, much of the evidence will relate to equipment not designed or manufactured by Comcast, so there is reason to believe that many relevant documents will be located elsewhere throughout the country or in foreign countries.

In short, this case does not revolve around activities occurring exclusively at a single principal place of business. Defendants' case law regarding this issue is inapplicable.

### C.   Factors Relevant to Defendants' Motion Clearly Weigh Against Transfer

Transfer under 28 U.S.C. § 1404(a) may only be granted if a balancing test involving eight public and private factors "*clearly* point towards trial in the alternative form." *See Z-TEL Comms.*, 331 F. Supp. 2d at 571. The private factors include:

> (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*In re Volkswagen AG*, 371 F.3d 201, 203. The factors relating to the public interest include

> (1) the administrative difficulties flowing from court congestion;
> (2) the local interest in having localized interests decided at home;

10

> (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws o[r] the application of foreign law.

*Id.*

Defendants' showing falls well short of that required to overcome the substantial presumption in favor of Plaintiff's choice of venue. Indeed, Defendants' argument is flawed with respect to each enumerated factor. As set forth below, these factors weigh ***against*** Comcast's Motion to transfer.

### 1.    Relative Ease of Access to Sources of Proof

Proof of patent infringement focuses primarily on a comparison between the patent and the infringing product. In this patent infringement case, the central evidence is likely to consist of engineering diagrams and source code listings for Comcast's hardware devices, such as its cable modems and cable head-end devices, as well as expert testimony reviewing this evidence in light of the patents in suit. Some of the documents relevant to this litigation will be located in the Eastern District of Texas, such as records of infringing activity that takes place within this District.

Moreover, since Comcast does not design or develop much of this actual equipment, relevant documents related to these devices will be located throughout the United States, or throughout the world. (*See* Exs. D, E, and F.) Additional documents may be in the possession or control of the inventors, who are located in Florida. (*See* "Kamber Decl." attached to Docket No. 10 at ¶¶ 5–9.) Documents in the possession or control of those prosecuting attorneys who fall outside the subpoena power of the United States District Court for the Eastern District of Pennsylvania likewise suggest that transfer will have no impact on any burden related to discovery. (Kamber Decl. at ¶¶ 12 & 13.)

In fact, courts have recognized that documents are readily shipped for review and production. "[N]ew technologies for storing and transmitting information [make] the burden of gathering and transmitting documents 3,000 miles . . . not significantly more than it is to transport them 30 miles." *ADE Corp. v. KLA-Tencor Corp.*, 138 F.Supp.2d 656, 571 (D. Del. 2001) (quoted in *Source, Inc.*, 2005 WL 2367562 at *2). Comcast made this very point in its *Acacia* Opposition: "[D]ocument discovery will be equally convenient in Delaware as in California." (Acacia Opposition at 20.)

It is difficult to understand how document production would be facilitated if this case were transferred to Pennsylvania. Neither party's outside counsel is located in Pennsylvania. Plaintiff's counsel are located in Austin, Texas; Boston, Massachusetts; Wilmington, Delaware; Dallas, Texas; and Marshall, Texas. Defendants' counsel are located in San Francisco, California and Texarkana, Texas. Thus, any burden associated with document exchange among counsel will remain the same whether the case is in Texas or Pennsylvania. This factor cannot support a transfer.

        **2.**       **Availability of Compulsory Process to Secure the Attendance of Witnesses**

Contrary to Defendants' statements, the issue of compulsory process does not favor transfer. Compulsory process is available under Fed. R. Civ. P. 30 and 45 to secure the attendance of witnesses at a deposition anywhere in the country. Comcast will be able to obtain the deposition testimony of any witness located throughout the United States, regardless of venue. Thus, this factor relates only to the availability of compulsory process to secure the attendance of witnesses at trial.

The only relevant witnesses Comcast identifies are the inventors and the prosecuting attorneys. Comcast admits that the inventors are beyond the subpoena power of the United

States District Court for the Eastern District of Pennsylvania. (*See* Motion at 8-9.) The only witnesses at issue here are some of the prosecuting attorneys. Typically these attorneys provide testimony regarding their own practices and procedures during prosecution, not to privileged subject matter regarding their advice to a patent applicant. The former testimony generally relates to issues of inequitable conduct, not patent validity or infringement, but Defendants have not even alleged inequitable conduct here. (*See* Defendants' Answer.)

In fact, Defendants have entirely failed to explain what testimony it expects to obtain from any prosecuting attorney. This failure alone renders Defendants' arguments on this issue moot. *See LeBouef v. Gulf Operators, Inc.*, 20 F.Supp.2d 1057, 1060 (S.D. Tex. 1998) ("[T]he moving party must offer more than mere allegations that certain key witnesses are not available or are inconveniently located. Instead, the movant must specifically identify the key witnesses *and outline their testimony.*") (citation omitted).

### 3. Cost of Attendance for Willing Witnesses

In its Motion, Comcast invests considerable effort outlining the location of employee witnesses it expects will testify. These facts, however, do not provide any basis for transfer, as Comcast itself has noted in the *Acacia* litigation. "The convenience of witnesses who are employees of a party is entitled to no weight." (Ex. J at 16.)

Comcast's previous statements in *Acacia* are consistent with case law. *See LeBouef*, 20 F.Supp.2d at 1060 ("where these anticipated witnesses are employees of the party seeking transfer, the sympathy of this Court is forfeited"); *Shoemake*, 233 F.Supp.2d at 832 ("the convenience of nonparty witnesses is accorded greater weight than that of party witnesses"). Moreover, since Comcast commits infringing activity in the Eastern District of Texas, some of Comcast's witnesses and documents are local to this District, giving rise to inconvenience only if the case is transferred to Pennsylvania.

13

At best, a transfer to Pennsylvania would merely shift any purported burden from Comcast's witnesses to Rembrandt's. At least one of Rembrandt's expected testifying experts is located in Austin, and would be substantially inconvenienced by travel to Pennsylvania. It is for this reason that courts generally discount the importance of the convenience of party witnesses. *Quicksilver, Inc. v. Academy Corp.*, No. 3:98-CV-1772R, 1998 WL 874929 (N.D. Tex. Dec. 3, 1998) at *2 ("the availability and convenience of party-witnesses is generally insignificant because a transfer based on this factor would only shift the inconvenience from movant to non-movant").

Therefore, contrary to Comcast's suggestion, an analysis of the costs imposed on witnesses properly focuses on ***nonparty*** witnesses. Here the primary nonparty witnesses are the inventors—all of whom live within the state of Florida, near the city of Largo. (Kamber Decl,. ¶¶ 5–9.) The distance between Largo, Florida and Marshall, Texas is slightly *less than* the distance between Largo and Philadelphia, where the Eastern District of Pennsylvania is located. (*Compare* Ex. L, showing that the distance from Largo, Florida to Philadelphia, Pennsylvania is 1,100 miles, *with* Ex. M, showing that the distance from Largo, Florida to Marshall, Texas is 1,076 miles).

Moreover, "Marshall is not in the wastelands of Siberia." *Cummings-Allison Corp. v. Glory, Ltd.*, Civ. No. 2:03-CV-358-TJW, 2004 WL 1635534, *5 (May 26, 2004) (*citing Mohamed*, 90 F.Supp.2d at 776). Indeed, Marshall may be significantly more convenient to non-party witnesses than Philadelphia. As noted above, other relevant witnesses may include those individuals who were central to the design and manufacture of the hardware at issue in this case. Many of those individuals are employees of third parties, and may come from any part of the

14

country.  (*See, e.g.,* Exs. D, E, & F.)  Marshall, Texas is centrally situated, making it far more convenient for travelers from the west coast or from Asia than Philadelphia would be.

### 4.    Other Practical Problems That Make Trial of a Case Easy, Expeditious and Inexpensive

No other factor makes litigation within Pennsylvania more expeditious or inexpensive than trial in this District.  Defendants' presence within the Eastern District of Texas establishes that Comcast will be readily able to litigate here.  Indeed, although Comcast Corporation now asserts that it has no connection to the Eastern District of Texas, this position is belied by its admission, in a separate litigation, that this Court has personal jurisdiction over it.  (*See* Comcast's Caritas Answer at ¶ 3.)

Comcast has a substantial presence in this District, as outlined above.  This case is no more difficult for a large company such as Comcast to litigate here than in any other venue.

### 5.    Administrative Difficulties Flowing From Court Congestion

Comcast admits that the case load of the Eastern District of Pennsylvania is heavier than that of the Eastern District of Texas.  (See Kamber Decl., ¶ 16.)  This factor, therefore, should weigh against transfer.  Moreover, Comcast ignores the fact that this action has been pending in this District for some time, whereas transferring the case would re-set its schedule on a new docket.  Transferring the case could therefore substantially lengthen the time to trial.

### 6.    Local Interest In Having Localized Interests Decided at Home

Rembrandt's allegations regarding Comcast's acts of patent infringement are not limited to the Eastern District of Pennsylvania.  On the contrary, Rembrandt has alleged in its Complaint that Comcast has committed acts of infringement in this District.  (Docket No. 1, at ¶ 5.) Certainly, the Eastern District of Texas—and its jurors—have a strong interest in "enforcing United States patent laws in [this] jurisdiction," *Source, Inc.,* 2005 WL 2367562  at *3.

15

7. **Familiarity of The Forum With the Law That Will Govern the Case**

Rembrandt selected the Eastern District of Texas for three reasons: 1) Comcast infringes its patents in this District; 2) this District's judges are well-versed in patent law, and 3) this District and its judges have a well-developed set of patent rules that smooth the progress of patent litigation. Rembrandt's choice is entitled to deference.

The docket of the Eastern District of Texas consists of a significantly higher percentage of patent cases than does the docket of the Eastern District of Pennsylvania. In fact, the Eastern District of Texas will soon have the third-busiest patent docket, after the United States District Courts for the Northern and Southern Districts of California. (*See* "Texas Challenges California as IP Litigation Hotbed," *IP Law Bulletin*, *available at* http://www.iplawbulletin.com/ Secure/ViewArticle.aspx?id=4329, attached as Ex. N.) This factor, therefore, should weigh against transfer.

8. **Avoidance of Unnecessary Problems of Conflict of Laws or the Application of Foreign Law**

This factor is inapplicable, as no conflict of laws or foreign law issues exist.

In short, the factors above are either neutral, or weigh against transfer here. Nothing in the facts or law satisfies the strong showing necessary for transfer. *Gulf Oil Corp.*, 330 U.S. at 508. Comcast's Motion should be denied.

## IV.    CONCLUSION

For the foregoing reasons, Rembrandt respectfully requests that the Defendants' Motion to Transfer be denied.

Dated:  December 2, 2005                     Respectfully submitted,


                                             By:   /s/ Otis W. Carroll by permission S. Calvin Capshaw
                                                   Otis W. Carroll, Jr. – Lead Attorney
                                                   Ireland Carroll & Kelley, PC
                                                   6101 S Broadway
                                                   Suite 500
                                                   Tyler, TX 75703
                                                   Telephone:  (903) 561-1600
                                                   Facsimile: (903) 581-1071
                                                   E-mail: fedserv@icklaw.com

                                                   Franklin Jones, Jr.
                                                   Jones & Jones - Marshall
                                                   201 W Houston St
                                                   PO Drawer 1249
                                                   Marshall, TX 75670
                                                   Telephone: (903) 938-4395
                                                   Facsimile: (903) 938-3360
                                                   E-mail: maizieh@millerfirm.com

                                                   Robert Christopher Bunt
                                                   Parker & Bunt, P.C.
                                                   100 East Ferguson, Ste. 1114
                                                   Tyler, TX 75702
                                                   Telephone: (903) 531-3535
                                                   Facsimile: (903) 533-9687
                                                   E-mail: cbunt@cox-internet.com

                                                   Robert M. Parker
                                                   Parker & Bunt, P.C.
                                                   100 E. Ferguson
                                                   Suite 1114
                                                   Tyler, TX 75702
                                                   Telephone: (903) 533-9288
                                                   Facsimile: (903) 533-9687
                                                   E-mail: rmparker@cox-internet.com

S. Calvin Capshaw
State Bar No. 03783900
BROWN McCARROLL LLP
1127 Judson Road, Suite 220,
P.O. Box 3999 (75606-3999)
Longview, Texas 75601-5157
Telephone: (903) 236-9800
Facsimile: (903) 236-8787
E-mail: ccapshaw@mailbmc.com

OF COUNSEL:
Frank E. Scherkenbach
Lawrence K. Kolodney
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, Massachsetts 02110
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Alan D. Albright
State Bar No. 00973650
FISH & RICHARDSON, P.C.
One Congress Plaza
4th Floor
111 Congress Avenue
Austin, Texas 78701
Telephone: (512) 391-4930
Facsimile: (512) 391-6837

Timothy Devlin
FISH & RICHARDSON
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, Delaware 19899
Telephone: (302) 652-5070
Facsimile: (302) 652-0607

ATTORNEYS FOR PLAINTIFF
REMBRANDT TECHNOLOGIES, LP

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following counsel of record who are deemed to have consented to electronic service are being served this 2nd day of December, 2005, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by, electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ S. Calvin Capshaw
S. Calvin Capshaw

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP,<br><br>       Plaintiff (s),<br><br>  v.<br><br>COMCAST CORPORATION, COMCAST<br>CABLE COMMUNICATIONS, LLC, and<br>COMCAST OF PLANO, OP,<br><br>       Defendant(s). | C.A. No. 2:05-443 (TJW) |

## DECLARATION OF TIMOTHY DEVLIN IN SUPPORT OF
## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER

I, Timothy Devlin, declare as follows:

1.     I am a principal of Fish & Richardson P.C., counsel of record in this

action for Rembrandt Technologies, LP ("Rembrandt").  I am a member of the Bar of the

State of Delaware.  I have personal knowledge of the matters stated in this declaration

and would testify truthfully to them if called upon to do so.

2.     Attached hereto as Exhibit A is true and correct copy of Comcast's Local

Home Web Page for Dallas, Texas.

3.     Attached hereto as Exhibit B is a true and correct copy of Comcast

Corporation's 2004 SEC Form 10-K

4.     Attached hereto as Exhibit C is a true and correct copy of FCC Press

Release, "FCC Adopts Rules for Cable Carriage of Digital TV Signals, dated January 22,

2001.

5.      Attached hereto as Exhibit D is a true and correct copy of HELP – FAQ – Comcast.net, showing a list of cable modems used on the Comcast cable network.

6.      Attached hereto as Exhibit E is a true and correct copy of Hoover's: Motorola, Inc. – Fact Sheet.

7.      Attached hereto as Exhibit F is a true and correct copy of Hoover's: Scientific-Atlanta – Fact Sheet.

8.      Attached hereto as Exhibit G is a true and correct copy of Cable World internet article, "Houston Yields a Digital Sub Gusher, dated June 9, 2003.

9.      Attached hereto as Exhibit H is a true and correct copy of the Complaint for Patent Infringement, *Rembrandt Vision Technologies, L.P., v Bausch & Lomb, et al.*, E.D. TX, C.A. No. 2:05CV-00491-TJW, dated October 21, 2005.

10.      Attached hereto as Exhibit I is a true and correct copy of Defendant Comcast Corporation's Answer and Counterclaims, *Caritas Technologies, Inc. v Comcast Corporation*, E.D. Tex. C.A. No. 2:05CV-339-DF, dated September 16, 2005.

11.      Attached hereto as Exhibit J is a true and correct copy of Comcast Cable Communications, LLC's Opposition to Acacia's Motion to Dismiss or Transfer, *Comcast Cable Communications LLC v Acacia Media Technologies Corporation,* D. Del., C.A. No. 04-372-GMS, dated July 26, 2004.

12.      Attached hereto as Exhibit K is a true and correct copy of Kansas City Business Journal internet article, "Exec:  Comcast might get all of Time Warner Cable in KC", dated May 11, 2005.

13.      Attached hereto as Exhibit L is a true and correct copy of a Google internet map showing the distance from Largo Florida to Philadelphia, Pennsylvania.

14.    Attached hereto as Exhibit M is a true and correct copy of a Google internet map showing the distance from Largo Florida to Marshall, Texas.

15.    Attached hereto as Exhibit N is a true and correct copy of IP Law Bulletin internet article, "Texas Challenges California As IP Litigation Hotbed".

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed at Wilmington, Delaware, this 2nd day of December, 2005.

Timothy Devlin

80028618.doc

3

# Exhibit A

Case 2:05-cv-00493-GMS    Document 185-23    Filed 02/28/2007    Page 2 of 2



Comcast.net        

                     75023 Plano, Tx

## Welcome to Comcast of Dallas, TX

**SUPPORT**



**Understand My Bill
FAQs and Answers
My Channel Lineup
My Account**        

**PARENTAL CONTROLS**



**Learn More about
Parental Controls**

**NFL NETWORK**



Let Comcast and
the NFL Network
be your link this
season!



**CONTACT US**

Customer Servic
Contact informa
your area.

**DIGITAL CABLE**

 

Get more control
with Advanced
Services!

**ON DEMAND
HDTV
DVR**



**DIGITAL TELEPHONE**



Comcast Digital
Telephone

**Great Long Distance
Rates
Refer a Friend
and Save Now!**

**HIGH-SPEED INTERNET**



100% Pure
Broadband Power!

**Faster, More Powerful
More Convenient**



**SERVICE REQUEST**

At Your Fingertip
**Channel Lineu
Payment Loca
Explanation of
Moving?
Send Site Feed
User Manuals
High-Speed In**

High-Speed I
Technical Sup




**PRODUCTS AND S**

**Get Started He**
Get prices for p
available in you
and order onlin

© 2005 Comcast Corporation        Investor Relations        Press Room        Privacy Statement

# Exhibit B

10-K 1 a2141960z10-k.htm FORM 10-K

Use these links to rapidly review the document
COMCAST CORPORATION 2004 FORM 10-K ANNUAL REPORT TABLE OF CONTENTS

# FORM 10-K

## SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

(Mark One)

✍    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED DECEMBER 31, 2004

OR

✍    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM                    TO

Commission file number 000-50093



## COMCAST CORPORATION

(Exact name of registrant as specified in its charter)

| PENNSYLVANIA | 27-0000798 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1500 Market Street, Philadelphia, PA | 19102-2148 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (215) 665-1700

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:
NONE

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
Class A Common Stock, $0.01 par value
Class A Special Common Stock, $0.01 par value

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑          No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendments to this Form 10-K. ☐

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).

Yes ☑          No ☐

As of June 30, 2004, the aggregate market value of the Class A Common Stock and Class A Special Common Stock held by non-affiliates of the Registrant was $38.160 billion and $23.744 billion, respectively.

As of December 31, 2004, there were 1,359,680,364 shares of Class A Common Stock, 842,944,570 shares of Class A Special Common Stock and 9,444,375 shares of Class B Common Stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Part III—The Registrant's definitive Proxy Statement for its Annual Meeting of Shareholders presently scheduled to be held in June 2005.

COMCAST CORPORATION
2004 FORM 10-K ANNUAL REPORT
TABLE OF CONTENTS

## PART I

| Item 1 | Business |
| Item 2 | Properties |
| Item 3 | Legal Proceedings |
| Item 4 | Submission of Matters to a Vote of Security Holders |
| Item 4A | Executive Officers of the Registrant |

## PART II

| Item 5 | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities |
| Item 6 | Selected Financial Data |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk |
| Item 8 | Financial Statements and Supplementary Data |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure |
| Item 9A | Controls and Procedures |
| Item 9B | Other Information |

## PART III

| Item 10 | Directors and Executive Officers of the Registrant |
| Item 11 | Executive Compensation |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management |
| Item 13 | Certain Relationships and Related Transactions |
| Item 14 | Principal Accountant Fees and Services |

## PART IV

| Item 15 | Exhibits and Financial Statement Schedules |
| SIGNATURES | |

This Annual Report on Form 10-K is for the year ended December 31, 2004. This Annual Report modifies and supersedes documents filed prior to this Annual Report. The SEC allows us to "incorporate by reference" information that we file with them, which means that we can disclose important information to you by referring you directly to those documents. Information incorporated by reference is considered to be part of this Annual Report. In addition, information that we file with the SEC in the future will automatically update and supersede information contained in this Annual Report. Throughout this Annual Report, we refer to Comcast Corporation as "Comcast"; Comcast and its consolidated subsidiaries as "we", "us" and "our"; and Comcast Holdings Corporation as "Comcast Holdings."

You should carefully review the information contained in this Annual Report and particularly consider any risk factors that we set forth in this Annual Report and in other reports or documents that we file from time to time with the SEC. In this Annual Report, we state our beliefs of future events and of our future financial performance. In some cases, you can identify these so-called "forward-looking statements" by words such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential," or "continue," or the negative of these words, and other comparable words. You should be aware that those statements are only our predictions. In evaluating those statements, you should specifically consider various factors, including the risks and uncertainties listed in our *Risk Factors* section beginning on page 13 and in other reports we file with the SEC. Actual events or our actual results may differ materially from any of our forward-looking statements.

1

PART I

ITEM 1   BUSINESS

We are a Pennsylvania corporation and were incorporated in December 2001. Through our predecessors, we have developed, managed and operated broadband cable networks since 1963.

We are involved in:

- Cable—through the development, management and operation of broadband communications networks, including video, high-speed Internet and phone services, and regional sports and news networks,

- Content—through our consolidated programming investments, including our national cable television networks E! Entertainment Television, Style Network, The Golf Channel, Outdoor Life Network, G4 and International Channel Networks, and

- Other business and programming interests—primarily Comcast-Spectacor, our group of businesses that perform live sporting events and own or manage facilities for sporting events, concerts and other special events.

We have our principal executive offices at 1500 Market Street, Philadelphia, PA 19102-2148. Our telephone number is (215) 665-1700. We also have a Web site at http://www.comcast.com. Copies of the annual, quarterly and current reports we file with the SEC, and any amendments to those reports, are available on our Web site as well as on the SEC's Web site at http://www.sec.gov. The information posted on our Web site is not incorporated into this Annual Report. The public may read and copy any material we file with the SEC at the SEC's Public Reference Room at 450 Fifth Street, N.W., Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330.

FINANCIAL INFORMATION ABOUT BUSINESS SEGMENTS

Refer to *Note 14* to our consolidated financial statements included in Item 8 for information about our operations by business segment.

GENERAL DEVELOPMENTS OF OUR BUSINESS

We operate our businesses in an increasingly competitive, highly regulated and technologically complex environment. We are the largest video, broadband high-speed Internet and cable phone service provider in the United States. We have now substantially completed the upgrade of our broadband communications networks, allowing us to provide customers with new and improved products and advanced services in each of our video, high-speed Internet and phone services. We also have expanded our ownership and management of content businesses on a national, regional and local level.

The following paragraphs review the more significant strategic transactions (and potential transactions) by segment since the beginning of 2004:

Cable

During 2004, we expanded our efforts to acquire and develop technology that will drive product differentiation and new applications and extend our nationwide fiber-optic network. We achieved these objectives in 2004 through strategic agreements signed with Gemstar-TV Guide and Microsoft Corporation, which enable us to control and develop the enhancement of the user interface and the functionality of our service offerings, such as our interactive programming guide and our Video on Demand ("VOD") and digital video recorder ("DVR") service. In December 2004, we also announced a long-term agreement with Level 3 Communications that is part of the extension of our fiber-optic network. This national network, or "backbone," provides a technically-advanced, nationwide broadband network over which we can deliver new and enhanced services.

On September 27, 2004, we and Time Warner Inc. announced an agreement that provides us with an option to reduce our effective overall interest in Time Warner Cable Inc. ("TWC") from approximately 21% to 17% in exchange for stock of a subsidiary that will hold cable systems which will serve approximately 90,000 basic subscribers and hold approximately $750 million in cash. The

agreement grants us the option to require TWC to redeem a portion of the TWC common stock held in trust in exchange for 100% of the common stock of the TWC subsidiary. The option may be exercised at any time prior to the 60th day (the "Termination Date") following a notice that may be given at any time by either party of termination of the option period. In addition, the trust that holds the TWC shares agreed not to request that TWC register the trust's shares in TWC for sale in a public offering prior to the Termination Date.

On January 31, 2005, we and Time Warner submitted a joint proposal to acquire substantially all of the cable assets of Adelphia Communications Corporation, the fifth-largest cable television company in the United States.

Content

On May 10, 2004, we completed the acquisition of TechTV Inc. for approximately $300 million in cash. On May 28, 2004, G4 and TechTV began operating as one network that is available to approximately 47 million cable and satellite homes nationwide as of December 31, 2004, providing video and computer game-related programming.

2

On July 28, 2004, we exchanged approximately 120 million shares of Liberty Media Corporation Series A common stock that we held, valued at approximately $1.022 billion, with Liberty for 100% of the stock of Liberty's subsidiary, Encore ICCP, Inc. Encore's assets consisted of cash of $547 million, a 10.4% interest in E! Entertainment Television and 100% of International Channel Networks, a cultural and heritage-related national cable network that is available to over 10 million cable homes nationwide as of December 31, 2004.

On September 23, 2004, we announced that we entered into a definitive agreement with a consortium of investors led by Sony Corporation of America to acquire Metro-Goldwyn-Mayer, Inc ("MGM"). The investor group has committed a total of up to $1.6 billion of equity financing, of which our commitment would be $300 million. This transaction, which has been approved by MGM's Board of Directors and shareholders, is subject to various regulatory approvals and customary closing conditions. The transaction is expected to close during the first half of 2005. We have also reached a broad programming and distribution arrangement with Sony and the other equity partners that allows for the distribution of Sony Pictures' content (and MGM's upon the closing of the acquisition) on our VOD service and provides for joint ventures, which we will manage, establishing new cable channels featuring Sony Pictures and MGM content.

## DESCRIPTION OF OUR BUSINESSES

Cable

We are the largest cable operator in the United States. As of December 31, 2004, our consolidated cable operations served 21.5 million subscribers in thirty-five states, passed 40.8 million homes, and provided digital cable to 8.7 million subscribers, high-speed Internet to 7.0 million subscribers and phone to 1.2 million subscribers.

The table below summarizes certain information for our cable operations as of December 31 (homes and subscribers in millions):

|  | 2004 | 2003 | 2002[1] | 2001[2] | 2000[2] |
|---|---|---|---|---|---|
| Cable |  |  |  |  |  |
| Homes Passed[3] | 40.8 | 39.8 | 39.2 | 13.9 | 12.7 |
| Subscribers[4] | 21.5 | 21.5 | 21.3 | 8.5 | 7.6 |
| Penetration | 52.8% | 53.9% | 54.4% | 60.8% | 60.0% |
| Digital Cable |  |  |  |  |  |
| "Digital Ready" Subscribers[5] | 21.5 | 21.5 | 21.3 | 8.4 | 7.3 |
| Subscribers[6] | 8.7 | 7.7 | 6.6 | 1.7 | 1.2 |
| Penetration | 40.2% | 35.7% | 31.1% | 20.8% | 16.6% |
| High-Speed Internet |  |  |  |  |  |
| "Available" Homes[7] | 40.0 | 34.7 | 30.1 | 10.4 | 6.4 |
| Subscribers | 7.0 | 5.3 | 3.6 | 0.9 | 0.4 |
| Penetration | 17.5% | 15.2% | 12.0% | 9.1% | 6.3% |
| Phone[8] |  |  |  |  |  |
| "Available" Homes[7] | 10.4 | 9.4 | 8.7 |  |  |
| Subscribers | 1.2 | 1.3 | 1.4 |  |  |
| Penetration | 11.7% | 13.5% | 16.5% |  |  |

[1] On November 18, 2002, we completed the acquisition of AT&T Corp.'s broadband business, which we refer to as "Broadband" and "the Broadband acquisition." The Broadband acquisition substantially increased the size of our cable operations, and direct comparisons of our cable information for periods prior to November 18, 2002, to subsequent periods are not meaningful. The information as of December 31, 2002, excludes the operating statistics for Broadband cable systems held for sale.

[2] On December 31, 2000, and January 1, 2001, we completed our cable systems exchanges with AT&T and Adelphia, respectively. In April and June 2001, we acquired cable systems serving an aggregate of approximately 697,000 subscribers from AT&T. The subscriber information as of December 31, 2000, excludes the effects of our exchange with AT&T.

[3] A home is "passed" if we can connect it to our distribution system without further extending the transmission lines. As described in Note 4 below, in the case of certain multiple dwelling units ("MDU"s), homes "passed" are counted on an

adjusted basis. "Homes passed" is an estimate based on the best available information.

(4)    Generally, a dwelling or commercial unit with one or more television sets connected to a system counts as one cable subscriber. In the case of some MDUs, we count cable subscribers on an FCC equivalent basis by dividing total revenue received from a contract with an MDU by the standard residential rate where the specific MDU is located.

(5)    A subscriber is "digital ready" if the subscriber is in a market where we have launched our digital cable service.

(6)    A dwelling with one or more digital set-top boxes counts as one digital cable subscriber. On average, as of December 31, 2004, each digital cable subscriber had 1.5 digital set-top boxes.

3

(7)    A home passed is "available" if we can connect it to our distribution system without further upgrading the transmission lines and if we offer the service in that area.

(8)    Prior to the Broadband acquisition, the number of phone "available" homes and subscribers was not material.

*Cable Services*

We offer a variety of services over our cable networks, including video, high-speed Internet and phone. Over the past several years, we have increased the reliability and capacity of our systems, enabling us to deliver new services, such as digital cable, high-speed Internet and phone. As of December 31, 2004, approximately 99% of our cable systems are capable of handling two-way communications. Although our upgrade is substantially complete, we expect to make significant capital expenditures during 2005 associated with the continued growth of these new services.

*Video Services*

We offer a full range of video services. We tailor both our basic channel lineup and our additional channel offerings to each system according to demographics, programming preferences and local regulation. Subscribers typically pay us on a monthly basis and generally may discontinue services at any time. Monthly subscription rates and related charges vary according to the type of service selected and the type of equipment subscribers use. Our video service offerings include the following:

*Basic and expanded basic.*    Our basic cable service typically consists of 10-20 channels of programming. This service generally consists of programming provided by national television networks, local broadcast television stations, locally-originated programming, including governmental and public access, and limited satellite-delivered programming. Our expanded basic cable service includes a group of satellite-delivered or non-broadcast channels, typically consisting of 50-60 channels in addition to the basic channel lineup.

*Premium channel programming.*    Our premium channel programming service, which includes cable networks such as Home Box Office, Showtime, Starz and Cinemax, generally offers, without commercial interruption, feature motion pictures, live and taped sporting events, concerts and other special features.

*Pay-per-view programming.*    Our pay-per-view service permits our subscribers to order, for a separate fee, individual feature motion pictures and special event programs, such as professional boxing, professional wrestling and concerts on an unedited, commercial-free basis.

*Digital cable.*    Subscribers to our digital cable service receive a digital cable set-top box, an interactive program guide, multiple channels of digital programming and music, and "multiplexes" of premium channels that are varied as to time of broadcast or programming content theme.

*Video On Demand (VOD).*    Our VOD service allows digital cable subscribers the opportunity to choose from a library of thousands of programs, start the programs at whatever time is convenient, and pause, rewind or fast-forward the programs. A substantial portion of our VOD content is available at no additional charge.

*High-Definition Television (HDTV).*    HDTV features improved, high-resolution picture quality, improved audio quality and a wide-screen, theater-like display. Our HDTV service offers a broad selection of high-definition programming of most major broadcast networks, leading cable channels, premium channels and regional sports networks.

*Digital Video Recorder (DVR).*    Our DVR service lets digital subscribers select, record and store programs and play them at whatever time is convenient. DVR service also provides the ability to pause and rewind "live" television.

*High-Speed Internet Services*

We offer high-speed Internet access via our cable modems, providing a service that is constantly connected. This service also includes our interactive portal, Comcast.net, which provides multiple e-mail addresses, online storage and a variety of value-added features and enhancements designed to take advantage of the speed of the Internet connection we provide.

*Phone Services*

In some areas, we offer traditional circuit-switched local phone service, a full array of associated calling features and third-party long-distance services. We are also beginning to offer a phone service delivered over our broadband communications networks

involving voice transmissions using Internet protocol ("Digital Voice").

*Advertising*

As part of our programming carriage agreements with non-broadcast networks, we often receive an allocation of scheduled advertising time into which we may insert commercials. We sell advertising time to local, regional and national advertisers for insertion on these channels.

4

We also coordinate the advertising sales efforts of other cable operators in certain markets. Utilizing these arrangements and similar arrangements with other companies, we have formed and operate advertising interconnects, which establish a physical, direct link between multiple cable systems and provide for the insertion primarily of regional and national advertising across larger geographic areas.

*Regional Sports and News Networks*

Our regional sports and news networks provide programming to our cable subscribers. These regional networks include Comcast SportsNet, Comcast SportsNet Mid-Atlantic, Cable Sports Southeast, CN8—The Comcast Network, and launched in 2004, Comcast SportsNet Chicago and Comcast SportsNet West (Sacramento). These networks sell advertising time and enter into affiliation agreements with cable and satellite television companies.

*Other Revenue Sources*

We also generate revenues from installation services, commissions from third-party electronic retailing and from other services, such as providing businesses with Internet connectivity and networked business applications.

*Programming*

We generally acquire a license for the programming we sell to our subscribers by paying a monthly fee to the licensor on a per subscriber, per channel basis. Our programming costs are increased by:

- growth in the number of subscribers,

- expansion of the number of channels provided to subscribers, and

- increases in contract rates from programming suppliers.

We attempt to secure long-term programming contracts with volume discounts and/or marketing support and incentives from programming suppliers. Our programming contracts are generally for a fixed period of time and are subject to negotiated renewal. We expect our programming costs to remain our largest single expense item for the foreseeable future. In recent years, the cable and satellite video industries have experienced a substantial increase in the cost of programming, particularly sports programming. We anticipate our programming expenses will increase in the future, primarily as a result of increased costs to purchase programming and as additional programming is provided to our subscribers. We anticipate that these increases may be mitigated, to some extent, by volume discounts.

*Customer and Technical Service*

We service our customers through local, regional and national call and technical centers. Generally, our call centers provide 24 hours per day, 7 days per week call answering capability, telemarketing and other services. Our technical services function performs various tasks, including cable installations, transmission and distribution plant maintenance, plant upgrades and activities related to customer service.

*Technology Development*

Historically, we have relied on third-party hardware and software vendors for many of the technologies needed for the operation of our businesses, the addition of new features to existing services, and the development and commercialization of new service offerings. In recent years, we have begun developing strategically important software and technologies internally and integrating third-party software to our specifications. We have also now arranged for long-term access rights to national fiber-based networks that we actively manage to interconnect our local and regional distribution systems and facilitate the efficient delivery of our broadband services. We expect these efforts to continue and expand in the future. These efforts require greater initial expenditures than would be required if we continued to purchase or license these products and services from third parties.

*Sales and Marketing*

Our sales efforts are primarily directed toward generating incremental revenues and increasing the number of subscribers we serve. We sell our products and services through direct customer contact through our call centers, door-to-door selling, direct mail

advertising, cable television advertising, local media advertising, telemarketing, and retail outlets.

*Competition*

We operate our businesses in an increasingly competitive environment. Our cable communications systems compete with a number of different companies that offer a broad range of services through increasingly diverse means. In addition, we operate in a technologically complex environment and new technologies may increase further the number of competitors we face for our video, high-speed Internet and phone services, and advertising. We expect advances in communications technology to continue in the future. We are unable to predict what effects, if any, such future developments will have on our business and operations.

5

*Video Services*

We compete with a number of different sources that provide news, information and entertainment programming to consumers, including:

- program distributors that use direct broadcast satellite, or DBS, systems that transmit satellite signals containing video programming, data and other information to receiving dishes of varying sizes located on the subscriber's premises,

- local exchange carriers, commonly known as LECs, that are marketing DBS service, and some that are building wireline fiber-optic networks and beginning to provide service in various communities across the United States,

- other wireline communications providers who build and operate wireline communications systems in the same communities that we serve, including those operating as franchised cable operators or under an alternative regulatory scheme known as Open Video Systems, or OVS,

- satellite master antenna television systems, commonly known as SMATVs, that generally serve condominiums, apartment and office complexes, and residential developments,

- local television broadcast stations that provide free over-the-air programming which can be received using an antenna and a television set,

- digital subscription services transmitted over local television broadcast stations that can be received by a special set-top box,

- interactive online computer services, including Internet video streaming and distribution of movies,

- video stores and home video products,

- movie theaters,

- newspapers, magazines and bookstores, and

- live concerts and sporting events.

In recent years, Congress has enacted legislation and the FCC has adopted regulatory policies intended to provide a favorable operating environment for existing competitors and for potential new competitors to our cable systems. The FCC recently adopted rules favoring new investment by LECs in fiber-optic networks capable of distributing video programming and rules allocating and auctioning spectrum for new wireless services that are expected to compete with our video service offerings. In order to compete effectively, we strive to provide, at a reasonable price to subscribers, new products and services, superior technical performance and customer service, and a greater variety of video programming.

*DBS Systems.* According to recent government and industry reports, conventional, medium- and high-power satellites currently provide video programming to over 24 million subscribers in the United States. DBS providers with high-power satellites typically offer to their subscribers more than 300 channels of programming, including programming services substantially similar to those our cable systems provide. Two companies, DIRECTV and EchoStar, provide service to substantially all of these DBS subscribers.

DBS service can be received throughout the continental United States through a small rooftop or side-mounted outside antenna. DBS systems use video compression technology to increase channel capacity and digital technology to improve the quality and quantity of the signals transmitted to their subscribers. Our digital cable service is competitive with the programming, channel capacity and quality of signals delivered to subscribers by DBS systems.

Federal legislation establishes, among other things, a compulsory copyright license that permits DBS systems to retransmit local broadcast television signals to subscribers who reside in the local television station's market. These companies are currently transmitting local broadcast signals in most markets that we currently serve. Additionally, federal law generally provides DBS systems with access to all cable-affiliated video programming services delivered by satellite. As a result, DBS providers are competitive with cable system operators like us because they offer programming that closely resembles what we offer. These DBS providers are attempting to expand their service offerings to include, among other things, high-speed Internet service and have

entered marketing arrangements in which their service is promoted and sold by LECs, such as Verizon Communications, Inc., SBC Communications, Inc., BellSouth Corporation and Qwest Communications International, Inc.

*Local Exchange Carriers (LECs).*    In addition to entering into joint marketing arrangements with DBS providers, some LECs are building fiber-optic networks capable of distributing video programming. The LECs, to date, have taken various positions on the question of whether they need a local cable television franchise to provide video services, including applying for a local franchise, seeking state-level regulation only, and claiming that video services can be provided without a cable television franchise.

*Other Wireline Providers.*    We operate our cable systems pursuant to a non-exclusive franchise that is issued by the community's governing body, such as a city council, a county board of supervisors or, in some cases, by a state regulatory agency.

6

Federal law prohibits franchising authorities from unreasonably denying requests for additional franchises, and it permits franchising authorities to operate cable systems. Companies that traditionally have not provided cable services and that have substantial financial resources (such as public utilities that own some of the poles to which our cables are attached) may also obtain cable franchises and may provide competing communications services. These and other wireline communications systems offer video and other communications services in various areas where we hold franchises. We anticipate that facilities-based competitors will emerge in other franchise areas that we serve.

*SMATV.* Our cable systems also compete for subscribers with SMATV systems. SMATV system operators typically are not subject to regulation like local franchised cable system operators. SMATV systems offer subscribers both improved reception of local television stations and many of the same satellite-delivered programming services offered by our cable systems. In addition, some SMATV operators are offering packages of phone, data and video services to private residential and commercial developments. SMATV system operators often enter into exclusive service agreements with building owners or homeowners' associations, although some states have enacted laws to provide cable systems access to multiple dwelling units.

*Broadcast Subscription Services.* Over the past year, local television broadcasters in selected markets have begun deployment of digital subscription services. These services typically contain a limited number of cable programming services at a price of approximately $20 per month. Recently, several leading television broadcast station ownership groups announced that they are negotiating funding for U.S. Digital Television, Inc., an entity that currently offers these digital subscription services in select markets and has announced plans to offer its service in several additional markets as a low cost alternative to cable television service. Many other broadcasters are considering similar plans.

High-Speed Internet Services

Substantially all of our cable systems offer high-speed Internet services within their service areas. These systems compete with a number of other companies, many of whom have substantial resources, including:

- LECs,

- Internet service providers (ISPs), such as America Online, Earthlink, Inc. and Microsoft,

- long-distance telephone companies and

- wireless telephone companies and other providers of wireless Internet services.

The deployment of digital subscriber line, or DSL, technology allows Internet access to be provided to subscribers over analog lines at data transmission speeds substantially greater than that of conventional modems. Numerous companies have introduced DSL service, and some of these companies are seeking to provide high-speed Internet services without regard to their present service boundaries and other regulatory restrictions. In addition, some LECs have begun construction of fiber-optic networks that will allow them to provide data transmission speeds that exceed the speed that can be provided with DSL technology. The FCC has reduced the obligations of LECs to offer their broadband facilities on a wholesale basis to competitors and is considering further measures to deregulate LECs' retail broadband offerings. Congress may also consider measures to deregulate such broadband offerings.

Various wireless telephone companies are beginning to offer wireless, high-speed Internet services. In addition, in a growing number of commercial areas, such as retail malls, restaurants and airports, wireless "WiFi" Internet access capability is available. Numerous local governments are also considering or actively pursuing publicly-subsidized WiFi Internet access networks. The availability of these alternatives may adversely affect demand for our high-speed Internet services.

A number of cable operators have reached agreements to provide unaffiliated ISPs access to their cable systems in the absence of regulatory requirements. We reached "access" agreements with several national and regional third-party ISPs, although to date these ISPs have made limited use of their access rights. We cannot provide any assurance, however, that regulatory authorities will not impose "open access" or similar requirements on us as part of an industry-wide requirement. These requirements could adversely affect our results of operations.

During 2004, a number of competitors offered substantial price discounts to subscribers willing to sign extended contracts or purchase additional bundled services. We expect competition for high-speed Internet service subscribers to remain intense, with companies competing on service availability, price, transmission speed and bundled services.

*Phone Services*

Our traditional circuit-switched local phone service and Digital Voice service compete against incumbent local exchange carriers ("ILECs"), wireless telephone service providers, competitive LECs (including established long-distance companies) and other internet protocol phone ("IP phone") service providers. The ILECs have substantial capital and other resources, longstanding customer relationships, extensive existing facilities and network rights-of-way. A few competitive LECs also have existing local networks and significant financial resources.

7

In addition, many telecommunications carriers are expanding their offerings to include high-speed Internet access services, and as such access services become more widely deployed, IP services will likely become more popular. We anticipate that our Digital Voice service will be deployed over the next two years in substantially all of our cable systems. We expect to migrate our circuit-switched phone customers to our Digital Voice service over the next several years. Our competitors are engaging in similar deployment strategies, and the proliferation of IP phone services may negatively affect demand for and pricing of our phone services.

*Advertising*

Our cable systems compete against a wide variety of media for sales of advertising, including local television broadcast stations, national television broadcast networks, national cable television networks, local radio broadcast stations, local and regional newspapers, magazines, and the Internet. Continuing competition from these media outlets and the continued expansion of new media outlets offering advertising opportunities may result in a dilution of the portion of advertising expenditures our cable systems currently receive.

Content

We have made investments in national cable television networks as a means of generating additional revenues and subscriber interest. As of December 31, 2004, these investments include the following (approximate subscribers in millions):

| Investment | Economic Ownership Percentage | Approximate U.S. Subscribers | Description |
|---|---|---|---|
| E! Entertainment Television | 60.5% | 77.2 | Entertainment-related news and original programming |
| Style Network | 60.5 | 33.5 | Lifestyle-related programming |
| The Golf Channel | 99.9 | 56.2 | Golf-related programming |
| Outdoor Life Network | 100.0 | 53.5 | Outdoor sports and leisure programming |
| G4 | 83.5 | 46.7 | Video and computer game-related programming |
| International Channel Networks | 100.0 | 10.3 | Cultural and heritage-related programming |

Other Businesses and Programming Interests

We own a controlling interest in Comcast-Spectacor, our group of businesses that perform live sporting events and own or manage facilities for sporting events, concerts and other special events. We also own other non-controlling interests in programming investments including iN DEMAND, TV One, Sports Channel New England, New England Cable News, Pittsburgh Cable News Channel and Music Choice.

LEGISLATION AND REGULATION

Our video and phone services are subject to numerous requirements, prohibitions and limitations imposed by various federal and state laws and regulations, local ordinances and our franchise agreements. Our high-speed Internet service, while not currently subject to significant regulation, may be subject to such regulation in the future. Our content businesses are generally not subject to direct governmental regulation. Laws and regulations affect the prices we can charge for some services, such as basic cable service and associated customer-premises equipment; the costs we incur (for example, for attaching our wires to poles owned by utility companies); the relationships we establish with our suppliers, subscribers and competitors; and many other aspects of our businesses.

The most significant federal law affecting our cable business is the Communications Act of 1934, as amended. The provisions of the Communications Act and the manner in which the FCC, state and local authorities, and the courts implement and interpret those provisions affect our ability to develop and execute business plans, our ability to raise capital and the competitive dynamics between and among different sectors of the communications and entertainment industries in which we operate. The FCC also has the authority to enforce its regulations through the imposition of substantial fines, the issuance of cease-and-desist orders and the imposition of other administrative sanctions, such as the revocation of FCC licenses needed to operate some of the transmission facilities we use in connection with our cable business.

We believe we are currently in substantial compliance with all applicable statutory and regulatory requirements imposed by, or under, the Communications Act, but we caution that the precise requirements of the law are not always clear. Moreover, many laws and regulations can be interpreted in after-the-fact enforcement proceedings or private-party litigation in a manner that is inconsistent with the judgments we have made. We also note that regulators at all levels of government frequently consider changing, and sometimes do change, existing rules or interpretations of existing rules, or prescribe new ones. Judicial decisions often alter the regulatory framework in ways that are inconsistent with regulator, business and investor expectations. In addition, our businesses can be significantly affected by the enactment of new legislation. Congress seriously considers the enactment of new legislative requirements potentially affecting our businesses virtually every year, and a significant initiative to update the Communications Act has begun this year. We always face the risk that Congress or a state will approve legislation significantly

8

affecting our businesses. In particular, we could be materially disadvantaged if we are subject to new laws or regulations that do not equally affect our satellite, wireline and wireless competitors.

A major objective of Congress and the FCC has been to increase competition in all communications services, including those central to our business. For example, Congress has removed barriers to local telephone companies offering video services in their local service areas, and the FCC has taken additional steps that are encouraging local telephone companies to expand their investment in fiber-optic networks, which would make it easier for those companies to deliver video, high-speed Internet, and other services. The FCC has also assigned spectrum licenses for MVDDS, a new wireless service providing multichannel video programming. In addition, the FCC is continuing to adopt measures to increase the capacity for satellite-delivered services and is currently pursuing efforts intended to facilitate the use of utility power lines to provide video and high-speed Internet services. Our cable business could be affected by additional competitors that enter the video or high-speed Internet businesses as a result of these and similar efforts by Congress or the FCC. In particular, we could be materially disadvantaged if we remain subject to legal constraints that do not apply equally to these new competitors, such as if local telephone companies that provide video programming services are not subject to the local franchising requirements and other requirements that apply to us.

There are potential risks associated with various potential new laws or regulations, or proceedings that are currently pending at the FCC, in the courts, and before state regulatory agencies and local franchise authorities. We believe few of these items have the potential to materially affect our ability to conduct our cable business.

The following paragraphs describe existing and potential future legal and regulatory requirements that are the most significant to our businesses today.

Broadband Acquisition

The FCC approved the Broadband acquisition in November 2002, subject to various conditions. The most significant were a requirement for the divestiture of our interest in TWC by May 2008, a requirement that the TWC interest be placed in trust pending divestiture, and safeguards that limit our involvement in the programming-related activities of TWC and the two partnerships held jointly by us and TWC pending divestiture. Complying with these conditions has limited and will continue to limit our flexibility as to the timing and nature of a sale or other disposition of the TWC interest and, in the interim, may constrain our business dealings with TWC. We have fully complied with these conditions and are committed to meeting our obligations under the FCC's order going forward.

Ownership Limits

The FCC is considering imposing "horizontal ownership limits" that would limit the percentage of multichannel video subscribers that any single cable provider could serve nationwide. A federal appellate court struck down the previous 30% limit, and the FCC is now considering this issue anew. As we already serve approximately 29% of multichannel video subscribers, limits similar to those previously imposed would restrict our ability to take advantage of future growth opportunities. The FCC is also assessing whether it should reinstate "vertical ownership limits" on the number of affiliated programming services a cable operator may carry on its cable systems (the previous limit of 40% of the first 75 channels was also invalidated by the federal appellate court). New vertical limits could affect our content-related business plans. In addition, the FCC is considering revisions to its ownership attribution rules that would affect which cable subscribers are counted under any horizontal ownership limit and which programming interests are counted for purposes of any vertical ownership limit. It is uncertain when the FCC will rule on these cable ownership issues. In addition, it is possible that the controversy relating to separate ownership rules for the broadcast industry could affect the cable ownership proceeding and the FCC's deliberations over cable ownership issues.

Pricing and Packaging

The Communications Act and the FCC's regulations and policies limit the prices that cable systems may charge for basic services and equipment. (These rules do not apply to cable systems that are determined by the FCC to be "subject to effective competition," but these determinations have thus far been made for only a small number of our cable systems.) Failure to comply with these rate rules could result in rate reductions and refunds for subscribers. From time to time, Congress considers imposing new pricing or packaging regulations on the cable industry, including proposals to require cable operators to offer programming services on an a la carte basis instead of or in addition to the current packaged offerings. We cannot now predict whether or when Congress or any regulatory agency may adopt any new constraints on the pricing or packaging of cable services. Also, various competitors are trying to persuade the FCC and the Justice Department to limit our ability to respond to increased competition through offers, promotions or other discounts that aim to retain existing subscribers or regain those we have lost. We believe our competitive pricing practices are lawful and pro-competitive. If we cannot make individualized offers to subscribers who would otherwise choose a different provider, our subscriber attrition may increase, or our overall prices may need to be reduced, or both.

High-Speed Internet Service

Ever since high-speed Internet service was introduced, some local governments and various competitors have sought to impose regulatory requirements on how we deal with third-party ISPs. Thus far, only a few local governments have imposed such

9

requirements, and the courts have invalidated all of them. Likewise, the FCC has refused to treat our service as a common carrier "telecommunications service" but has instead classified it as an "interstate information service," which has historically meant that no regulations apply. However, the FCC's decision was vacated by a panel of a federal appellate court, which found that high-speed Internet service is, in part, a telecommunications service. That decision was stayed pending an appeal to the United States Supreme Court, which decided in December 2004 to hear the case. Thus, it is unclear how our high-speed Internet service will ultimately be classified for regulatory purposes, or whether we will be subject to requirements regarding our dealings with third-party ISPs. Any such requirements could adversely affect our results of operations. In addition, even if the FCC's decision is upheld, the FCC will then renew its assessment of whether to impose any regulatory requirements on high-speed Internet service and also whether local franchising authorities should be permitted to impose fees or other requirements, such as service quality or customer service standards. One local franchise authority has already imposed some of these requirements and made them a condition of our cable franchise agreement, and other local governments may follow suit. Also, a few franchising authorities have sued us seeking payment of franchise fees on high-speed Internet service revenues. Further, a number of software and content providers and electronic retailers have urged the FCC to adopt "nondiscrimination principles" that purport to be intended to allow Internet customers access to the Internet content of their choosing (something we already provide). We cannot now predict whether these or similar regulations will be adopted and, if so, what effects, if any, they would have on our business.

Internet Regulation

Congress and federal regulators have adopted a wide range of measures affecting Internet use, including, for example, consumer privacy, copyright protection, defamation liability, taxation, obscenity and unsolicited commercial e-mail. Further, state and local governmental organizations have also adopted Internet-related regulations. These various governmental jurisdictions are also considering additional regulations in these and other areas, such as pricing, service and product quality, and intellectual property ownership. The adoption of new laws or the adaptation of existing laws to the Internet could have a material adverse effect on our high-speed Internet service.

Must-Carry/Retransmission Consent

Cable companies are currently subject to a requirement that they carry, without compensation, the programming transmitted by most commercial and non-commercial local television stations ("must-carry"). Alternatively, local television stations may insist that a cable operator negotiate for "retransmission consent," which may enable popular stations to demand significant concessions (such as the carriage of and payment for other programming networks) as a condition of our ability to transmit the TV broadcast signals that cable subscribers expect to receive. As broadcasters transition from analog to digital transmission technologies, the FCC is considering whether to require cable companies to simultaneously carry both the analog and digital signals of each broadcaster. It is also considering whether to allow broadcasters to choose must-carry for either their analog or digital signals during this transition period. Additionally, it is considering whether, following the digital transition and the return of broadcaster analog spectrum to the government, a cable company may be required to carry multiple digital programming streams that each broadcaster may include within its digital transmission. If the FCC should adopt such must-carry requirements, we would have less freedom to allocate the usable spectrum of our cable plant to provide the services that we believe will be of greatest interest to our subscribers. This could diminish our ability to attract and retain subscribers. In addition, expanded must-carry requirements may similarly reduce the freedom of other cable operators to allocate use of their cable plant. This could adversely impact the ability of our cable networks to maintain or increase their carriage. Although the FCC has thus far ruled against expanded must-carry requirements, we cannot now predict whether such requirements may result from additional FCC proceedings, judicial proceedings or legislation.

Program Access

The Communications Act and the FCC's "program access" rules generally prevent satellite video programmers affiliated with cable operators from favoring cable operators over competing multichannel video distributors, such as DBS, and limit the ability of such programmers to offer exclusive programming arrangements to cable operators. The FCC has extended the exclusivity restrictions through October 2007. The FCC has concluded that the program access rules generally do not apply to programming services, such as Comcast SportsNet (Philadelphia), that are delivered terrestrially. The FCC has also indicated that it may reconsider how it regulates cable operators with regional sports programming interests in its cable ownership rulemaking, and there has been some Congressional interest in extending the exclusivity prohibition to terrestrially-delivered programming. Any decision by the FCC or Congress to apply new regulations to cable operators like us who have regional sports programming interests could have an adverse impact on our cable and programming businesses.

Cable Equipment Issues

Current FCC rules bar cable operators from leasing to subscribers digital set-top boxes that integrate security and other operating functions, effective July 1, 2006. The FCC is conducting a rulemaking on the ban, and we have urged elimination of the ban on the

grounds that it will limit consumer choice, increase the cost of set-top box equipment, and slow the deployment of digital cable services, but there is no assurance that the FCC will accept our position. In addition, the FCC has adopted rules to implement an agreement between the cable and consumer electronics industries aimed at promoting the manufacture of

10

"plug-and-play" TV sets that can connect directly to the cable network and receive one-way, analog and digital cable services without the need for a set-top box. Among other things, the rules: direct cable operators to implement technical standards in their networks to support these digital television sets; require operators to provide a sufficient supply of conditional access devices to subscribers who want to receive encrypted programming services on their digital television sets; and require operators to support basic home recording rights and copy protection rules for digital programming content. We believe that we are substantially in compliance with these plug-and-play requirements. These rules are being challenged at the FCC and in the courts, and we cannot at this time predict the outcome of these challenges. In addition, the FCC has initiated a rulemaking that will consider additional plug-and-play regulations, including standards for approving new digital connectors and copy protection technologies that cable operators would have to support. It is uncertain when the FCC will complete this rulemaking and how it might affect cable operators. Also, the cable and consumer electronics industries are currently negotiating an agreement that would allow for the manufacture of two-way, interactive plug-and-play equipment. Once this agreement is finalized, it will likely be subject to a separate FCC rulemaking. It is unclear how this process will unfold and how it will ultimately affect our cable business and our efforts to sell cable services at retail outlets.

Phone Service

Our traditional circuit-switched phone service is subject to federal, state and local regulation. In general, the Communications Act imposes interconnection requirements and universal service contribution obligations on all telecommunications service providers, including those that provide traditional circuit-switched phone service over cable facilities, and more significant regulations on ILECs, such as Verizon and SBC. These traditional common-carrier rules, however, are being re-evaluated at the FCC and in Congress. For example, the FCC has initiated several rulemakings that, in the aggregate, could significantly change the rules that apply to telephone competition, including the relationship between wireless and wireline providers, long-distance and local providers, and incumbents and new entrants. It is unclear how those proceedings (and the litigation and implementation proceedings that are already under way as a product of one such rulemaking) will affect our phone service.

We are beginning to launch our Digital Voice service on a limited commercial basis. The FCC has initiated a rulemaking to consider whether and how to regulate IP phone and other IP-enabled services. Among other things, the FCC will determine whether and how certain types of common-carrier regulations should apply to IP phone, including intercarrier compensation, universal service, 911 emergency services, and disabilities access obligations. The FCC has also initiated a separate rulemaking to consider whether to impose Communications Assistance to Law Enforcement Act requirements on IP phone as well as broadband Internet access services. Several states have already attempted to impose traditional common-carrier regulation on IP phone services. However, the FCC adopted an order in November 2004 declaring that one particular IP phone service is not subject to traditional state public utility regulation. Further, the FCC indicated that other types of IP phone services, such as those offered by cable companies, would not be subject to traditional state public utility regulation if they: require a broadband connection from the user's location; require the use of IP-compatible customer premises equipment; and include a suite of integrated capabilities and features, able to be invoked sequentially or simultaneously, that allows customers to manage personal communications dynamically. It is unclear how this ruling and other IP phone-related proceedings at the federal and state levels, and the related judicial proceedings that will ensue, might affect our planned IP phone service.

Franchise Matters

Cable operators generally operate their cable systems pursuant to non-exclusive franchises granted by local or state franchising authorities. While the terms and conditions of franchises vary materially from jurisdiction to jurisdiction, these franchises typically last for a fixed term, obligate the franchisee to pay franchise fees and meet service quality, customer service and other requirements, and are terminable if the franchisee fails to comply with material provisions. The Communications Act includes provisions governing the franchising process, including, among other things, renewal procedures designed to protect incumbent franchisees against arbitrary denials of renewal. We anticipate that our future franchise renewal prospects generally will be favorable.

Leased Access/PEG

The Communications Act permits franchising authorities to require cable operators to set aside the use of channels for public, educational and governmental access programming. The Communications Act also requires a cable system with 36 or more activated channels to make available a portion of its channel capacity for commercial leased access by third parties to provide programming that may compete with services offered directly by the cable operator. To date, we have generally not been required to devote significant channel capacity to leased access.

State and Local Taxes

Some states and localities are considering imposing new taxes, including sales taxes, on the services we offer. We cannot predict at this time whether such taxes will be enacted or what impact they might have on our business.

11

Other Regulatory Issues

There are a number of other regulatory matters under review by Congress, the FCC, and other federal agencies that could affect our cable business.

- *Tier Buy Through:* The Communications Act generally requires cable operators to allow subscribers to purchase premium or pay-per-view services without the necessity of subscribing to any tier of service, other than the basic service tier. The applicability of this rule in certain situations remains unclear, and adverse decisions by the FCC on this issue could affect our pricing and packaging of services.

- *Content Regulation:* The Communications Act prohibits the transmission of obscene programming over cable systems. Additionally, some parties have proposed that new laws or rules regulating indecent and violent programming be imposed on cable operators. It is uncertain whether and when any such laws will be enacted or regulations will be adopted and, if enacted or adopted, what impact such laws or regulations would have on our businesses.

- *Broadcast Flag:* The FCC has adopted rules that require cable operators to implement the "broadcast flag," a code that may be embedded in digital broadcast programming that directs digital TVs and other consumer electronics equipment to block the redistribution of such content over the Internet. It is unclear how these rules might affect the future design of cable-related equipment and home-networking technologies. Several petitions have been filed at the FCC requesting revisions to the broadcast flag rules. The rules are also subject to a challenge in federal court. We cannot now predict how or when the FCC will rule on these petitions or how the federal court will decide the case. The FCC has also initiated a rulemaking to consider, among other things, whether cable operators should be permitted to encrypt digital basic services. It is uncertain when this rulemaking will be completed and how it will affect cable operators.

- *MDU Access:* The FCC has adopted rules intended to make it easier for multichannel video service providers to compete with established cable operators in serving multiple dwelling units ("MDU"s), such as apartment buildings and condominium complexes.

- *Pole Attachments:* The Communications Act requires that utilities (other than those owned by municipalities or cooperatives) provide cable systems with nondiscriminatory access to any pole, or right-of-way, controlled by the utility. The rates that utilities may charge for such access are regulated by the FCC or, alternatively, by states that certify to the FCC that they regulate such rates (several states in which we have cable systems have so certified). There is always the possibility that the FCC or a state could alter the pole attachment rate paid by cable operators, and such adverse decisions could potentially increase our pole attachment costs. Additionally, higher pole attachment rates will apply to pole attachments that are subject to the FCC's telecommunications services pole rates. The applicability of and method for calculating those rates for cable systems over which various phone services are transmitted remains unclear.

- *EAS and Closed Captioning:* The FCC has initiated a rulemaking to consider changes to the Emergency Alert System ("EAS"). The proposed rules changes, if adopted, would impose additional requirements and costs on cable operators, including, among other things, installation of new EAS equipment in cable headends and delivery of EAS warnings via digital cable services. It is uncertain when and if the FCC will act on these proposals. The FCC has also invited comment on a petition for a rulemaking with respect to closed captioning requirements for cable operators, broadcasters, programmers, and others. Advocates for the hearing impaired have urged the FCC to toughen its rules on closed captioning compliance and enforcement. If adopted, such requirements would impose further regulatory burdens on cable operators. The FCC has not indicated whether it will proceed with the rulemaking.

- *Privacy Regulation:* The Communications Act generally restricts the nonconsensual collection and disclosure of subscribers' personal information by cable operators. There are possible interpretations of the Communications Act that could severely limit the ability of service providers to collect and use personal information for commercial purposes. Further constraints could be imposed if and to the extent that state or local authorities establish their own privacy standards. In addition, the FCC, the Federal Trade Commission and many states have adopted rules that limit the telemarketing practices of cable operators and other commercial entities.

- *Copyright Regulation:* In exchange for filing certain reports and contributing a percentage of their revenue to a U.S. federal copyright royalty pool, cable operators can obtain blanket permission to retransmit copyrighted material contained in broadcast signals. The U.S. Copyright Office has recommended that Congress revise this compulsory

licensing scheme, although Congress has thus far declined to do so. The elimination or substantial modification of the cable compulsory license could adversely affect our ability to obtain certain programming and substantially increase our programming costs. Further, the Copyright Office has not yet made any determinations as to how the compulsory license will apply to digital broadcast signals and services. In addition, we pay standard industry licensing fees to use music in the programs we provide to cable subscribers, including local advertising, local origination programming and pay-per-view events. These licensing fees have been the source of litigation between the cable industry and music performance rights organizations in the past, and we cannot predict with certainty whether license fee disputes may arise in the future.

- *Other Areas:* The FCC actively regulates other aspects of our cable business, including, among other things: (1) the mandatory blackout of syndicated, network and sports programming; (2) customer service standards; (3) advertising in children's programming; (4) political advertising; (5) origination cablecasting (i.e., programming locally originated by and under the control of the

12

cable operator); (6) sponsorship identification; (7) equal employment opportunity; (8) lottery programming; (9) program carriage; (10) recordkeeping and public file access requirements; and (11) technical standards relating to operation of the cable network. We are not aware that the FCC is considering any significant revisions to these rules at this time, but we are unable to predict how these regulations might be changed in the future and how any such changes might affect our cable business.

In all these areas and a variety of others, we face the potential of increased regulation. Given the intensely competitive nature of every aspect of our business, we believe that increased regulation is not warranted. We cannot provide any assurance, however, that regulation of our businesses will not increase.

## EMPLOYEES

As of December 31, 2004, we had approximately 74,000 employees. Of these employees, approximately 59,000 were associated with cable and approximately 15,000 were associated with our other divisions. Approximately 3,000 of our employees are covered by collective bargaining agreements or have organized but are not covered by collective bargaining agreements. We believe we have good relationships with our employees.

## RISK FACTORS

All of the services offered by our cable systems face a wide range of competition that could adversely affect our future results of operations.

Our cable systems compete with a number of different sources that provide news, information and entertainment programming to consumers. We compete directly with other program distributors, including satellite companies, telephone companies, companies that build competing cable systems in the same communities we serve, and companies that offer programming and other communications services to our subscribers and potential subscribers. Some local telephone companies provide, or have announced plans to provide, video services within and outside their telephone service areas. Additionally, we are subject to competition from telecommunications providers and ISPs in connection with offerings of new and advanced services, including telecommunications and Internet services. This competition may materially adversely affect our business and operations in the future.

Programming costs are increasing, which could adversely affect our future results of operations.

Programming costs are expected to continue to be our largest single expense item in the foreseeable future. In recent years, the cable and satellite video industries have experienced a rapid increase in the cost of programming. If we are unable to raise our subscribers' rates or offset such programming cost increases through the sale of additional services, this could have an adverse impact on our operating results. In addition, as we upgrade the channel capacity of our systems and add programming to our basic, expanded basic and digital programming services, we may face increased programming costs that, in conjunction with the additional pricing constraints, may reduce operating margins. However, we do expect additional volume discounts associated with our future growth in subscribers receiving such programming channels.

We also expect to be subject to increasing demands by broadcasters in exchange for their required consent for the retransmission of broadcast programming to our subscribers. We cannot predict the impact of these demands or the effect on our business and operations should we fail to obtain the required consents.

We are subject to regulation by federal, state and local governments, which may impose costs and restrictions.

Federal, state and local governments extensively regulate the cable industry and the circuit-switched phone services industry and may begin regulating the Internet services industry. We expect that legislative enactments, court actions and regulatory proceedings will continue to clarify and in some cases change the rights and obligations of cable companies and other entities under the Communications Act and other laws, possibly in ways that we have not foreseen. The results of these legislative, judicial and administrative actions may materially affect our business operations. Local authorities grant us franchises that permit us to operate our cable systems. We have to renew or renegotiate these franchises from time to time. Local franchising authorities often demand concessions or other commitments as a condition to renewal or transfer, and such concessions or other commitments could be costly to us in the future.

We may face increased competition because of technological advances and new regulatory requirements, which could adversely affect our future results of operations.

Numerous companies, including telephone companies, have introduced DSL technology, which provides Internet access to subscribers at data transmission speeds substantially greater than that of conventional analog modems. We expect other advances in communications technology, as well as changes in the marketplace, to occur in the future. Other new technologies and services may develop and may compete with services that cable systems offer, including video services. The success of these ongoing and future developments could have an adverse effect on our business operations. Moreover, in recent years, Congress has enacted legislation and the FCC has adopted regulatory policies intended to provide a favorable operating environment for existing competitors and for potential new competitors to our cable systems.

13

We face risks arising from the outcome of various litigation matters, including litigation associated with our acquisition of AT&T's Broadband operations.

We are involved in various litigation matters, including those arising in the ordinary course of business and those described under the caption "Legal Proceedings" in Item 3 to this Annual Report. Among these matters is litigation associated with our acquisition of AT&T's Broadband operations and for which AT&T controls the defense of the litigation. While we do not believe that any of these litigation matters alone or in the aggregate, will have a material adverse effect on our consolidated financial position, an adverse outcome in one or more of these matters could be material to our consolidated results of operations for any one period. Further, no assurance can be given that any adverse outcome would not be material to our consolidated financial position.

Our Chairman and CEO has considerable influence over our operations.

Brian L. Roberts has significant control over our operations through his beneficial ownership of all of the outstanding shares of our Class B common stock, which have a nondilutable $33^1/3\%$ of the combined voting power of our common stock and separate approval rights over certain material transactions involving us.

ITEM 2    PROPERTIES

Cable

A central receiving apparatus, distribution cables, servers, customer premises equipment, customer service call centers and local business offices are the principal physical assets of a cable system. We own or lease the receiving and distribution equipment of each system and own or lease parcels of real property for the receiving sites, customer service call centers and local business offices.

Content

Television studios and business offices are the principal physical assets of our content operations. We own or lease the television studios and business offices of our content operations.

Other

Two large, multi-purpose arenas that we own are the principal physical assets of our other operations.

We believe that substantially all of our physical assets are in good operating condition.

ITEM 3    LEGAL PROCEEDINGS

At Home

Litigation has been filed against us as a result of our alleged conduct with respect to our investment in and distribution relationship with At Home Corporation. At Home was a provider of high-speed Internet services that filed for bankruptcy protection in September 2001. Filed actions are: (i) class action lawsuits against us, Brian L. Roberts (our Chairman and Chief Executive Officer and a director), AT&T (the former controlling shareholder of At Home and also a former distributor of the At Home service) and others in the Superior Court of San Mateo County, California, alleging breaches of fiduciary duty in connection with transactions agreed to in March 2000 among At Home, AT&T, Cox Communications, Inc. (Cox is also an investor in At Home and a former distributor of the At Home service) and us; (ii) class action lawsuits against us, AT&T and others in the United States District Court for the Southern District of New York, alleging securities law violations and common law fraud in connection with disclosures made by At Home in 2001; (iii) a lawsuit brought in the United States District Court for the District of Delaware in the name of At Home by certain At Home bondholders against us, Brian L. Roberts, Cox and others, alleging breaches of fiduciary duty relating to the March 2000 transactions and seeking recovery of alleged short-swing profits of at least $600 million, pursuant to Section 16(b) of the Securities Exchange Act of 1934, as amended ("the 1934 Act"), purported to have arisen in connection with certain transactions relating to At Home stock, effected pursuant to the March 2000 agreements; and (iv) a lawsuit brought in the United States Bankruptcy Court for the Northern District of California by certain At Home bondholders against us, AT&T, AT&T Credit Holdings, Inc. and AT&T Wireless Services, Inc., seeking to avoid and recover certain alleged "preference" payments in excess of $89 million, allegedly made to the defendants prior to the At Home bankruptcy filing.

The actions in San Mateo County, California (item (i) above), have been stayed by the United States Bankruptcy Court for the Northern District of California, the court in which At Home filed for bankruptcy, as violating the automatic bankruptcy stay. The decision to stay the actions was affirmed by the District Court, and an appeal to the Court of Appeals for the Ninth Circuit is

14

pending. In the Southern District of New York actions (item (ii) above), the court has dismissed the common law fraud claims against all defendants, leaving only the securities law claims. In a subsequent decision, the court limited the remaining claims against us and Mr. Roberts to disclosures that are alleged to have been made by At Home prior to August 28, 2000. Plaintiffs' motion for class certification is pending. The Delaware case (item (iii) above) was transferred to the United States District Court for the Southern District of New York. The court dismissed the Section 16(b) claims against us for failure to state a claim and the breach of fiduciary duty claim for lack of federal jurisdiction. The plaintiffs have appealed the decision dismissing the Section 16 (b) claims. They may also recommence the breach of fiduciary duty claim depending on the outcome of the Santa Clara, California, state court action against AT&T (described in item (i) below). In the meantime, we have entered into an agreement with plaintiffs tolling the statute of limitations for the breach of fiduciary duty claim. In the action in the United States Bankruptcy Court for the Northern District of California (item (iv) above), the parties filed a stipulation in January 2004, staying the case (on account of other pending litigation relating to the At Home bankruptcy) until such time as either party elects to resume the case.

Under the terms of the Broadband acquisition, we are contractually liable for 50% of any liabilities of AT&T relating to certain At Home litigation. For litigation in which we are contractually liable for 50% of any liabilities, AT&T will be liable for the other 50%. In addition to the actions against AT&T described in items (i), (ii) and (iv) above, (in which we are also a defendant), such litigation matters may also include two additional actions brought by At Home's bondholders' liquidating trust against AT&T (and not naming us): (i) a lawsuit filed against AT&T and certain of its senior officers in Santa Clara, California, state court alleging various breaches of fiduciary duties, misappropriation of trade secrets and other causes of action in connection with the transactions and prior and subsequent alleged conduct on the part of the defendants, and (ii) an action filed against AT&T in the District Court for the Northern District of California, alleging that AT&T infringes an At Home patent by using its broadband distribution and high-speed Internet backbone networks and equipment. Discovery in the Santa Clara action is nearly complete and trial is scheduled for May 2005. The action in the District Court for the Northern District of California is in the discovery stage.

We deny any wrongdoing in connection with the claims that have been made directly against us, our subsidiaries and Brian L. Roberts, and are defending all of these claims vigorously. The final disposition of these claims and the final resolution of our share (if any) of the AT&T At Home potential liabilities are not expected to have a material adverse effect on our consolidated financial position but could possibly be material to our consolidated results of operations of any one period. Further, no assurance can be given that any adverse outcome would not be material to our consolidated financial position.

AT&T—Wireless and Common Stock Cases

Under the terms of the Broadband acquisition, we are potentially responsible for a portion of the liabilities arising from two purported securities class action lawsuits brought against AT&T and others and consolidated for pre-trial purposes in the United States District Court for the District of New Jersey. These lawsuits assert claims under Section 11 and Section 12(a)(2) of the Securities Act of 1933, as amended, and Section 10(b) of the 1934 Act.

The first lawsuit, for which our portion of any loss is up to 15%, alleges, among other things, that AT&T made material misstatements and omissions in the Registration Statement and Prospectus for the AT&T Wireless initial public offering ("Wireless Case"). In March 2004, the plaintiffs, and AT&T and the other defendants, moved for summary judgment in the Wireless Case. The New Jersey District Court denied the motions and the Judicial Panel on Multidistrict Litigation remanded the cases for trial to the United States District Court for the Southern District of New York, where they had originally been brought. No trial date has been set. We and AT&T believe that AT&T has meritorious defenses in the Wireless Case, and it is being vigorously defended.

The second lawsuit, for which our portion of any loss is 50%, alleges, among other things, that AT&T knowingly provided false projections relating to AT&T common stock ("Common Stock Case"). In October 2004, the plaintiffs, and AT&T and the other defendants, agreed to settle the Common Stock Case for $100 million, which was preliminarily approved by the court. We expect final approval of the settlement by the court in the second quarter of 2005. We have agreed to pay $50 million of the settlement amount.

In November 2004, AT&T brought suit against the D&O insurers in Delaware Superior Court, seeking a declaration of coverage and damages in the At Home cases, the Wireless Case and the Common Stock Case. This litigation is in its very early stages.

AT&T—TCI

In June 1998, the first of a number of purported class action lawsuits was filed by then-shareholders of Tele-Communications, Inc. ("TCI") Series A TCI Group Common Stock ("Common A") against AT&T and the directors of TCI relating to the acquisition of TCI by AT&T. A consolidated amended complaint combining the various different actions was filed in February 1999 in the Delaware Court of Chancery. The consolidated amended complaint alleges that former members of the TCI board of directors

breached their fiduciary duties to Common A shareholders by agreeing to transaction terms whereby holders of the Series B TCI Group Common Stock received a 10% premium over what Common A shareholders received in connection with the transaction. The complaint further alleges that AT&T aided and abetted the TCI directors' breach of their fiduciary duties.

15

In connection with the TCI acquisition, which was completed in early 1999, AT&T agreed under certain circumstances to indemnify TCI's former directors for certain losses, expenses, claims or liabilities, potentially including those incurred in connection with this action. In connection with the Broadband acquisition, we agreed to indemnify AT&T for certain losses, expenses, claims or liabilities. Those losses and expenses potentially include those incurred by AT&T in connection with this action, both as a defendant and in connection with any obligation that AT&T may have to indemnify the former TCI directors for liabilities incurred as a result of the claims against them.

In July 2003, the Delaware Court of Chancery granted AT&T's motion to dismiss on the ground that the complaint failed to adequately plead AT&T's "knowing participation," as required to state a claim for aiding and abetting a breach of fiduciary duty. The other claims made in the complaint remain outstanding. Fact discovery in this matter is now closed. The former TCI director defendants anticipate filing a motion for summary judgment in February 2005. No trial date has been set.

The final disposition of these claims is not expected to have a material adverse effect on our consolidated financial position but could possibly be material to our consolidated results of operations of any one period. Further, no assurance can be given that any adverse outcome would not be material to our consolidated financial position.

Acacia

In June 2004, Acacia Media Technologies Corporation ("Acacia") filed a lawsuit against us and others in the United States District Court for the Northern District of California. The complaint alleges infringement of certain United States patents that allegedly relate to systems and methods for transmitting and/or receiving digital audio and video content. The complaint seeks injunctive relief and damages in an unspecified amount. In the event that a Court ultimately determines that we infringe on any of the patents, we may be subject to substantial damages, which may include treble damages and/or an injunction that could require us to materially modify certain products and services that we currently offer to subscribers. We believe that the claims are without merit and intend to defend the action vigorously.

The final disposition of this claim is not expected to have a material adverse effect on our consolidated financial position but could possibly be material to our consolidated results of operations of any one period. Further, no assurance can be given that any adverse outcome would not be material to our consolidated financial position.

Liberty Digital

In January 2003, Liberty Digital, Inc. filed a complaint in Colorado state court against us. The complaint alleged that we breached a 1997 Contribution Agreement with Liberty Digital and that we tortiously interfered with that agreement. The complaint alleged that this agreement obligated us to pay fees to Liberty Digital totaling $18 million (increasing at CPI) per year through 2017. Liberty Digital sought, among other things, compensatory damages, specific performance of the agreement, a declaration that the agreement is valid and enforceable going forward, and an unspecified amount of exemplary damages from us based on the alleged intentional interference claim.

In July 2004, we entered into an exchange agreement with Liberty (the parent company of Liberty Digital). The transactions closed in July 2004 and resolved all claims in the litigation.

Other

We are subject to other legal proceedings and claims that arise in the ordinary course of our business. The amount of ultimate liability with respect to such actions is not expected to materially affect our financial position, results of operations or liquidity.

16

ITEM 4   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

 Not applicable.


ITEM 4A EXECUTIVE OFFICERS OF THE REGISTRANT

 Except for our Chairman and CEO (who continues in these offices unless and until removed), the term of office of each of our officers continues until his or her successor is selected and qualified, or until his or her earlier death, resignation or removal. The following table sets forth information concerning our executive officers, including their ages, positions and tenure as of December 31, 2004:

| Name | Age | Officer Since | Position with Comcast |
|------|-----|--------------|-----------------------|
| Brian L. Roberts | 45 | 1986 | Chairman and CEO; Director |
| Ralph J. Roberts | 84 | 1969 | Chairman of the Executive and Finance Committee of the Board of Directors; Director |
| John R. Alchin | 56 | 1990 | Executive Vice President; Co-Chief Financial Officer; Treasurer |
| Stephen B. Burke | 46 | 1998 | Executive Vice President; Chief Operating Officer; President, Comcast Cable |
| David L. Cohen | 49 | 2002 | Executive Vice President |
| Lawrence S. Smith | 57 | 1988 | Executive Vice President; Co-Chief Financial Officer |
| Arthur R. Block | 49 | 1993 | Senior Vice President; General Counsel; Secretary |
| Lawrence J. Salva | 48 | 2000 | Senior Vice President; Chief Accounting Officer; Controller |

*Brian L. Roberts* has served as a director and as our President and Chief Executive Officer since November 2002 and our Chairman of the Board since May 2004. Prior to November 2002, Mr. Roberts served as a director and President of Comcast Holdings Corporation (our immediate predecessor and now a subsidiary) for more than five years. As of December 31, 2004, Mr. Roberts had sole voting power over approximately $33^{1}/_{3}\%$ of the combined voting power of our two classes of voting common stock. He is a son of Mr. Ralph J. Roberts. Mr. Roberts is also a director of Comcast Holdings and The Bank of New York Company, Inc.

*Ralph J. Roberts* has served as a director and as our Chairman of the Executive and Finance Committee of the Board of Directors since November 2002. Prior to November 2002, Mr. Roberts served as a director and Chairman of the Board of Directors of Comcast Holdings for more than five years. He is the father of Mr. Brian L. Roberts.

*John R. Alchin* has served as our Executive Vice President, Co-Chief Financial Officer and Treasurer since November 2002. Prior to November 2002, Mr. Alchin served as an Executive Vice President and Treasurer of Comcast Holdings since January 2000. Mr. Alchin is also a director of BNY Capital Markets, Inc.

*Stephen B. Burke* has served as our Chief Operating Officer since July 2004, and as our Executive Vice President and President of Comcast Cable and Comcast Cable Communications Holdings since November 2002. Prior to November 2002, Mr. Burke served as an Executive Vice President of Comcast Holdings and as President of Comcast Cable since January 2000. Mr. Burke is also a director of JPMorgan Chase & Company.

*David L. Cohen* has served as our Executive Vice President since November 2002. Mr. Cohen joined Comcast Holdings in July 2002 as an Executive Vice President. Prior to that time, he was partner in, and Chairman of, the law firm of Ballard Spahr Andrews & Ingersoll, LLP for more than five years. Mr. Cohen is also a director of Comcast Holdings.

*Lawrence S. Smith* has served as our Executive Vice President and Co-Chief Financial Officer since November 2002. Prior to November 2002, Mr. Smith served as an Executive Vice President of Comcast Holdings for more than five years. Mr. Smith is also a director of Comcast Holdings and Air Products and Chemicals, Inc.

*Arthur R. Block* has served as our Senior Vice President, General Counsel and Secretary since November 2002. Prior to

November 2002, Mr. Block served as General Counsel of Comcast Holdings since June 2000 and as Senior Vice President of Comcast Holdings since January 2000. Mr. Block is also a director of Comcast Holdings.

*Lawrence J. Salva* has served as our Senior Vice President and Controller since November 2002 and as Chief Accounting Officer since May 2004. Mr. Salva joined Comcast Holdings in January 2000 as Senior Vice President and Chief Accounting Officer.

17

PART II

ITEM 5   MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our Class A common stock is included on Nasdaq under the symbol CMCSA and our Class A Special common stock is included on Nasdaq under the symbol CMCSK. There is no established public trading market for our Class B common stock. Our Class B common stock can be converted, on a share for share basis, into Class A or Class A Special common stock. The following table sets forth, for the indicated periods, the closing price range of our Class A and Class A Special common stock, as furnished by Nasdaq.

| | Class A | | Class A Special | |
|---|---|---|---|---|
| | High | Low | High | Low |
| **2004** | | | | |
| First Quarter | $ 36.13 | $ 28.00 | $ 35.10 | $ 27.05 |
| Second Quarter | 30.66 | 27.63 | 29.70 | 26.67 |
| Third Quarter | 28.75 | 26.48 | 28.13 | 26.18 |
| Fourth Quarter | 33.28 | 27.84 | 32.84 | 27.50 |
| **2003** | | | | |
| First Quarter | $ 30.80 | $ 24.47 | $ 29.33 | $ 23.57 |
| Second Quarter | 34.54 | 28.65 | 32.60 | 27.50 |
| Third Quarter | 32.95 | 28.52 | 31.72 | 27.15 |
| Fourth Quarter | 33.87 | 30.76 | 32.49 | 29.47 |

We do not intend to pay dividends on our Class A, Class A Special or Class B common stock for the foreseeable future.

Holders of our Class A common stock in the aggregate hold $66^{2}/3$% of the aggregate voting power of our capital stock. The number of votes that each share of our Class A common stock will have at any given time will depend on the number of shares of Class A common stock and Class B common stock then outstanding. Holders of shares of our Class A Special common stock cannot vote in the election of directors or otherwise, except where class voting is required by law. In that case, holders of our Class A Special common stock will have the same number of votes per share as each share of Class A common stock. Our Class B common stock has a $33^{1}/3$% nondilutable voting interest and each share of Class B common stock has 15 votes per share. Mr. Brian L. Roberts beneficially owns all outstanding shares of our Class B common stock. Generally, including as to the election of directors, holders of Class A common stock and Class B common stock vote as one class except where class voting is required by law.

As of December 31, 2004, there were 1,095,080 record holders of our Class A common stock, 2,530 record holders of our Class A Special common stock and three record holders of our Class B common stock.

A summary of our repurchases, totalling approximately $1.3 billion, during 2004 under our Board-authorized $2 billion repurchase program is as follows:

| Period | Total Number of Shares Purchased | Average Price per Share | Total Number of Shares Purchased as Part of Publicly Announced Program | Total Dollars Purchased Under the Program | Maximum Dollar Value of Shares that May Yet Be Purchased Under the Program |
|---|---|---|---|---|---|
| 1Q04 | 845,212 | $ 32.75 | 730,500 | $ 24,081,628 | $ 1,949,999,018 |
| 2Q04 | 18,548,102 | 28.11 | 17,772,535 | $ 499,411,832 | $ 1,450,587,186 |
| 3Q04 | 19,802,075 | 27.35 | 18,363,200 | $ 501,514,629 | $ 949,072,557 |
| October 1-31, 2004 | 1,801,216 | 28.73 | 1,800,000 | $ 51,718,889 | $ 897,353,668 |
| November 1-30, 2004 | 2,872,071 | 29.09 | 2,538,000 | $ 73,813,980 | $ 823,539,688 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| December 1-31, 2004 | 6,236,389 | $ | 30.93 | 5,730,000 | $ | 177,464,221 | $ | 646,075,467 |
| Total 4Q04 | 10,909,676 | $ | 30.08 | 10,068,000 | $ | 302,997,090 | $ | 646,075,467 |
| Total 2004 | 50,105,065 | $ | 28.32 | 46,934,235 | $ | 1,328,005,179 | $ | 646,075,467 |

The total number of shares purchased during 2004 includes 3,170,830 shares received in the administration of employee equity compensation plans.

18

ITEM 6    SELECTED FINANCIAL DATA

(Dollars in millions, except per share data)
Year Ended December 31,

| | 2004[1] | 2003[1] | 2002[1] | 2001 | 2000 |
|---|---|---|---|---|---|
| **Statement of Operations Data:** | | | | | |
| Revenues | $ 20,307 | $ 18,348 | $ 8,102 | $ 5,937 | $ 4,836 |
| Operating income (loss) | 2,908 | 1,954 | 921 | (1,325) | (654) |
| Income (loss) from continuing operations before cumulative effect of accounting change | 970 | (218) | (469) | 4 | 1,873 |
| Discontinued operations[2] | — | 3,458 | 195 | 220 | 148 |
| Cumulative effect of accounting change[3] | — | — | — | 385 | — |
| Net income (loss) | 970 | 3,240 | (274) | 609 | 2,021 |
| **Basic earnings (loss) for common stockholders per common share** | | | | | |
| Income (loss) from continuing operations before cumulative effect of accounting change | $ 0.43 | $ (0.10) | $ (0.42) | $ 0.00 | $ 2.08 |
| Discontinued operations[2] | — | 1.54 | 0.17 | 0.24 | 0.16 |
| Cumulative effect of accounting change[3] | — | — | — | 0.40 | — |
| Net income (loss) | $ 0.43 | $ 1.44 | $ (0.25) | $ 0.64 | $ 2.24 |
| **Diluted earnings (loss) for common stockholders per common share** | | | | | |
| Income (loss) from continuing operations before cumulative effect of accounting change | $ 0.43 | $ (0.10) | $ (0.42) | $ 0.00 | $ 1.97 |
| Discontinued operations[2] | — | 1.54 | 0.17 | 0.23 | 0.16 |
| Cumulative effect of accounting change[3] | — | — | — | 0.40 | — |
| Net income (loss) | $ 0.43 | $ 1.44 | $ (0.25) | $ 0.63 | $ 2.13 |
| **Balance Sheet Data (at year end):** | | | | | |
| Total assets | $ 104,694 | $ 109,159 | $ 113,128 | $ 38,261 | $ 35,874 |
| Long-term debt | 20,093 | 23,835 | 27,956 | 11,679 | 10,215 |
| Stockholders' equity | 41,422 | 41,662 | 38,329 | 14,473 | 14,086 |
| **Statement of Cash Flows Data** | | | | | |
| Net cash provided by (used in): | | | | | |
| Operating activities from continuing operations | $ 5,930 | $ 2,854 | $ 2,421 | $ 1,169 | $ 907 |
| Financing activities from continuing operations | (2,516) | (7,048) | (1,005) | 1,651 | (171) |
| Investing activities from continuing operations | (4,512) | 5,239 | (1,125) | (3,150) | (1,044) |

[1]    Refer to *Management's Discussion and Analysis of Financial Condition and Results of Operations* in Item 7 of this Annual Report for a discussion of events that affect the comparability of the information reflected in this financial data.

[2]    In September 2003, we sold our interest in QVC to Liberty Media Corporation. QVC is presented as a discontinued operation for the years ended on and before December 31, 2003 (see *Note 5* to our consolidated financial statements in Item 8 of this Annual Report).

[3]    In 2001, we recognized as income a cumulative effect of accounting change upon adoption of Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities."

19

ITEM 7   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### OVERVIEW

We are principally involved in the management and operation of broadband communications networks (our cable segment) and in the management of programming content that is distributed over national cable television networks (our content segment). In 2004, we received over 95% of our revenue from our cable segment, primarily through monthly subscriptions to our video, high-speed Internet and phone services, as well as from advertising. Subscribers typically pay us monthly, based on rates and related charges that vary according to their chosen level of service and the type of equipment they use. Revenue from our content segment is derived from the sale of advertising time and affiliation agreements with cable and satellite television companies. We have several competitors in each aspect of our businesses, including satellite providers, DSL providers, telephone companies and broadcast networks.

Highlights for the year 2004 include the following:

- Revenue growth of 10.4% in our cable segment compared to the year 2003, driven by continued subscriber growth in our digital cable and high-speed Internet services and rate increases in our video services. Our subscriber growth is attributable to new and improved products and advanced services in our digital cable and high-speed Internet services. These include video on demand ("VOD" or "On Demand"), high-definition television ("HDTV") programming and digital video recorders ("DVR"s) in our video services and a fast and reliable network, enhanced Internet portal, video mail and additional content in our high-speed Internet services;

- Operating income before depreciation and amortization growth of 17.6% in our cable segment compared to the year 2003, resulting from our revenue growth, efficiencies achieved and volume-related savings based on our size;

- Substantial completion of our cable systems upgrade;

- Investment in and long-term access to technology platforms and national fiber-optic networks that allow us to control the development, delivery and quality of our digital and advanced services for our video, high-speed Internet and phone services; and

- Repurchases of approximately 46.9 million shares of our Class A Special common stock for aggregate consideration of $1.328 billion pursuant to our Board authorized repurchase program.

The following discussion provides the details of these highlights and insights into our consolidated financial statements, including business developments, critical accounting judgments and estimates used in preparing the financial statements, and discussions of our results of operations, liquidity and capital resources.

### BUSINESS DEVELOPMENTS

We operate our businesses in an increasingly competitive, highly regulated and technologically complex environment. We are the largest video, broadband high-speed Internet and cable phone service provider in the United States. We have substantially completed the upgrade of our broadband communications networks, allowing us to provide customers with new and improved products and advanced services in our video, high-speed Internet and phone services. We also have expanded the ownership and management of our content businesses on national, regional and local levels.

Cable

On November 18, 2002, we completed the acquisition of AT&T Corp.'s broadband business, which we refer to as "Broadband" and "the Broadband acquisition." The Broadband acquisition substantially increased the size of our cable operations and caused significant changes in our capital structure, including a substantially higher amount of debt. As a result, direct comparisons of our results of operations for periods prior to November 18, 2002, to subsequent periods are not meaningful.

During 2004, we expanded our efforts to acquire and develop technology that will drive product differentiation and new applications and extend our nationwide fiber-optic network. We achieved these objectives in 2004 through strategic agreements signed with Gemstar-TV Guide and Microsoft, which enable us to control and develop the enhancement of the user interface and

the functionality of our service offerings, such as our interactive programming guide and our VOD and DVR service. In addition, we and Gemstar formed an entity to develop and enhance interactive programming guides. In December 2004, we also announced a long-term agreement with Level 3 Communications that is part of the extension of our fiber-optic network. This national network, or "backbone," provides a technically-advanced, nationwide broadband network over which we can deliver new and enhanced services.

Content

On May 10, 2004, we completed the acquisition of TechTV Inc. ("TechTV") for approximately $300 million in cash. On May 28, 2004, G4 and TechTV began operating as one network that is available to approximately 47 million cable and satellite homes nationwide as of December 31, 2004, and provides video and computer game-related programming.

20

On July 28, 2004, we exchanged approximately 120 million shares of Liberty Media Corporation ("Liberty") Series A common stock that we held with Liberty for cash of $547 million, an additional 10.4% interest in E! Entertainment Television ("E! Entertainment") and 100% of International Channel Networks, a cultural and heritage-related national cable network that is available to approximately 10 million cable homes nationwide as of December 31, 2004.

QVC

On September 17, 2003, we completed the sale to Liberty of our approximate 57% interest in QVC, Inc. for approximately $7.7 billion. We received from Liberty $4.0 billion of three-year senior unsecured floating rate notes, approximately 218 million shares of Liberty Series A common stock valued at $2.339 billion, and cash of $1.35 billion. QVC is presented as a discontinued operation in our consolidated financial statements.

Refer to *General Developments of Our Business* in Part I and *Note 5* to our consolidated financial statements included in Item 8 for a discussion of our acquisitions and other significant events.

CRITICAL ACCOUNTING JUDGMENTS AND ESTIMATES

We believe our judgments and related estimates associated with the valuation and impairment testing of our cable franchise rights and the accounting for income taxes and legal contingencies are critical in the preparation of our financial statements. Management has discussed the development and selection of these critical accounting judgments and estimates with the Audit Committee of our Board of Directors, and the Audit Committee has reviewed our disclosures relating to them presented below.

Valuation and Impairment Testing of Cable Franchise Rights

Our cable systems are constructed and operated under non-exclusive franchises granted by state or local governmental authorities for varying lengths of time. As of December 31, 2004, we served approximately 4,500 franchise areas in the United States. We have concluded that our cable franchise rights have an indefinite useful life since there are no legal, regulatory, contractual, competitive, economic or other factors limiting the period over which these rights will contribute to our cash flows. Accordingly, our cable franchise rights are not subject to amortization but are assessed periodically for impairment in accordance with Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142").

We have acquired these cable franchise rights either directly from local franchise authorities or through many separate cable system acquisitions that include multiple franchise territories. Upon acquisition, we integrate the individual franchise territories into our national footprint, typically by incorporating the management of those territories into our existing geographic regions. We control the sourcing of content, pricing, marketing and branding, and capital deployment throughout the company as if our cable franchise rights were a single asset. Therefore, we have concluded that we operate our cable franchise rights as a single asset within our cable segment. From time to time, however, certain cable franchise rights may be separated and sold in units below the cable segment level. We have concluded that Emerging Issues Task Force 02-07, "Unit of Accounting for Testing Impairment of Indefinite-Lived Intangible Assets," supports the testing of our cable franchise rights for impairment at a level no higher than where the assets are both operated together and essentially inseparable. Upon the adoption of SFAS No. 142 in 2002, we tested our cable franchise rights for impairment at the cable segment level. Effective in the first quarter of 2004, we changed the unit of accounting used for testing impairment to geographic regions.

We assess the recoverability of our cable franchise rights annually or more frequently whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. We estimate the fair value of our cable franchise rights primarily based on multiples of operating income before depreciation and amortization generated by the underlying assets, discounted cash flow analyses, analyses of current market transactions, and profitability information, including estimated future operating results, trends or other determinants of fair value. If the value of our cable franchise rights determined by these evaluations is less than its carrying amount, an impairment charge would be recognized for the difference between the estimated fair value and the carrying value of the assets. Future adverse changes in market conditions or in the operating results of the related business may indicate an inability to recover the carrying value of the assets, thereby possibly requiring a future impairment charge.

The carrying amount of cable franchise rights related to some of our historical cable systems is significantly less than their current estimated fair value largely because we acquired many of these rights directly from local franchise authorities rather than through separate cable system acquisitions. Conversely, the carrying amount of cable franchise rights for our more recent cable system acquisitions has not been significantly reduced through amortization (and has not been reduced at all for acquisitions made subsequent to the adoption of SFAS No. 142). Nevertheless, testing for impairment at a level higher than the individual franchise

agreement or cable system level reduces the likelihood of a future impairment charge related to our cable franchise rights.

Income Taxes

Our provision for income taxes is based on our current period income, changes in deferred income tax assets and liabilities, income tax rates, and tax planning opportunities available in the jurisdictions in which we operate. From time to time, we engage in transactions in which the tax consequences may be subject to some uncertainty. Examples of such transactions include business acquisitions and disposals, including like-kind exchanges, issues related to consideration paid or received in connection with

21

acquisitions, and certain financing transactions. Significant judgment is required in assessing and estimating the tax consequences of these transactions. We prepare and file tax returns based on our interpretation of tax laws and regulations and record estimates based on these judgments and interpretations.

In the normal course of business, our tax returns are subject to examination by various taxing authorities. Such examinations may result in future tax and interest assessments by these taxing authorities, and we record a liability when we believe that it is probable that we will be assessed. We adjust our estimates periodically because of ongoing examinations by and settlements with the various taxing authorities, as well as changes in tax laws, regulations and precedent. The financial statement effects of income tax uncertainties that arise in connection with business combinations and those associated with entities acquired in business combinations are discussed in *Note 2* to our consolidated financial statements included in Item 8. The consolidated tax provision of any given year includes adjustments to prior year income tax provisions that are considered appropriate and any related estimated interest. We believe that adequate accruals have been made for income taxes. Differences between the estimated and actual amounts determined upon ultimate resolution, individually or in the aggregate, are not expected to have a material adverse effect on our consolidated financial position but could possibly be material to our consolidated results of operations or cash flow of any one period.

Legal Contingencies

We are subject to legal, regulatory and other proceedings and claims that arise in the ordinary course of our business and, in certain cases, those that we assume from an acquired entity in a business combination. We record an estimated liability for those proceedings and claims arising in the ordinary course of business based upon the probable and reasonably estimable criteria contained in SFAS No. 5, "Accounting for Contingencies." For those litigation contingencies assumed in a business combination subsequent to the adoption of SFAS No. 142, we record a liability based on estimated fair value when such fair value is determinable. We review outstanding claims with internal as well as external counsel to assess probability and estimates of loss. The risk of loss is reassessed as new information becomes available and liabilities are adjusted, as appropriate. The actual cost of resolving a claim may be substantially different from the amount of the liability recorded.

Significant and Subjective Estimates

The following discussion and analysis of our results of operations and financial condition is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires us to make estimates that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and contingent liabilities. We base our judgments on historical experience and on various other assumptions that we believe are reasonable under the circumstances, the results of which form the basis for making estimates about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

Refer to *Note 2* to our consolidated financial statements included in Item 8 for a discussion of our accounting policies with respect to these and other items.

RESULTS OF CONTINUING OPERATIONS

Consolidated Operating Results

*Revenues*

Consolidated revenues for the years 2004 and 2003 increased $1.959 billion and $10.246 billion, respectively, from the previous year. Of these increases, $1.824 billion and $10.142 billion, respectively, relate to our cable segment and $159 million and $107 million, respectively, relate to our content segment, which are both discussed separately below. The remaining changes primarily relate to our other business activities, primarily Comcast-Spectacor.

*Operating, selling, general and administrative expenses*

Consolidated operating, selling, general and administrative expenses for the years 2004 and 2003 increased $820 million and $6.690 billion, respectively, from the previous year. Of these increases, $703 million and $6.590 billion, respectively, relate to our cable segment and $108 million and $63 million, respectively, relate to our content segment, both of which are discussed separately below. The remaining increases relate to our other business activities, primarily Comcast-Spectacor and corporate

activities.

*Depreciation*

The changes in depreciation expense for the years 2004 and 2003 are primarily attributable to our cable segment. The increase in our cable segment for the year 2004 compared to the previous year is principally due to the higher level of depreciation associated with capital expenditures related to our cable systems upgrade. The increase in our cable segment for the year 2003 compared to the previous year is principally due to the effects of the Broadband acquisition, as well as our increased level of capital expenditures.

22

*Amortization*

The changes in amortization expense for the years 2004 and 2003 are primarily attributable to our cable segment. The decrease in our cable segment for the year 2004 compared to the previous year relates to decreases in the amortization of our franchise-related customer relationship intangible assets. As a result of the Broadband acquisition, we recorded approximately $3.4 billion of franchise-related customer relationship intangible assets, which we are amortizing over their average estimated useful life of approximately four years. In the fourth quarter of 2003, we reduced the value of these intangible assets because we obtained updated valuation reports, which resulted in lower amortization expense. This decrease was partially offset by amortization associated with intangibles acquired in the Gemstar transaction. This decrease was also offset by our content segment, principally associated with intangibles acquired in the TechTV and Liberty exchange transactions. (See *Note 5* to our consolidated financial statements included in Item 8 for further discussion about these transactions). The increase in our cable segment for the year 2003 compared to the previous year relates principally to the effects of the Broadband acquisition.

*2003 to 2002 Historical Comparisons*

On November 18, 2002, we completed the acquisition of AT&T Corp.'s broadband business, which we refer to as "Broadband" and "the Broadband Acquisition." The Broadband acquisition substantially increased the size of our cable operations and caused significant changes in our capital structure, including a substantially higher amount of debt. As a result, direct comparisons of our consolidated results of operations for periods prior to November 18, 2002, to subsequent periods are not meaningful. Please refer to our 2003 to 2002 historical and pro forma cable segment discussion below.

*Segment Operating Results*

Operating income before depreciation and amortization is the primary basis we use to measure the operational strength and performance of our segments. Operating income before depreciation and amortization is defined as operating income before depreciation and amortization, impairment charges, if any, related to fixed and intangible assets, and gains or losses from the sale of assets, if any. As such, it eliminates the significant level of non-cash depreciation and amortization expense that results from the capital intensive nature of our businesses and from intangible assets recognized in business combinations, and it is unaffected by our capital structure or investment activities. Our management and Board of Directors use this measure in evaluating our consolidated operating performance and the operating performance of all of our operating segments. This metric is used to allocate resources and capital to our operating segments and is a significant component of our annual incentive compensation programs. We believe that this measure is also useful to investors as it is one of the bases for comparing our operating performance with other companies in our industries, although our measure may not be directly comparable to similar measures used by other companies. Because we use operating income before depreciation and amortization as the measure of our segment profit or loss, we reconcile it to operating income, the most directly comparable financial measure calculated and presented in accordance with Generally Accepted Accounting Principles ("GAAP"), in the business segment footnote to our consolidated financial statements. This measure should not be considered a substitute for operating income (loss), net income (loss), net cash provided by operating activities or other measures of performance or liquidity reported in accordance with GAAP.

All percentages are calculated based on actual amounts. Minor differences may exist due to rounding.

*Cable Segment*

The following table presents our cable segment operating results (dollars in millions):

*2004 to 2003 Historical Comparisons*

|  | | 2004 | | 2003 | | Increase (Decrease) | |
|---|---|---|---|---|---|---|---|
|  | | | | | | $ | % |
| Video | $ | 12,892 | $ | 12,096 | $ | 796 | 6.6% |
| High-speed Internet | | 3,124 | | 2,255 | | 869 | 38.5 |
| Phone | | 701 | | 801 | | (100) | (12.5) |
| Advertising sales | | 1,287 | | 1,112 | | 175 | 15.7 |
| Other | | 666 | | 620 | | 46 | 7.4 |
| Franchise fees | | 646 | | 608 | | 38 | 6.3 |

| | | | | |
|---|---|---|---|---|
| Revenues | | 19,316 | 17,492 | 1,824 | 10.4 |
| Operating expenses | | 7,170 | 6,762 | 408 | 6.0 |
| Selling, general and administrative expenses | | 4,675 | 4,380 | 295 | 6.7 |
| Operating income before depreciation and amortization | $ 7,471 | $ 6,350 | $ 1,121 | 17.6% |

23

The following tables present our subscriber and monthly average revenue statistics on both a historical and a pro forma basis. The pro forma adjustments reflect the addition of approximately 72,000 video subscribers acquired in various small acquisitions during the years presented as though the acquisitions occurred on January 1, 2003. The impact of these acquisitions on our segment operating results was not material (subscribers in thousands).

|  | Historical December 31, | | Pro forma December 31, | |
|  | 2004 | 2003 | 2004 | 2003 |
| --- | --- | --- | --- | --- |
| Video subscribers | 21,548 | 21,468 | 21,548 | 21,540 |
| High-speed Internet subscribers | 6,992 | 5,284 | 6,992 | 5,285 |
| Phone subscribers | 1,223 | 1,267 | 1,223 | 1,267 |

|  | Historical Years Ended December 31, | | Pro forma Years Ended December 31, | |
|  | 2004 | 2003 | 2004 | 2003 |
| --- | --- | --- | --- | --- |
| Monthly average video revenue per video subscriber | $ 49.87 | $ 47.11 | $ 49.89 | $ 47.01 |
| Monthly average high-speed Internet revenue per high-speed Internet subscriber | $ 42.41 | $ 42.08 | $ 42.41 | $ 42.20 |
| Monthly average phone revenue per phone subscriber | $ 46.89 | $ 49.33 | $ 46.90 | $ 49.33 |

*Revenues.*   Video revenue consists of our basic, expanded basic, premium, pay-per-view and digital cable services, as well as equipment rentals. The increase in video revenue from 2003 to 2004 is attributable to subscriber growth in our digital video service and rate increases. During 2004, we added approximately 990,000 digital subscribers. The growth in our digital cable subscribers was driven by an increase in consumer demand for new digital services and features, such as VOD, DVRs and HDTV programming, and enhancements in digital service packages. We expect continued growth in our video revenue.

The increase in high-speed Internet revenue from 2003 to 2004 is primarily due to the addition of approximately 1,708,000 high-speed Internet subscribers in 2004. The growth in high-speed Internet subscribers reflects increased consumer demand for the faster and more reliable Internet service provided over our cable networks. We expect continued growth in our high-speed Internet revenue.

The decrease in phone revenue from 2003 to 2004 is primarily a result of our focus on operating efficiencies to drive profitability in the phone business rather than focusing on subscriber growth. As a result, during 2004, our phone subscribers decreased by approximately 44,000 subscribers.

The increase in advertising sales revenue from 2003 to 2004 is primarily due to the effects of growth in regional/national advertising as a result of the continued success of our regional interconnects, a stronger local advertising market and an increase in political advertising. We expect continued growth in our advertising sales revenue.

Other revenue includes installation revenues, revenue from our regional sports and news networks, guide revenues, commissions from electronic retailing, revenue from commercial data services and revenue from other service offerings.

The increase in franchise fees collected from our cable subscribers from 2003 to 2004 is primarily attributable to the increase in our revenues upon which the fees apply.

*Operating Expenses.*   Programming expenses represent our single largest operating expense and are fees paid to license programming from cable networks that we distribute, package and sell to our video subscribers. Programming expenses are impacted by changes in programming rates, the number of subscribers and the programming packages offered to subscribers. In 2004, programming costs increased $240 million to $4.149 billion, or 6.1%, from 2003. We anticipate our programming expenses will increase in the future primarily as a result of increased costs to purchase programming and as additional programming is provided to our subscribers. We anticipate that these increases will be mitigated, to some extent, by additional volume discounts.

Other operating expenses increased $168 million, or 5.9%, from 2003, primarily driven by increases in personnel associated with the growth in our high-speed Internet and digital cable services.

*Selling, General and Administrative Expenses.*    Selling, general and administrative expenses increased $295 million from 2003, primarily driven by increases in marketing costs and the administrative costs associated with growth in our business.

*2003 to 2002 Historical Comparisons*

The following discussion of our cable segment operating results first presents a comparison of the 2003 and 2002 periods on a historical basis, which only includes the Broadband results subsequent to November 18, 2002. In order to provide additional

<div align="center">24</div>

information relating to our cable segment operating results, we also present a comparison of 2003 actual results to 2002 results on a pro forma basis.

| (Dollars in millions) | 2003 | 2002 | Increase | |
|---|---|---|---|---|
| | | | $ | % |
| Video | $ 12,096 | $ 5,516 | $ 6,580 | 119.3% |
| High-speed Internet | 2,255 | 715 | 1,540 | 215.4 |
| Phone | 801 | 127 | 674 | 530.7 |
| Advertising sales | 1,112 | 474 | 638 | 134.6 |
| Other | 620 | 275 | 345 | 125.5 |
| Franchise fees | 608 | 243 | 365 | 150.2 |
| Revenues | 17,492 | 7,350 | 10,142 | 138.0 |
| Operating expenses | 6,762 | 2,685 | 4,077 | 151.8 |
| Selling, general and administrative expenses | 4,380 | 1,867 | 2,513 | 134.6 |
| Operating income before depreciation and amortization | $ 6,350 | $ 2,798 | $ 3,552 | 126.9% |

*Revenues.*    Video revenues increased $6.580 billion from 2002 to 2003, of which $6.286 billion is attributable to the effects of the Broadband acquisition and $294 million relates to changes in rates and subscriber growth in our historical operations, driven principally by growth in digital subscribers. During 2003, we added approximately 1,033,000 digital subscribers.

The increase in high-speed Internet revenue from 2002 to 2003 is primarily due to the effects of the Broadband acquisition and growth in high-speed Internet subscribers. During 2003, we added approximately 1,692,000 high-speed Internet subscribers.

The increases in phone, advertising sales and other revenue from 2002 to 2003 are primarily attributable to the effects of the Broadband acquisition. Our historical operations prior to the Broadband acquisition did not contain significant phone revenue.

The increase in franchise fees collected from our cable subscribers from 2002 to 2003 is primarily attributable to the increase in our revenues upon which the fees apply.

*Operating Expenses.*    Programming expenses increased $2.271 billion to $3.909 billion from 2002 to 2003, primarily due to the effects of the Broadband acquisition. The increase in other operating expenses from 2002 to 2003 is primarily attributable to the effects of the Broadband acquisition, the effects of an increase in labor costs and other volume-related expenses, and, to a lesser extent, the effects of high-speed Internet subscriber growth.

*Selling, General and Administrative Expenses.*    The increase in selling, general and administrative expenses from 2002 to 2003 is primarily attributable to the effects of the Broadband acquisition.

*2003 to 2002 Pro Forma Comparisons*

Management uses pro forma data to evaluate performance when significant acquisitions or dispositions occur. Historical data reflects results of acquired businesses only after the acquisition dates, while pro forma data enhances comparability of financial information between periods by adjusting the data as if the acquisitions (or dispositions) occurred at the beginning of the prior year. Our pro forma data is only adjusted for the timing of acquisitions and does not include adjustments for costs related to integration activities, cost savings or synergies that have or may be achieved by the combined businesses. In the opinion of management, this information is not indicative of what our results would have been had we operated Broadband since January 1, 2002, nor is it indicative of our future results. The following table presents our cable segment operating results for 2002 on a pro forma basis and a reconciliation to historical and pro forma data (dollars in millions):

| | 2003 | Pro Forma 2002 | Preacquisition Broadband | As reported | 2003 to 2002 Increase/(Decrease) | |
|---|---|---|---|---|---|---|
| | | | | | $ | % |

| | | | | | | |
|---|---|---|---|---|---|---|
| Video | $ 12,096 | $ 11,460 | $ 5,944 | $ 5,516 | $ 636 | 5.5% |
| High-speed Internet | 2,255 | 1,486 | 771 | 715 | 769 | 51.7 |
| Phone | 801 | 818 | 691 | 127 | (17) | (2.2) |
| Advertising sales | 1,112 | 1,036 | 562 | 474 | 76 | 7.4 |
| Other | 620 | 667 | 392 | 275 | (47) | (7.2) |
| Franchise fees | 608 | 570 | 327 | 243 | 38 | 6.8 |
| Revenues | 17,492 | 16,037 | 8,687 | 7,350 | 1,455 | 9.1 |
| Operating expenses | 6,762 | 6,756 | 4,071 | 2,685 | 6 | (0.0) |
| Selling, general and administrative expenses | 4,380 | 4,812 | 2,945 | 1,867 | (432) | (9.0) |
| Operating income before depreciation and amortization | $ 6,350 | $ 4,469 | $ 1,671 | $ 2,798 | $ 1,881 | 42.1% |

25

The following tables present our subscriber and monthly average revenue statistics on a pro forma basis as though acquisitions during these years occurred on January 1, 2002 (subscribers in thousands).

| | December 31, | | Increase/(Decrease) | |
| --- | --- | --- | --- | --- |
| | 2003 | 2002 | | |
| Video subscribers | 21,468 | 21,327 | 141 | 0.7% |
| High-speed Internet subscribers | 5,284 | 3,620 | 1,664 | 45.9% |
| Phone subscribers | 1,267 | 1,438 | (171) | (11.9%) |

| | Years Ended December 31, | | Increase/(Decrease) | |
| --- | --- | --- | --- | --- |
| | 2003 | 2002 | | |
| Monthly average video revenue per video subscriber | $ 47.15 | $ 44.54 | $ 2.61 | 5.9% |
| Monthly average high-speed Internet revenue per high-speed Internet subscriber | $ 42.44 | $ 41.81 | $ 0.63 | 1.5% |
| Monthly average phone revenue per phone subscriber | $ 48.90 | $ 54.35 | $ (5.45) | (10.0%) |

*Revenues.*    The increase in video revenue from 2002 to 2003 is primarily due to increases in monthly average revenue per video subscriber as a result of rate increases in our traditional video service, growth in digital subscribers, and repricing and repackaging of the digital and premium channel services in the Broadband systems. During 2003, we added approximately 1,033,000 digital subscribers.

The increase in high-speed Internet revenue from 2002 to 2003 is primarily due to the addition in 2003 of approximately 1,692,000 high-speed Internet subscribers and is also due to the effects of an increase in monthly average revenue per subscriber.

The decrease in phone revenue from 2002 to 2003 is primarily a result of our focusing on operating efficiencies to drive profitability in the phone business, rather than focusing on subscriber growth. As a result, during 2003, our phone subscribers decreased by approximately 171,000 subscribers.

The increase in advertising sales revenue from 2002 to 2003 is primarily due to the effects of growth in regional/national advertising as a result of the continued success of our regional interconnects, offset by reduced growth in a soft local advertising market.

Other revenue includes revenue from our regional sports programming networks, installation revenues, guide revenues, commissions from electronic retailing and reduced revenue from other service offerings.

The increase in franchise fees collected from our cable subscribers from 2002 to 2003 is primarily attributable to the increase in our revenues upon which the fees apply.

*Operating Expenses.*    Programming expenses increased $87 million to $3.909 billion, or 2.3%, in 2003 compared to 2002, primarily because we were able to negotiate reductions in programming rates, principally in premium channels, during 2003.

Other operating expenses decreased $81 million in 2003 from 2002, primarily due to the effects of cost reductions in the integration of the Broadband systems.

*Selling, General and Administrative Expenses.*    Selling, general and administrative expenses decreased $432 million in 2003 from 2002, primarily driven by reductions in headcount and elimination of redundancies in 2003. In addition, the 2002 amounts include $425 million of acquisition and employee termination related costs recorded by Broadband.

*Content Segment*

*2004, 2003 and 2002 Historical Comparisons*

The following table presents our content segment operating results (dollars in millions):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Revenues | $ 787 | $ 628 | $ 521 |
| Operating, selling, general and administrative expenses | 522 | 414 | 351 |
| Operating income before depreciation and amortization | $ 265 | $ 214 | $ 170 |

Our content segment consists of the national networks E! Entertainment and Style Network (E! Networks), The Golf Channel, Outdoor Life Network, G4 and International Channel Networks.

*Revenues.* Our content segment revenue increased $159 million and $107 million, or 25.3% and 20.5%, for the years 2004 and 2003, respectively, compared to the previous year. The increases in 2004 and 2003 revenue reflect increases in distribution and advertising revenue for all of the networks and the 2004 acquisitions of TechTV and International Channel Networks.

26

*Operating, Selling, General and Administrative Expenses.*    Operating, selling, general and administrative expenses increased $108 million and $63 million, or 26.1% and 17.9%, for the years 2004 and 2003, respectively, compared to the previous year. Expenses increased in 2004 and 2003 as a result of higher development and marketing expenses for signature events and other original programming in all of our networks, as well as to the effects of our acquisitions of TechTV and International Channel Networks during 2004.

*Consolidated Other Income (Expense) Items*

*2004, 2003 and 2002 Historical Comparisions*

*Interest Expense.*    The decrease in interest expense for the year 2004 from 2003 is a result of our debt reduction during 2003 and 2004 and due to the effects of our interest rate risk management program. This decrease was offset somewhat by the effects of the write-off of unamortized debt issue costs to interest expense in connection with the refinancing of our previously existing revolving credit facilities and by the early redemption of a portion of the Comcast exchangeable notes. The costs during 2004 associated with the refinancing and the redemption totaled $38 million and $31 million, respectively. The decrease for 2004 from 2003 was also offset by the effects of our adoption of SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity" ("SFAS No. 150"), on July 1, 2003. As a result of the adoption of SFAS No. 150, interest expense for 2004 and 2003 includes $100 million and $53 million, respectively, of dividends on a subsidiary's preferred stock, which were classified as minority interest prior to the adoption of SFAS No. 150.

The increase in interest expense for 2003 from 2002 is due to our increased amount of debt outstanding in 2003 as a result of the Broadband acquisition.

*Investment Income (Loss), Net.*    Investment income (loss), net for the years ended December, 31, 2004, 2003 and 2002 is comprised of the following (dollars in millions):

|  | 2004 | | 2003 | | 2002 |
|---|---|---|---|---|---|
| Interest and dividend income | $ | 160 | $ | 166 | $ | 53 |
| Gains (losses) on sales and exchanges of investments, net | | 45 | | 28 | | (48) |
| Investment impairment charges | | (16) | | (72) | | (247) |
| Unrealized gains (losses) on trading securities | | 378 | | 965 | | (1,569) |
| Mark to market adjustments on derivatives related to trading securities | | (120) | | (818) | | 1,284 |
| Mark to market adjustments on derivatives and hedged items | | 25 | | (353) | | (16) |
| Investment income (loss), net | $ | 472 | $ | (84) | $ | (543) |

The investment impairment charges for 2003 and 2002 relate principally to other than temporary declines in our investment in AT&T.

We have entered into derivative financial instruments that we account for at fair value and which economically hedge the market price fluctuations in the common stock of most (as of December 31, 2004) of our investments accounted for as trading securities. The differences between the unrealized gains (losses) on trading securities and the mark-to-market adjustments on derivatives related to trading securities, as presented in the table above, result from one or more of the following:

- we did not maintain an economic hedge for our entire investment in the security during some portion or for all of the period,

- the security to which the derivative relates changed due to a corporate reorganization of the issuing company to a security with a different volatility rate,

- the issuing company paid a new or an increased dividend to the shareholders of the security, or

- the change in the time value component of the derivative value during the period.

The mark-to-market adjustments on derivatives and hedged items consist principally of the fair value adjustments related to the

derivative component of the notes exchangeable into Comcast stock. We are exposed to changes in the fair value of this derivative since the underlying shares of Comcast Class A Special common stock that we hold in treasury are carried at our historical cost and not adjusted for changes in fair value. As of December 31, 2004, approximately 8.4 million shares of Comcast Class A Special common stock collateralize the outstanding Comcast exchangeable notes.

*Equity in Net Losses of Affiliates.*    The increase in equity in net losses of affiliates from 2003 to 2004 results principally from the effects of our additional investments and changes in the net income or loss of our equity method investees.

*Other Income.*    The increase in other income from 2003 to 2004 is primarily attributable to the $250 million reduction in the estimated fair value liability associated with the AT&T securities litigation recorded as part of the Broadband acquisition and the $94 million gain recognized on the sale of our 20% interest in DHC Ventures, LLC (Discovery Health Channel). Refer to *Notes 6*

27

and *13* to our consolidated financial statements included in Item 8 for a discussion of this settlement and this sale. The increase in other income from 2002 to 2003 is primarily attributable to lease rental income related to certain assets acquired in the Broadband acquisition.

*Income Tax (Expense) Benefit.* The changes in income tax (expense) benefit are primarily the result of the effects of changes in our income (loss) from continuing operations before taxes and minority interest.

*Minority Interest.* The decrease in minority interest from 2003 to 2004 is attributable to the effects of our adoption of SFAS No. 150 on July 1, 2003, upon which we now record our subsidiary preferred dividends, previously included within minority interest, to interest expense and, to a lesser extent, to increases in the net losses of some of our less than wholly owned consolidated subsidiaries. The increase in minority interest from 2002 to 2003 is attributable to increases in the net income of our less than wholly-owned consolidated subsidiaries and to dividends recorded to minority interest related to certain subsidiaries acquired in the Broadband acquisition prior to the adoption of SFAS No. 150 on July 1, 2003.

*Discontinued operations.* Income from discontinued operations decreased from 2002 to 2003 primarily as a result of the 2003 period's including the results of QVC through August 31, while the 2002 period includes QVC's results for the full year. As a result of the sale of QVC, we recognized a $3.290 billion gain, net of approximately $2.865 billion of related income taxes.

## STOCK OPTION ACCOUNTING

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share-Based Payment" ("SFAS No. 123R"), which replaces SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS No. 123") and supercedes APB Opinion No. 25, "Accounting for Stock Issued to Employees." SFAS No. 123R requires all share-based payments to employees, including grants of employee stock options, to be recognized in the financial statements based on their fair values, beginning with the first interim or annual period after June 15, 2005, with early adoption encouraged. In addition, SFAS No. 123R will cause unrecognized expense (based on the amounts in our pro forma footnote disclosure) related to options vesting after the date of initial adoption to be recognized as a charge to results of operations over the remaining vesting period. We are required to adopt SFAS No. 123R in our third quarter of 2005, beginning July 1, 2005. Under SFAS No. 123R, we must determine the appropriate fair value model to be used for valuing share-based payments, the amortization method for compensation cost and the transition method to be used at the date of adoption. The transition alternatives include prospective and retroactive adoption methods. Under the retroactive methods, prior periods may be restated either as of the beginning of the year of adoption or for all periods presented. The prospective method requires that compensation expense be recorded for all unvested stock options and share awards at the beginning of the first quarter of adoption of SFAS No. 123R, while the retroactive methods would record compensation expense for all unvested stock options and share awards beginning with the first period restated. We are evaluating the requirements of SFAS No. 123R and we expect that the adoption of SFAS No. 123R will have a material impact on our consolidated results of operations and earnings per share. We have not determined the method of adoption or the effect of adopting SFAS No. 123R.

## LIQUIDITY AND CAPITAL RESOURCES

During 2004, we continued to strengthen our balance sheet through the repayment and refinancing of debt, and improved our liquidity through the sales or exchanges of our investments, which are more fully described below. We believe that we will be able to meet our current and long-term liquidity and capital requirements, including fixed charges, through our cash flows from operating activities, existing cash, cash equivalents and investments; through available borrowings under our existing credit facilities; and through our ability to obtain future external financing.

Operating Activities

Net cash provided by operating activities from continuing operations amounted to $5.930 billion for the year ended December 31, 2004, due principally to our operating income before depreciation and amortization, the effects of interest and income tax payments, proceeds from sales or exchanges of trading securities, and changes in operating assets and liabilities.

During 2004, we made cash payments for interest totaling $1.898 billion. We anticipate that, for the foreseeable future, our cash paid for interest will decline modestly as average debt balances decline but will remain significant. During 2004, we made cash payments for income taxes totaling $205 million, primarily as a result of state income taxes associated with our net income. Offsetting the cash payments were federal income tax refunds received during 2004 of approximately $591 million. We anticipate that our income tax payments will increase as our income increases and certain tax audits are settled.

Also contributing to the increase in our cash flow from operating activities was $680 million of proceeds received on the sale or exchange of our trading securities, including $547 million received in connection with the Liberty exchange transaction in July 2004 and $128 million received in connection with our sale of 3 million shares of Liberty International common stock in December 2004. Although the presentation of these proceeds within cash provided by operating activities is in accordance with

28

generally accepted accounting principles, these amounts are not indicative of our recurring operations, but result from sales of investments.

During 2004, the net change in our operating assets and liabilities was $331 million. The changes in operating assets and liabilities are primarily a result of $515 million in cash payments for liabilities recorded associated with the Broadband acquisition.

Financing Activities

Net cash used in financing activities from continuing operations was $2.516 billion for the year ended December 31, 2004, and consists principally of our net repayments of debt of $1.293 billion and repurchases of common stock of $1.324 billion. During the year ended December 31, 2004, our debt repayments and borrowings consisted of the following:

*Repayments*

- $867 million under senior and medium-term notes,

- $700 million under revolving credit facilities,

- $609 million of Comcast exchangeable debt and

- $147 million under capital leases and other debt instruments.

*Borrowings*

- $700 million under revolving credit facilities,

- $320 million, net under our commercial paper program and

- $10 million under other debt instruments.

We have made, and may, from time to time in the future, make optional repayments on our debt obligations, which may include open market repurchases of our outstanding public notes and debentures, depending on various factors, such as market conditions.

*Commercial Paper Program.*   In June 2004, we entered into a commercial paper program to provide a lower-cost borrowing source of liquidity to fund our short-term working capital requirements. The program allows for a maximum of $2.25 billion of commercial paper to be issued at any one time. Our revolving bank credit facility supports this program. As of December 31, 2004, amounts outstanding under the program totaled $320 million with a weighted average interest rate of 2.68%.

*Available Borrowings Under Credit Facilities.*   We have traditionally maintained significant availability under our lines of credit to meet our short-term liquidity requirements. In January 2004, we refinanced three of our existing revolving credit facilities with a new $4.5 billion, five-year revolving bank credit facility due January 2009. The interest rate for borrowings under this revolver is LIBOR plus 0.625% based on our current credit ratings. We have four lines of credit aggregating $4.872 billion and, as of December 31, 2004, amounts available under our lines of credit totaled $4.062 billion.

*The Cross-Guarantee Structure.*   We and a number of our wholly-owned subsidiaries that hold substantially all of our cable assets have unconditionally guaranteed each other's debt securities and indebtedness for borrowed money, including amounts outstanding under the $4.5 billion bank credit facility. As of December 31, 2004, $20.223 billion of our debt was included in the cross-guarantee structure.

Comcast Holdings Corporation, our immediate predecessor and now a subsidiary, is not a guarantor and none of its debt is guaranteed under the cross-guarantee structure. As of December 31, 2004, $950 million of our debt was outstanding at Comcast Holdings.

*Debt Covenants.*   We and our cable subsidiaries that have provided guarantees are subject to the covenants and restrictions set forth in the indentures governing our public debt securities and in the credit agreement governing our bank credit facilities. We and the guarantors are in compliance with the covenants and we believe that neither the covenants nor the restrictions in our indentures

or loan documents will limit our ability to operate our business or raise additional capital. The two financial covenants in our bank credit facility are tested on an ongoing basis and measure our leverage and interest coverage. We have significant headroom under these financial covenants. Future compliance with these financial covenants is not dependent on further debt reduction or on improved operating results.

   *Exchangeable Notes.*   We have outstanding notes exchangeable into the common stock of Cablevision Class A common stock, Microsoft common stock, Vodafone ADRs and Comcast Class A Special common stock (together, the "Exchangeable Notes"). At maturity the Exchangeable Notes are mandatorily redeemable at our option into (i) a number of shares of common stock or ADRs equal to the underlying shares multiplied by an exchange ratio (as defined), or (ii) its cash equivalent. The maturity value of

29

Case 2:05-cv-00443-GMS   Document 85-14   Filed 02/28/2005   Page 59 of 160
Case 2:03-cv-00888-GMS   Document 851-44   Filed 06/23/2007   Page 59 of 159

Page 58 of 159

the Exchangeable Notes varies based upon the fair market value of the security to which it is indexed. The Exchangeable Notes are collateralized by our investments in Cablevision, Microsoft and Vodafone, respectively. The Comcast exchangeable notes are collateralized by our Class A Special common stock held in treasury. We have settled and intend in the future to settle all of the Comcast exchangeable notes using cash.

During 2004 and 2003, we settled an aggregate of $847 million face amount and $638 million face amount, respectively, of our obligations relating to our notes exchangeable into Comcast stock by delivering cash to the counterparty upon maturity of the instruments, and the equity collar agreements related to the underlying shares expired or were settled. During 2004 and 2003, we settled $2.359 billion face amount and $1.213 billion face amount, respectively, of our obligations relating to our Exchangeable Notes by delivering the underlying shares of common stock to the counterparty upon maturity of the investments.

As of December 31, 2004, our debt includes an aggregate of $1.699 billion of Exchangeable Notes, including $1.645 billion within current portion of long-term debt. As of December 31, 2004, the securities we hold collateralizing the Exchangeable Notes were sufficient to substantially satisfy the debt obligations associated with the outstanding Exchangeable Notes.

*Stock Repurchases.*   During 2004, under our Board-authorized, $2 billion share repurchase program, we repurchased 46.9 million shares of our Class A Special common stock for $1.328 billion. We expect such repurchases to continue from time to time in the open market or in private transactions, subject to market conditions.

Refer to *Notes 8* and *10* to our consolidated financial statements included in Item 8 for a discussion of our financing activities.

Investing Activities

Net cash used in investing activities from continuing operations was $4.512 billion for the year ended December 31, 2004, and consists primarily of capital expenditures of $3.660 billion, additions to intangible and other noncurrent assets of $628 million and the acquisition of TechTV for approximately $300 million.

*Capital Expenditures.*   Our most significant recurring investing activity has been and is expected to continue to be capital expenditures. The following table illustrates the capital expenditures we incurred in our cable segment during 2004 and expect to incur in 2005 (dollars in millions):

|  | 2004 | 2005 |
|---|---|---|
| Deployment of cable modems, digital converters, and new service offerings | $ 2,106 | $ 2,300 |
| Upgrading of cable systems | 902 | 200 |
| Recurring capital projects | 614 | 500 |
| Total cable segment capital expenditures | $ 3,622 | $ 3,000 |

The amount of our capital expenditures for 2005 and for subsequent years will depend on numerous factors, some of which are beyond our control, including competition, changes in technology and the timing and rate of deployment of new services.

*Additions to Intangibles.*   Additions to intangibles during 2004 primarily relate to our investment in a $250 million long-term strategic license agreement with Gemstar, multiple dwelling unit contracts of approximately $133 million and other licenses and software intangibles of approximately $168 million.

*Investments.*   Proceeds from sales, settlements and restructurings of investments totaled $228 million during 2004, related to the sales of our non-strategic investments, including our 20% interest in DHC Ventures, LLC (Discovery Health Channel) for approximately $149 million. We consider investments that we determine to be non-strategic, highly-valued, or both to be a source of liquidity. We consider our investment in $1.5 billion in Time Warner common-equivalent preferred stock to be an anticipated source of liquidity.

We do not have any significant contractual funding commitments with respect to any of our investments.

Refer to *Notes 6 and 7* to our consolidated financial statements included in Item 8 for a discussion of our investments and our intangible assets, respectively.

OFF-BALANCE SHEET ARRANGEMENTS

We do not have any significant off-balance sheet arrangements that are reasonably likely to have a current or future effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources.

30

CONTRACTUAL OBLIGATIONS

Our unconditional contractual obligations as of December 31, 2004, which consist primarily of our debt obligations, and the effect such obligations are expected to have on our liquidity and cash flow in future periods, are summarized in the following table (dollars in millions):

| Contractual Obligations | Total | | Year 1 | | Years 2 – 3 | | Years 4 – 5 | | More than 5 years |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Payments Due by Period** | | | | |
| Debt obligations, excluding Exchangeable Notes[1] | $ | 21,820 | $ | 1,835 | $ | 2,390 | $ | 2,844 | $ 14,751 |
| Exchangeable Notes | | 1,699 | | 1,645 | | 54 | | — | — |
| Capital lease obligations | | 73 | | 19 | | 38 | | 9 | 7 |
| Operating lease obligations | | 987 | | 190 | | 295 | | 203 | 299 |
| Purchase obligations[2] | | 7,214 | | 2,222 | | 1,774 | | 1,159 | 2,059 |
| Other long-term liabilities reflected on the balance sheet: | | | | | | | | | |
| Acquisition related obligations[3] | | 509 | | 294 | | 172 | | 32 | 11 |
| Other long-term obligations[4] | | 3,693 | | 238 | | 312 | | 140 | 3,003 |
| Total | $ | 35,995 | $ | 6,443 | $ | 5,035 | $ | 4,387 | $ 20,130 |

Refer to *Note 8* to our consolidated financial statements included in Item 8 for a discussion of our long-term debt. Refer to *Note 13* to our consolidated financial statements for a discussion of our operating lease and purchase obligations. Refer to *Note 5* to our consolidated financial statements for a discussion of our acquisition-related obligations.

[1]   Excludes interest payments.

[2]   Purchase obligations consist of agreements to purchase goods and services that are enforceable and legally binding on us and that specify all significant terms, including fixed or minimum quantities to be purchased, price provisions and timing of the transaction. Our purchase obligations include payments under the employment agreements that we, through Comcast Spectacor, have with both players and coaches of our professional sports teams that are guaranteed regardless of employee injury or termination. Some of these agreements may be covered by disability insurance if certain conditions are met. Also included are payments under license agreements that our programming networks have entered into for programs and sporting events that will be available for telecast subsequent to December 31, 2004. Also included are the minimum guaranteed payments under programming contracts that our cable segment enters into for the purchase of programming from cable network providers. We have also included commitments to purchase cable related equipment. We did not include contracts with immaterial future commitments.

[3]   Acquisition-related obligations consist primarily of costs related to terminating employees, costs relating to exiting contractual obligations, and other assumed contractual obligations of the acquired entity.

[4]   Other long-term obligations consist principally of our prepaid forward transactions on equity securities we hold, subsidiary preferred shares, deferred compensation obligations, pension, post-retirement and post-employment benefit obligations, and program rights payable under license agreements.

Affiliation Agreements

Our content subsidiaries enter into multi-year affiliation agreements with various cable and satellite television system operators for carriage of their respective programming. In connection with these affiliation agreements, we, at times, have paid a fee to the cable or satellite television operator for the initial or renewal agreement based upon the number of subscribers. During 2005, we expect to incur fees of approximately $25 million related to these affiliation agreements, excluding amounts applicable to our cable systems.

## INTEREST RATE RISK MANAGEMENT

We are exposed to the market risk of adverse changes in interest rates. In order to manage the cost and volatility relating to our interest cost of our outstanding debt, we maintain a mix of fixed and variable rate debt and enter into various interest rate risk management derivative transactions pursuant to our policies.

We monitor our interest rate risk exposures using techniques including market value and sensitivity analyses. We do not hold or issue any derivative financial instruments for speculative purposes and are not a party to leveraged instruments.

We manage the credit risks associated with our derivative financial instruments through the evaluation and monitoring of the creditworthiness of the counterparties. Although we may be exposed to losses in the event of nonperformance by the counterparties, we do not expect such losses, if any, to be significant.

These derivative financial instruments, which can include swaps, rate locks, caps and collars, represent an integral part of our interest rate risk management program. During 2004, we decreased our interest expense by approximately $66 million through

31

this program. Our derivative financial instruments did not have a significant effect on interest expense for the years ended December 31, 2003 and 2002. However, interest rate risk management instruments may have a significant effect on our interest expense in the future.

The table set forth below summarizes the fair values and contract terms of financial instruments subject to interest rate risk maintained by us as of December 31, 2004 (dollars in millions):

| | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | Total | Fair Value at 12/31/04 |
|---|---|---|---|---|---|---|---|---|
| **Debt** | | | | | | | | |
| Fixed Rate | $ 2,547 | $ 1,690 | $ 725 | $ 1,486 | $ 1,015 | $ 14,756 | $ 22,219 | $ 25,086 |
| Average Interest Rate | 7.4% | 7.4% | 8.2% | 7.2% | 7.3% | 7.8% | 7.7% | |
| | | | | | | | | |
| Variable Rate | $ 952 | $ 7 | $ 61 | $ 10 | $ 343 | — | $ 1,373 | $ 1,373 |
| Average Interest Rate | 3.8% | 3.9% | 4.5% | 4.5% | 5.0% | — | 4.2% | |
| | | | | | | | | |
| **Interest Rate Instruments** | | | | | | | | |
| Variable to Fixed Swaps (notional amounts) | $ 488 | — | — | — | — | — | $ 488 | $ 8 |
| Average Pay Rate | 7.6% | — | — | — | — | — | 7.6% | |
| Average Receive Rate | 3.5% | — | — | — | — | — | 3.5% | |
| | | | | | | | | |
| Fixed to Variable Swaps (notional amounts) | — | $ 400 | — | $ 600 | $ 750 | $ 2,150 | $ 3,900 | $ 9 |
| Average Pay Rate | — | 6.7% | — | 7.0% | 6.8% | 5.6% | 6.1% | |
| Average Receive Rate | — | 6.4% | — | 6.2% | 6.9% | 6.0% | 6.3% | |

The notional amounts of interest rate instruments, as presented in the table above, are used to measure interest to be paid or received and do not represent the amount of exposure to credit loss. The estimated fair value approximates the proceeds necessary to settle the outstanding contracts. We estimate interest rates on variable debt using the average implied forward London Interbank Offered Rate ("LIBOR") rates for the year of maturity based on the yield curve in effect at December 31, 2004, plus the borrowing margin in effect for each credit facility at December 31, 2004. We estimate the floating rates on our swaps using the average implied forward LIBOR rates for the year of maturity based on the yield curve in effect at December 31, 2004.

Excluding the effects of interest rate risk management instruments, 5.8% of our total debt as of December 31, 2004, was at variable rates, compared to 8.2% at December 31, 2003.

As a matter of practice, we typically do not structure our financial contracts to include credit ratings-based triggers that could affect our liquidity. In the ordinary course of business, some of our swaps could be subject to termination provisions if we do not maintain investment-grade credit ratings. As of December 31, 2004, the estimated fair value of the proceeds to be received related to those swaps was immaterial. The amount due or to be received upon termination, if any, would be based upon the fair value of those outstanding contracts at that time.

EQUITY PRICE RISK MANAGEMENT

We are exposed to the market risk of changes in the equity prices of some of our investments accounted for as trading securities. We enter into various derivative transactions pursuant to our policies to manage the volatility relating to these exposures.

We monitor our equity price risk exposures to ensure that the instruments are matched with the underlying assets or liabilities, reduce our risks relating to equity prices, and through market value and sensitivity analyses, maintain a high correlation to the risk inherent in the hedged item.

We use the following derivative financial instruments, which we account for at fair value, to limit our exposure to and benefits from price fluctuations in the common stock of some of our investments accounted for as trading securities:

- Cashless collar agreements ("equity collars");

- Prepaid forward sales agreements ("prepaid forward sales");

- Indexed debt instruments ("exchangeable notes").

Except as described in *Results of Continuing Operations—Investment Income (Loss), Net* on page 27, the changes in the fair value of our investments accounted for as trading securities were substantially offset by the changes in the fair values of the equity collars and the derivative components of the exchangeable notes and the prepaid forward sales.

Refer to *Note 2* to our consolidated financial statements included in Item 8 for a discussion of our accounting policies with respect to derivative financial instruments and to *Notes 6* and *8* to our consolidated financial statements included in Item 8 for discussions of our derivative financial instruments.

32

ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

The components of accumulated other comprehensive income (loss) primarily are unrealized losses on our rate locks, offset by unrealized gains and losses on available for sale securities. Changes to these components account for the change in accumulated other comprehensive income (loss) from December 31, 2003, to December 31, 2004. Refer to *Notes 6 and 8* to our consolidated financial statements included in Item 8 for more information about these components of accumulated other comprehensive income (loss).

We believe that our operations are not materially affected by inflation.

ITEM 7A QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Refer to *Interest Rate Risk Management* on page 31 and *Equity Price Risk Management* on page 32 for a discussion of this item.

ITEM 8    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

<u>REPORT OF MANAGEMENT</u>

Management's Report on Financial Statements

Our management is responsible for the preparation, integrity and fair presentation of information in our consolidated financial statements, including estimates and judgments. The consolidated financial statements presented in this report have been prepared in accordance with accounting principles generally accepted in the United States of America. Our management believes the consolidated financial statements and other financial information included in this report fairly present, in all material respects, our financial condition, results of operations and cash flows as of and for the periods presented in this report. The consolidated financial statements have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report, which is included herein.

Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining an adequate system of internal control over financial reporting. Our system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.

Our internal control over financial reporting includes those policies and procedures that:

  •    pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect our transactions and dispositions of our assets;

  •    provide reasonable assurance that our transactions are recorded as necessary to permit preparation of our financial statements in accordance with accounting principles generally accepted in the United States of America, and that our receipts and expenditures are being made only in accordance with authorizations of our management and our directors; and

  •    provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable assurance and may not prevent or detect misstatements. Further, because of changes in conditions, effectiveness of internal controls over financial reporting may vary over time. Our system contains self monitoring mechanisms, and actions are taken to correct deficiencies as they are identified.

Our management conducted an evaluation of the effectiveness of the system of internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management concluded that our system of internal control over financial reporting was effective as of December 31, 2004. Our management's assessment of the effectiveness of our internal control over financial reporting has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report which is included herein.

Audit Committee Oversight

The Audit Committee of the Board of Directors, which is comprised solely of independent directors, has oversight responsibility for our financial reporting process and the audits of our consolidated financial statements and internal control over financial reporting. The Audit Committee meets regularly with management and with our internal auditors and independent registered public accounting firm (collectively, the "auditors") to review matters related to the quality and integrity of our financial reporting, internal control over financial reporting (including compliance matters related to our Code of Ethics and Business Conduct), and the nature, extent, and results of internal and external audits. Our auditors have full and free access and report directly to the Audit Committee. The Audit Committee recommended, and the Board of Directors approved, that the audited consolidated financial statements be included in this Annual Report on Form 10-K.

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders
Comcast Corporation
Philadelphia, Pennsylvania

We have audited the accompanying consolidated balance sheet of Comcast Corporation and subsidiaries (the "Company") as of December 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004. We also have audited management's assessment, included under the caption *Management's Report on Internal Control Over Financial Reporting*, that the Company maintained effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on these financial statements, an opinion on management's assessment, and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Comcast Corporation and subsidiaries as of December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Deloitte & Touche LLP

Philadelphia, Pennsylvania
February 21, 2005

## Consolidated Balance Sheet

**(Amounts in millions, except share data)**
December 31,

| | | 2004 | | 2003 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents | $ | 452 | $ | 1,550 |
| Investments | | 1,555 | | 2,493 |
| Accounts receivable, less allowance for doubtful accounts of $132 and $146 | | 959 | | 907 |
| Other current assets | | 569 | | 453 |
| Total current assets | | 3,535 | | 5,403 |
| INVESTMENTS | | 12,812 | | 14,818 |
| PROPERTY AND EQUIPMENT, net of accumulated depreciation of $9,416 and $6,563 | | 18,711 | | 18,473 |
| FRANCHISE RIGHTS | | 51,071 | | 51,050 |
| GOODWILL | | 14,020 | | 14,841 |
| OTHER INTANGIBLE ASSETS, net of accumulated amortization of $3,452 and $2,182 | | 3,851 | | 3,859 |
| OTHER NONCURRENT ASSETS, net | | 694 | | 715 |
| | $ | 104,694 | $ | 109,159 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Accounts payable and accrued expenses related to trade creditors | $ | 2,041 | $ | 2,355 |
| Accrued expenses and other current liabilities | | 2,735 | | 3,459 |
| Deferred income taxes | | 360 | | 679 |
| Current portion of long-term debt | | 3,499 | | 3,161 |
| Total current liabilities | | 8,635 | | 9,654 |
| LONG-TERM DEBT, less current portion | | 20,093 | | 23,835 |
| DEFERRED INCOME TAXES | | 26,815 | | 25,900 |
| OTHER NONCURRENT LIABILITIES | | 7,261 | | 7,716 |
| MINORITY INTEREST | | 468 | | 392 |
| COMMITMENTS AND CONTINGENCIES (NOTE 13) | | | | |
| **STOCKHOLDERS' EQUITY** | | | | |
| Preferred stock—authorized 20,000,000 shares; issued, zero | | — | | — |
| Class A common stock, $0.01 par value—authorized, 7,500,000,000 shares; issued, 1,603,320,864 and 1,601,161,057; outstanding, 1,359,680,364 and 1,357,520,557 | | 16 | | 16 |
| Class A Special common stock, $0.01 par value—authorized, 7,500,000,000 shares; issued 890,234,413 and 931,732,876; outstanding, 842,944,570 and 884,443,033 | | 9 | | 9 |
| Class B common stock, $0.01 par value—authorized, 75,000,000 shares; issued and outstanding, 9,444,375 | | — | | — |
| Additional capital | | 44,142 | | 44,742 |
| Retained earnings | | 4,891 | | 4,552 |
| Treasury stock, 243,640,500 Class A common shares and 47,289,843 Class A Special common shares | | (7,517) | | (7,517) |
| Accumulated other comprehensive loss | | (119) | | (140) |
| Total stockholders' equity | | 41,422 | | 41,662 |
| | $ | 104,694 | $ | 109,159 |

See notes to consolidated financial statements.

36

## Consolidated Statement of Operations

(Dollars in millions, except per share data)
Year Ended December 31,

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| REVENUES | $ 20,307 | $ 18,348 | $ 8,102 |
| COSTS AND EXPENSES | | | |
| Operating (excluding depreciation) | 7,462 | 7,041 | 3,012 |
| Selling, general and administrative | 5,314 | 4,915 | 2,254 |
| Depreciation | 3,420 | 3,166 | 1,694 |
| Amortization | 1,203 | 1,272 | 221 |
| | 17,399 | 16,394 | 7,181 |
| OPERATING INCOME | 2,908 | 1,954 | 921 |
| OTHER INCOME (EXPENSE) | | | |
| Interest expense | (1,876) | (2,018) | (870) |
| Investment income (loss), net | 472 | (84) | (543) |
| Equity in net losses of affiliates | (88) | (60) | (63) |
| Other income | 394 | 71 | 1 |
| | (1,098) | (2,091) | (1,475) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND MINORITY INTEREST | 1,810 | (137) | (554) |
| INCOME TAX (EXPENSE) BENEFIT | (826) | 16 | 128 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE MINORITY INTEREST | 984 | (121) | (426) |
| MINORITY INTEREST | (14) | (97) | (43) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | 970 | (218) | (469) |
| INCOME FROM DISCONTINUED OPERATIONS, net of tax | — | 168 | 195 |
| GAIN ON DISCONTINUED OPERATIONS, net of tax | — | 3,290 | — |
| NET INCOME (LOSS) | $ 970 | $ 3,240 | $ (274) |
| BASIC EARNINGS (LOSS) FOR COMMON STOCKHOLDERS PER COMMON SHARE | | | |
| Income (loss) from continuing operations | $ 0.43 | $ (0.10) | $ (0.42) |
| Income from discontinued operations | — | 0.08 | 0.17 |
| Gain on discontinued operations | — | 1.46 | — |
| Net income (loss) | $ 0.43 | $ 1.44 | $ (0.25) |
| DILUTED EARNINGS (LOSS) FOR COMMON STOCKHOLDERS PER COMMON SHARE | | | |
| Income (loss) from continuing operations | $ 0.43 | $ (0.10) | $ (0.42) |
| Income from discontinued operations | — | 0.08 | 0.17 |
| Gain on discontinued operations | — | 1.46 | — |
| Net income (loss) | $ 0.43 | $ 1.44 | $ (0.25) |

See notes to consolidated financial statements.

## Consolidated Statement of Cash Flows

**(Dollars in millions)**
**Year Ended December 31,**

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ 970 | $ 3,240 | $ (274) |
| Income from discontinued operations | — | (168) | (195) |
| Gain on discontinued operations | — | (3,290) | — |
| Income (loss) from continuing operations | 970 | (218) | (469) |
| Adjustments to reconcile net income (loss) from continuing operations to net cash provided by operating activities from continuing operations: | | | |
| Depreciation | 3,420 | 3,166 | 1,694 |
| Amortization | 1,203 | 1,272 | 221 |
| Non-cash interest (income) expense, net | 33 | (113) | 10 |
| Equity in net losses of affiliates | 88 | 60 | 63 |
| Losses (gains) on investments and other (income) expense, net | (678) | 145 | 604 |
| Minority interest | 14 | 45 | 43 |
| Deferred income taxes | 531 | 820 | (95) |
| Proceeds from sales of trading securities | 680 | 85 | — |
| Current tax associated with sale of discontinued operation | — | (2,028) | — |
| Change in operating assets and liabilities, net of effects of acquisitions and divestitures: | | | |
| Change in accounts receivable, net | (54) | (45) | 80 |
| Change in accounts payable and accrued expenses related to trade creditors | (315) | 35 | 220 |
| Change in other operating assets and liabilities | 38 | (370) | 50 |
| Net cash provided by operating activities from continuing operations | 5,930 | 2,854 | 2,421 |
| **FINANCING ACTIVITIES** | | | |
| Proceeds from borrowings | 1,030 | 9,398 | 8,759 |
| Retirements and repayments of debt | (2,323) | (16,465) | (9,508) |
| Proceeds from settlement of interest rate exchange agreements | — | — | 57 |
| Issuances of common stock and sales of put options on common stock | 113 | 67 | 19 |
| Repurchases of common stock and stock options held by non-employees | (1,361) | (14) | — |
| Deferred financing costs | — | (34) | (332) |
| Other financing activities | 25 | — | — |
| Net cash used in financing activities from continuing operations | (2,516) | (7,048) | (1,005) |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (3,660) | (4,161) | (1,852) |
| Proceeds from sales, settlements and restructuring of investments | 228 | 7,971 | 1,263 |
| Acquisitions, net of cash acquired | (296) | (152) | (251) |
| Additions to intangible and other noncurrent assets | (628) | (155) | (197) |
| Purchases of short-term investments, net | (13) | (32) | (21) |
| Proceeds from sales of discontinued operations and assets held for sale | — | 1,875 | — |
| Capital contributions to and purchases of investments | (156) | (202) | (67) |
| Proceeds from settlement of contract of acquired company | 26 | 95 | — |
| Other investing activities | (13) | — | — |
| Net cash (used in) provided by investing activities from continuing operations | (4,512) | 5,239 | (1,125) |
| (DECREASE) INCREASE IN CASH AND CASH EQUIVALENTS | (1,098) | 1,045 | 291 |
| CASH AND CASH EQUIVALENTS, beginning of year | 1,550 | 505 | 214 |
| CASH AND CASH EQUIVALENTS, end of year | $ 452 | $ 1,550 | $ 505 |

See notes to consolidated financial statements.

38

Consolidated Statement of Stockholders' Equity

| (Dollars in millions) | Common Stock | | | Additional Capital | Retained Earnings | Treasury Stock At Cost | Accumulated Other Comprehensive Income (Loss) | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Class A | Class A Special | Class B | | | | Unrealized Gains (Losses) | Cumulative Translation Adjustments | |
| BALANCE, JANUARY 1, 2002 | $ — | $ 9 | $ — | $ 12,688 | $ 1,632 | $ — | $ 166 | $ (22) | $ 14,473 |
| Comprehensive loss: | | | | | | | | | |
| Net loss | | | | | (274) | | | | |
| Unrealized losses on marketable securities, net of deferred taxes of $165 | | | | | | | (307) | | |
| Reclassification adjustments for losses included in net loss, net of deferred taxes of $92 | | | | | | | 169 | | |
| Unrealized losses on effective portion of cash flow hedges, net of deferred taxes of $79 | | | | | | | (146) | | |
| Cumulative translation adjustments | | | | | | | | 1 | |
| Total comprehensive loss | | | | | | | | | (557) |
| Acquisitions | 16 | | | 31,870 | | (7,517) | | | 24,369 |
| Stock compensation plans | | | | 52 | (18) | | | | 34 |
| Employee stock purchase plan | | | | 10 | | | | | 10 |
| BALANCE, DECEMBER 31, 2002 | 16 | 9 | — | 44,620 | 1,340 | (7,517) | (118) | (21) | 38,329 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | | | 3,240 | | | | |
| Unrealized losses on marketable securities, net of deferred taxes of $12 | | | | | | | (23) | | |
| Reclassification adjustments for losses included in net income, net of deferred taxes of $15 | | | | | | | 29 | | |
| Cumulative translation adjustments | | | | | | | | (7) | |
| Total comprehensive income | | | | | | | | | 3,239 |
| Stock compensation plans | | | | 117 | (28) | | | | 89 |
| Retirement of common stock | | | | (14) | | | | | (14) |
| Employee stock purchase plan | | | | 19 | | | | | 19 |
| BALANCE, DECEMBER 31, 2003 | 16 | 9 | — | 44,742 | 4,552 | (7,517) | (112) | (28) | 41,662 |
| Comprehensive income: | | | | | | | | | |
| Net income | | | | | 970 | | | | |
| Reclassification adjustments for losses included in net income, net of deferred taxes | | | | | | | 1 | | |

|  | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cumulative translation adjustments | | | | | | | | 20 |
| Total comprehensive income | | | | | | | | 991 |
| Stock compensation plans | | | | 130 | (73) | | | 57 |
| Retirement of common stock | | | | (758) | (558) | | | (1,316) |
| Employee stock purchase plan | | | | 28 | | | | 28 |
| BALANCE, DECEMBER 31, 2004 | $ 16 | $ 9 | $ — | $ 44,142 | $ 4,891 | $ (7,517) | $ (111) | $ (8) $ 41,422 |

See notes to consolidated financial statements.

39

Notes to Consolidated Financial Statements

Years Ended December 31, 2004, 2003 and 2002

1. ORGANIZATION AND BUSINESS

We are a Pennsylvania corporation and were incorporated in December 2001. Through our predecessors, we have developed, managed and operated broadband cable networks since 1963. On November 18, 2002, we, our immediate predecessor Comcast Holdings Corporation ("Comcast Holdings") and AT&T completed a transaction that resulted in Comcast Holdings' acquisition of AT&T Broadband (the "Broadband acquisition"). Upon completion of the Broadband acquisition, Comcast Holdings and Broadband are our wholly owned subsidiaries. Accordingly, the accompanying consolidated financial statements include the results of Comcast Holdings for all periods presented and the results of Broadband from the date of the Broadband acquisition (see *Note 5*).

Our cable segment is principally involved in the development, management and operation of broadband communications networks in the United States. Our consolidated cable operations served approximately 21.5 million subscribers as of December 31, 2004. Our regional sports and news networks Comcast SportsNet ("CSN"), Comcast SportsNet Mid-Atlantic ("CSN Mid-Atlantic"), Comcast SportsNet Chicago ("CSN Chicago"), Comcast SportsNet West ("CSN West"), Cable Sports Southeast ("CSS"), and CN8—The Comcast Network ("CN8") are included in our cable segment because they derive a substantial portion of their revenues from our cable operations and are managed by cable segment management.

We conduct the national networks of our content segment through our consolidated subsidiaries E! Entertainment Television ("E!"), Style Network, The Golf Channel ("TGC"), Outdoor Life Network ("OLN"), G4 and International Channel Networks.

Our other businesses consist principally of Comcast-Spectacor, our group of businesses that perform live sporting events and own or manage facilities for sporting events, concerts, and other special events, and our corporate activities.

On September 17, 2003, we sold our approximate 57% interest in QVC, Inc., which markets a wide variety of products directly to consumers primarily on merchandise-focused television programs. Accordingly, we present QVC as a discontinued operation pursuant to Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" (see *Note 5*).

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Consolidation*

The consolidated financial statements include our accounts and all entities that we directly or indirectly control. We have eliminated all significant intercompany accounts and transactions among consolidated entities.

*Variable Interest Entities*

We account for our interests in variable interest entities ("VIEs") in accordance with Financial Accounting Standards Board ("FASB") Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"), as amended by FIN 46R. We consolidate all VIEs for which we are the primary beneficiary and for which the entities do not effectively disperse risks among parties involved. We do not consolidate VIEs that effectively disperse risks unless we hold an interest or combination of interests that effectively recombines risks that were previously dispersed. We adopted the initial recognition and measurement provisions of FIN 46 effective January 1, 2002, and the provisions of FIN 46R effective March 31, 2004. The adoption of FIN 46 and FIN 46R did not have a material impact on our financial condition or results of operations.

*Our Use of Estimates*

We prepare our consolidated financial statements in conformity with accounting principles generally accepted in the United States of America, which require us to make estimates and assumptions that affect the reported amounts and disclosures. Actual results could differ from those estimates. Estimates are used when accounting for various items, such as allowances for doubtful accounts, investments and derivative financial instruments, depreciation and amortization, asset impairment, non-monetary transactions, certain acquisition-related liabilities, programming-related liabilities, pensions and other postretirement benefits, income taxes, and legal contingencies.

*Fair Values*

We have determined the estimated fair value amounts presented in these consolidated financial statements using available market information and appropriate methodologies. However, considerable judgment is required in interpreting market data to develop the estimates of fair value. The estimates presented in these consolidated financial statements are not necessarily indicative of the amounts that we could realize in a current market exchange. The use of different market assumptions and/or

40

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

estimation methodologies may have a material effect on the estimated fair value amounts. We based these fair value estimates on pertinent information available to us as of December 31, 2004 and 2003. We have not comprehensively updated these fair value estimates for the purposes of these consolidated financial statements since those dates.

*Cash Equivalents*

Cash equivalents consist principally of commercial paper, money market funds, U.S. government obligations and certificates of deposit with maturities of less than three months when purchased. The carrying amounts of our cash equivalents approximate their fair values.

*Investments*

Investments in entities in which we have the ability to exercise significant influence over the operating and financial policies of the investee are accounted for under the equity method. Equity method investments are recorded at original cost and adjusted to recognize our proportionate share of the investees' net income or losses after the date of investment, amortization of basis differences, additional contributions made and dividends received, and impairment charges resulting from adjustments to net realizable value. We generally record our proportionate share of our investees' net income or loss one quarter in arrears given the timing of the receipt of such information.

Changes in our proportionate share of the underlying equity of a consolidated subsidiary or equity method investee that result from the issuance of additional securities by such subsidiary or investee are recognized as gains or losses in our consolidated statement of operations unless gain realization is not assured in the circumstances. Gains for which realization is not assured are credited directly to additional capital.

Unrestricted publicly traded investments are classified as available for sale or trading securities and are recorded at their fair value. Unrealized gains or losses resulting from changes in fair value between measurement dates for available for sale securities are recorded as a component of other comprehensive income (loss), except for declines in value that we consider to be other than temporary. Unrealized gains or losses resulting from changes in fair value between measurement dates for trading securities are recorded as a component of investment income (loss), net. We recognize realized gains and losses using the specific identification method. Cash flows from all trading securities are classified as cash flows from operating activities as required by SFAS No. 95, "Statement of Cash Flows," as amended, while cash flows from all other investment securities are classified as cash flows from investing activities in our statement of cash flows.

We review our investment portfolio each reporting period to determine whether a decline in the market value is considered to be other than temporary. Investments deemed to have experienced an other than temporary decline below their cost basis are reduced to their current fair market value. The impairment is charged to earnings and a new cost basis for the investment is established.

Restricted publicly traded investments and investments in privately held companies are stated at cost, adjusted for any known decrease in value (see *Note 6*).

*Property and Equipment*

Depreciation is generally recorded using the straight-line method over estimated useful lives. The significant components of property and equipment are as follows (dollars in millions):

|  | Useful Life | December 31, 2004 | December 31, 2003 |
|---|---|---|---|
| Transmission and distribution plant | 2-15 years | $ 25,645 | $ 22,609 |
| Buildings and building improvements | 2-40 years | 1,365 | 1,255 |
| Land | N/A | 152 | 152 |
| Other | 3-12 years | 965 | 1,020 |
| Property and equipment, at cost |  | 28,127 | 25,036 |
| Less: accumulated depreciation |  | (9,416) | (6,563) |

| Property and equipment, net | $ | 18,711 | $ | 18,473 |
|---|---|---|---|---|

We capitalize improvements that extend asset lives and expense other repairs and maintenance charges as incurred. The cost and related accumulated depreciation applicable to assets sold or retired are removed from the accounts and, unless they are presented separately, the gain or loss on disposition is recognized as a component of depreciation expense.

41

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

We capitalize the costs associated with the construction of cable transmission and distribution facilities and new cable service installations. Costs include all direct labor and materials, as well as various indirect costs.

*Asset Retirement Obligations*

Certain of our franchise agreements and leases contain provisions requiring us to restore facilities or remove equipment in the event that the franchise or lease agreement is not renewed. We expect to continually renew our franchise agreements and have concluded that the related franchise right is an indefinite-lived intangible asset. Accordingly, the possibility is remote that we would be required to incur significant restoration or removal costs in the foreseeable future. SFAS No. 143, "Accounting for Asset Retirement Obligations," requires that a liability be recognized for an asset retirement obligation in the period in which it is incurred if a reasonable estimate of fair value can be made. We would record an estimated liability in the unlikely event a franchise agreement containing such a provision were no longer expected to be renewed. We also expect to renew many of our lease agreements related to the continued operation of our cable business in the franchise areas. For our lease agreements, the liabilities related to the removal provisions, if any, are either not estimable or are not material.

*Intangible Assets*

Cable franchise rights represent the value attributed to agreements with local authorities that allow access to homes in cable service areas acquired in connection with business combinations. We do not amortize cable franchise rights because we have determined that they have an indefinite life. We reassess this determination periodically for each franchise based on the factors included in SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142"). Costs we incur in negotiating and renewing cable franchise agreements are included in other intangible assets and are amortized on a straight-line basis over the term of the franchise renewal period, generally 10 years.

Goodwill is the excess of the acquisition cost of an acquired entity over the fair value of the identifiable net assets acquired. We test our goodwill and intangible assets that are determined to have an indefinite life for impairment at least annually.

Other intangible assets consist principally of franchise related customer relationships acquired in business combinations subsequent to the adoption of SFAS No. 141, "Business Combinations" ("SFAS No. 141"), on July 1, 2001, cable and satellite television distribution rights, cable franchise renewal costs, contractual operating rights, computer software, programming costs and rights, patents and technology rights, and non-competition agreements. We record these costs as assets and amortize them on a straight-line basis over the term of the related agreements or estimated useful life, which generally range from 2 to 20 years.

Our content subsidiaries enter into multi-year affiliation agreements with various cable and satellite television system operators for carriage of their respective programming. We capitalize cable or satellite television distribution rights and amortize them on a straight-line basis over the term of the related distribution agreements of 4 to 11 years. We classify the amortization of distribution fees paid by our content subsidiaries pursuant to Emerging Issues Task Force ("EITF") 01-09, "Accounting for Consideration Given to a Customer (including a reseller of the Vendors Products)." Under EITF 01-09, the amortization of such fees is classified as a reduction of revenue unless the content subsidiary receives, or will receive, an identifiable benefit from the cable or satellite system operator separate from the distribution fee, in which case we recognize the fair value of the identified benefit as an operating expense in the period in which it is received.

Direct development costs associated with internal-use software are capitalized, including external direct costs of material and services, and payroll costs for employees devoting time to the software projects. Such costs are included within other assets and are amortized over a period not to exceed 5 years beginning when the asset is substantially ready for use. Costs incurred during the preliminary project stage, as well as maintenance and training costs, are expensed as incurred. Initial operating-system software costs are capitalized and amortized over the life of the associated hardware.

*Valuation of Long-Lived and Indefinite-Lived Assets*

In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," we periodically evaluate the recoverability and estimated lives of our long-lived assets, including property and equipment and intangible assets subject to amortization, whenever events or changes in circumstances indicate that the carrying amount may not be recoverable or the useful life has changed. Our evaluations include analyses based on the cash flows generated by the underlying assets, profitability information, including estimated future operating results, trends or other determinants of fair value. If the total of the expected

future undiscounted cash flows is less than the carrying amount of the asset, a loss is recognized for the difference between the fair value and the carrying value of the asset. Unless presented separately, the loss is included as a component of either depreciation expense or amortization expense, as appropriate.

We evaluate the recoverability of our goodwill and indefinite life intangible assets annually or more frequently whenever events or changes in circumstances indicate that the assets might be impaired. We perform the impairment assessment of our goodwill

42

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

one level below the business segment level, except for our cable business. In our cable business, components one level below the segment level are not separate reporting units and also have similar economic characteristics that allow them to be aggregated into one reporting unit at the cable segment level.

We estimate the fair value of our cable franchise rights primarily based on multiples of operating income before depreciation and amortization generated by the underlying assets, discounted cash flow analyses, analyses of current market transactions and profitability information, including estimated future operating results, trends or other determinants of fair value. If the value of our cable franchise rights determined by these evaluations is less than its carrying amount, an impairment charge would be recognized for the difference between the estimated fair value and the carrying value of the assets.

Upon adoption of SFAS No. 142 in 2002, we performed the impairment assessment of our cable franchise rights at the cable segment level based on our analysis of the factors outlined in EITF 02-07, "Unit of Accounting for Testing Impairment of Indefinite-Lived Intangible Assets." Effective in the first quarter of 2004, we changed the unit of accounting used for testing impairment to geographic regions and performed impairment testing on our cable franchise rights. We did not record any impairment charge in connection with the change in impairment testing.

*Foreign Currency Translation*

We translate assets and liabilities of our foreign subsidiaries, where the functional currency is the local currency, into US dollars at the December 31 exchange rate and record the related translation adjustments as a component of other comprehensive income (loss). We translate revenues and expenses using average exchange rates prevailing during the year. Foreign currency transaction gains and losses are included in other income.

*Revenue Recognition*

We recognize video, high-speed Internet, and phone revenues as service is provided. We manage credit risk by screening applicants for potential risk through the use of credit bureau data. If a customer's account is delinquent, various measures are used to collect outstanding amounts, up to and including termination of the customer's cable service. We recognize advertising sales revenue at estimated realizable values when the advertising is aired. Installation revenues obtained from the connection of subscribers to our broadband communications network are less than related direct selling costs. Therefore, such revenues are recognized as connections are completed. Revenues derived from other sources are recognized when services are provided or events occur. Under the terms of our franchise agreements, we are generally required to pay up to 5% of our gross revenues derived from providing cable services to the local franchising authority. We normally pass these fees through to our cable subscribers. We classify fees collected from cable subscribers as a component of revenues pursuant to EITF 01-14, "Income Statement Characterization of Reimbursements Received for `Out-of-Pocket' Expenses Incurred."

Our content businesses recognize affiliate fees from cable and satellite television system operators as programming is provided. Advertising revenue is recognized in the period in which commercial announcements or programs are telecast in accordance with the broadcast calendar. In some instances, our content businesses guarantee viewer ratings for their programming. Revenue is deferred to the extent of an estimated shortfall in the ratings. Such shortfalls are primarily settled by providing additional advertising time, at which point the revenue is recognized.

*Programming Costs*

Our cable subsidiaries have received or may receive incentives from programming networks for carriage of their programming. We reflect the deferred portion of these fees within noncurrent liabilities and recognize the fees as a reduction of programming costs (which are included in operating expenses) over the term of the programming contract.

*Stock-Based Compensation*

We account for stock-based compensation in accordance with Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25"), and related interpretations, as permitted by SFAS No. 123, "Accounting for Stock-Based Compensation," as amended. Compensation expense for stock options is measured as the excess, if any, of the quoted market price of our stock at the date of the grant over the amount an optionee must pay to acquire the stock. We record compensation expense for restricted stock awards based on the quoted market price of our stock at the date of the grant and the

vesting period. We record compensation expense for stock appreciation rights based on the changes in quoted market prices of our stock or other determinants of fair value (see *Note 10* ).

43

# Notes to Consolidated Financial Statements (Continued)

## Years Ended December 31, 2004, 2003 and 2002

The following table illustrates the effect on net income (loss) and earnings (loss) per share if we had applied the fair value recognition provisions of SFAS No. 123 to stock-based compensation. Total stock-based compensation expense was determined under the fair value method for all awards using the accelerated recognition method as permitted under SFAS No. 123 (dollars in millions, except per share data):

| Year Ended December 31, | | 2004 | | 2003 | | 2002 |
|---|---|---|---|---|---|---|
| Net income (loss), as reported | $ | 970 | $ | 3,240 | $ | (274) |
| Add: Stock-based compensation expense included in net income (loss), as reported above | | 27 | | 10 | | 11 |
| Deduct: Stock-based compensation expense determined under fair value-based method for all awards relating to continuing operations, net of related tax effects | | (206) | | (160) | | (126) |
| Deduct: Stock-based compensation expense determined under fair value-based method for all awards relating to discontinued operations, net of related tax effects | | — | | (12) | | (19) |
| Pro forma, net income (loss) | $ | 791 | $ | 3,078 | $ | (408) |
| Basic earnings (loss) from continuing operations for common stockholders per common share: | | | | | | |
|   As reported | $ | 0.43 | $ | (0.10) | $ | (0.42) |
|   Pro forma | $ | 0.35 | $ | (0.16) | $ | (0.53) |
| Diluted earnings (loss) from continuing operations for common stockholders per common share: | | | | | | |
|   As reported | $ | 0.43 | $ | (0.10) | $ | (0.42) |
|   Pro forma | $ | 0.35 | $ | (0.16) | $ | (0.53) |
| Basic earnings (loss) for common stockholders per common share: | | | | | | |
|   As reported | $ | 0.43 | $ | 1.44 | $ | (0.25) |
|   Pro forma | $ | 0.35 | $ | 1.36 | $ | (0.37) |
| Diluted earnings (loss) for common stockholders per common share: | | | | | | |
|   As reported | $ | 0.43 | $ | 1.44 | $ | (0.25) |
|   Pro forma | $ | 0.35 | $ | 1.36 | $ | (0.37) |

44

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

On December 23, 2004, the Compensation Committee of our Board of Directors approved the acceleration of vesting of all unvested options granted prior to January 1, 2003, to purchase shares of our Class A Special common stock having an exercise price of $34 or greater and held by current employees. Options with respect to approximately 15.6 million shares of our Class A Special common stock were subject to this acceleration. This acceleration was effective as of December 31, 2004, except for those holders of incentive stock options ("ISOs"), who were given the opportunity to decline the acceleration of an option if such acceleration would have the effect of changing the status of the option for federal income tax purposes from an ISO to a non-qualified stock option. Because these options had exercise prices in excess of current market values (are "underwater") and were not fully achieving their original objectives of incentive compensation and employee retention, the acceleration may have a positive effect on employee morale, retention and perception of option value. The acceleration also takes into account the fact that in December 2004, we completed the repurchase of stock options held by certain non-employees for cash (including underwater options) under a stock option liquidity program (see *Note 10* ), and that no such offer (nor any other "solution" for underwater options) was made to current employees. The effect of the acceleration of approximately $39 million, net of tax, is reflected in our 2004 pro forma amounts above. This acceleration eliminates the future compensation expense we would otherwise recognize in our statement of operations with respect to these options once FASB Statement No. 123R, "Share-Based Payment," ("SFAS No. 123R") becomes effective in 2005 (see *Note 3*).

The weighted-average fair value at date of grant of a Class A common stock option granted under our option plans during 2004, 2003 and 2002 was $11.44, $9.81 and $9.81, respectively. The weighted-average fair value at date of grant of a Class A Special common stock option granted under our option plans during 2002 was $13.72. The fair value of each option granted during 2004, 2003 and 2002 was estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted-average assumptions:

|  | 2004 | 2003 | 2002 | |
| --- | --- | --- | --- | --- |
|  | Class A Common Stock | Class A Common Stock | Class A Common Stock | Class A Special Common Stock |
| Dividend yield | 0% | 0% | 0% | 0% |
| Expected volatility | 28.6% | 29.3% | 29.2% | 29.6% |
| Risk-free interest rate | 3.5% | 3.2% | 4.0% | 4.9% |
| Expected option life (in years) | 7.0 | 5.9 | 7.0 | 7.0 |
| Forfeiture rate | 3.0% | 3.0% | 3.0% | 3.0% |

The pro forma effect on net income (loss) and net income (loss) per share for the years ended December 31, 2004, 2003 and 2002 by applying SFAS No. 123 may not be indicative of the pro forma effect on net income or loss in future years since SFAS No. 123 does not take into consideration additional awards that may be granted in future years on a much larger employee base.

As of December 31, 2004, there was $234 million of total unrecognized, pre-tax compensation cost related to non-vested stock options. This cost is expected to be recognized over a weighted average period of approximately two years. Upon adoption of FAS 123R effective July 1, 2005, such cost will be recognized directly in our consolidated statement of operations.

*Postretirement and Postemployment Benefits*

We charge to operations the estimated costs of retiree benefits and benefits for former or inactive employees, after employment but before retirement, during the years the employees provide services (see *Note 9* ).

*Income Taxes*

We recognize deferred tax assets and liabilities for temporary differences between the financial reporting basis and the tax basis of our assets and liabilities and the expected benefits of utilizing net operating loss carryforwards. The impact on deferred taxes of changes in tax rates and laws, if any, applied to the years during which temporary differences are expected to be settled, are reflected in the consolidated financial statements in the period of enactment (see *Note 11*).

We account for income tax uncertainties that arise in connection with business combinations and those that are associated with entities acquired in business combinations in accordance with EITF 93-7, "Uncertainties Related to Income Taxes in a Purchase Business Combination." Deferred tax assets and liabilities are recorded at the date of a business combination based on our best estimate of the ultimate tax basis that will be accepted by the various taxing authorities. Liabilities for contingencies associated with prior tax returns filed by the acquired entity are recorded based on our best estimate of the ultimate settlement that will be accepted by the various taxing authorities. Estimated interest expense on these liabilities subsequent to the acquisition is reflected in our consolidated tax

45

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

provision. We adjust these deferred tax accounts and liabilities periodically to reflect revised estimated tax bases and any estimated settlements with the various taxing authorities. The effect of these adjustments is generally applied to goodwill.

*Derivative Financial Instruments*

We use derivative financial instruments for a number of purposes. We manage our exposure to fluctuations in interest rates by entering into interest rate exchange agreements ("swaps"), interest rate lock agreements ("rate locks"), interest rate cap agreements ("caps") and interest rate collar agreements ("collars"). We manage the cost of our share repurchases through the sale of equity put option contracts ("Comcast put options") and the purchase of capped-call option contracts. We manage our exposure to fluctuations in the value of some of our investments by entering into equity collar agreements ("equity collars") and equity put option agreements ("equity put options"). We are also party to equity warrant agreements ("equity warrants"). We have issued indexed debt instruments ("Exchangeable Notes" and "ZONES") and entered into prepaid forward sale agreements ("prepaid forward sales") whose value, in part, is derived from the market value of certain publicly traded common stock, and we have also sold call options on some of our investments in equity securities in order to monetize a portion of those investments. Equity hedges are used to manage exposure to changes in equity prices associated with stock appreciation rights of some of Broadband's previously affiliated companies. These equity hedges are recorded at fair value based on market quotes.

For derivative instruments designated and effective as fair value hedges, such as our fixed to variable swaps, changes in the fair value of the derivative instrument are substantially offset in the consolidated statement of operations by changes in the fair value of the hedged item. For derivative instruments designated as cash flow hedges, such as our variable to fixed swaps and rate locks, the effective portion of any hedge is reported in other comprehensive income (loss) until it is recognized in earnings during the same period in which the hedged item affects earnings. The ineffective portion of all hedges is recognized in current earnings each period. Changes in the fair value of derivative instruments that are not designated as a hedge are recorded each period in current earnings.

When a fair value hedge is terminated, sold, exercised or has expired, the adjustment in the carrying amount of the fair value hedged item is deferred and recognized in earnings when the hedged item is recognized in earnings. When a hedged item is settled or sold, the adjustment in the carrying amount of the hedged item is recognized in earnings. When hedged variable rate debt is settled, the previously deferred effective portion of the hedge is written off similar to debt extinguishment costs.

Equity warrants and equity collars are adjusted to estimated fair value on a current basis with the result included in investment income (loss), net in our consolidated statement of operations.

Derivative instruments embedded in other contracts, such as our Exchangeable Notes, ZONES and prepaid forward sales, are separated into their host and derivative financial instrument components. The derivative component is recorded at its estimated fair value in our consolidated balance sheet with changes in estimated fair value recorded in investment income (loss), net in our consolidated statement of operations.

All derivative transactions must comply with our Board-authorized derivatives policy. We do not hold or issue any derivative financial instruments for speculative or trading purposes and are not a party to leveraged instruments (see *Note 8*). We manage the credit risks associated with our derivative financial instruments through the evaluation and monitoring of the creditworthiness of the counterparties. Although we may be exposed to losses in the event of nonperformance by the counterparties, we do not expect such losses, if any, to be significant.

We periodically examine those instruments we use to hedge exposure to interest rate and equity price risks to ensure that the instruments are matched with underlying assets or liabilities, reduce our risks relating to interest rates or equity prices and, through market value and sensitivity analysis, maintain a high correlation to the risk inherent in the hedged item. For those instruments that do not meet the above criteria, variations in their fair value are reflected on a current basis in our consolidated statement of operations.

*Securities Lending Transactions*

We may enter into securities lending transactions pursuant to which we require the borrower to provide cash collateral equal to the value of the loaned securities, as adjusted for any changes in the value of the underlying loaned securities. Loaned securities for which we maintain effective control are included in investments in our consolidated balance sheet.

*Reclassifications*

Reclassifications have been made to the prior years' consolidated financial statements to conform to those classifications used in 2004.

46

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

3. RECENT ACCOUNTING PRONOUNCEMENTS

*EITF 03-16*

In March 2004, the EITF reached a consensus regarding Issue No. 03-16, "Accounting for Investments in Limited Liability Companies" ("EITF 03-16"). EITF 03-16 requires investments in limited liability companies ("LLCs") that have separate ownership accounts for each investor to be accounted for similar to a limited partnership investment under Statement of Position No. 78-9, "Accounting for Investments in Real Estate Ventures." Investors are required to apply the equity method of accounting to their investments at a much lower ownership threshold than the 20% threshold applied under APB No. 18, "The Equity Method of Accounting for Investments in Common Stock." We adopted EITF 03-16 on July 1, 2004. The adoption of EITF 03-16 did not have a material impact on our financial condition or results of operations.

*EITF 04-1*

In September 2004, the EITF reached a consensus regarding Issue No. 04-1, "Accounting for Preexisting Relationships Between the Parties to a Business Combination" ("EITF 04-1"). EITF 04-1 requires an acquirer in a business combination to evaluate any preexisting relationship with the acquiree to determine if the business combination in effect contains a settlement of the preexisting relationship. A business combination between parties with a preexisting relationship should be viewed as a multiple element transaction. EITF 04-1 is effective for business combinations after October 13, 2004, but requires goodwill resulting from prior business combinations involving parties with a preexisting relationship to be tested for impairment by applying the guidance in the consensus. We will apply EITF 04-1 to acquisitions subsequent to the effective date and in our future goodwill impairment testing.

*SFAS No. 123R*

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share-Based Payment" ("SFAS No. 123R"), which replaces SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS No. 123") and supercedes APB Opinion No. 25, "Accounting for Stock Issued to Employees." SFAS No. 123R requires all share-based payments to employees, including grants of employee stock options, to be recognized in the financial statements based on their fair values, beginning with the first interim or annual period after June 15, 2005, with early adoption encouraged. In addition, SFAS No. 123R will cause unrecognized expense (based on the amounts in our pro forma footnote disclosure) related to options vesting after the date of initial adoption to be recognized as a charge to results of operations over the remaining vesting period. We are required to adopt SFAS No. 123R in our third quarter of 2005, beginning July 1, 2005. Under SFAS No. 123R, we must determine the appropriate fair value model to be used for valuing share-based payments, the amortization method for compensation cost and the transition method to be used at the date of adoption. The transition alternatives include prospective and retroactive adoption methods. Under the retroactive methods, prior periods may be restated either as of the beginning of the year of adoption or for all periods presented. The prospective method requires that compensation expense be recorded for all unvested stock options and share awards at the beginning of the first quarter of adoption of SFAS No. 123R, while the retroactive methods would record compensation expense for all unvested stock options and share awards beginning with the first period restated. We are evaluating the requirements of SFAS No. 123R and we expect that the adoption of SFAS No. 123R will have a material impact on our consolidated results of operations and earnings per share. We have not determined the method of adoption or the effect of adopting SFAS No. 123R.

4. EARNINGS PER SHARE

Earnings (loss) per common share ("EPS") is computed by dividing net income (loss) for common stockholders by the weighted average number of common shares outstanding during the period on a basic and diluted basis.

Our potentially dilutive securities include potential common shares related to our stock options, restricted stock, and Comcast exchangeable notes (see *Note 8* ). Diluted earnings for common stockholders per common share ("Diluted EPS") considers the impact of potentially dilutive securities except in periods in which there is a loss because the inclusion of the potential common shares would have an antidilutive effect. Diluted EPS excludes the impact of potential common shares related to our stock options in periods in which the option exercise price is greater than the average market price of our Class A common stock and our Class A Special common stock during the period. Diluted EPS excludes the impact of potential common shares related to our Class A Special common stock held in treasury because it is our intent to settle the related Comcast exchangeable notes using cash (see *Note 8* ).

Diluted EPS for 2004 excludes approximately 103 million potential common shares related to our stock compensation plans because the option exercise price was greater than the average market price of our Class A common stock and our Class A Special common stock for the period.

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

Diluted EPS for 2003 and 2002 excludes approximately 146 million and 91 million potential common shares, respectively, primarily related to our stock compensation plans because the assumed issuance of such potential common shares is antidilutive in periods in which there is a loss from continuing operations.

The following table reconciles the numerator and denominator of the computations of Diluted EPS for common stockholders from continuing operations for the years presented:

| (Dollars in millions, except per share data) Year Ended December 31, | 2004 | | | 2003 | | | 2002 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Income | Shares | Per Share Amount | Loss | Shares | Per Share Amount | Loss | Shares | Per Share Amount |
| Basic EPS for common stockholders | $ 970 | 2,240 | $ 0.43 | $ (218) | 2,256 | $ (0.10) | $ (469) | 1,110 | $ (0.42) |
| Effect of Dilutive Securities | | | | | | | | | |
| Assumed exercise or issuance of shares relating to stock compensation plans | — | 10 | — | — | — | — | — | — | — |
| Diluted EPS | $ 970 | 2,250 | $ 0.43 | $ (218) | 2,256 | $ (0.10) | $ (469) | 1,110 | $ (0.42) |

5. ACQUISITIONS AND OTHER SIGNIFICANT EVENTS

*Acquisition of Broadband*

On November 18, 2002, we completed the acquisition of Broadband. The results of the Broadband operations have been included in our consolidated financial statements since that date. The acquisition created the largest cable operator in the United States by combining Broadband's and our cable networks.

The consideration to complete the acquisition of Broadband was $50.660 billion, consisting of $25.495 billion of our common stock and options, $24.740 billion of assumed debt, and $425 million of transaction costs directly related to the acquisition. We issued approximately 1.348 billion shares of our common stock (excluding shares of Class A common stock issued and classified as treasury stock) consisting of 1.233 billion shares of our Class A common stock issued to Broadband shareholders in exchange for all of AT&T's interests in Broadband and approximately 100.6 million shares and 14.4 million shares of our Class A and Class A Special common stock, respectively, issued to Microsoft in exchange for Broadband shares that Microsoft received immediately prior to the completion of the Broadband acquisition for settlement of its $5 billion aggregate principal amount in quarterly income preferred securities. We also issued 61.1 million options in exchange for outstanding Broadband options. The shares issued for Broadband were valued based on a price per share of $18.80 that reflects the weighted average market price of Comcast Holdings common stock during the period beginning two days before and ending two days after August 12, 2002. The acquisition was structured as a tax-free transaction to us, to Comcast Holdings and to AT&T. The identification of Comcast Holdings as the acquiring entity was made after careful consideration of all facts and circumstances, including those outlined in SFAS No. 141 related to voting rights, the existence of a large minority voting interest, governance arrangements and composition of senior management.

*Purchase Price Allocation.* The application of purchase accounting under SFAS No. 141 requires that the total purchase price of an acquisition be allocated to the fair value of the assets acquired and liabilities assumed based on their fair values at the acquisition date. During 2003, we finalized the Broadband purchase price allocation except for litigation contingencies relating to our share of AT&T's potential liability associated with the At Home Corporation litigation (see *Note 13*). We have arranged with AT&T to obtain additional information to assist with the evaluation of this potential liability and continue to expect to receive such information. However, we have concluded that continued delays in obtaining such information indicate it cannot be used in allocating the Broadband purchase price. Accordingly, the allocation period is complete and any adjustment recorded in the future associated with these litigation contingencies will be included in our results of operations in the period in which a liability, if any, is deemed probable and reasonably estimable. Such adjustment is not expected to have a material effect on our consolidated financial position, but it could possibly be material to our results of operations in the period in which it is determined.

As of the acquisition date, we initiated integration activities based on a preliminary plan to terminate employees and exit specific

contractual obligations. Under the guidance in EITF 95-3, "Recognition of Liabilities in Connection with a Purchase Business Combination," the plan must be finalized within one year of the acquisition date and must identify all significant actions to be taken to complete the plan. Therefore, costs related to terminating employees and exiting contractual obligations of the acquired entity are included in the purchase price allocation. Changes to these estimated termination or exit costs are reflected as adjustments to the purchase price allocation to the extent they occur within one year of the acquisition date or if there are reductions in the amount of estimated termination or exit costs accrued. Otherwise, changes will affect results of operations.

48

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

The following table summarizes the fair values of the assets acquired and liabilities assumed and the related deferred income taxes as of the acquisition date and reflects adjustments to the purchase price allocation through the end of the allocation period. Adjustments have been made to Broadband's goodwill in 2004 related to tax contingencies and exit accruals that are not reflected below (dollars in millions):

| | | |
|---|---|---:|
| Current assets | $ | 1,768 |
| Investments | | 17,325 |
| Property, plant and equipment | | 11,023 |
| Amortizable intangible assets: | | |
|     Franchise related customer relationships | | 3,386 |
|     Other | | 146 |
| Cable franchise rights | | 34,390 |
| Goodwill | | 9,178 |
| Other noncurrent assets | | 300 |
|     Total assets | | 77,516 |
| Accounts payable, accrued expenses and other current liabilities | | (4,407) |
| Short-term debt and current portion of long-term debt | | (8,049) |
| Long-term debt | | (16,691) |
| Deferred income taxes | | (18,397) |
| Other non-current liabilities | | (5,178) |
|     Total liabilities | | (52,722) |
| Comcast shares held by Broadband, classified as treasury stock | | 1,126 |
|     Net assets acquired | $ | 25,920 |

In the aggregate, the intangible assets that are subject to amortization have a weighted average useful life of 4 years. Franchise related customer relationships have a weighted average useful life of 4 years. The $9.178 billion of goodwill, none of which was deductible for income tax purposes, was assigned to our cable segment.

Liabilities associated with exit activities originally recorded in the purchase price allocation consisted of $602 million associated with accrued employee termination and related costs and $929 million associated with either the cost of terminating contracts or the present value of remaining amounts payable under non cancelable contracts. Amounts paid, adjustments made against these accruals and interest accretion during 2003 and 2004 were as follows (dollars in millions):

| | | Employee Termination and Related Costs | | Contract Exit Costs |
|---|---|---:|---|---:|
| Balance, December 31, 2002 | $ | 492 | $ | 913 |
| Payments | | (216) | | (48) |
| Adjustments | | (141) | | (412) |
| Interest accretion | | — | | 8 |
| Balance, December 31, 2003 | $ | 135 | $ | 461 |
| Payments | | (76) | | (21) |
| Adjustments | | (36) | | (391) |
| Interest accretion | | — | | 3 |
| Balance, December 31, 2004 | $ | 23 | $ | 52 |

The adjustments in the preceding table reflect reductions in the estimated payments related to employee termination and contract exit costs.

49

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

The following unaudited pro forma information has been presented as if the Broadband acquisition occurred on January 1, 2002. This information is based on historical results of operations, adjusted for acquisition costs, and, in the opinion of management, is not necessarily indicative of what the results would have been had we operated the entities acquired since such dates.

| **(Dollars in millions, except per share data)**<br>**Year Ended December 31,** | | **2002** |
|---|---|---:|
| Revenues | $ | 16,754 |
| Loss before cumulative effect of accounting change | $ | (15,071) |
| Net loss | $ | (15,071) |
| Diluted EPS | $ | (6.55) |

The unaudited pro forma information for the year ended December 31, 2002 includes $11.781 billion, net of tax, of goodwill and franchise impairment charges, and $56 million of asset impairment, restructuring and other charges recorded by Broadband prior to the closing of the Broadband acquisition.

Pro forma information reflecting our 2004 and 2003 transactions is not presented due to immateriality.

2004 Activity

*Gemstar*

On March 31, 2004, we entered into a long-term, non-exclusive patent license and distribution agreement with Gemstar-TV Guide International in exchange for a one-time payment of $250 million to Gemstar. This agreement allows us to utilize Gemstar's intellectual property and technology and the TV Guide brand and content on our interactive program guides. We have allocated the $250 million amount paid based on the fair value of the components of the contract to various intangible and other assets, which are being amortized over a period of 3 to 12 years. In addition, we and Gemstar formed an entity to develop and enhance interactive programming guides.

*TechTV*

On May 10, 2004, we completed the acquisition of TechTV Inc. by acquiring all outstanding common and preferred stock of TechTV from Vulcan Programming Inc. for approximately $300 million in cash. Substantially all of the purchase price has been recorded to intangible assets based on a preliminary allocation of value and is being amortized over a period of 2 to 12 years. On May 28, 2004, G4 and TechTV began operating as one network that is available to approximately 47 million cable and satellite homes nationwide as of December 31, 2004. We have classified G4 as part of our content business segment (*see Note 14*). The effects of our acquisition of TechTV have been reflected in our consolidated statement of operations from the date of the transaction.

*Liberty Exchange Agreement*

On July 28, 2004, we exchanged approximately 120 million shares of Liberty Media Corporation Series A common stock that we held (*see Note 6*), valued at approximately $1.022 billion based upon the price of Liberty common stock on the closing date of the transaction, with Liberty for 100% of the stock of Liberty's subsidiary, Encore ICCP, Inc. Encore's assets consisted of cash of approximately $547 million, a 10.4% interest in E! and 100% of International Channel Networks. We also received all of Liberty's rights, benefits and obligations under the TCI Music contribution agreement, which resulted in the resolution of all pending litigation between Liberty and us regarding the contribution agreement (see *Note 13*). The Liberty exchange increased our portfolio of programming investments because we now own 60.5% of E! and 100% of International Channel Networks. The exchange was structured as a tax free transaction. We allocated the value of the shares exchanged in the transaction among cash, our additional investment in E!, International Channel Networks and the resolution of the litigation related to the contribution agreement. The values of certain of these assets and liabilities are based on preliminary valuations and are subject to adjustment as the valuation reports are obtained. The effects of our acquisition of the additional interest in E! and our acquisition of International Channel Networks have been reflected in our consolidated statement of operations from the date of the transaction.

2003 Activity

*Comcast SportsNet Chicago*

In December 2003, we, in conjunction with affiliates of the Chicago Blackhawks, Bulls, Cubs and White Sox professional sports teams, formed CSN Chicago. This 24-hour regional sports network is available to approximately 2.8 million Chicago-area cable and satellite subscribers as of December 31, 2004. We acquired our controlling interest in this network for approximately $87 million in cash, which

50

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

was allocated to contract-related intangibles and is being amortized over a period of 15 years. The results of CSN Chicago have been included in our consolidated financial statements since the date of formation.

*The Golf Channel*

In December 2003, we acquired the approximate 8.6% interest in TGC previously held by the Tribune Company for $100 million in cash. This amount has been allocated to cable and satellite television distribution rights, which is being amortized over a period of approximately eight years, and to goodwill. As a result, we now own 99.9% of TGC.

*Bresnan Transaction*

On March 20, 2003, we completed the transaction with Bresnan Broadband Holdings, LLC and Bresnan Communications, LLC (together, "Bresnan") pursuant to which we transferred cable systems serving approximately 314,000 subscribers in Montana, Wyoming, Colorado and Utah to Bresnan that we had acquired in connection with the Broadband acquisition. We received $525 million in cash, plus preferred and common equity interests in Bresnan, in exchange for these cable systems. The transfer of these cable systems was accounted for at fair value with no gain or loss recognized. The results of operations for these cable systems for the first quarter of 2003 were not significant and were included in equity in net losses of affiliates in our consolidated statement of operations.

*TWE Restructuring*

On March 31, 2003, we completed the restructuring of our investment in Time Warner Entertainment Company L.P. ("TWE"). As a result of the restructuring, Time Warner Inc. assumed complete control over TWE's content assets, including Home Box Office, Warner Bros., and stakes in The WB Network, Comedy Central and Court TV. All of Time Warner's interests in cable, including those held through TWE, are now held through or for the benefit of a new subsidiary of Time Warner called Time Warner Cable Inc. ("TWC"). In exchange for our 27.6% interest in TWE, we received common-equivalent preferred stock of Time Warner, which will be converted into $1.5 billion of Time Warner common stock valued upon completion of an effective registration statement filing with the SEC, and we received a 21% economic stake in the business of TWC. In addition, we received $2.1 billion in cash that was used immediately to repay amounts outstanding under our credit facilities (*see Notes 6 and 8* ). The TWE restructuring was accounted for as a fair value exchange with no gain or loss recognized. Under the restructuring agreement, we have registration rights that should facilitate the disposal or monetization of our shares in TWC and in Time Warner. On December 29, 2003, demand registration rights were exercised to start the registration process for the sale of up to 17.9% of TWC.

As part of the process of obtaining approval of the Broadband acquisition from the Federal Communications Commission ("FCC"), at the closing of the Broadband acquisition, we placed our entire interest in TWE in trust for orderly disposition. Any non-cash consideration received in respect of such interest as a result of the TWE restructuring, including the Time Warner and TWC stock, will remain in trust until disposed of or FCC approval is obtained to remove such interests from the trust.

Under the trust, the trustee has exclusive authority to exercise any management or governance rights associated with the securities in trust. The trustee also has the obligation, subject to our rights as described in the last sentence of this paragraph, to exercise available registration rights to effect the sale of such interests in a manner intended to maximize the value received consistent with the goal of disposing such securities in their entirety by November 2007. Following this time, if any securities remain in trust, the trustee will be obligated to dispose of the remaining interests as quickly as possible, and in any event by May 2008. The trustee is also obligated, through November 2007, to effect various specified types of sale or monetization transactions with respect to the securities as may be proposed by us from time to time.

On September 27, 2004, we and Time Warner announced an agreement that provides us with an option to reduce our effective overall interest in TWC from approximately 21% to 17% in exchange for stock of a subsidiary that will hold cable systems which will serve approximately 90,000 basic subscribers and own approximately $750 million in cash. The agreement grants us the option to require TWC to redeem a portion of the TWC common stock held in trust in exchange for 100% of the common stock of the TWC subsidiary. The option may be exercised at any time prior to the 60th day (the "Termination Date") following a notice that may be given at any time by either party of termination of the option period. In addition, the trust that holds the TWC shares agreed not to request that TWC register the trust's shares in TWC for sale in a public offering prior to the Termination Date. In the absence of an effective registration statement, the common-equivalent preferred stock of Time Warner will automatically convert into $1.5 billion of Time Warner common stock on March 31, 2005. These shares of common stock will then be freely saleable

without registration under the Securities Act.

*Sale of QVC*

On September 17, 2003, we completed the sale to Liberty Media Corporation of all shares of QVC common stock held by a number of our direct wholly-owned subsidiaries for an aggregate value of approximately $7.7 billion, consisting of $4 billion principal amount of

51

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

Liberty's Floating Rate Senior Notes due 2006 (the "Liberty Notes"), $1.35 billion in cash and approximately 218 million shares of Liberty Series A common stock. The shares had a fair value on the closing date of $10.73 per share. As a condition of closing, some equity awards were required to be settled. The cost of settling the awards was included in the costs of the transaction. The consideration received, net of transaction costs, over our carrying value of the net assets of QVC resulted in a gain of approximately $3.290 billion, net of approximately $2.865 billion of related income taxes.

The results of operations of QVC prior to its disposition are included within income from discontinued operations, net of tax as follows (dollars in millions):

| Year Ended December 31, | 2003 | 2002 |
|---|---|---|
| Revenues | $ 2,915 | $ 4,381 |
| Income before income taxes and minority interest | $ 496 | $ 624 |
| Income tax expense | $ 184 | $ 263 |

For financial reporting purposes, the QVC transaction is presented as having occurred on September 1, 2003. As such, the 2003 period includes QVC operations through August 31, 2003, as reported to us by QVC.

6. INVESTMENTS

| (Dollars in millions) December 31, | 2004 | 2003 |
|---|---|---|
| Fair value method | | |
| Cablevision | $ 362 | $ 970 |
| Liberty Media Corporation | 1,098 | 2,644 |
| Liberty Media International | 366 | — |
| Microsoft | 626 | 1,331 |
| Sprint | 701 | 349 |
| Vodafone | 540 | 1,245 |
| Other | 24 | 44 |
| | 3,717 | 6,583 |
| Equity method, principally cable-related | 2,460 | 2,493 |
| Cost method, principally TWC and Time Warner | 8,190 | 8,235 |
| Total investments | 14,367 | 17,311 |
| Less: current investments | 1,555 | 2,493 |
| Non-current investments | $ 12,812 | $ 14,818 |

*Fair Value Method*

We hold unrestricted equity investments, which we account for as available for sale or trading securities, in publicly traded companies. Our investments in Liberty, Liberty Media International, Inc. ("Liberty International"), Microsoft, Sprint and Vodafone, and approximately 80% of our investment in Cablevision, are accounted for as trading securities. The net unrealized pre-tax gains on investments accounted for as available for sale securities as of December 31, 2004 and 2003, of $26 million and $65 million, respectively, have been reported in our consolidated balance sheet principally as a component of accumulated other comprehensive loss, net of related deferred income taxes of $9 million and $23 million, respectively.

On June 7, 2004, we received approximately 11 million shares of Liberty Media International, Inc. ("Liberty International")

Series A common stock in connection with the spin-off by Liberty of Liberty International. In the spin-off, each share of Liberty Series A and Series B common stock received 0.05 shares of the new Liberty International Series A common stock. Approximately 5 million of these shares collateralize a portion of the 10 year prepaid forward sale of Liberty common stock that we entered into in December 2003 (see below). On December 2, 2004, we sold 3 million shares of Liberty International Series A common stock to Liberty in a private transaction for proceeds of $128 million.

52

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

The cost, fair value and unrealized gains and losses related to our available for sale securities are as follows (dollars in millions):

| December 31, | | 2004 | | 2003 |
|---|---|---|---|---|
| Cost | $ | 65 | $ | 92 |
| Unrealized gains | | 26 | | 66 |
| Unrealized losses | | — | | (1) |
| Fair value | $ | 91 | $ | 157 |

Proceeds from the sales of available for sale securities for the years ended December 31, 2004, 2003 and 2002 were $67 million, $1.222 billion and $874 million, respectively. Gross realized gains and losses on these sales for the years ended December 31, 2004, 2003 and 2002 were $10 million, $27 million and ($48) million, respectively.

We also hold a series of option agreements (the "Microsoft Collars" and "Vodafone Collars") with a single bank counterparty that limits our exposure to and benefits from price fluctuations in the Microsoft common stock and Vodafone ADRs. Certain Microsoft Collars and Vodafone Collars are recorded in investments at fair value, with unrealized gains or losses being recorded to investment income (loss), net. These unrealized gains or losses are substantially offset by the changes in the fair value of shares of Microsoft common stock and Vodafone ADRs.

During 2004, we settled some of our obligations relating to our Cablevision, Microsoft and Vodafone exchangeable notes (see *Note 8*) by delivering approximately 26.9 million Cablevision shares, 21.4 million Microsoft shares and 19.5 million Vodafone ADRs to the counterparty upon maturity of the instruments.

During 2003, we sold all $4.0 billion principal amount of the Liberty Notes that we received in the sale of QVC for net proceeds of approximately $4.0 billion. In December 2003, we entered into a 10 year prepaid forward sale of 100 million shares of Liberty common stock and received $894 million in cash. At maturity, the counterparty is entitled to receive Liberty and Liberty International common stock, or an equivalent amount of cash at our option, based upon the market value of Liberty common stock at the time.

As of December 31, 2004, approximately $2.681 billion of our fair value method securities support our obligations under our exchangeable notes or prepaid forward contracts.

*Equity Method*

Our recorded investments exceed our proportionate interests in the book value of the investees' net assets by $1.469 billion and $1.696 billion as of December 31, 2004 and 2003, respectively (principally related to our 50% owned investments in Texas and Kansas City Cable Partners, L.P. and Insight Midwest). A portion of this basis difference has been attributed to franchise related customer relationships of the investees. This difference is amortized to equity in net income or loss of affiliates over a period of four years. As a result of the adoption of SFAS No. 142, we do not amortize the portion of the basis difference attributable to goodwill but will continue to test such excess for impairment in accordance with APB Opinion 18, "The Equity Method of Accounting for Investments in Common Stock."

Equity in net losses of affiliates for the years ended December 31, 2004 and 2002 includes impairment charges of $3 million and $31 million, respectively, related principally to other than temporary declines in our investments in and advances to certain of our equity method investees.

Summarized financial information for investments deemed significant and accounted for under the equity method was as follows (dollars in millions):

| | (A)GSI Commerce, Inc. | | Broadnet Consorcio, S.A. | | |
|---|---|---|---|---|---|
| Year ended December 31, | 2003 | 2002 | 2004 | 2003 | 2002 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ | 147 | $ | 173 | $ | 5 | $ | 3 | $ | 1 |
| Operating loss | | (16) | | (30) | | (15) | | (17) | | (23 |
| Loss from continuing operations before extraordinary items and cumulative effect of accounting change | | (15) | | (34) | | (15) | | (18) | | (23 |
| Net loss | | (15) | | (34) | | (15) | | (18) | | (23 |

<div align="center">53</div>

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

[A]      GSI Commerce, Inc. was an equity method investment of QVC, and such amounts are included within discontinued operations for all periods through QVC's sale date (see *Note 5)*.

On September 30, 2004, we sold our 20% interest in DHC Ventures, LLC (Discovery Health Channel) to Discovery Communications, Inc. for approximately $149 million in cash and recognized a gain on the sale of approximately $94 million to other income.

*Cost Method*

In connection with the TWE restructuring, we received a 21% economic stake in the business of TWC. This investment is accounted for under the cost method because we do not have the ability to exercise significant influence over the operating and financial policies of TWC (see *Note 5* ).

We hold two series of preferred stock of AirTouch Communications, Inc., a subsidiary of Vodafone, that are recorded at $1.423 billion and $1.409 billion as of December 31, 2004 and 2003, respectively. The dividend and redemption activity of the AirTouch preferred stock is tied to the dividend and redemption payments associated with substantially all of the preferred shares issued by one of our consolidated subsidiaries, which is a VIE. The subsidiary has three series of preferred stock outstanding with an aggregate redemption value of $1.750 billion. Substantially all of the preferred shares are redeemable in April 2020 at a redemption value of $1.650 billion, with one of the series bearing a 9.08% dividend rate. The two redeemable series of subsidiary preferred shares are recorded at $1.428 billion and $1.420 billion, and such amounts are included in other noncurrent liabilities as of December 31, 2004 and 2003, respectively. The non-redeemable series of subsidiary preferred shares is recorded at $100 million as of both December 31, 2004 and 2003, and such amounts are included in minority interest.

In connection with the Broadband acquisition, we acquired an indirect interest in CC VIII, LLC, a cable joint venture with Charter Communications, Inc. In April 2002, AT&T exercised its rights to cause Paul G. Allen, Charter's Chairman, or his designee to purchase this indirect interest. In June 2003, Paul Allen purchased our interest in CC VIII for $728 million in cash. We accounted for the sale of our interest in CC VIII at fair value with no gain or loss recognized.

*Investment Income (Loss), Net*

Investment income (loss), net includes the following (dollars in millions):

| Year ended December 31, | | 2004 | | 2003 | | 2002 |
|---|---|---|---|---|---|---|
| Interest and dividend income | $ | 160 | $ | 166 | $ | 53 |
| Gains (losses) on sales and exchanges of investments, net | | 45 | | 28 | | (48) |
| Investment impairment charges | | (16) | | (72) | | (247) |
| Unrealized gains (losses) on trading securities | | 378 | | 965 | | (1,569) |
| Mark to market adjustments on derivatives related to trading securities | | (120) | | (818) | | 1,284 |
| Mark to market adjustments on derivatives and hedged items | | 25 | | (353) | | (16) |
| Investment income (loss), net | $ | 472 | $ | (84) | $ | (543) |

The investment impairment charges for the years ended December 31, 2003 and 2002 relate principally to other than temporary declines in our investment in AT&T.

54

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

7. GOODWILL AND INTANGIBLE ASSETS

The changes in the carrying amount of goodwill by business segment (see *Note 14* ) for the periods presented are as follows (dollars in millions):

| | Cable | Content | Corporate and Other | Total |
|---|---|---|---|---|
| Balance, December 31, 2002 | $ 15,644 | $ 722 | $ 196 | $ 16,562 |
| Purchase price allocation adjustments | (1,773) | — | — | (1,773) |
| Acquisitions | — | 52 | — | 52 |
| Intersegment transfers | 20 | — | (20) | — |
| Balance, December 31, 2003 | $ 13,891 | $ 774 | $ 176 | $ 14,841 |
| Purchase price allocation adjustments | (964) | — | 4 | (960) |
| Acquisitions | 71 | 50 | 18 | 139 |
| Balance, December 31, 2004 | $ 12,998 | $ 824 | $ 198 | $ 14,020 |

During 2004, the decrease to goodwill relates to the settlement or adjustment of various liabilities associated with the Broadband acquisition.

The gross carrying amount and accumulated amortization of our intangible assets subject to amortization are as follows (dollars in millions):

| December 31, | 2004 | | 2003 | |
|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Franchise related customer relationships | $ 3,408 | $ (2,030) | $ 3,386 | $ (1,090) |
| Cable and satellite television distribution rights | 1,388 | (530) | 1,303 | (430) |
| Cable franchise renewal costs and contractual operating rights | 882 | (188) | 394 | (126) |
| Computer software | 540 | (110) | 259 | (76) |
| Patents and other technology rights | 105 | (11) | — | — |
| Programming costs and rights | 560 | (371) | 338 | (274) |
| Other agreements and rights | 420 | (212) | 361 | (186) |
| | $ 7,303 | $ (3,452) | $ 6,041 | $ (2,182) |

As of December 31, 2004, the weighted average amortization period for our intangible assets subject to amortization is 4.6 years and estimated related amortization expense for each of the next five years ended December 31 is as follows (dollars in millions):

| | |
|---|---|
| 2005 | $ 1,146 |
| 2006 | 786 |
| 2007 | 483 |
| 2008 | 267 |
| 2009 | 216 |

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

8. LONG-TERM DEBT

| (Dollars in millions) December 31, | Weighted Average Interest Rate at December 31, 2004 | 2004 | 2003 |
|---|---|---|---|
| Exchangeable notes, due 2004 - 2007 | 4.18% | $ 1,699 | $ 4,318 |
| Commercial paper | 2.68% | 320 | — |
| Senior notes, due 2004 - 2097 | 7.54% | 19,781 | 20,735 |
| Senior subordinated notes, due 2006 - 2012 | 10.58% | 363 | 372 |
| ZONES due 2029 | 2.00% | 708 | 783 |
| Debt supporting Trust Preferred Securities, due 2027 | 9.65% | 285 | 301 |
| Other, including capital lease obligations | — | 436 | 487 |
| | | 23,592 | 26,996 |
| Less: current portion | | 3,499 | 3,161 |
| Long-term debt | | $ 20,093 | $ 23,835 |

Maturities of long-term debt outstanding as of December 31, 2004 for the four years after 2005 are as follows (dollars in millions):

| 2006 | $ 1,697 |
|---|---|
| 2007 | 786 |
| 2008 | 1,496 |
| 2009 | 1,358 |

*The Cross-Guarantee Structure*

We and a number of our wholly-owned subsidiaries that hold substantially all of our cable assets have unconditionally guaranteed each other's debt securities and indebtedness for borrowed money, including amounts outstanding under the new credit facilities. As of December 31, 2004, $20.223 billion of our debt was included in the cross-guarantee structure.

Comcast Holdings is not a guarantor, and none of its debt is guaranteed under the cross-guarantee structure. As of December 31, 2004, $950 million of our debt was outstanding at Comcast Holdings.

*Lines and Letters of Credit*

As of December 31, 2004, we and certain of our subsidiaries had unused lines of credit of $4.062 billion under their respective credit facilities.

As of December 31, 2004, we and certain of our subsidiaries had unused irrevocable standby letters of credit totaling $442 million to cover potential fundings under various agreements.

*Commercial Paper*

In June 2004, we entered into a commercial paper program to provide a lower cost borrowing source of liquidity to fund our short-term working capital requirements. The program allows for a maximum of $2.25 billion of commercial paper to be issued at any one time. Our revolving bank credit facility supports this program. Amounts outstanding under the program are classified as long-term in our consolidated balance sheet because we have both the ability and the intent to refinance these obligations, if necessary, on a long-term basis with amounts available under our revolving bank credit facility.

*Revolving Bank Credit Facility*

In January 2004, we entered into a $4.5 billion, five-year revolving bank credit facility. Interest rates on this facility vary based on an underlying base rate ("Base Rate"), chosen at our option, plus a borrowing margin. The Base Rate is either LIBOR or the greater of the prime rate or the Federal Funds rate plus 0.5%. The borrowing margin is based on our senior unsecured debt ratings. The interest rate for borrowings under this revolver is LIBOR plus 0.625% based on our current credit ratings.

56

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

*Notes Exchangeable into Common Stock*

We hold exchangeable notes (the "Exchangeable Notes") that are mandatorily redeemable at our option into shares of Cablevision Class A common stock or its cash equivalent, Microsoft common stock or its cash equivalent, (i) Vodafone ADRs, (ii) the cash equivalent, or (iii) a combination of cash and Vodafone ADRs, and Comcast Class A Special common stock or its cash equivalent. The maturity value of the Exchangeable Notes varies based upon the fair market value of the security to which it is indexed. Our Exchangeable Notes are collateralized by our investments in Cablevision, Microsoft and Vodafone, respectively, and the Comcast Class A Special common stock held in treasury (see *Note 6*).

During 2004, we redeemed an aggregate of $847 million face amount of notes exchangeable into Comcast common stock (covering approximately 22.5 million shares of our Class A Special common stock) prior to their scheduled maturity dates by paying $609 million in cash and by exercising our options to put the underlying equity collar agreements to the counterparties. Interest expense for 2004 includes $31 million related to the early redemption of these obligations. As of December 31, 2004, $272 million of Comcast exchangeable notes, which are due in November 2005, remain outstanding. The remaining outstanding notes exchangeable into Comcast common stock are collateralized by approximately 8.4 million shares of our Class A Special common stock held in treasury.

During 2004 and 2003, we settled an aggregate of $2.359 billion face amount and $1.213 billion face amount, respectively, of our obligations relating to our Exchangeable Notes by delivering the underlying Cablevision and Microsoft shares and Vodafone ADRs to the counterparties upon maturity of the instruments, and the equity collar agreements related to the underlying securities were exercised. These transactions represented non-cash investing and financing activities and had no effect on our statement of cash flows due to their non-cash nature.

As of December 31, 2004, the securities we hold collateralizing the Exchangeable Notes were sufficient to substantially satisfy the debt obligations associated with the outstanding Exchangeable Notes (*see Notes 6* and *12* ).

*Repayments of Senior Notes*

On March 31, 2004, we repaid all $250 million principal amount of our 8.875% senior notes due 2007. On May 1, 2004, we repaid all $300 million principal amount of our 8.125% senior notes due 2004. These repayments were both financed with available cash. On September 15, 2004, we repaid all $300 million principal amount of our 8.65% senior notes due 2004. The repayment was financed with borrowings under our commercial paper program and available cash.

*ZONES*

At maturity, holders of our 2.0% Exchangeable Subordinated Debentures due 2029 (the "ZONES") are entitled to receive in cash an amount equal to the higher of the principal amount of the ZONES of $1.807 billion or the market value of Sprint common stock. Prior to maturity, each ZONES is exchangeable at the holder's option for an amount of cash equal to 95% of the market value of Sprint common stock.

We separated the accounting for the Exchangeable Notes and the ZONES into derivative and debt components. We record the change in the fair value of the derivative component of the Exchangeable Notes and the ZONES (see *Note 6*) and the change in the carrying value of the debt component of the Exchangeable Notes and the ZONES as follows (in millions):

| Year ended December 31, 2004 | | Exchangeable Notes | | ZONES |
|---|---|---|---|---|
| **Balance at Beginning of Year:** | | | | |
| Debt component | $ | 5,030 | $ | 515 |
| Derivative component | | (712) | | 268 |
| Total | | 4,318 | | 783 |
| Decrease in debt component due to maturities and redemptions | | (3,206) | | — |
| Change in debt component to interest expense | | (63) | | 25 |

| | | | | |
|---|---|---|---|---|
| Change in derivative component due to settlements | | | 653 | — |
| Change in derivative component to investment income (loss), net | | | (3) | (100) |
| Balance at End of Year: | | | | |
| Debt component | | | 1,761 | 540 |
| Derivative component | | | (62) | 168 |
| Total | | $ | 1,699 | $ 708 |

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

*Interest Rates*

Excluding the derivative component of the Exchangeable Notes and the ZONES whose changes in fair value are recorded to investment income (loss), net, our effective weighted average interest rate on our total debt outstanding was 7.38% and 7.08% as of December 31, 2004 and 2003, respectively. As of December 31, 2004 and 2003, accrued interest was $444 million and $481 million, respectively.

*Interest Rate Risk Management*

We are exposed to the market risk of adverse changes in interest rates. To manage the volatility relating to these exposures, our policy is to maintain a mix of fixed and variable rate debt and to enter into various interest rate derivative transactions as described below.

Using swaps, we agree to exchange, at specified intervals, the difference between fixed and variable interest amounts calculated by reference to an agreed-upon notional principal amount. Rate locks are used to hedge the risk that the cash flows related to the interest payments on an anticipated issuance or assumption of fixed rate debt may be adversely affected by interest rate fluctuations.

The following table summarizes the terms of our existing swaps (dollars in millions):

|  | | Notional Amount | Maturities | Average Pay Rate | Average Receive Rate | Estimated Fair Value |
|---|---|---|---|---|---|---|
| *As of December 31, 2004* | | | | | | |
| Variable to Fixed Swaps | $ | 488 | 2005 | 7.6% | 3.0% $ | 8 |
| Fixed to Variable Swaps | $ | 3,900 | 2006 – 2027 | 4.6% | 6.3% $ | 9 |
| | | | | | | |
| *As of December 31, 2003* | | | | | | |
| Variable to Fixed Swaps | $ | 1,203 | 2004 – 2005 | 7.6% | 1.7% $ | 25 |
| Fixed to Variable Swaps | $ | 2,450 | 2006 – 2027 | 3.7% | 6.6% $ | 15 |

The notional amounts of interest rate instruments, as presented in the above table, are used to measure interest to be paid or received and do not represent the amount of exposure to credit loss. The estimated fair value approximates the proceeds to settle the outstanding contracts. Swaps and rate locks represent an integral part of our interest rate risk management program. During 2004, we decreased our interest expense by approximately $66 million through our interest rate risk management program. Our interest rate derivative financial instruments did not have a significant effect on interest expense for the years ended December 31, 2003 and 2002.

In 2002, we entered into rate locks to hedge the risk that the cash flows related to the interest payments on an anticipated issuance or assumption of fixed rate debt in connection with the Broadband acquisition may be adversely affected by interest rate fluctuations. Upon the assumption of fixed rate debt in connection with the Broadband acquisition, the value of the rate locks is being recognized as an adjustment to interest expense, similar to a deferred financing cost, over 15 years, which is the same period in which the related interest costs on the debt are recognized in earnings. The unrealized pre-tax losses on cash flow hedges as of December 31, 2004 and 2003, of $196 million and $213 million, respectively, have been reported in our balance sheet as a component of accumulated other comprehensive income (loss), net of related deferred income taxes of $69 million and $75 million, respectively.

*Estimated Fair Value*

Our debt had estimated fair values of $26.459 billion and $30.427 billion as of December 31, 2004 and 2003, respectively. The

estimated fair value of our publicly traded debt is based on quoted market prices for that debt. Interest rates that are currently available to us for issuance of debt with similar terms and remaining maturities are used to estimate fair value for debt issues for which quoted market prices are not available.

*Debt Covenants*

Some of our and our subsidiaries' loan agreements require that we maintain financial ratios based on debt, interest and operating income before depreciation and amortization, as defined in the agreements. In addition, some of our subsidiaries' loan agreements contain restrictions on dividend payments and advances of funds to us. We were in compliance with all financial covenants for all periods presented.

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

9. PENSION, POSTRETIREMENT AND OTHER EMPLOYEE BENEFIT PLANS

We sponsor two former Broadband pension plans that together provide benefits to substantially all former Broadband employees. Future benefits for both plans have been frozen, except for some union groups and some change-in-control payments.

The following table provides condensed information relating to our pension benefits and postretirement benefits for the periods presented (dollars in millions):

| | 2004 | | 2003 | |
|---|---|---|---|---|
| Year Ended December 31, | Pension Benefits | Postretirement Benefits | Pension Benefits | Postretirement Benefits |
| Net periodic benefit cost | $ 9 | $ 23 | $ 15 | $ 19 |
| Benefit obligation | $ 189 | $ 207 | $ 234 | $ 200 |
| Fair value of plan assets | $ 72 | $ — | $ 69 | $ — |
| Plan funded status and recorded benefit obligation | $ (117) | $ (215) | $ (166) | $ (195) |
| Discount rate | 5.75% | 6.00% | 6.00% | 6.25% |
| Expected return on plan assets | 7.00% | N/A | 7.00% | N/A |

We sponsor various retirement-investment plans that allow eligible employees to contribute a portion of their compensation through payroll deductions in accordance with specified guidelines. We match a percentage of the employees' contributions up to certain limits. Expenses related to these plans amounted to $100 million, $85 million and $28 million for the years ended December 31, 2004, 2003 and 2002, respectively.

We also maintain unfunded, non-qualified deferred compensation plans, which were created for key executives, other members of management and non-employee directors (each a "Participant"). The amount of compensation deferred by each Participant is based on Participant elections. Account balances of Participants are credited with income based generally on a fixed annual rate of interest. Participants will be eligible to receive distributions of the amounts credited to their account balance based on elected deferral periods that are consistent with the plans and applicable tax law. Interest expense recognized under the plans totaled $33 million, $22 million and $15 million for the years ended December 31, 2004, 2003 and 2002, respectively. The unfunded obligation of the plans total $396 million and $294 million as of December 31, 2004 and 2003, respectively.

10. STOCKHOLDERS' EQUITY

*Preferred Stock*

We are authorized to issue, in one or more series, up to a maximum of 20 million shares of preferred stock. We can issue the shares with such designations, preferences, qualifications, privileges, limitations, restrictions, options, conversion rights and other special or related rights as our board of directors shall from time to time fix by resolution.

*Common Stock*

Our Class A Special common stock is generally nonvoting. Holders of our Class A common stock in the aggregate hold $66^2/3$% of the aggregate voting power of our common stock. The number of votes that each share of our Class A common stock will have at any given time will depend on the number of shares of Class A common stock and Class B common stock then outstanding. Each share of our Class B common stock is entitled to 15 votes, and all shares of our Class B common stock in the aggregate have $33^1/3$% of the voting power of all of our common stock. The $33^1/3$% aggregate voting power of our Class B common stock will not be diluted by additional issuances of any other class of our common stock. Our Class B common stock is convertible, share for share, into Class A or Class A Special common stock, subject to certain restrictions.

*Treasury Stock*

Various Broadband subsidiaries held AT&T preferred stock convertible into AT&T common stock. Prior to the closing of the Broadband acquisition, these subsidiaries converted the AT&T preferred stock into AT&T common stock. Upon closing of the Broadband acquisition, the shares of Broadband common stock were exchanged for approximately 243.6 million shares of our Class A common stock. We classified these shares, which are held by some of our subsidiaries, as treasury stock within stockholders' equity. The shares were valued at $6.391 billion based on the closing share price of our Class A common stock as of the closing date of the Broadband acquisition and will continue to be carried at this amount. The shares are deemed issued but not outstanding and are not included in the computation of Diluted EPS.

<center>59</center>

---

# Notes to Consolidated Financial Statements (Continued)

## Years Ended December 31, 2004, 2003 and 2002

Prior to the Broadband acquisition, Broadband held approximately 47.3 million shares of our Class A Special common stock that collateralized the related Comcast exchangeable notes (see *Note 8*). Upon closing of the Broadband acquisition, we classified these shares, which are held by our subsidiary, as treasury stock within stockholders' equity. The shares were valued based on the closing share price of our Class A Special common stock as of the closing date of the Broadband acquisition. The shares are deemed issued but not outstanding and are not included in the computation of Diluted EPS because it is our intent to settle the related Comcast exchangeable notes using cash.

*Board-Authorized Repurchase Program*

During 2004, we repurchased approximately 46.9 million shares of our Class A Special common stock for aggregate consideration of $1.328 billion pursuant to our Board-authorized, $2 billion share repurchase program. We expect such repurchases to continue from time to time in the open market or in private transactions, subject to market conditions.

The following table summarizes our share activity for the three years ended December 31, 2004:

| | Common Stock | | |
| | Class A | Class A Special | Class B |
|---|---|---|---|
| Balance, January 1, 2002 | 21,829,422 | 913,931,554 | 9,444,375 |
| Acquisitions | 1,577,117,883 | 14,376,283 | — |
| Shares classified as treasury stock | (243,640,500) | (47,289,843) | — |
| Stock compensation plans | 66,843 | 1,861,961 | — |
| Employee Stock Purchase Plan | — | 463,635 | — |
| Balance, December 31, 2002 | 1,355,373,648 | 883,343,590 | 9,444,375 |
| Stock compensation plans | 1,451,469 | 1,807,358 | — |
| Employee Stock Purchase Plan | 695,440 | 137,085 | — |
| Repurchases of common stock | — | (845,000) | — |
| Balance, December 31, 2003 | 1,357,520,557 | 884,443,033 | 9,444,375 |
| Stock compensation plans | 1,024,856 | 5,435,772 | — |
| Employee Stock Purchase Plan | 1,134,951 | — | — |
| Repurchases of common stock | — | (46,934,235) | — |
| Balance, December 31, 2004 | 1,359,680,364 | 842,944,570 | 9,444,375 |

*Stock-Based Compensation Plans*

As of December 31, 2004, we and our subsidiaries have several stock-based compensation plans for certain employees, officers and directors. These plans are described below.

*Comcast Option Plans.* We maintain stock option plans for certain employees, directors and other persons under which fixed stock options are granted and the option price is generally not less than the fair value of a share of the underlying stock at the date of grant (collectively, the "Comcast Option Plans"). Under the Comcast Option Plans, approximately 182 million shares of our Class A and Class A Special common stock were reserved for issuance upon the exercise of options, including those outstanding as of December 31, 2004. Option terms are generally 10 years, with options generally becoming exercisable between two and nine-and-one-half years from the date of grant.

60

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

The following table summarizes the activity of the Comcast Option Plans (options in thousands):

| | 2004 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|
| | Options | Weighted-Average Exercise Price | Options | Weighted-Average Exercise Price | Options | Weighted-Average Exercise Price |
| **Class A Common Stock** | | | | | | |
| Outstanding at beginning of year | 85,151 $ | 39.28 | 63,575 $ | 43.31 | — | — |
| Options exchanged for outstanding Broadband options in connection with acquisition | — | — | — | — | 61,094 $ | 44.17 |
| Granted | 16,190 | 29.86 | 25,206 | 28.84 | 2,762 | 24.85 |
| Exercised | (986) | 19.51 | (1,264) | 20.44 | (43) | 17.79 |
| Forfeited, expired, cancelled or repurchased | (18,011) | 42.37 | (2,366) | 47.14 | (238) | 55.19 |
| Outstanding at end of year | 82,344 | 36.99 | 85,151 | 39.28 | 63,575 | 43.31 |
| Exercisable at end of year | 43,284 | 44.36 | 56,110 | 44.90 | 58,135 | 44.91 |
| **Class A Special Common Stock** | | | | | | |
| Outstanding at beginning of year | 60,464 $ | 29.43 | 64,890 $ | 28.57 | 55,521 $ | 26.89 |
| Granted | — | — | — | — | 13,857 | 32.29 |
| Exercised | (4,207) | 11.53 | (3,176) | 8.92 | (2,347) | 8.83 |
| Forfeited, expired, cancelled or repurchased | (1,019) | 35.53 | (1,250) | 36.19 | (2,141) | 30.38 |
| Outstanding at end of year | 55,238 | 30.67 | 60,464 | 29.43 | 64,890 | 28.57 |
| Exercisable at end of year | 48,394 | 31.20 | 29,212 | 25.26 | 22,798 | 21.08 |

The following table summarizes information about the options outstanding under the Comcast Option Plans as of December 31, 2004 (options in thousands):

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable | Weighted-Average Exercise Price |
| *Class A Common Stock* | | | | | |
| $5.43 – $15.21 | 1,305 | 1.8 years | $ 10.01 | 1,305 | $ 10.01 |
| $16.11 – $27.74 | 22,086 | 7.4 years | 26.27 | 5,996 | 24.69 |
| $27.76 – $33.73 | 32,272 | 6.8 years | 31.01 | 9,824 | 32.38 |
| $33.89 – $45.07 | 9,927 | 2.7 years | 38.42 | 9,405 | 38.50 |
| $45.08 – $60.89 | 10,052 | 4.0 years | 55.31 | 10,052 | 55.31 |
| $60.90 – $89.85 | 6,702 | 4.1 years | 77.79 | 6,702 | 77.79 |
| | 82,344 | | | 43,284 | |

| Class A Special Common Stock | | | | | | |
|---|---|---|---|---|---|---|
| $7.31 – $14.94 | 4,875 | 2.1 years | $ | 11.29 | 4,873 | $ | 11.29 |
| $16.94 – $25.58 | 12,118 | 4.5 years | | 18.50 | 8,248 | 17.69 |
| $27.04 – $35.49 | 15,849 | 6.0 years | | 34.10 | 14,248 | 34.14 |
| $35.53 – $45.17 | 20,947 | 5.8 years | | 38.25 | 19,603 | 38.28 |
| $45.94 – $53.13 | 1,449 | 5.0 years | | 50.43 | 1,422 | 50.40 |
| | 55,238 | | | | 48,394 | |

61

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

*Stock Option Liquidity Program.* During 2004, we repurchased 11.1 million options from various non-employee holders of stock options under a stock option liquidity program, targeted primarily to former Broadband employees. The former option holders received $37 million for their options under the program. Our financial counterparty in connection with the stock option liquidity program funded the cost of the program through the simultaneous purchase by the counterparty of new stock options from us that had similar economic terms as the options being purchased by us from the option holders. As a result, 11.1 million options remain outstanding, with a weighted-average exercise price of $45.64 per share and expire over the course of the next 8 years. These options are excluded from options outstanding in the preceding tables at dates subsequent to this transaction. We will benefit from the elimination of ongoing administrative expenses, such as the indirect employee time associated with servicing this option holder group.

*Subsidiary Option Plans.* Some of our subsidiaries maintain combination stock option/stock appreciation rights ("SAR") plans (collectively, the "Tandem Plans") for employees, officers, directors and other designated persons. Under the Tandem Plans, the option price is generally not less than the fair value, as determined by an independent appraisal, of a share of the underlying common stock at the date of grant. If the eligible participant elects the SAR feature of the Tandem Plans, the participant receives 75% of the excess of the fair value of a share of the underlying common stock over the exercise price of the option to which it is attached at the exercise date. The holders of a majority of the outstanding options have stated an intention not to exercise the SAR feature of the Tandem Plans. Because the exercise of the option component is more likely than the exercise of the SAR feature, compensation expense is measured based on the stock option component. Under the Tandem Plans, option/SAR terms are 10 years from the date of grant, with options/SARs generally becoming exercisable over 4 to 5 years from the date of grant.

*Other Stock-Based Compensation Plans*

We maintain a restricted stock plan under which certain employees may be granted restricted share awards in our Class A or Class A Special common stock (the "Restricted Stock Plan"). The share awards vest annually, generally over a period not to exceed five years from the date of the award, and do not have voting rights. At December 31, 2004, there were 2,536,000 shares of our Class A common stock and 392,000 shares of our Class A Special common stock issuable in connection with restricted share awards under the Restricted Stock Plan.

The following table summarizes information related to our Restricted Stock Plan:

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Share awards granted (in thousands) | 2,490 | 197 | 61 |
| Weighted-average fair value per share at date of grant | $ 31.09 | $ 30.85 | $ 28.47 |
| Compensation expense (dollars in millions) | $ 33 | $ 8 | $ 8 |

We also maintain a deferred stock option plan for certain employees, officers and directors that provides the optionees with the opportunity to defer the receipt of shares of our Class A or Class A Special common stock which would otherwise be deliverable upon exercise by the optionees of their stock options. As of December 31, 2004, 1.7 million shares of Class A Special common stock were issuable under options exercised but the receipt of which was irrevocably deferred by the optionees pursuant to our deferred stock option plan.

62

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

11. INCOME TAXES

We join with our 80% or more owned subsidiaries in filing consolidated federal income tax returns. E! Entertainment files separate consolidated federal income tax returns. Income tax (expense) benefit consists of the following components (dollars in millions):

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| **Current (expense) benefit** | | | |
| Federal | $ (90) | $ 846 | $ 73 |
| State | (205) | (10) | (40) |
| | (295) | 836 | 33 |
| **Deferred (expense) benefit** | | | |
| Federal | (589) | (886) | 88 |
| State | 58 | 66 | 7 |
| | (531) | (820) | 95 |
| Income tax (expense) benefit | $ (826) | $ 16 | $ 128 |

Our effective income tax (expense) benefit differs from the statutory amount because of the effect of the following items (dollars in millions):

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Federal tax at statutory rate | $ (634) | $ 48 | $ 193 |
| State income taxes, net of federal benefit | (96) | 37 | (22) |
| Foreign income and equity in net losses of affiliates | (9) | 23 | 3 |
| Adjustments to prior year accrual | (82) | (90) | (45) |
| Other | (5) | (2) | (1) |
| Income tax (expense) benefit | $ (826) | $ 16 | $ 128 |

Our net deferred tax liability consists of the following components (dollars in millions):

| December 31, | 2004 | 2003 |
|---|---|---|
| **Deferred tax assets:** | | |
| Net operating loss carryforwards | $ 483 | $ 224 |
| Differences between book and tax basis of long-term debt | 221 | 231 |
| Non-deductible accruals and other | 956 | 1,339 |
| | 1,660 | 1,794 |
| **Deferred tax liabilities:** | | |
| Differences between book and tax basis of property and equipment and intangible assets | $ 23,414 | $ 21,991 |
| Differences between book and tax basis of investments | 4,855 | 5,926 |
| Differences between book and tax basis of indexed debt securities | 566 | 456 |

|                          |   |         |   |        |
|--------------------------|---|---------|---|--------|
|                          |   | 28,835  |   | 28,373 |
| Net deferred tax liability | $ | 27,175 | $ | 26,579 |

We increased net deferred income tax liabilities by an additional $77 million in 2004, principally in connection with adjustments made to the Broadband purchase price allocation, the Liberty exchange and the TechTV acquisition. We recorded an increase (decrease) of $(12) million, $3 million and $(152) million to net deferred income tax liabilities in 2004, 2003 and 2002, respectively, in connection with unrealized gains (losses) on marketable securities and cash flow hedges that are included in accumulated other comprehensive income (loss).

We have recorded net deferred tax liabilities of $360 million and $679 million, as of December 31, 2004 and 2003, respectively, which have been included in current liabilities, related primarily to our current investments. We have federal net operating loss carryforwards of $565 million and various state carryforwards that expire in periods through 2024. The determination of the state net operating loss

63

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

carryforwards are dependent upon the subsidiaries' taxable income or loss, apportionment percentages and other respective state laws, which can change from year to year and impact the amount of such carryforward.

In 2004, 2003 and 2002, income tax benefits attributable to employee stock option transactions of approximately $80 million, $19 million and $27 million, respectively, were allocated to stockholders' equity.

In the normal course of business, our tax returns are subject to examination by various taxing authorities. Such examinations may result in future tax and interest assessments by these taxing authorities, and we have accrued a liability when we believe that it is probable that we will be assessed. Differences between the estimated and actual amounts determined upon ultimate resolution, individually or in the aggregate, are not expected to have a material adverse effect on our consolidated financial position but could possibly be material to our consolidated results of operations or cash flow of any one period.

12.  STATEMENT OF CASH FLOWS—SUPPLEMENTAL INFORMATION

The following table summarizes the fair values of the assets and liabilities associated with the Broadband acquisition, which is considered a non-cash financing and investing activity (see *Note 5* ) (dollars in millions):

| Year Ended December 31, | | 2002 |
|---|---|---|
| Current assets | $ | 1,533 |
| Investments | | 17,325 |
| Property and equipment | | 11,757 |
| Intangible assets | | 46,510 |
| Other noncurrent assets | | 300 |
| Current liabilities | | (4,694) |
| Short-term debt and current portion of long-term debt | | (8,049) |
| Long-term debt | | (16,811) |
| Deferred income taxes | | (17,541) |
| Other noncurrent liabilities and minority interest | | (5,831) |
| Comcast shares held by Broadband | | 1,126 |
| Net assets acquired | $ | 25,625 |

The following table summarizes our cash payments for interest and income taxes (dollars in millions):

| Year Ended December 31, | | 2004 | | 2003 | | 2002 |
|---|---|---|---|---|---|---|
| Interest | $ | 1,898 | $ | 2,053 | $ | 788 |
| Income taxes | $ | 205 | $ | 945 | $ | 33 |

During 2004, we:

•  received federal income tax refunds of approximately $591 million,

•  settled through non-cash financing and investing activities approximately $1.944 billion related to our Exchangeable Notes (see *Note 8* ),

•  acquired cable systems through the assumption of $68 million of debt, which is considered a non-cash investing and financing activity,

- issued shares of G4 with a value of approximately $70 million in connection with the acquisition of TechTV (see *Note 5* ), which is considered a non-cash financing and investing activity; and

- received non-cash consideration of approximately $475 million in connection with the Liberty Exchange Agreement (see *Note 5* ), which is considered a non-cash investing activity.

During 2003, we:

- settled through non-cash financing and investing activities approximately $1.353 billion related to our Exchangeable Notes (see *Note 8* ) and

64

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

- received 218 million Liberty shares and $4 billion of Liberty Notes in connection with the sale of QVC, which are non-cash investing activities (see *Note 5* ).

13. COMMITMENTS AND CONTINGENCIES

*Commitments*

Our programming networks have entered into license agreements for programs and sporting events that are available for telecast. In addition, we, through Comcast-Spectacor, have employment agreements with both players and coaches of our professional sports teams. Certain of these employment agreements, which provide for payments that are guaranteed regardless of employee injury or termination, are covered by disability insurance if certain conditions are met.

Certain of our subsidiaries support debt compliance with respect to obligations of certain cable television partnerships and investments in which we hold an ownership interest (see *Note 6* ). The obligations expire between March 2007 and September 2010. Although there can be no assurance, we believe that we will not be required to meet our obligations under such commitments. The total notional amount of our commitments was $1.021 billion as of December 31, 2004, at which time there were no quoted market prices for similar agreements.

The following table summarizes our minimum annual commitments under program license agreements and our minimum annual rental commitments for office space, equipment and transponder service agreements under noncancelable operating leases as of December 31, 2004 (dollars in millions):

|  | Program License Agreements | Operating Leases | Total |
|---|---|---|---|
| 2005 | $        168 | $        190 | $        358 |
| 2006 | 165 | 163 | 328 |
| 2007 | 142 | 132 | 274 |
| 2008 | 147 | 111 | 258 |
| 2009 | 131 | 92 | 223 |
| Thereafter | 1,474 | 299 | 1,773 |

The following table summarizes our rental expense charged to operations (dollars in millions):

| Year Ended December 31, | 2004 | 2003 | 2002 |
|---|---|---|---|
| Rental expense | $    194 | $    157 | $    140 |

*Contingencies*

We and the minority owner group in Comcast-Spectacor each have the right to initiate an "exit" process under which the fair market value of Comcast-Spectacor would be determined by appraisal. Following such determination, we would have the option to acquire the interest in Comcast-Spectacor owned by the minority owner group based on the appraised fair market value. In the event we do not exercise this option, we and the minority owner group would then be required to use our best efforts to sell Comcast-Spectacor. This exit process includes the minority owner group's interest in CSN.

We hold 39.7% of our 60.5% interest in E! Entertainment through Comcast Entertainment Holdings, LLC ("Entertainment Holdings"), which is owned 50.1% by us and 49.9% by The Walt Disney Company ("Disney"). We own an additional 20.8% direct interest in E! Entertainment. Under a limited liability company agreement between us and Disney, we control E! Entertainment's operations. Under the agreement, Disney is entitled to trigger a potential exit process in which Entertainment

Holdings would have the right to purchase Disney's entire interest in Entertainment Holdings at its then fair market value (as determined by an appraisal process). If Disney exercises this right within a specified time period and Entertainment Holdings elects not to purchase Disney's interest, Disney then has the right to purchase, at appraised fair market value, either our entire interest in Entertainment Holdings or all of the shares of stock of E! Entertainment held by Entertainment Holdings. In the event that Disney exercises its right and neither Disney's nor our interest is purchased, Entertainment Holdings will continue to be owned as it is today, as if the exit process had not been triggered.

The minority owner of G4 is entitled to trigger an exit process whereby upon the fifth anniversary of the closing date and each successive anniversary of the closing date or the occurrence of certain other defined events, G4 would be required to purchase the minority owner's 15% interest at fair market value (as determined by an appraisal process).

65

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

<u>At Home.</u>

Litigation has been filed against us as a result of our alleged conduct with respect to our investment in and distribution relationship with At Home Corporation. At Home was a provider of high-speed Internet services that filed for bankruptcy protection in September 2001. Filed actions are: (i) class action lawsuits against us, Brian L. Roberts (our Chairman and Chief Executive Officer and a director), AT&T (the former controlling shareholder of At Home and also a former distributor of the At Home service) and others in the Superior Court of San Mateo County, California, alleging breaches of fiduciary duty in connection with transactions agreed to in March 2000 among At Home, AT&T, Cox Communications, Inc. (Cox is also an investor in At Home and a former distributor of the At Home service) and us; (ii) class action lawsuits against us, AT&T and others in the United States District Court for the Southern District of New York, alleging securities law violations and common law fraud in connection with disclosures made by At Home in 2001; (iii) a lawsuit brought in the United States District Court for the District of Delaware in the name of At Home by certain At Home bondholders against us, Brian L. Roberts, Cox and others, alleging breaches of fiduciary duty relating to the March 2000 transactions and seeking recovery of alleged short-swing profits of at least $600 million, pursuant to Section 16(b) of the Securities Exchange Act of 1934, as amended ("the 1934 Act"), purported to have arisen in connection with certain transactions relating to At Home stock, effected pursuant to the March 2000 agreements; and (iv) a lawsuit brought in the United States Bankruptcy Court for the Northern District of California by certain At Home bondholders against us, AT&T, AT&T Credit Holdings, Inc. and AT&T Wireless Services, Inc., seeking to avoid and recover certain alleged "preference" payments in excess of $89 million, allegedly made to the defendants prior to the At Home bankruptcy filing.

The actions in San Mateo County, California (item (i) above), have been stayed by the United States Bankruptcy Court for the Northern District of California, the court in which At Home filed for bankruptcy, as violating the automatic bankruptcy stay. The decision to stay the actions was affirmed by the District Court, and an appeal to the Court of Appeals for the Ninth Circuit is pending. In the Southern District of New York actions (item (ii) above), the court has dismissed the common law fraud claims against all defendants, leaving only the securities law claims. In a subsequent decision, the court limited the remaining claims against us and Mr. Roberts to disclosures that are alleged to have been made by At Home prior to August 28, 2000. Plaintiffs' motion for class certification is pending. The Delaware case (item (iii) above) was transferred to the United States District Court for the Southern District of New York. The court dismissed the Section 16(b) claims against us for failure to state a claim and the breach of fiduciary duty claim for lack of federal jurisdiction. The plaintiffs have appealed the decision dismissing the Section 16 (b) claims. They may also recommence the breach of fiduciary duty claim depending on the outcome of the Santa Clara, California, state court action against AT&T (described in item (i) below). In the meantime, we have entered into an agreement with plaintiffs tolling the statute of limitations for the breach of fiduciary duty claim. In the action in the United States Bankruptcy Court for the Northern District of California (item (iv) above), the parties filed a stipulation in January 2004, staying the case (on account of other pending litigation relating to the At Home bankruptcy) until such time as either party elects to resume the case.

Under the terms of the Broadband acquisition, we are contractually liable for 50% of any liabilities of AT&T relating to certain At Home litigation. For litigation in which we are contractually liable for 50% of any liabilities, AT&T will be liable for the other 50%. In addition to the actions against AT&T described in items (i), (ii) and (iv) above, (in which we are also a defendant), such litigation matters may also include two additional actions brought by At Home's bondholders' liquidating trust against AT&T (and not naming us): (i) a lawsuit filed against AT&T and certain of its senior officers in Santa Clara, California, state court alleging various breaches of fiduciary duties, misappropriation of trade secrets and other causes of action in connection with the transactions and prior and subsequent alleged conduct on the part of the defendants, and (ii) an action filed against AT&T in the District Court for the Northern District of California, alleging that AT&T infringes an At Home patent by using its broadband distribution and high-speed Internet backbone networks and equipment. Discovery in the Santa Clara action is nearly complete and trial is scheduled for May 2005. The action in the District Court for the Northern District of California is in the discovery stage.

We deny any wrongdoing in connection with the claims that have been made directly against us, our subsidiaries and Brian L. Roberts, and are defending all of these claims vigorously. The final disposition of these claims and the final resolution of our share (if any) of the AT&T At Home potential liabilities are not expected to have a material adverse effect on our consolidated financial position but could possibly be material to our consolidated results of operations of any one period. Further, no assurance can be given that any adverse outcome would not be material to our consolidated financial position.

66

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

AT&T—Wireless and Common Stock Cases.

Under the terms of the Broadband acquisition, we are potentially responsible for a portion of the liabilities arising from two purported securities class action lawsuits brought against AT&T and others and consolidated for pre-trial purposes in the United States District Court for the District of New Jersey. These lawsuits assert claims under Section 11 and Section 12(a)(2) of the Securities Act of 1933, as amended, and Section 10(b) of the 1934 Act.

The first lawsuit, for which our portion of any loss is up to 15%, alleges, among other things, that AT&T made material misstatements and omissions in the Registration Statement and Prospectus for the AT&T Wireless initial public offering ("Wireless Case"). In March 2004, the plaintiffs, and AT&T and the other defendants, moved for summary judgment in the Wireless Case. The New Jersey District Court denied the motions and the Judicial Panel on Multidistrict Litigation remanded the cases for trial to the United States District Court for the Southern District of New York, where they had originally been brought. No trial date has been set. We and AT&T believe that AT&T has meritorious defenses in the Wireless Case, and it is being vigorously defended.

The second lawsuit, for which our portion of any loss is 50%, alleges, among other things, that AT&T knowingly provided false projections relating to AT&T common stock ("Common Stock Case"). In October 2004, the plaintiffs, and AT&T and the other defendants, agreed to settle the Common Stock Case for $100 million, which was preliminarily approved by the court. We expect final approval of the settlement by the court in the second quarter of 2005. We have agreed to pay $50 million of the settlement amount.

In November 2004, AT&T brought suit against the D&O insurers in Delaware Superior Court, seeking a declaration of coverage and damages in the At Home cases, the Wireless Case and the Common Stock Case. This litigation is in its very early stages.

In connection with the Broadband acquisition, we recorded an estimate of the fair value of the potential liability associated with both the Wireless and Common Stock cases. As a result of the settlement reached during the fourth quarter of 2004, we reduced the fair value liability in the Common Stock Case by $250 million, which has been recognized in other income in our statement of operations.

AT&T—TCI.

In June 1998, the first of a number of purported class action lawsuits was filed by then-shareholders of Tele-Communications, Inc. ("TCI") Series A TCI Group Common Stock ("Common A") against AT&T and the directors of TCI relating to the acquisition of TCI by AT&T. A consolidated amended complaint combining the various different actions was filed in February 1999 in the Delaware Court of Chancery. The consolidated amended complaint alleges that former members of the TCI board of directors breached their fiduciary duties to Common A shareholders by agreeing to transaction terms whereby holders of the Series B TCI Group Common Stock received a 10% premium over what Common A shareholders received in connection with the transaction. The complaint further alleges that AT&T aided and abetted the TCI directors' breach of their fiduciary duties.

In connection with the TCI acquisition, which was completed in early 1999, AT&T agreed under certain circumstances to indemnify TCI's former directors for certain losses, expenses, claims or liabilities, potentially including those incurred in connection with this action. In connection with the Broadband acquisition, we agreed to indemnify AT&T for certain losses, expenses, claims or liabilities. Those losses and expenses potentially include those incurred by AT&T in connection with this action, both as a defendant and in connection with any obligation that AT&T may have to indemnify the former TCI directors for liabilities incurred as a result of the claims against them.

In July 2003, the Delaware Court of Chancery granted AT&T's motion to dismiss on the ground that the complaint failed to adequately plead AT&T's "knowing participation," as required to state a claim for aiding and abetting a breach of fiduciary duty. The other claims made in the complaint remain outstanding. Fact discovery in this matter is now closed. The former TCI director defendants anticipate filing a motion for summary judgment in February 2005. No trial date has been set.

The final disposition of these claims is not expected to have a material adverse effect on our consolidated financial position but could possibly be material to our consolidated results of operations of any one period. Further, no assurance can be given that any adverse outcome would not be material to our consolidated financial position.

Acacia.

In June 2004, Acacia Media Technologies Corporation ("Acacia") filed a lawsuit against us and others in the United States District Court for the Northern District of California. The complaint alleges infringement of certain United States patents that allegedly relate to systems and methods for transmitting and/or receiving digital audio and video content. The complaint seeks injunctive relief and damages in an unspecified amount. In the event that a Court ultimately determines that we infringe on any of the patents, we may be subject to substantial damages, which may include treble damages and/or an injunction that could require us to materially modify

67

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

certain products and services that we currently offer to subscribers. We believe that the claims are without merit and intend to defend the action vigorously.

The final disposition of this claim is not expected to have a material adverse effect on our consolidated financial position but could possibly be material to our consolidated results of operations of any one period. Further, no assurance can be given that any adverse outcome would not be material to our consolidated financial position.

Liberty Digital.

In January 2003, Liberty Digital, Inc. filed a complaint in Colorado state court against us. The complaint alleged that we breached a 1997 Contribution Agreement with Liberty Digital and that we tortiously interfered with that agreement. The complaint alleged that this agreement obligated us to pay fees to Liberty Digital totaling $18 million (increasing at CPI) per year through 2017. Liberty Digital sought, among other things, compensatory damages, specific performance of the agreement, a declaration that the agreement is valid and enforceable going forward, and an unspecified amount of exemplary damages from us based on the alleged intentional interference claim.

In July 2004, we entered into an exchange agreement with Liberty (the parent company of Liberty Digital). The transactions closed in July 2004 and resolved all claims in the litigation.

Other.

We are subject to other legal proceedings and claims that arise in the ordinary course of our business. The amount of ultimate liability with respect to such actions is not expected to materially affect our financial position, results of operations or liquidity.

14. FINANCIAL DATA BY BUSINESS SEGMENT

Our reportable segments consist of our Cable and Content businesses. Beginning in the first quarter of 2004, we elected to disclose our content businesses separately as a reportable segment even though our content segment does not meet the quantitative disclosure requirements of SFAS No. 131, "Disclosures About Segments of an Enterprise and Related Information." These consolidated financial statements present all periods on a comparable basis. Our content segment consists of our national networks E!, Style Network, TGC, OLN, G4 and International Channel Networks. In evaluating the profitability of our segments, the components of net income (loss) below operating income (loss) before depreciation and amortization are not separately evaluated by our management (dollars in millions).

| | Cable[1] | Content | Corporate and Other[2] | Eliminations[3] | Total |
|---|---|---|---|---|---|
| **2004** | | | | | |
| Revenues[4] | $ 19,316 | $ 787 | $ 332 | $ (128) | $ 20,307 |
| Operating income (loss) before depreciation and amortization[5] | 7,471 | 265 | (203) | (2) | 7,531 |
| Depreciation and amortization | 4,375 | 162 | 88 | (2) | 4,623 |
| Operating income (loss) | 3,096 | 103 | (291) | — | 2,908 |
| Assets | 103,727 | 2,533 | 1,112 | (2,678) | 104,694 |
| Capital expenditures | 3,622 | 17 | 21 | — | 3,660 |
| **2003** | | | | | |
| Revenues[4] | $ 17,492 | $ 628 | $ 341 | $ (113) | $ 18,348 |
| Operating income (loss) before depreciation and amortization[5] | 6,350 | 214 | (178) | 6 | 6,392 |
| Depreciation and amortization | 4,223 | 129 | 88 | (2) | 4,438 |
| Operating income (loss) | 2,127 | 85 | (266) | 8 | 1,954 |
| Assets | 105,316 | 2,048 | 1,945 | (150) | 109,159 |

| | | | | | |
|---|---|---|---|---|---|
| Capital expenditures | | 4,097 | 18 | 46 | — | 4,161 |

**2002**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Revenues[4] | $ | 7,350 | $ | 521 | $ | 302 | $ | (71) | $ | 8,102 |
| Operating income (loss) before depreciation and amortization[5] | | 2,798 | | 170 | | (126) | | (6) | | 2,836 |
| Depreciation and amortization | | 1,670 | | 129 | | 118 | | (2) | | 1,915 |
| Operating income (loss) | | 1,128 | | 41 | | (244) | | (4) | | 921 |
| Assets | | 106,291 | | 2,100 | | 4,808 | | (71) | | 113,128 |
| Capital expenditures | | 1,814 | | 12 | | 26 | | — | | 1,852 |

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

(1) Our regional sports and news networks CSN, CSN Mid-Atlantic, CSN Chicago, CSN West, CSS and CN8 are included in our cable segment.

(2) Corporate and other includes Comcast-Spectacor, corporate activities and all other businesses not presented in our cable or content segments. Assets included in this caption consist primarily of our investments (see *Note 6* ).

(3) Included in the Eliminations column in the table above are intersegment transactions that our segments enter into with one another. The most common types of transactions are the following:

- Our Content segment generates affiliate revenue by selling cable network programming to our Cable segment, which represents a substantial majority of the revenue elimination amount.

- Our Cable segment receives incentives offered by our Content segment when negotiating programming contracts that are recorded as a reduction of programming costs.

- Our Cable segment generates revenue by selling the use of satellite feeds to our Content segment.

- Our Cable segment generates revenue by selling the use of its fiber-optic lines and site conditioning to our Corporate and Other segment. Our Corporate and Other segment pays our Cable segment a lump sum and holds the property and the related depreciation expense and accumulated depreciation. Our Cable segment's revenue is generated through the amortization of the deferred revenue recorded for the lump sum payment.

- Our Corporate and Other segment generates revenue by selling long-distance services to our Cable segment.

(4) Non-U.S. revenues were not significant in any period. No single customer accounted for a significant amount of our revenue in any period.

(5) Operating income (loss) before depreciation and amortization is defined as operating income (loss) before depreciation and amortization, impairment charges, if any, related to fixed and intangible assets and gains or losses from the sale of assets, if any. As such, it eliminates the significant level of non-cash depreciation and amortization expense that results from the capital intensive nature of our businesses and intangible assets recognized in business combinations, and is unaffected by our capital structure or investment activities. Our management and Board of Directors use this measure in evaluating our consolidated operating performance and the operating performance of all of our operating segments. This metric is used to allocate resources and capital to our operating segments and is a significant component of our annual incentive compensation programs. We believe that this measure is also useful to investors as it is one of the bases for comparing our operating performance with other companies in our industries, although our measure may not be directly comparable to similar measures used by other companies. This measure should not be considered as a substitute for operating income (loss), net income (loss), net cash provided by operating activities or other measures of performance or liquidity reported in accordance with generally accepted accounting principles.

69

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

15. QUARTERLY FINANCIAL INFORMATION (UNAUDITED)

| (Dollars in millions, except per share data) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Total Year |
|---|---|---|---|---|---|
| **2004** | | | | | |
| Revenues | $ 4,908 | $ 5,066 | $ 5,098 | $ 5,235 | $ 20,307 |
| Operating income | 659 | 852 | 686 | 711 | 2,908 |
| Net income | 65 | 262 | 220 | 423 | 970 |
| | | | | | |
| Basic earnings for common stockholders per common share | 0.03 | 0.12 | 0.10 | 0.19 | 0.43 |
| Diluted earnings for common stockholders per common share | 0.03 | 0.12 | 0.10 | 0.19 | 0.43 |
| | | | | | |
| **2003** | | | | | |
| Revenues | $ 4,466 | $ 4,594 | $ 4,546 | $ 4,742 | $ 18,348 |
| Operating income[1] | 294 | 425 | 493 | 742 | 1,954 |
| Income (loss) from continuing operations | (355) | (93) | (153) | 383 | (218) |
| Income from discontinued operations[2] | 58 | 71 | 39 | — | 168 |
| Gain on discontinued operations[2] | — | — | 3,290 | — | 3,290 |
| Net income (loss) | (297) | (22) | 3,176 | 383 | 3,240 |
| | | | | | |
| Basic earnings (loss) for common stockholders per common share | | | | | |
| Income (loss) from continuing operations | (0.16) | (0.04) | (0.07) | 0.17 | (0.10) |
| Income from discontinued operations[2] | 0.03 | 0.03 | 0.02 | — | 0.08 |
| Gain on discontinued operations[2] | — | — | 1.46 | — | 1.46 |
| Net income (loss) | (0.13) | (0.01) | 1.41 | 0.17 | 1.44 |
| | | | | | |
| Diluted earnings (loss) for common stockholders per common share | | | | | |
| Income (loss) from continuing operations | (0.16) | (0.04) | (0.07) | 0.17 | (0.10) |
| Income from discontinued operations[2] | 0.03 | 0.03 | 0.02 | — | 0.08 |
| Gain on discontinued operations[2] | — | — | 1.46 | — | 1.46 |
| Net income (loss) | (0.13) | (0.01) | 1.41 | 0.17 | 1.44 |

[1] In the fourth quarter of 2003, we reduced our intangible assets as a result of obtaining updated valuation reports related to the Broadband acquisition. Accordingly, fourth quarter operating income includes a reduction in amortization expense of approximately $115 million related to prior quarters.

[2] In September 2003, we sold our interest in QVC to Liberty. QVC is presented as a discontinued operation for all periods presented.

70

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

16. CONDENSED CONSOLIDATING FINANCIAL INFORMATION

In November 2002, in order to simplify our capital structure, we and four of our cable holding company subsidiaries, Comcast Cable Communications, LLC ("CCCL"), Comcast Cable Communications Holdings, Inc. ("CCCH"), Comcast MO Group, Inc. ("Comcast MO Group"), and Comcast Cable Holdings, LLC ("CCH"), fully and unconditionally guaranteed each other's debt securities. On March 12, 2003, Comcast MO of Delaware, LLC ("Comcast MO of Delaware") was added to the cross-guarantee structure. Comcast MO Group and CCH (for the year ended December 31, 2002) and Comcast MO Group, CCH and Comcast MO of Delaware (as of December 31, 2004 and 2003, and for the years ended December 31, 2004 and 2003) are collectively referred to as the "Combined CCHMO Parents." Our condensed consolidating financial information is as follows (dollars in millions):

COMCAST CORPORATION
CONDENSED CONSOLIDATING BALANCE SHEET
AS OF DECEMBER 31, 2004

| | Comcast Parent | CCCL Parent | CCCH Parent | Combined CCHMO Parents | Non-Guarantor Subsidiaries | Elimination and Consolidation Adjustments | Consolidated Comcast Corporation |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Cash and cash equivalents | $ — | $ — | $ — | $ — | $ 452 | $ — | $ 452 |
| Investments | — | — | — | — | 1,555 | — | 1,555 |
| Accounts receivable, net | — | — | — | — | 959 | — | 959 |
| Other current assets | 15 | — | — | — | 554 | — | 569 |
| Total current assets | 15 | — | — | — | 3,520 | — | 3,535 |
| INVESTMENTS | — | | | | 12,812 | — | 12,812 |
| INVESTMENTS IN AND AMOUNTS DUE FROM SUBSIDIARIES ELIMINATED UPON CONSOLIDATION | 48,317 | 28,687 | 35,642 | 41,898 | 22,135 | (176,679) | — |
| PROPERTY AND EQUIPMENT, net | 8 | — | 3 | — | 18,700 | — | 18,711 |
| FRANCHISE RIGHTS | — | — | — | — | 51,071 | — | 51,071 |
| GOODWILL | | | | | 14,020 | | 14,020 |
| OTHER INTANGIBLE ASSETS, net | — | — | — | — | 3,851 | — | 3,851 |
| OTHER NONCURRENT ASSETS, net | 107 | 30 | 27 | | 530 | | 694 |
| Total Assets | $ 48,447 | $ 28,717 | $ 35,672 | $ 41,898 | $ 126,639 | $ (176,679) | $ 104,694 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | |
| Accounts payable and accrued expenses related to trade creditors | $ — | $ — | $ — | $ — | $ 2,041 | $ — | $ 2,041 |
| Accrued expenses and other current liabilities | 671 | 216 | 126 | 197 | 1,525 | — | 2,735 |
| Deferred income taxes | — | — | — | — | 360 | — | 360 |
| Current portion of long-term debt | — | 700 | — | 1,080 | 1,719 | — | 3,499 |
| Total current liabilities | 671 | 916 | 126 | 1,277 | 5,645 | — | 8,635 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| LONG-TERM DEBT, less current portion | 4,323 | 5,643 | 3,498 | 4,979 | 1,650 | — | 20,093 |
| DEFERRED INCOME TAXES | — | — | — | — | 26,815 | — | 26,815 |
| OTHER NONCURRENT LIABILITIES | 2,031 | 23 | — | — | 5,207 | — | 7,261 |
| MINORITY INTEREST | — | — | — | — | 468 | — | 468 |
| STOCKHOLDERS' EQUITY | | | | | | | |
| Common stock | 25 | — | — | — | — | — | 25 |
| Other stockholders' equity | 41,397 | 22,135 | 32,048 | 35,642 | 86,854 | (176,679) | 41,397 |
| Total Stockholders' Equity | 41,422 | 22,135 | 32,048 | 35,642 | 86,854 | (176,679) | 41,422 |
| Total Liabilities and Stockholders' Equity | $ 48,447 | $ 28,717 | $ 35,672 | $ 41,898 | $ 126,639 | $ (176,679) | $ 104,694 |

71

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

COMCAST CORPORATION
CONDENSED CONSOLIDATING BALANCE SHEET
AS OF DECEMBER 31, 2003

| | Comcast Parent | CCCL Parent | CCCH Parent | Combined CCHMO Parents | Non-Guarantor Subsidiaries | Elimination and Consolidation Adjustments | Consolidated Comcast Corporation |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Cash and cash equivalents | $ — | $ — | $ — | $ — | 1,550 | $ — | $ 1,550 |
| Investments | 50 | — | — | — | 2,443 | — | 2,493 |
| Accounts receivable, net | — | — | — | — | 907 | — | 907 |
| Other current assets | 15 | — | — | — | 438 | — | 453 |
| Total current assets | 65 | — | — | — | 5,338 | — | 5,403 |
| INVESTMENTS | — | — | — | — | 14,818 | — | 14,818 |
| INVESTMENTS IN AND AMOUNTS DUE FROM SUBSIDIARIES ELIMINATED UPON CONSOLIDATION | 46,268 | 26,643 | 33,138 | 39,919 | 19,678 | (165,646) | — |
| PROPERTY AND EQUIPMENT, net | 7 | — | 4 | — | 18,462 | — | 18,473 |
| FRANCHISE RIGHTS | — | — | — | — | 51,050 | — | 51,050 |
| GOODWILL | — | — | — | — | 14,841 | — | 14,841 |
| OTHER INTANGIBLE ASSETS, net | — | — | — | — | 3,859 | — | 3,859 |
| OTHER NONCURRENT ASSETS, net | 87 | 43 | 30 | — | 555 | — | 715 |
| Total Assets | $ 46,427 | $ 26,686 | $ 33,172 | $ 39,919 | 128,601 | $ (165,646) | $ 109,159 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | |
| Accounts payable and accrued expenses related to trade creditors | $ — | $ — | $ — | $ — | 2,355 | $ — | $ 2,355 |
| Accrued expenses and other current liabilities | 391 | 99 | 76 | 316 | 2,577 | — | 3,459 |
| Deferred income taxes | — | — | — | — | 679 | — | 679 |
| Current portion of long-term debt | — | 303 | — | 314 | 2,544 | — | 3,161 |
| Total current liabilities | 391 | 402 | 76 | 630 | 8,155 | — | 9,654 |
| LONG-TERM DEBT, less current portion | 3,994 | 6,606 | 3,498 | 6,151 | 3,586 | — | 23,835 |
| DEFERRED INCOME TAXES | — | — | — | — | 25,900 | — | 25,900 |
| OTHER NONCURRENT LIABILITIES | 380 | — | — | — | 7,336 | — | 7,716 |
| MINORITY INTEREST | — | — | — | — | 392 | — | 392 |
| **STOCKHOLDERS' EQUITY** | | | | | | | |
| Common stock | 25 | — | — | — | — | — | 25 |
| Other stockholders' equity | 41,637 | 19,678 | 29,598 | 33,138 | 83,232 | (165,646) | 41,637 |
| Total Stockholders' Equity | 41,662 | 19,678 | 29,598 | 33,138 | 83,232 | (165,646) | 41,662 |

| Total Liabilities and Stockholders' Equity | $ | 46,427 | $ | 26,686 | $ | 33,172 | $ | 39,919 | $ | 128,601 | $ | (165,646) | $ | 109,159 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

72

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

COMCAST CORPORATION
CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS
FOR THE YEAR ENDED DECEMBER 31, 2004

| | Comcast Parent | CCCL Parent | CCCH Parent | Combined CCHMO Parents | Non-Guarantor Subsidiaries | Elimination and Consolidation Adjustments | Consolidated Comcast Corporation |
|---|---|---|---|---|---|---|---|
| REVENUES | | | | | | | |
| Service revenues | $ — | $ — | $ — | $ — | 20,307 | $ — | $ 20,307 |
| Management fee revenue | 416 | 161 | 253 | 253 | — | (1,083) | — |
| | 416 | 161 | 253 | 253 | 20,307 | (1,083) | 20,307 |
| COSTS AND EXPENSES | | | | | | | |
| Operating (excluding depreciation) | — | — | — | — | 7,462 | — | 7,462 |
| Selling, general and administrative | 168 | 161 | 253 | 253 | 5,562 | (1,083) | 5,314 |
| Depreciation | 2 | — | — | — | 3,418 | — | 3,420 |
| Amortization | — | — | — | — | 1,203 | — | 1,203 |
| | 170 | 161 | 253 | 253 | 17,645 | (1,083) | 17,399 |
| OPERATING INCOME | 246 | — | — | — | 2,662 | — | 2,908 |
| OTHER INCOME (EXPENSE) | | | | | | | |
| Interest expense | (289) | (474) | (348) | (399) | (366) | — | (1,876) |
| Investment loss, net | — | — | — | — | 472 | — | 472 |
| Equity in net (losses) income of affiliates | 998 | 1,170 | 310 | 569 | 774 | (3,909) | (88) |
| Other income | — | — | — | — | 394 | — | 394 |
| | 709 | 696 | (38) | 170 | 1,274 | (3,909) | (1,098) |
| INCOME (LOSS) BEFORE INCOME TAXES AND MINORITY INTEREST | 955 | 696 | (38) | 170 | 3,936 | (3,909) | 1,810 |
| INCOME TAX BENEFIT (EXPENSE) | 15 | 166 | 122 | 140 | (1,269) | — | (826) |
| INCOME (LOSS) BEFORE MINORITY INTEREST | 970 | 862 | 84 | 310 | 2,667 | (3,909) | 984 |
| MINORITY INTEREST | — | — | — | — | (14) | — | (14) |
| NET INCOME (LOSS) | $ 970 | $ 862 | $ 84 | $ 310 | $ 2,653 | $ (3,909) | $ 970 |

73

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

COMCAST CORPORATION
CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS
FOR THE YEAR ENDED DECEMBER 31, 2003

| | Comcast Parent | CCCL Parent | CCCH Parent | Combined CCHMO Parents | Non-Guarantor Subsidiaries | Elimination and Consolidation Adjustments | Consolidated Comcast Corporation |
|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | |
| Service revenues | $ — | $ — | $ — | $ — | 18,348 | $ — | $ 18,348 |
| Management fee revenue | 376 | 147 | 231 | 231 | — | (985) | — |
| | 376 | 147 | 231 | 231 | 18,348 | (985) | 18,348 |
| **COSTS AND EXPENSES** | | | | | | | |
| Operating (excluding depreciation) | — | — | — | — | 7,041 | — | 7,041 |
| Selling, general and administrative | 156 | 147 | 231 | 231 | 5,135 | (985) | 4,915 |
| Depreciation | — | — | — | — | 3,166 | — | 3,166 |
| Amortization | — | — | — | — | 1,272 | — | 1,272 |
| | 156 | 147 | 231 | 231 | 16,614 | (985) | 16,394 |
| **OPERATING INCOME** | 220 | — | — | — | 1,734 | — | 1,954 |
| **OTHER INCOME (EXPENSE)** | | | | | | | |
| Interest expense | (292) | (527) | (373) | (398) | (428) | — | (2,018) |
| Investment loss, net | — | — | — | — | (84) | — | (84) |
| Equity in net (losses) income of affiliates | 3,287 | 996 | (356) | (97) | 593 | (4,483) | (60) |
| Other income | — | — | — | — | 71 | — | 71 |
| | 2,995 | 469 | (729) | (495) | 152 | (4,483) | (2,091) |
| **INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND MINORITY INTEREST** | 3,215 | 469 | (729) | (495) | 1,886 | (4,483) | (137) |
| **INCOME TAX BENEFIT (EXPENSE)** | 25 | 184 | 131 | 139 | (463) | — | 16 |
| **INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE MINORITY INTEREST** | 3,240 | 653 | (598) | (356) | 1,423 | (4,483) | (121) |
| **MINORITY INTEREST** | — | — | — | — | (97) | — | (97) |
| **INCOME (LOSS) FROM CONTINUING OPERATIONS** | 3,240 | 653 | (598) | (356) | 1,326 | (4,483) | (218) |
| **INCOME FROM DISCONTINUED OPERATIONS, net of tax** | — | — | — | — | 168 | — | 168 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GAIN ON DISCONTINUED OPERATIONS, net of tax | — | — | — | — | 3,290 | — | 3,290 |
| NET INCOME (LOSS) | $ 3,240 | $ 653 | $ (598) | $ (356) | $ 4,784 | $ (4,483) | $ 3,240 |

74

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

COMCAST CORPORATION
CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS
FOR THE YEAR ENDED DECEMBER 31, 2002

| | Comcast Parent | CCCL Parent | CCCH Parent | Combined CCHMO Parents | Non-Guarantor Subsidiaries | Elimination and Consolidation Adjustments | Consolidated Comcast Corporation |
|---|---|---|---|---|---|---|---|
| REVENUES | $ — | $ — | $ — | $ — | $ 8,102 | $ — | $ 8,102 |
| COSTS AND EXPENSES | | | | | | | |
| Operating (excluding depreciation) | — | — | — | — | 3,012 | — | 3,012 |
| Selling, general and administrative | 24 | — | — | 37 | 2,193 | — | 2,254 |
| Depreciation | — | — | — | — | 1,694 | — | 1,694 |
| Amortization | — | — | — | — | 221 | — | 221 |
| | 24 | — | — | 37 | 7,120 | | 7,181 |
| OPERATING INCOME (LOSS) | (24) | — | — | (37) | 982 | — | 921 |
| OTHER INCOME (EXPENSE) | | | | | | | |
| Interest expense | (2) | (566) | (59) | (46) | (197) | — | (870) |
| Investment loss, net | — | — | — | — | (543) | | (543) |
| Equity in net (losses) income of affiliates | (124) | 847 | (176) | (125) | 439 | (924) | (63) |
| Other income | — | — | — | — | 1 | | 1 |
| | (126) | 281 | (235) | (171) | (300) | (924) | (1,475) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES AND MINORITY INTEREST | (150) | 281 | (235) | (208) | 682 | (924) | (554) |
| INCOME TAX BENEFIT (EXPENSE) | 10 | 221 | 23 | 32 | (158) | — | 128 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE MINORITY INTEREST | (140) | 502 | (212) | (176) | 524 | (924) | (426) |
| MINORITY INTEREST | — | — | — | — | (43) | — | (43) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | (140) | 502 | (212) | (176) | 481 | (924) | (469) |
| INCOME FROM DISCONTINUED OPERATIONS | — | — | — | — | 195 | — | 195 |
| NET INCOME (LOSS) | $ (140) | $ 502 | $ (212) | $ (176) | $ 676 | $ (924) | $ (274) |

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

COMCAST CORPORATION
CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2004

| | Comcast Parent | CCCL Parent | CCCH Parent | Combined CCHMO Parents | Non-Guarantor Subsidiaries | Elimination and Consolidation Adjustments | Consolidated Comcast Corporation |
|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | |
| Net cash provided by (used in) operating activities | $ 1,809 | $ (143) | $ (155) | $ (478) | $ 4,897 | $ — | $ 5,930 |
| **FINANCING ACTIVITIES** | | | | | | | |
| Proceeds from borrowings | 620 | — | 400 | — | 10 | — | 1,030 |
| Retirements and repayments of debt | (300) | (561) | (400) | (306) | (756) | — | (2,323) |
| Issuances of common stock and sales of put options on common stock | 113 | — | — | — | — | — | 113 |
| Repurchases of common stock and stock options held by non-employees | (1,361) | — | — | — | — | — | (1,361) |
| Other financing activities | 8 | — | — | — | 17 | — | 25 |
| Net cash (used in) provided by financing activities | (920) | (561) | | (306) | (729) | — | (2,516) |
| **INVESTING ACTIVITIES** | | | | | | | |
| Net transactions with affiliates | (889) | 704 | 155 | 784 | (754) | — | — |
| Capital expenditures | — | — | — | — | (3,660) | — | (3,660) |
| Proceeds from sales, settlements and restructuring of investments | — | — | — | — | 228 | — | 228 |
| Acquisitions, net of cash acquired | — | — | — | — | (296) | — | (296) |
| Additions to intangible and other noncurrent assets | — | — | — | — | (628) | — | (628) |
| Proceeds from sales of (purchases of) short-term investments, net | — | — | — | — | (13) | — | (13) |
| Capital contributions to and purchases of investments | — | — | — | — | (156) | — | (156) |
| Proceeds from settlement of contract of acquired company | — | — | — | — | 26 | — | 26 |
| Other investing activities | — | — | — | — | (13) | — | (13) |
| Net cash provided by (used in) investing activities | (889) | 704 | 155 | 784 | (5,266) | — | (4,512) |
| **DECREASE IN CASH AND CASH EQUIVALENTS** | — | — | — | — | (1,098) | — | (1,098) |
| **CASH AND CASH EQUIVALENTS, beginning of year** | — | — | — | — | 1,550 | — | 1,550 |
| **CASH AND CASH EQUIVALENTS, end of year** | $ — | $ — | $ — | $ — | $ 452 | $ — | $ 452 |

76

Notes to Consolidated Financial Statements (Continued)

Years Ended December 31, 2004, 2003 and 2002

COMCAST CORPORATION
CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2003

| | Comcast Parent | CCCL Parent | CCCH Parent | Combined CCHMO Parents | Non-Guarantor Subsidiaries | Elimination and Consolidation Adjustments | Consolidated Comcast Corporation |
|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | |
| Net cash provided by (used in) operating activities from continuing operations | $ 165 | $ (297) | $ (121) | $ (553) | $ 3,660 | $ — | $ 2,854 |
| **FINANCING ACTIVITIES** | | | | | | | |
| Proceeds from borrowings | 8,138 | 1,150 | — | — | 110 | — | 9,398 |
| Retirements and repayments of debt | (4,830) | (2,104) | (6,250) | (2,407) | (874) | — | (16,465) |
| Issuances of common stock and sales of put options on common stock | — | — | — | — | 67 | — | 67 |
| Repurchases of common stock | — | — | — | — | (14) | — | (14) |
| Deferred financing costs | — | — | — | — | (34) | — | (34) |
| Net cash (used in) provided by financing activities from continuing operations | 3,308 | (954) | (6,250) | (2,407) | (745) | — | (7,048) |
| **INVESTING ACTIVITIES** | | | | | | | |
| Net transactions with affiliates | (3,473) | 1,251 | 6,371 | 2,960 | (7,109) | — | — |
| Capital expenditures | — | — | — | — | (4,161) | — | (4,161) |
| Proceeds from sales, settlements and restructuring of investments | — | — | — | — | 7,971 | — | 7,971 |
| Acquisitions, net of cash acquired | — | — | — | — | (152) | — | (152) |
| Additions to intangible and other noncurrent assets | — | — | — | — | (155) | — | (155) |
| Purchases of short-term investments, net | — | — | — | — | (32) | — | (32) |
| Proceeds from sale of discontinued operations and assets held for sale | — | — | — | — | 1,875 | — | 1,875 |
| Capital contributions to and purchases of investments | — | — | — | — | (202) | — | (202) |
| Proceeds from settlement of contract of acquired company | — | — | — | — | 95 | — | 95 |
| Net cash provided by (used in) investing activities from continuing operations | (3,473) | 1,251 | 6,371 | 2,960 | (1,870) | — | 5,239 |
| INCREASE IN CASH AND CASH EQUIVALENTS | — | — | — | — | 1,045 | — | 1,045 |
| CASH AND CASH EQUIVALENTS, beginning of year | — | — | — | — | 505 | — | 505 |
| CASH AND CASH EQUIVALENTS, end of year | $ — | $ — | $ — | $ — | $ 1,550 | $ — | 1,550 |

77

Notes to Consolidated Financial Statements (Concluded)

Years Ended December 31, 2004, 2003 and 2002

<div align="center">

COMCAST CORPORATION
CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2002

</div>

| | Comcast Parent | CCCL Parent | CCCH Parent | Combined CCHMO Parents | Non-Guarantor Subsidiaries | Elimination and Consolidation Adjustments | Consolidated Comcast Corporation |
|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | |
| Net cash provided by (used in) operating activities from continuing operations | $ — | $ (358) | $ (51) | $ (174) | $ 3,004 | $ — | $ 2,421 |
| **FINANCING ACTIVITIES** | | | | | | | |
| Proceeds from borrowings | 680 | 1,568 | 6,501 | — | 10 | — | 8,759 |
| Retirements and repayments of debt | — | (2,216) | (6,100) | (10) | (1,182) | — | (9,508) |
| Proceeds from settlement of interest rate exchange agreements | — | 57 | — | — | — | — | 57 |
| Issuances of common stock | — | — | — | — | 19 | — | 19 |
| Deferred financing costs | — | (225) | — | — | (107) | — | (332) |
| Net cash (used in) provided by financing activities from continuing operations | 680 | (816) | 401 | (10) | (1,260) | — | (1,005) |
| **INVESTING ACTIVITIES** | | | | | | | |
| Net transactions with affiliates | (680) | 1,174 | (350) | 184 | (328) | — | — |
| Capital expenditures | — | — | — | — | (1,852) | — | (1,852) |
| Proceeds from sales and settlements of investments | — | — | — | — | 1,263 | — | 1,263 |
| Acquisitions, net of cash acquired | — | — | — | — | (251) | — | (251) |
| Additions to intangible and other noncurrent assets | — | — | — | — | (197) | — | (197) |
| Purchases of short-term investments, net | — | — | — | — | (21) | — | (21) |
| Capital contributions to and purchases of investments | — | — | — | — | (67) | — | (67) |
| Net cash (used in) provided by investing activities from continuing operations | (680) | 1,174 | (350) | 184 | (1,453) | — | (1,125) |
| **INCREASE IN CASH AND CASH EQUIVALENTS** | — | — | — | — | 291 | — | 291 |
| CASH AND CASH EQUIVALENTS, beginning of year | — | — | — | — | 214 | — | 214 |
| CASH AND CASH EQUIVALENTS, end of year | $ — | $ — | $ — | $ — | $ 505 | $ — | $ 505 |

<div align="center">78</div>

ITEM 9    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

  None.


ITEM 9A    CONTROLS AND PROCEDURES

  Conclusions regarding disclosure controls and procedures. Our principal executive and principal financial officers, after evaluating the effectiveness of our disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) or 15d-15(e)) as of the end of the period covered by this report, have concluded that, based on the evaluation of these controls and procedures required by paragraph (b) of Exchange Act Rules 13a-15 or 15d-15, our disclosure controls and procedures were effective.

Management's annual report on internal control over financial reporting. Refer to *Management's Report on Internal Control Over Financial Reporting* on page 34.

Attestation report of the registered public accounting firm. Refer to *Report of Independent Registered Public Accounting Firm* on page 35.

Changes in internal control over financial reporting. There were no changes in our internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Exchange Act Rules 13a-15 or 15d-15 that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.


ITEM 9B    OTHER INFORMATION

  None.


PART III

ITEM 10    DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

  Except for the information regarding executive officers required by Item 401 of Regulation S-K, which is included in Part I of this Annual Report on Form 10-K as Item 4A, we incorporate the information required by this item by reference to our definitive proxy statement for our annual meeting of shareholders presently scheduled to be held in June 2005. We refer to this proxy statement as the 2005 Proxy Statement.


ITEM 11    EXECUTIVE COMPENSATION

  We incorporate the information required by this item by reference to our 2005 Proxy Statement.


ITEM 12    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

  We incorporate the information required by this item by reference to our 2005 Proxy Statement.


ITEM 13    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

  We incorporate the information required by this item by reference to our 2005 Proxy Statement.


ITEM 14    PRINCIPAL ACCOUNTANT FEES AND SERVICES

We incorporate the information required by this item by reference to our 2005 Proxy Statement.

We will file our 2005 Proxy Statement for our Annual Meeting of Shareholders with the Securities and Exchange Commission on or before April 30, 2005.

79

PART IV

ITEM 15 EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a)    The following consolidated financial statements of the Company are included in Part II, Item 8:

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 35 |
| Consolidated Balance Sheet—December 31, 2004 and 2003 | 36 |
| Consolidated Statement of Operations—Years Ended December 31, 2004, 2003 and 2002 | 37 |
| Consolidated Statement of Cash Flows—Years Ended December 31, 2004, 2003 and 2002 | 38 |
| Consolidated Statement of Stockholders' Equity—Years Ended December 31, 2004, 2003 and 2002 | 39 |
| Notes to Consolidated Financial Statements | 40 |

(b) (i)    The following financial statement schedules required to be filed by Items 8 and 14(d) of Form 10-K are included in Part IV:

*Schedule II—Valuation and Qualifying Accounts*

All other schedules are omitted because they are not applicable, not required or the required information is included in the consolidated financial statements or notes thereto.

(c)    Reports on Form 8-K:

(i)    We filed a Current Report on Form 8-K under Items 5.02 and 9.01(c) on October 19, 2004, announcing the election of Mr. Joseph J. Collins to our Board of Directors. We included the press release announcing Mr. Collins' election to the Board as exhibit 99.1 to this Current Report.

(ii)    We filed a Current Report on Form 8-K under Items 1.01 and 9.01(c) on December 8, 2004, announcing the adoption of the 2005 Deferred Compensation Plan by our Board of Directors. We included a copy of the Plan as exhibit 10.1 to this Current Report.

(d)    Exhibits required to be filed by Item 601 of Regulation S-K:

| | |
|---|---|
| 3.1 | Restated Articles of Incorporation of Comcast Corporation (incorporated by reference to Exhibit 3.1 to our Quarterly Report on Form 10-Q for the quarter ended June 30, 2004). |
| 3.2 | Restated By-Laws of Comcast Corporation. |
| 4.1 | Specimen Class A Common Stock Certificate (incorporated by reference to Exhibit 4.1 to our Annual Report on Form 10-K for the year ended December 31, 2002). |
| 4.2 | Specimen Class A Special Common Stock Certificate (incorporated by reference to Exhibit 4.2 to our Annual Report on Form 10-K for the year ended December 31, 2002). |
| 4.3 | Rights Agreement dated as of November 18, 2002, between Comcast Corporation and EquiServe Trust Company, N.A., as Rights Agent, which includes the Form of Certificate of Designation of Series A Participant's Cumulative Preferred Stock as Exhibit A and the Form of Right Certificate as Exhibit B (incorporated by reference to our registration statement on Form 8-A12g filed on November 18, 2002). |
| 4.4 | Credit Agreement dated as of April 26, 2002, among Comcast Corporation, Comcast Cable Communications Holdings, Inc., the Financial Institutions party thereto, JPMorgan Chase Bank, as Administrative Agent, Swing Line Lender and Issuing Lender, Citibank, N.A., as Syndication Agent, and Bank of America, N.A., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley Senior Funding, Inc., as Co-Documentation Agent (incorporated by reference to Exhibit 4.1 to our amended registration statement on Form S-4/A filed on May 14, 2002). |
| 4.5 | Bridge Credit Agreement dated as of April 26, 2002 among Comcast Corporation, Comcast Cable Communications Holdings, Inc., the Financial Institutions party thereto, JPMorgan Chase Bank, as Administrative Agent, Citibank, N.A., as Syndication Agent, and Bank of America, N.A., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley Senior Funding, Inc., as Co-Documentation Agents (incorporated by reference to Exhibit 4.2 to our amended registration statement on Form S-4/A filed on May 14, 2002). |
| 4.6 | Amended and Restated Five-Year Revolving Credit Agreement effective as of November 18, 2002, amending and |

restating the Five-Year Revolving Credit Agreement dated as of August 24, 2000, among Comcast Cable Communications, LLC, Comcast Corporation, the Lenders party thereto and Bank of America, N.A., as Administrative Agent. (incorporated by reference to Annex I of Exhibit 10.3 to the Comcast Cable Communications, LLC Quarterly Report on Form 10-Q for the quarter ended March 31, 2002).

4.7    First Amendment to Amended and Restated Five-Year Revolving Credit Agreement dated as of February 7, 2003, among Comcast Cable Communications, LLC, Comcast Corporation, the Lenders party thereto and Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 4.7 to our Annual Report on Form 10-K for the year ended December 31, 2002).

80

4.8 Amended and Restated 364-Day Revolving Credit Agreement effective as of November 18, 2002, amending and restating the 364-Day Revolving Credit Agreement dated as of August 24, 2000, among Comcast Cable Communications, LLC, Comcast Corporation, the Lenders party thereto and Bank of America, N.A., as Administrative Agent. (incorporated by reference to Annex I of Exhibit 10.4 to the Comcast Cable Communications, LLC Quarterly Report on Form 10-Q for the quarter ended March 31, 2002).

4.9 First Amendment to Amended and Restated 364-Day Revolving Credit Agreement dated as of February 7, 2003, among Comcast Cable Communications, LLC, Comcast Corporation, the Lenders party to thereto and Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 4.9 to our Annual Report on Form 10-K for the year ended December 31, 2002).

4.10 Indenture, dated as of October 17, 1991, between Comcast Holdings Corporation and Bank of Montreal/Harris Trust (successor to Morgan Guaranty Trust Company of New York), as Trustee, relating to Comcast Holdings' $10^5/8\%$ Senior Subordinated Debentures due 2012 (incorporated by reference to Exhibit 2 to the Comcast Holdings Corporation Current Report on Form 8-K filed on October 31, 1991).

4.11 Form of Debenture relating to Comcast Holdings Corporation's $10^5/8\%$ Senior Subordinated Debentures due 2012 (incorporated by reference to Exhibit 4(17) to the Comcast Holdings Corporation Annual Report on Form 10-K for the year ended December 31, 1992).

4.12 Senior Indenture dated as of June 15, 1999, between Comcast Holdings Corporation and The Bank of New York (as successor in interest to Bank of Montreal Trust Company), as Trustee (incorporated by reference to Exhibit 4.1 to the registration statement on Form S-3 of Comcast Holdings filed on June 23, 1999).

4.13 Form of Debenture relating to Comcast Holdings Corporation's Zero Coupon Convertible Debentures due 2020 (incorporated by reference to Exhibit 4.7 to the Comcast Holdings Corporation Annual Report on Form 10-K for the year ended December 31, 2000).

4.14 Indenture dated as of May 1, 1997, between Comcast Cable Communications, LLC and The Bank of New York (as successor in interest to Bank of Montreal Trust Company), as Trustee, relating to Comcast Cable Communications, LLC's $8^1/8\%$ Notes due 2004, $8^3/8\%$ Notes due 2007, $8^7/8\%$ Notes due 2017, $8^1/2\%$ Notes due 2027, 6.20% Notes due 2008, 6.375% Notes due 2006, 6.75% Notes due 2011, 6.875% Notes due 2009 and 7.125% Notes due 2013 (incorporated by reference to Exhibit 4.1(a) to the registration statement on Form S-4 of Comcast Cable Communications, LLC filed on June 3, 1997).

4.15 Form of Comcast Cable Communications, LLC's $8^1/8\%$ Notes due 2004, $8^3/8\%$ Notes due 2007, $8^7/8\%$ Notes due 2017 and $8^1/2\%$ Notes due 2027, 6.20% Notes due 2008, 6.375% Notes due 2006, 6.75% Notes due 2011, 6.875% Notes due 2009 and 7.125% Notes due 2013 (incorporated by reference to Exhibit 4.1(b) to the registration statement on Form S-4 of Comcast Cable Communications, LLC filed on June 3, 1997).

4.16 Form of Indenture among Comcast Corporation, Comcast Cable Communications, LLC, Comcast Cable Communications Holdings, Inc., Comcast Cable Holdings, LLC, Comcast MO Group, Inc., and The Bank of New York, as Trustee relating to Comcast Cable Communications Holdings, Inc.'s 8.375% Notes due March 15, 2013 and 9.455% Notes Due November 15, 2022 (incorporated by reference to Exhibit 4.18 to our amended registration statement on Form S-4/A filed on September 26, 2002).

4.17 Form of Comcast Cable Communications Holdings, Inc.'s 8.375% Notes Due March 15, 2013 (incorporated by reference to Exhibit 4.19 to our amended registration statement on Form S-4/A filed on September 26, 2002).

4.18 Form of Comcast Cable Communications Holdings, Inc.'s 9.455% Notes Due November 15, 2022 (incorporated by reference to Exhibit 4.20 to our amended registration statement on Form S-4/A filed on September 26, 2002).

4.19 Form of Indenture among Comcast Corporation, Comcast Cable Communications, LLC, Comcast Cable Communications Holdings, Inc., Comcast Cable Holdings, LLC, Comcast MO Group, Inc., and The Bank of New York, as Trustee relating to our 5.85% Notes due 2010 and 6.50% Notes Due 2015 (incorporated by reference to Exhibit 4.5 to our registration statement on Form S-3 filed on December 16, 2002).

4.20 Form of Comcast Corporation's 5.85% Notes due 2010 (incorporated by reference to Exhibit 4.1 to our Current Report on Form 8-K filed on January 10, 2003).

4.21 Form of Comcast Corporation's 6.50% Notes due 2015 (incorporated by reference to Exhibit 4.2 to our Current Report on Form 8-K filed on January 10, 2003).

4.22 Form of Subordinated Indenture between Comcast Holdings Corporation and Bankers Trust Company, as Trustee, relating to Comcast Holdings Corporation's 2.0% Exchangeable Subordinated Debentures Due 2029 and 2.0% Exchangeable Subordinated Debentures Due November 2029 (incorporated by reference to Exhibit 4.2 to Comcast Holdings Corporation's registration statement on Form S-3 filed on June 23, 1999).

4.23 Form of Comcast Holdings Corporation's 2.0% Exchangeable Subordinated Debentures Due 2029 (ZONES I) (incorporated by reference to Exhibit 4 to Comcast Holdings Corporation's Current Report on Form 8-K filed on October 14, 1999).

4.24 Form of Comcast Holdings Corporation's 2.0% Exchangeable Subordinated Debentures Due November 2029 (ZONES II) (incorporated by reference to Exhibit 4 to Comcast Holdings Corporation's Current Report on Form 8-K filed on November 3, 1999).

| 4.25 | Form of Supplemental Indenture among Comcast Corporation, Comcast Cable Holdings, LLC, Comcast Cable Communications Holdings, Inc., Comcast Cable Communications, LLC, Comcast MO Group, Inc., Comcast MO of Delaware, Inc. and The Bank of New York as Trustee relating to our 5.85% Notes due 2010, 6.50% Notes due 2015, 5.50% Notes due 2011, 7.05% Notes Due 2033 and 5.30% Notes due 2014 (incorporated by reference to Exhibit 4.25 to our Annual Report on Form 10-K for the year ended December 31, 2003). |
|------|---|
| 4.26 | Pursuant to Item 601(b)(4)(iii)(A) of Regulation S-K, the registrant hereby agrees to furnish upon request to the Securities and Exchange Commission other instruments defining the rights of holders of long-term debt. The amount of securities authorized under each such instrument does not exceed ten percent of the total assets of the registrant and its subsidiaries on a consolidated basis. |
| 9.1 | Agreement and Declaration of Trust of TWE Holdings I Trust by and among MOC Holdco I, Inc., Edith E. Holiday and The Capital Trust Company of Delaware (incorporated by reference to Exhibit 99.2 to our Current Report on Form 8-K12g3 filed on November 18, 2002). |
| 9.2 | Form of Agreement and Declaration of Trust of TWE Holdings II Trust by and among MOC Holdco II, Inc., Edith E. Holiday and The Capital Trust Company of Delaware (incorporated by reference to Exhibit 99.3 to our Current Report on Form 8-K12g3 filed on November 18, 2002). |
| 9.3 | Agreement and Declaration of Trust of TWE Holdings III Trust by and among Media One TWE Holdings, Inc., Edith E. Holiday and The Capital Trust Company of Delaware (incorporated by reference to Exhibit 99.4 to our Current Report on Form 8-K12g3 filed on November 18, 2002). |
| 10.1* | Comcast Corporation 1987 Stock Option Plan, as amended and restated, effective November 18, 2002 (incorporated by reference to Exhibit 10.1 to our Annual Report on Form 10-K for the year ended December 31, 2002). |
| 10.2* | Comcast Corporation 2002 Stock Option Plan, as amended and restated, effective January 30, 2004 (incorporated by reference to Exhibit 10.2 to our Annual Report on Form 10-K for the year ended December 31, 2003). |
| 10.3* | Comcast Corporation 2003 Stock Option Plan, as amended and restated, effective January 30, 2004 (incorporated by reference to Exhibit 10.3 to our Annual Report on Form 10-K for the year ended December 31, 2003). |
| 10.4* | Comcast Corporation 2002 Deferred Compensation Plan, as amended and restated, effective February 16, 2005. |
| 10.5* | Comcast Corporation 2005 Deferred Compensation Plan, as amended and restated, effective January 1, 2005. |
| 10.6* | Comcast Corporation 2002 Deferred Stock Option Plan, as amended and restated, effective February 16, 2005. |
| 10.7* | Comcast Corporation 2002 Restricted Stock Plan, as amended and restated, effective January 1, 2005. |
| 10.8* | 2004 Management Achievement Plan, effective January 1, 2004 (incorporated by reference to Exhibit 10.7 to our Annual Report on Form 10-K for the year ended December 31, 2003). |
| 10.9* | 1992 Executive Split Dollar Insurance Plan (incorporated by reference to Exhibit 10(12) to the Comcast Holdings Corporation Annual Report on Form 10-K for the year ended December 31, 1992). |
| 10.10* | Comcast Corporation 2002 Cash Bonus Plan (formerly, the 1996 Cash Bonus Plan), as amended and restated, effective March 3, 2003 (incorporated by reference to Exhibit 10.9 to our Annual Report on Form 10-K for the year ended December 31, 2003). |
| 10.11* | Comcast Corporation 2002 Executive Cash Bonus Plan (formerly the 1996 Executive Cash Bonus Plan), as amended and restated, effective January 30, 2004 (incorporated by reference to Exhibit 10.10 to our Annual Report on Form 10-K for the year ended December 31, 2003). |
| 10.12* | Comcast Corporation 2002 Supplemental Cash Bonus Plan, as amended and restated, effective January 30, 2004 (incorporated by reference to Exhibit 10.11 to our Annual Report on Form 10-K for the year ended December 31, 2003). |
| 10.13* | Comcast Corporation 2002 Non-Employee Director Compensation Plan, as amended and restated, effective January 12, 2005. |
| 10.14* | Comcast Corporation 2002 Employee Stock Purchase Plan, as amended and restated, effective January 1, 2005. |
| 10.15* | Compensation and Deferred Compensation Agreement and Stock Appreciation Bonus Plan between Comcast Holdings Corporation and Ralph J. Roberts, as amended and restated March 16, 1994 (incorporated by reference to Exhibit 10(13) to the Comcast Holdings Corporation Annual Report on Form 10-K for the year ended December 31, 1993). |
| 10.16* | Compensation and Deferred Compensation Agreement between Comcast Holdings Corporation and Ralph J. Roberts, as amended and restated August 31, 1998 (incorporated by reference to Exhibit 10.1 to the Comcast Holdings Corporation quarterly report on Form 10-Q for the quarter ended September 30, 1998). |
| 10.17* | Amendment Agreement to Compensation and Deferred Compensation Agreement between Comcast Holdings Corporation and Ralph J. Roberts, dated as of August 19, 1999 (incorporated by reference to Exhibit 10.2 to the Comcast Holdings Corporation quarterly report on Form 10-Q for the quarter ended March 31, 2000). |
| 10.18* | Amendment to Compensation and Deferred Compensation Agreement between Comcast Holdings Corporation and Ralph J. Roberts, dated as of June 5, 2001 (incorporated by reference to Exhibit 10.8 to the Comcast Holdings Corporation Annual Report on Form 10-K for the year ended December 31, 2001). |
| 10.19* | Amendment to Compensation and Deferred Compensation Agreement between Comcast Holdings Corporation and Ralph J. Roberts, dated as of January 24, 2002 (incorporated by reference to Exhibit 10.16 to our Annual Report on Form 10-K for the year ended December 31, 2002). |
| 10.20* | Amendment to Compensation and Deferred Compensation Agreement between Comcast Holdings Corporation and Ralph J. Roberts, dated as of November 18, 2002 (incorporated by reference to Exhibit 10.17 to our Annual Report on Form 10-K for the year ended December 31, 2002). |

82

10.21*  Insurance Premium Termination Agreement between Comcast Corporation and Ralph J. Roberts, effective January 30, 2004 (incorporated by reference to Exhibit 10.1 to our Form 10-Q for the quarter ended March 31, 2004).

10.22*  Compensation Agreement between Comcast Holdings Corporation and Brian L. Roberts, dated as of June 16, 1998 (incorporated by reference to Exhibit 10.1 to the Comcast Holdings Corporation quarterly report on Form 10-Q for the quarter ended March 31, 2000).

10.23*  Amendment to Compensation Agreement between Comcast Holdings Corporation and Brian L. Roberts, dated as of November 18, 2002 (incorporated by reference to Exhibit 10.20 to our Annual Report on Form 10-K for the year ended December 31, 2002).

10.24*  Consulting Agreement between Comcast Corporation and C. Michael Armstrong, dated as of May 26, 2004 (incorporated by reference to Exhibit 10.1 to our Quarterly Report on Form 10-Q for the quarter ended June 30, 2004).

10.25*  First Amendment to Consulting Agreement between Comcast Corporation and C. Michael Armstrong, dated as of May 26, 2004 (incorporated by reference to Exhibit 10.2 to our Quarterly Report on Form 10-Q for the quarter ended June 30, 2004).

10.26*  Certificate of Interest of Julian Brodsky under the Comcast Holdings Corporation Unfunded Plan of Deferred Compensation (incorporated by reference to Exhibit 10.21 to our Annual Report on Form 10-K for the year ended December 31, 2002).

10.27*  Employment Agreement between Comcast Holdings Corporation and Julian A. Brodsky, dated as of May 1, 2002 (incorporated by reference to Exhibit 10.22 to our Annual Report on Form 10-K for the year ended December 31, 2002).

10.28*  Amendment to Employment Agreement between Comcast Holdings Corporation and Julian A. Brodsky, dated as of November 18, 2002 (incorporated by reference to Exhibit 10.23 to our Annual Report on Form 10-K for the year ended December 31, 2002).

10.29*  Employment Agreement between Comcast Corporation and Stephen B. Burke, effective January 1, 2004 (incorporated by reference to Exhibit 10.2 to our Form 10-Q for the quarter ended March 31, 2004).

10.30*  Executive Employment Agreement between Comcast Holdings Corporation and Lawrence S. Smith, dated as of May 31, 2000 (incorporated by reference to Exhibit 10.26 to our Annual Report on Form 10-K for the year ended December 31, 2002).

10.31*  Executive Employment Agreement between Comcast Holdings Corporation and John R. Alchin, dated as of May 31, 2000 (incorporated by reference to Exhibit 10.27 to our Annual Report on Form 10-K for the year ended December 31, 2002).

10.32*  Comcast Corporation Supplemental Executive Retirement Plan, as amended and restated, effective June 5, 2001 (incorporated by reference to Exhibit 10.10 to the Comcast Holdings Corporation Annual Report on Form 10-K for the year ended December 31, 2001).

10.33  Amended and Restated Stock Purchase Agreement, dated as of June 30, 2003, among Comcast Corporation, Comcast QVC, Inc., Liberty Media Corporation and QVC, Inc. (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on October 1, 2003).

10.34  Term Life Insurance Premium and Tax Bonus Agreement between Comcast Holdings Corporation and Brian L. Roberts, dated as of September 23, 1998 (incorporated by reference to Exhibit 10.1 to our quarterly report on Form 10-Q for the quarter ended March 31, 2003).

21  List of Subsidiaries.

23.1  Consent of Deloitte & Touche LLP.

31  Certifications of Chief Executive Officer and Co-Chief Financial Officers pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32  Certifications of Chief Executive Officer and Co-Chief Financial Officers pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

---

*       Constitutes a management contract or compensatory plan or arrangement.

83

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized in Philadelphia, Pennsylvania on February 23, 2005.

By:                    /s/  BRIAN L. ROBERTS
                       _____
                              Brian L. Roberts
                              *Chairman and CEO*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/  BRIAN L. ROBERTS<br>_____<br>Brian L. Roberts | Chairman and CEO; Director (Principal Executive Officer) | February 23, 2005 |
| /s/  RALPH J. ROBERTS<br>_____<br>Ralph J. Roberts | Chairman of the Executive and Finance Committee of the Board of Directors; Director | February 23, 2005 |
| /s/  JULIAN A. BRODSKY<br>_____<br>Julian A. Brodsky | Non-Executive Vice Chairman; Director | February 23, 2005 |
| /s/  LAWRENCE S. SMITH<br>_____<br>Lawrence S. Smith | Executive Vice President (Co-Principal Financial Officer) | February 23, 2005 |
| /s/  JOHN R. ALCHIN<br>_____<br>John R. Alchin | Executive Vice President and Treasurer (Co-Principal Financial Officer) | February 23, 2005 |
| /s/  LAWRENCE J. SALVA<br>_____<br>Lawrence J. Salva | Senior Vice President, Chief Accounting Officer and Controller (Principal Accounting Officer) | February 23, 2005 |
| /s/  S. DECKER ANSTROM<br>_____<br>S. Decker Anstrom | Director | February 23, 2005 |
| /s/  C. MICHAEL ARMSTRONG<br>_____<br>C. Michael Armstrong | Director | February 23, 2005 |
| /s/  KENNETH J. BACON<br>_____<br>Kenneth J. Bacon | Director | February 23, 2005 |
| /s/  SHELDON M. BONOVITZ<br>_____<br>Sheldon M. Bonovitz | Director | February 23, 2005 |

84

| Signature | Title | Date |
|---|---|---|
| /s/  JOSEPH L. CASTLE, II | Director | February 23, 2005 |
| Joseph L. Castle, II | | |
| /s/  JOSEPH J. COLLINS | Director | February 23, 2005 |
| Joseph J. Collins | | |
| /s/  J. MICHAEL COOK | Director | February 23, 2005 |
| J. Michael Cook | | |
| /s/  DR. JUDITH RODIN | Director | February 23, 2005 |
| Dr. Judith Rodin | | |
| /s/  MICHAEL I. SOVERN | Director | February 23, 2005 |
| Michael I. Sovern | | |

85

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders
Comcast Corporation
Philadelphia, Pennsylvania


We have audited the consolidated financial statements of Comcast Corporation and subsidiaries (the "Company") as of December 31, 2004 and 2003, and for each of the three years in the period ended December 31, 2004, management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2004, and the effectiveness of the Company's internal control over financial reporting as of December 31, 2004, and have issued our report thereon dated February 21, 2005; such consolidated financial statements and report are included elsewhere in this Form 10-K. Our audits also included the consolidated financial statement schedule of Comcast Corporation and its subsidiaries, listed in Item 15(b)(i). This consolidated financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.


Deloitte & Touche LLP


Philadelphia, Pennsylvania
February 21, 2005

86

---

Comcast Corporation and Subsidiaries

Schedule II—Valuation and Qualifying Accounts

Years Ended December 31, 2004, 2003 and 2002

| (In millions) | Balance at Beginning of Year | | Additions Charged to Costs and Expenses(A) | | Deductions from Reserves(B) | | Balance at End of Year |
|---|---|---|---|---|---|---|---|
| Allowance for Doubtful Accounts | | | | | | | |
| 2004 | $ | 146 | $ | 247 | $ | 261 | $ | 132 |
| 2003 | | 172 | | 220 | | 246 | | 146 |
| 2002 | | 71 | | 198 | | 97 | | 172 |

(A)   Includes $71 million not charged to costs and expenses but resulting from the Broadband acquisition in 2002.

(B)   Uncollectible accounts written off.

87

# Exhibit C

FCC News Release: FCC ADOPTS RULES FOR CABLE CARRIAGE OF DIGITA...mation Regarding Dual Carriage of Analog and Digital TV Signals

Case 2:05-cv-00493-GMS CED Document 85-25    Filed 02/22/2006    Page 2 of 4

This News Release: [Text](#) | [Word97](#)

FCC 01-22: [Text](#) | [Word97](#) | [Acrobat](#)

Statements: [Powell](#) | [Ness](#) | [Furchtgott-Roth](#) | [Tristani](#)

Survey Questions: [Word97](#) | [Acrobat](#)

[Summary of Issues](#).



# NEWS

### Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554

News media information 202 / 418-0500
Fax-On-Demand 202 / 418-2830
Internet: http://www.fcc.gov
TTY: 202/418-2555

---

This is an unofficial announcement of Commission action. Release of the full text of a Commission order constitutes official action. See MCI v. FCC. 515 F 2d 385 (D.C. Circ 1974).

---

FOR IMMEDIATE RELEASE
January 22, 2001

NEWS MEDIA CONTACT:
David Fiske (202) 418-0513

## FCC ADOPTS RULES FOR CABLE CARRIAGE OF DIGITAL TV SIGNALS
### Also Requests Further Information Regarding Dual Carriage of Analog and Digital TV Signals

Washington, DC – The Federal Communications Commission (FCC) has adopted rules related to the cable carriage of digital broadcast television signals. In addition to resolving a number of technical and legal matters, the FCC's action clarifies that a digital-only TV station, commercial or non-commercial, can immediately assert its right to carriage on a local cable system. The FCC also said that a TV station that returns its analog spectrum and converts to digital operations must be carried by local cable systems.

This action is one of a series of steps to facilitate the transition from analog to digital television broadcasting. This transition will ultimately expand consumer choice of video programming and other services. The transition from analog to digital will allow for more efficient use of the spectrum that will permit new communications and video services in parts of the spectrum returned to the FCC for auction to new competitive providers.

The FCC's Report and Order resolves issues related to the cable carriage of digital

FCC News Release: FCC ADOPTS RULES FOR CABLE CARRIAGE OF DIGITA...mation Regarding Dual Carriage of Analog and Digital TV Signals

Case 2:05-cv-00493-GMS CEDocument 85-25    Filed 02/28/2005    Page 3 of 4

broadcast signals including retransmission consent; channel capacity; signal quality; scope of signal carriage; material degradation; set-top box availability; channel location; market modifications; digital signal carriage on PEG channels (public, educational, government access channels); complaints and enforcement; subscriber notification; program exclusivity; and tiers and rates. Based on the current record, the Report and Order finds that for a digital-TV station, the "primary video" that is entitled to mandatory carriage includes a single programming stream and other program-related content. The Commission issued a Further Notice of Proposed Rulemaking (FNPRM) to define the scope of "program-related."

Regarding the issue of whether a local TV station may assert a right to carriage for both its analog and digital signals ("dual carriage"), the Report and Order tentatively concludes that, based on the existing record, such a requirement appears to burden cable operators' First Amendment interests more than is necessary to further a substantial governmental interest. The FNPRM seeks further comment on this and a number of other issues necessary to develop the record in this proceeding.

The FNPRM asks several questions related to developments in the digital television marketplace, the answers to which will help determine whether a dual carriage requirement could survive constitutional scrutiny under the First Amendment. In addition, in conjunction with the requirement that cable operators carry material that is associated with the primary video stream, the FNPRM seeks comment on the proper scope of program related content in this context. For example, the FNPRM asks if "educational" program streams broadcast by noncommercial stations should qualify as "program related" in light of statutory language that applies specifically to noncommercial stations.

The FNPRM also raises questions concerning the applicability of the rules adopted in the Report and Order to satellite carriers under the Satellite Home Viewer Improvement Act of 1999.

In conjunction with the FNPRM, the Cable Services Bureau will survey cable operators to ascertain current and future system capacity and to gather information about retransmission consent agreements with broadcasters that include carriage of digital signals.

A summary of these issues is attached to this news release.

Action by the Commission, January 18, 2001, by Report and Order and Further Notice of Proposed Rulemaking (FCC 01-22). Chairman Kennard, Commissioners Ness and Furchtgott-Roth concurring in part and dissenting in part and issuing separate statements; Commissioner Powell issuing a separate statement and Commissioner Tristani dissenting and issuing a statement.

-- FCC --

FCC News Release: FCC ADOPTS RULES FOR CABLE CARRIAGE OF DIGITA...mation Regarding Dual Carriage of Analog and Digital TV Signals

Case 2:05-cv-00493-GMS   Document 85-5   Filed 02/28/2007   Page 4 of 4

Cable Services Bureau contact: Deborah Klein, Eloise Gore at (202) 418-7200. TTY: (202) 418-7172

# Exhibit D

You are here:

[Home](#) > [Help](#) > [FAQs](#)  > [Connection ](#)  > [Cable Modems](#)

[Skip to Main Content](#)
[Skip to Channels](#)

# Comcast

# help

# Applications

- [Mail ](#)

- [Music](#)

- [Photos](#)

- [The Fan](#)

- [Security](#)

- [Sign In](#)

- [Ask Comcast](#)

Search the Web: [                    ] SEARCH [More...](#)

# Search

- Web
- Images
- Shopping
- Help

# User Options

- Welcome, Guest!
- [Go to Express](#)
- [Help](#)
- [My Account](#)

[Help:](#)

[Ask Comcast](#)|[FAQs](#)|[One Click Fixes](#)|[Desktop Doctor](#)|[Help Forums](#)|[Email Us](#)|[Live Chat](#)

[Security:](#)

[Anti-Virus](#)|[Online Privacy](#)|[Internet Safety](#)|[McAfee Security](#)|[McAfee Anti Virus](#)|[Security Forums](#)

[My Account:](#)

[Reset Password](#)|[Create Additional Email Account](#)|[Enable PWP](#)|[Pay Bill Online](#)

# FAQ

**Where can I download USB cable modem drivers?**

Comcast has provided the following USB cable modem drivers for you to download, should the need arise.

[3Com 3CR29220](#)

[Ambit 60678E](#)

[Arris CM300](#)

[Arris CM450a](#)

[Arris TC00DA103](#)

[Belkin F5D5530-W](#)

[BestData CMX300](#)

[Broadxant 8601](#)

[Castlenet CXC150](#)

[Castlenet CXC250](#)

[Com21 DP1110](#)

[Com21 DP1110XB](#)

[DLink DCM-200](#)

[DLink DCM-201](#)

[Ericsson HMC200c](#)

[High Speed Surfing SM200](#)

[Linksys BEFCMU10_H](#)

[Linksys BEFCMU10_V](#)

[Linksys WCG200](#)

[Motorola SB4100](#)

[Motorola SB4101](#)

[Motorola SB4200](#)

[Motorola SB4220](#)

[Motorola SB5100](#)

[Motorola SB5120](#)

[Motorola SBG1000](#)

[Netgear CG814W](#)

[Netgear 814M v2](#)

[Netgear CM212](#)

[RCA DCM225](#)

[RCA DCM235](#)

[RCA DCM245](#)

[RCA DCM305](#)

[RCA DCM315](#)

[RCA DCW615](#)

[Scientific Atlanta DPX100](#)

[Scientific Atlanta DPX110](#)

[Scientific Atlanta DPX2100](#)

[SMC 8002](#)

[SMC 8004CM](#)

[SMC 8011CM-B](#)

[SMC 8012WG](#)

[SMC 8013WG](#)

[SpeedStream SS6101](#)

[Terayon TJ615](#)

[Terayon TJ715](#)

[Toshiba PCX1100U](#)

[Toshiba PCX2000](#)

[Toshiba PCX2200](#)

[Toshiba PCX2500](#)

[Toshiba PCX2600](#)

[Toshiba PCX5000](#)

[Zoom 5041](#)

# Search Help

Enter Search Word

| | SEARCH |

## Related Faqs

1. [Can I send faxes through Comcast High-Speed Internet service?](#)
2. [How do I troubleshoot my cable modem?](#)
3. [What is DOCSIS/Cable Labs?](#)
4. [Which cable modems are approved for use with the Comcast High-Speed Internet Service?](#)
5. [Why do some of the lights on my cable modem blink even when my PC is idle or turned off?](#)

# Channels

- [Home](#)
- [News](#)
- [Finance](#)
- [Sports](#)
- [Entertainment](#)
- [TV](#)
- [Movies](#)
- [Music](#)
- [Kids](#)
- [Games](#)
- [Relationships](#)
- [Autos](#)
- [Travel](#)
- [Shopping](#)
- [Comcast Latino](#)

# Toolbox

- [Mail](#)
- [Find It](#)
- [Online Storage](#)
- [Photo Center](#)
- [Personal Web Pages](#)

- [Features and Extras](#)
- [Downloads](#)
- [Security](#)
- [My Account](#)
- [Help](#)

- [Privacy Statement](#)
- [Terms of Service](#)
- [Contact Comcast](#)
- [© 2005 Comcast Cable Communications, LLC. All rights reserved.](#)

[Back to Top](#)

**MCAFEE SECURITY DOWNLOADS**
[Protect your PC for FREE](#)

# Exhibit E



Return to the previous page

# Motorola, Inc. (NYSE: MOT)

1303 E. Algonquin Rd.                 Phone: 847-576-5000
Schaumburg, IL 60196 (Map)            Fax: 847-576-5372

http://www.motorola.com

*Covered by David Hamerly*

Motorola is continuing its drive down the information superhighway, but with a slimmer load and a new driver at the wheel. The company's reorganization has included the spin off of its semiconductor unit. Its remaining operations have been focused in four business segments that cover consumer broadband service systems, networks and software, government and enterprise, and mobile devices. Motorola is the #2 manufacturer of wireless handsets after global leader Nokia. The company also is a leading supplier of such wireless infrastructure equipment as cellular transmission base stations, amplifiers, and servers. Ed Zander, the former president of Sun Microsystems, took over as chairman and CEO of Motorola in 2004.

**Full Overview**

## Key Numbers

| | |
|---|---|
| **Company Type** | Public (NYSE: MOT) |
| **D&B D-U-N-S Number** | 001325463 |
| **Fiscal Year-End** | December |
| **2004 Sales (mil.)** | $31,323.0 |
| **1-Year Sales Growth** | 15.8% |
| **2004 Net Income (mil.)** | $1,532.0 |
| **1-Year Net Income Growth** | 71.6% |
| **2004 Employees** | 68,000 |
| **1-Year Employee Growth** | (22.7%) |

**More Financials**

## Key People

| | |
|---|---|
| **Chairman and CEO** | Edward J. (Ed) Zander |
| **EVP and CFO** | David W. Devonshire |
| **EVP and CTO** | Padmasree Warrior |
| **SVP and CIO** | Patricia B. (Patty) Morrison |
| **SVP and Director, Global Government Relations Organization** | Michael D. (Mike) Kennedy |

**More People**

## CEOs On Camera

Sponsored by Cingular

Motorola (MOT) Chairman & CEO Ed Zander (7:00)
10/19/05 10:00ET - Zander comments on MOT's quarterly earnings and business.

More Interviews

## Industry Information

- ✎ Telecommunications Equipment
    - ✎ Wireless Telecommunications Equipment
        - ✎ **Wireless Telephone Handsets** (primary)
        - ✎ Wireless Switching & Transmission Equipment
    - ✎ Wireline Telecommunications Equipment
- ✎ Automotive & Transport

**More Industry Information**

**Industry Watch**
Sponsored by Southern Company

Motorola Earnings Preview (5:15)
10/18/05 5:50ET - American Technology Research Director of Research Albert Lin and Piper Jaffray Wireless Communications Analyst Mike Walkley preview the quarterly earnings for Motorola.

More Industry Interviews

## Top Competitors

- ✎ Ericsson
- ✎ Nokia
- ✎ Siemens Communications

**Full Competitor List**

## Rankings

- ✎ #49 in FORTUNE 500 ⮕
- ✎ S&P 500
- ✎ #148 in FT Global 500 ⮕

## Subsidiaries/Affiliates Covered By Hoover's Online

- ✎ Motorola, Inc. -- Telecommunications

⮕ Indicates external site content that will open in a new browser window.

🇺🇸 **Hoover's Online US**  |  🇬🇧 **Hoover's Online UK**  |  **Choose Your Edition**
IPO Central | Hoover's Books | Upgrade Options | Newsletters
Hoover's Mobile | Help & Training | Feedback

**Copyright** © 2005, Hoover's, Inc., ALL RIGHTS RESERVED
About Hoover's | Job Opportunities | Privacy Policy | Advertising Info

Find this page at: http://premium.hoovers.com/subscribe/co/factsheet.xhtml?ID=11023

# Exhibit F



Send To Printer

Return to the previous page

# Scientific-Atlanta, Inc. (NYSE: SFA)

5030 Sugarloaf Pkwy.
Lawrenceville, GA 30044 (Map)

Phone: 770-236-5000
Fax: 770-236-4775
Toll Free: 800-433-6222

http://www.scientificatlanta.com

*Covered by David Hamerly*

Cable-bodied Scientific-Atlanta might box its way into your home. The company is one of the largest makers of set-top boxes used by cable subscribers to receive TV programming and interactive online services such as movies-on-demand, e-mail, and Web connection. Although set-top boxes account for a large portion of sales, the company also makes digital video recorders (DVRs), cable modems, and network transmission and distribution equipment (digital video compression products, multiplexers, and signal encoders/decoders) used in the central offices of broadcasters. Scientific-Atlanta has agreed to be acquired by Cisco Systems for about $6.9 billion.
**Full Overview**

## Key Numbers

| | |
|---|---|
| **Company Type** | Public (NYSE: SFA) |
| **D&B D-U-N-S Number** | 003265022 |
| **Fiscal Year-End** | June |
| **2005 Sales (mil.)** | $1,910.9 |
| **1-Year Sales Growth** | 11.9% |
| **2005 Net Income (mil.)** | $210.8 |
| **1-Year Net Income Growth** | (3.3%) |
| **2004 Employees** | 7,538 |
| **1-Year Employee Growth** | 7.0% |

**More Financials**

## Key People

| | |
|---|---|
| **Chairman, President, and CEO** | James F. McDonald |
| **SVP, Finance and Operations** | Wallace G. Haislip |
| **SVP, CFO, and Treasurer** | Julian W. Eidson |
| **SVP and CTO** | Robert C. McIntyre |
| **VP, Corporate Development** | John A. Buckett II |

**More People**

## Industry Information

- Telecommunications Equipment
  - **Satellite & Broadcast Network Equipment** (primary)
- Computer Hardware
  - Computer Networking Equipment
    - Network Access & Communication Devices

Case 2:05-cv-00303-TJW-CE    Document 185-28    Filed 02/22/2007    Page 3 of 3

**More Industry Information**

**Industry Watch**
Sponsored by Southern Company

Soleil Securities Analyst Shannon Cross (3:49)
11/18/05 9:25ET - Cross comments on quarterly earnings numbers out from Hewlett-Packard (HPQ).

More Industry Interviews

## Top Competitors

- ARRIS
- Motorola
- Pace Micro

**Full Competitor List**

## Rankings

- S&P 500

---

☞ Indicates external site content that will open in a new browser window.

🇺🇸 **Hoover's Online US** | 🇬🇧 **Hoover's Online UK** | **Choose Your Edition**
IPO Central | Hoover's Books | Upgrade Options | Newsletters
Hoover's Mobile | Help & Training | Feedback

**Copyright** © 2005, Hoover's, Inc., ALL RIGHTS RESERVED
About Hoover's | Job Opportunities | Privacy Policy | Advertising Info

Find this page at: http://premium.hoovers.com/subscribe/co/factsheet.xhtml?ID=11329

# Exhibit G

**Look**Smart

FindArticles > Cable World > June 9, 2003 > Article > Print friendly

**Houston Yields a Digital Sub Gusher**

Byline: MAVIS SCANLON

They grow 'em big in Texas, and Time Warner Cable's Houston division is no exception. Laid out in a straight line, the system's 16,600 miles of cable plant would stretch from New York to Hong Kong - and back. With over 700,000 customers, it's Time Warner Cable's second-largest system, after New York City.

As Houston has grown, so has the cable system. The population in the metropolitan area, which includes the eight counties surrounding Houston, grew over 25% between 1990 and 2000, to about 4.8 million. The city of Houston has just under 2 million residents.

In the early 1990s Time Warner knew that to serve its customers, it needed to upgrade its network. So in 1993, the company set out to transform itself into a state-of-the-art operator. Four years later it had upgraded about 6,000 miles of plant. But then it formed a joint venture with systems then owned by TCI, the forerunner of AT&T Broadband, which was acquired by Comcast last year. That joint venture, called Texas Cable Partners, serves some 1.2 million customers throughout Texas. In addition to the Houston division, the partnership includes about 100 smaller markets in the state, from El Paso, with about 120,000 subscribers, to systems in Harlingen, McAllen, Corpus Christi and Beaumont. As the operator, TWC counts those customers in its own sub counts and receives management fees from Comcast. The TWC systems in San Antonio and Austin are wholly owned by TWC.

In 1998, the company undertook an upgrade of more than 9,000 miles of cable plant owned by TCI. At one point, a team of about 168 contract workers worked on the upgrade, while a back-office staff of nearly 100 helped coordinate the work throughout the three-year project.

"It was a very difficult time for us, but we knew it was something we had to do," says Ron McMillan, division president of Time Warner Cable Houston. Node by node, the work was completed.

One thing that made the TCI portion of the upgrade more difficult was transitioning TCI customers from the HITS digital service to a local service. Every single box had to be swapped out, recalls Judy Walsh, the division's VP of marketing and GM.

But all the work that went into the upgrade has paid off. Even with the upgrade of the TCI systems, TWC's Houston division has had somewhat of a head start on other cable systems in offering digital, the platform for advanced services. It also gave the system the opportunity to streamline its channel lineup to one single lineup for the entire service area, Walsh says, which means there is generally one pricing structure throughout the division.

Not only is that easier for the customer to understand, "it makes it much simpler to market and much simpler to sell," McMillan explains.

"We focused everything we do on digital," Walsh says. "The product is competitive." Houstonians have responded. Although declining to give specific numbers, McMillan says digital penetration is close to 50%; that would be one of the highest rates of any system anywhere.

Deep digital penetration is a big competitive advantage. For one thing, the system has been able to offer a broad array of programming to the region's large Hispanic population. According to Scarborough Research, nearly 30% of Houstonians in the Time Warner Cable service area are of Hispanic origin. Throughout TWC's basic and digital tiers, a range of Hispanic programming is offered.

With digital, the system has been able to take a leading role in the rollout of high-definition television. TWC Houston was one of the first systems to offer broadcast channels in hi-def; it currently offers nine HD channels, including ABC, NBC, CBS, Fox, PBS, plus two Showtime and two HBO channels. The system is in negotiations with ESPN, Discovery and HDNet. McMillan says he expects to launch a few more HD channels "soon."

Adds Ray Purser, VP of public affairs, "Those three are being given strong consideration right now."

Operationally, Houston is divided into seven districts. Although there is just one large call center, trucks and technicians are dispatched by geographic region.

The folks who live in the seven counties served by TWC are 25% more likely than the average consumer in the top 75 markets to have a household income of more than $100,000, according to Scarborough. Higher levels of disposable income mean more TV purchases. In fact, 27% of consumers in TWC's Houston area have bought a new television in the past 12 months, according to Scarborough, a percentage that's far higher than the average.

McMillan has taken a page from his satellite competition and is getting word out to consumers at the retail level. TWC Houston has partnered with Best Buy and local large-screen TV retailer Home Theater Store. When customers come in looking for a new TV, they can see demos of HDTV in the store - a big incentive to purchase that HD-capable set.

Video-on-demand is the latest addition to TWC's stable of advanced products. Initially deployed late last year, in March it was rolled out throughout the entire Houston market. As with any new technology - and VOD is especially complex, when you consider there are hundreds or thousands of set-top boxes trying to "talk" to servers - there were glitches at first.

Customers are readily adopting VOD, McMillan says, although he adds that it is too early to discuss specific buy rates. He will say the company is making its VOD budgets. "We have some pretty aggressive buy rates built into the budgets. It's coming along as we expected it would."

To ensure reliability, the system is monitored constantly. It started out with a "poor percentage" of boxes responding, McMillan says, but they now have it down to where 95% of the boxes respond. In other words, he says, if someone wants to order a movie, 95% of the time they will be successful accessing VOD on their first try.

Like many of the big cable operators, TWC Houston has seen telecom companies flood the market with low-priced offers for DSL, the biggest competitor to cable modems. McMillan says the system hasn't seen the need to respond with competing low offers; word of mouth has been just one consistent way the service has been marketed.

Word of mouth has also helped spread the word for wireless home networking. A few thousand customers have signed up for the service, at $14.95 a month plus a $79.95 installation charge. McMillan says it's a good retention tool for those with high-speed Internet access.

The division completed construction of a new 80,000-square-foot headquarters last month, giving the company the chance to consolidate administrative functions under one roof. There are also 14 retail locations throughout the service area where customers can go to pay bills, swap out equipment and experience new services such as high-speed Internet, VOD and HDTV. And even though three more retail locations will open this year, McMillan says that's not enough to cover the entire service region, which sprawls from Galveston, far south of Houston, to the Woodlands, about 20 or 30 miles north of the metro area, near Bush Intercontinental Airport.

Despite the systems' array of products and the inroads made in customer service, it's still hard to fend off satellite competition. Satellite penetration has hovered around 16% in recent years. Over the past two years, TWC has won back

Case 2:05-cv-00498-TJW-CED Document 135-29 Filed 02/08/2007 Page 5 of 8

about 2% of the market. In addition to direct mail campaigns to satellite homes, an outdoor sales force hits the pavement trying to convince former customers to come back. A big media campaign is also in play, touting cable's advantage over satellite. In Houston, that's not too hard, especially given the temperamental nature of the weather. Although the chamber of commerce touts Houston's mild year-round climate, the region's disruptive thunderstorms are anything but mild. This past February and March were far wetter than normal. Since satellite is notorious for losing reception in bad weather, any time a storm crops up TWC triggers radio spots that talk up the benefits of cable.

"The weather has been constantly on our side in Houston," notes Walsh.

When it comes to ad sales, no one knows the market better than GM of ad sales Matt Reiff. Born and raised in Houston, he has spent more than two decades selling advertising here. Just over a year ago Reiff came to cable after a career in broadcast ad sales. The biggest part of that transition, he says, was adjusting to cable's higher inventory levels, the sheer number of networks and the spot load. One thing he has seen over his 24 years in the industry is the way advertisers have come to realize cable's importance as an advertising medium, due to the quality of cable programming.

"People will continue to watch programs, not stations," Reiff says. It's a thesis underscored by cable's outpacing broadcast in total share of the viewing audience in recent quarters and the spike in cable news ratings as viewers tuned in for war coverage.

Houston's economy, which is inextricably tied to the energy industry, has been in a slump with the collapse of Enron and continued troubles at other big companies. As a result, the advertising mix on cable has shifted somewhat.

Although categories go up and down, Reiff says, "people are always going to advertise." In a down economy, for example, categories for financial services such as debt consolidation and legal advertising for bankruptcy attorneys become more prominent. In addition, churn with regular advertisers, unsure of their own prospects, becomes somewhat higher. What that means for Reiff's team of 24 sales reps is that they have to prospect that much more to keep their numbers growing.

So far, advertising growth has continued, even in last year's dismal market. One thing that has kept TWC's cable advertising viable is the number of zones that are available for targeted advertising. The system offers 13 different zones, and a prospective advertiser can choose a zoned buy, a buy on the interconnect or some combination of the two. In such a large market, a zoned buy allows an advertiser to target a relatively small area, affordably.

"That's what makes it such a good buy and a viable medium," Reiff notes, especially when a cable buy is pitched to an

advertiser who's considering a print advertising schedule. Besides the mass reach of TV, "we can zone better than they can."

The same holds true when TWC pitches cable against broadcast. TWC captures a larger percentage of local automotive ads than broadcast. Still, the soft economy has taken a toll; the automotive category has been weak, and that's impacted the systems' numbers. Reiff does expect growth this year in the high teens, however.

He says TWC Houston is competitive on a pricing basis with broadcast. Depending on the agency or advertiser and the type of buy, sales reps will make a pitch on a cost-per-point or cost-per-thousand basis.

A couple of sales reps focus solely on Hispanics. Because of the number of Hispanics in Houston that are supporting family in other countries, the biggest Hispanic ad categories are wire transfer services and international phone cards. The system is using qualitative information to make advertisers understand that a growing percentage of people in Houston are bilingual - they may speak Spanish, but they don't limit themselves to Spanish-only TV. Using that type of data makes it easier to convince advertisers that by putting their messages on both English- and Spanish-language channels they will get a higher frequency and better recall by consumers.

When AOL acquired Time Warner, one big expectation was the ability to sell cross-platform advertising deals. In Houston, they pitch a sale that way only if it makes sense for the advertiser or if the advertiser asks for it.

"It's not something we've gone out and tried to shove down people's throats," says Reiff.

TIME WARNER CABLE

HOUSTON

THE BASICS

NUMBER OF EMPLOYEES: 1,800

MILES OF PLANT: 16,600

HOMES PASSED: 1.6 million

PERCENT UPGRADED: 100%

BANDWIDTH CAPACITY: 750 MHz

BASIC SUBSCRIBERS: 713,000

BASIC RATE: $12.95/standard package

DIGITAL SUBSCRIBERS: N/A

DIGITAL RATE: $41.95

HIGH-SPEED DATA SUBSCRIBERS: N/A

HIGH-SPEED DATA RATE: $44.95

AD INSERTIONS: 50 channels

SOURCE: TIME WARNER CABLE

MEET THE OPERATOR

Ronald N. McMillan President

Before going to Houston, McMillan was president and GM of TWC's system in Milwaukee. Earlier, he was corporate VP of engineering in Dublin, Ohio. Prior to joining Time Warner, McMillan spent nearly 14 years with GTE in various engineering and operations capacities throughout the Southwest. He is on the board of the Texas Cable & Telecommunications Association.

Judy Walsh VP of marketing/GM

Walsh has nearly two decades of cable experience, spending virtually her entire career at TWC. For the last three years she has primarily been responsible for marketing, and recently assumed responsibility for the division's technical operations as well, overseeing 800 employees. Before coming to Houston, Walsh spent 15 years at TWC's Austin division. She is a graduate of CTAM University at the Harvard School of Business.

Matt Reiff GM of ad sales

A Houston native, Reiff spent years in ad sales on the broadcasting side before joining TWC. In 25 years he has been general sales manager at KILT-TV, VP and GSM at Fox Broadcasting KRIV-TV and president of Daybreak Advertising. Reiff has also served as VP and GM at KTBU-TV and director of sales in Houston and Dallas for Telemundo Broadcasting.

Al Hudz VP of engineering

Hudz has been with TWC for over 13 years. His 17 years in cable include engineering, operating and management roles at such companies as Warner Amex Cable Communications, Byers Communications, Group W Cable, Cablevision and Time Warner. Hudz specializes in the use of new technology and automation to enhance technical operations and productivity.

T. Ray Purser VP of public affairs

A Houston native, Purser oversees all media relations, franchising, government affairs and community activities. Prior to his current position, he managed the division's ad sales operations. He successfully merged the TCI and TWC ad sales operations into one organization, resulting in one of the country's largest ad sales organizations with more than 60 employees and revenue exceeding $38 million.

Time Warner Cable Houston Scarborough Research Profile

Comparison of consumers in Time Warner Cable's Houston service area to the top 75 market average.

COPYRIGHT 2003 Copyright by Media Central Inc., A PRIMEDIA Company. All rights reserved.
COPYRIGHT 2003 Gale Group

# Exhibit H

FILED CLERK
S. DISTRICT COURT

'05 DEC 22 PM 1: 51

TE'AC-EASTERN

BY _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **REMBRANDT VISION TECHNOLOGIES, L.P.,** | |
| **Plaintiff,** | Case No. 2:05cv 491 |
| v. | **JURY TRIAL DEMANDED** |
| **BAUSCH & LOMB INCORPORATED; and CIBA VISION CORPORATION,** | |
| **Defendants.** | |

<u>**COMPLAINT FOR PATENT INFRINGEMENT**</u>

For its complaint plaintiff Rembrandt Vision Technologies, L.P. ("Rembrandt"), by and through the undersigned attorneys, alleges as follows:

<u>**THE PARTIES**</u>

1.    Plaintiff Rembrandt is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 528, Bala Cynwyd, PA 19004.

2.    Defendant Bausch & Lomb Incorporated ("BAUSCH & LOMB") is a corporation organized under the laws of the state of New York, with its principal place of business at One Bausch & Lomb Place, Rochester, NY 14604-2701. Service may be perfected through its registered agent for service, C. T. Corporation Systems, 350 N. St. Paul, Dallas, Texas 75201.

3.    Defendant CIBA Vision Corporation ("CIBA") is a corporation organized under the laws of the state of Delaware, with its principal place of business at 11460 Johns Creek Parkway, Duluth, GA 30097. Service may be perfected through the Secretary of the State of

1

Texas, Statutory Documents Section – Citations Unit, P. O. Box 12079, Austin, Texas 78711-2079

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq*.

5.      Subject matter jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over BAUSCH & LOMB. BAUSCH & LOMB has committed acts of patent infringement in this judicial district. It is otherwise present or doing business in this judicial district.

7.      This Court has personal jurisdiction over CIBA. CIBA has committed acts of patent infringement in this judicial district. It is otherwise present or doing business in this judicial district.

8.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c) and 1400(b) with respect to BAUSCH & LOMB. BAUSCH & LOMB has committed acts of patent infringement in this judicial district. It also provides goods or services and does business in this judicial district and otherwise has minimum contacts with this judicial district.

9.      Venue is also proper in this judicial district under 28 U.S.C. §§ 1391(b), (c) and 1400(b) with respect to CIBA. CIBA has committed acts of patent infringement in this judicial district. It also provides goods or services and does business in this judicial district and otherwise has minimum contacts with this judicial district.

## THE PATENT-IN-SUIT

10.     United States Patent No. 5,712,327 ("the '327 patent"), entitled "Soft Gas Permeable Contact Lens Having Improved Clinical Performance," was duly and legally issued by the United States Patent and Trademark Office to Dr. Sing-Hsiung ("Mike") Chang and Mei-Zyh ("May") Chang on January 27, 1998. A copy of the '327 patent is attached as Exhibit A.

11.     Dr. and Mrs. Chang have for many years worked on making improvements to the oxygen permeability and tear-wettability of contact lenses, in particular soft contact lenses. Aside from the '327 patent, Dr. Chang is the named inventor of three other patents relating to soft, oxygen permeable contact lenses.

12.     Based on agreements with Dr. and Mrs. Chang, Rembrandt is the owner of all right, title, and interest, including the right to sue, enforce and recover damages for all infringements, past, present, and future, in the '327 patent.

## COUNT 1
## INFRINGEMENT OF U.S. PATENT NO. 5,712,327 BY BAUSCH & LOMB

13.     Rembrandt re-alleges and incorporates herein by reference the allegations stated in paragraphs 1-12 of this Complaint.

14.     BAUSCH & LOMB manufactures contact lenses and sells contact lenses throughout the United States.

15.     On information and belief, BAUSCH & LOMB has directly or indirectly infringed the '327 patent, and is continuing such infringements, by practicing or causing others to practice the invention(s) in the '327 patent. For example, BAUSCH & LOMB has infringed and continues to infringe the '327 patent by making, offering to sell, and/or selling soft gas permeable contact lenses having a tear-wettable surface in this district and elsewhere in the United States.

3

16.     On information and belief, BAUSCH & LOMB will continue to infringe the '327 patent unless enjoined by this Court   Upon information and belief, BAUSCH & LOMB's infringement has been willful and will continue to be willful, making this case exceptional and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285 of the Patent Statute.

## COUNT 2
## INFRINGEMENT OF U.S. PATENT NO. 5,712,327 BY CIBA

17.     Rembrandt re-alleges and incorporates herein by reference the allegations stated in paragraphs 1-12 of this Complaint.

18.     CIBA manufactures contact lenses and sells contact lenses throughout the United States.

19.     On information and belief, CIBA has directly or indirectly infringed the '327 patent, and is continuing such infringements, by practicing or causing others to practice the invention(s) in the '327 patent.  For example, CIBA has infringed and continues to infringe the '327 patent by making, offering to sell, and/or selling soft gas permeable contact lenses having a tear-wettable surface in this district and elsewhere in the United States.

20.     On information and belief, CIBA will continue to infringe the '327 patent unless enjoined by this Court.  Upon information and belief, CIBA's infringement has been willful and will continue to be willful, making this case exceptional and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285 of the Patent Statute.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt prays that the Court enter judgment against BAUSCH & LOMB and CIBA that includes:

4

(1)     a decree that BAUSCH & LOMB has infringed the '327 patent;

(2)     a decree that CIBA has infringed the '327 patent;

(3)     a permanent injunction enjoining and restraining BAUSCH & LOMB and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any process, which falls within the scope of any claim of the '327 patent;

(4)     a permanent injunction enjoining and restraining CIBA and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any process, which falls within the scope of any claim of the '327 patent;

(5)     an award of damages;

(6)     an award of increased damages pursuant to 35 U.S.C. § 284;

(7)     an award of all costs of this action, including attorneys' fees and interest; and

(8)     such other and further relief, at law or in equity, to which Rembrandt is justly entitled.

## JURY DEMAND

Rembrandt demands a jury trial on all issues triable by a jury.

Dated:  October 21, 2005

Respectfully submitted,

By: _Otis Carroll_  *by permission Deborah Race*

Otis Carroll, *Attorney-in-Charge*
State Bar No. 03895700
IRELAND, CARROLL & KELLEY,
P.C.
6101 S. Broadway, Suite 500
Tyler, TX 75703
Tel: (903) 561-1600
Fax: (903) 581-1071
Email: fedserv@icklaw.com

OF COUNSEL:

Thomas Melsheimer
State Bar No. 13922550
FISH & RICHARDSON P.C.
1717 Main Street
Suite 5000
Dallas, TX 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091

Frank Porcelli
Jolynn Lussier
Tawen Chang
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

Timothy Devlin
FISH & RICHARDSON P.C.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE  19899
Tel: (302) 652-5070
Fax: (302) 652-0607

Franklin Jones, Jr.
State Bar No. 00000055
JONES & JONES, INC., P.C.
201 West Houston Street, Drawer 1249
Marshall, Texas 75671-1249
Tel: (903) 938-4395
Fax: (903) 938-3360

S. Calvin Capshaw, III
State Bar No. 03783900
BROWN MCCARROLL, L.L.P.
1127 Judson Road, Suite 220
P.O. Box 3999
Longview, Texas 75601-5157
Tel: (903) 236-9800
Fax: (903) 236-8787

Robert M. Parker
State Bar No. 15498000
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Tel: (903) 533-9288
Fax: (903) 533-9687

                    Counsel for Plaintiff
                    REMBRANDT VISION TECHNOLOGIES,
                    L.P.

US005712327A

# United States Patent [19]

## Chang et al.

| | |
|---|---|
| [11] | **Patent Number:** **5,712,327** |
| [45] | **Date of Patent:** **Jan. 27, 1998** |

[54] **SOFT GAS PERMEABLE CONTACT LENS HAVING IMPROVED CLINICAL PERFORMANCE**

[76] Inventors: **Sing-Hsiung Chang; Mei-Zyh Chang**, both of 6 Buckskin Heights Dr., Danbury, Conn. 06811

[21] Appl. No.: **899,217**

[22] Filed: **Jun. 16, 1992**

### Related U.S. Application Data

[63] Continuation of Ser. No. 551,156, Jul. 11, 1990, which is a continuation-in-part of Ser. No. 407,261, Sep. 14, 1989, abandoned, Ser. No. 381,587 Jul. 18, 1989, abandoned, and Ser. No. 132,174, Dec. 14, 1987, abandoned, which is a continuation-in-part of Ser. No. 1,149, Jan. 7, 1987, abandoned

[51] Int. Cl.⁶ ................ **C08K 3/00**; C08K 5/54; C08F 130/08; B29D 11/00

[52] U.S. Cl. .................... **523/107**; 264/1.1; 264/2.6; 351/160 R; 351/160 H; 427/2.24; 427/487; 427/496; 427/508; 427/515; 522/99; 524/424; 525/326.5; 525/342; 525/477

[58] Field of Search ..................... 523/106, 107; 264/2.6, 1.1; 351/160 R, 160 H; 427/2, 487, 496, 508, 515, 2.24; 524/424; 526/279, 282, 264; 522/99; 525/326.5, 342, 477

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,937,680 | 2/1976 | Carle | 526/264 |
| 4,099,859 | 7/1978 | Merrill | 351/160 H |
| 4,139,513 | 2/1979 | Tanaka et al | 526/279 |
| 4,158,089 | 6/1979 | Loshaek et al | 526/264 |
| 4,260,725 | 4/1981 | Keogh et al | 526/75 |
| 4,261,875 | 4/1981 | Le Boeuf | 526/279 |
| 4,343,927 | 8/1982 | Chang | 526/264 |
| 4,463,149 | 7/1984 | Ellis | 526/279 |
| 4,487,905 | 12/1984 | Mitchell | 526/279 |
| 4,550,001 | 10/1985 | Suminoe et al | 526/486 |
| 4,582,884 | 4/1986 | Ratkowski | 526/279 |
| 4,711,943 | 12/1987 | Harvey | 526/279 |
| 4,734,475 | 3/1988 | Goldenberg et al | 525/326.5 |
| 4,740,533 | 4/1988 | Su et al | 523/106 |
| 4,769,431 | 9/1988 | Ratkowski | 526/279 |
| 4,780,510 | 10/1988 | Uemiya et al | 526/279 |
| 4,806,382 | 2/1989 | Goldberg et al | 427/2.24 |
| 4,812,173 | 3/1989 | Tsao et al | 134/27 |
| 4,861,840 | 8/1989 | Lim et al | 525/326.5 |
| 4,892,402 | 1/1990 | Sawamoto et al | 351/160 H |
| 4,920,184 | 4/1990 | Schafer et al | 525/477 |
| 4,954,587 | 9/1990 | Mueller | 526/279 |
| 4,961,954 | 10/1990 | Goldberg et al | 427/2.24 |

*Primary Examiner*—Herbert J. Lilling
*Attorney, Agent, or Firm*—William J. Speranza

[57] **ABSTRACT**

A hydrophilic soft gas permeable contact lens having substantially improved clinical performance by the provision of a sufficient higher proportion of hydroxy acrylic units to silicon units in the lens surface layer, as compared to that existing in the lens core, by the surface treatment of the lens, such as by reacting of the lens surface with polyols and base or acid or by radiation treatment of the base lens to graft, deposit or coat thereon hydroxy acrylic units.

**14 Claims, No Drawings**



EXHIBIT A

5,712,327

## 1

### SOFT GAS PERMEABLE CONTACT LENS HAVING IMPROVED CLINICAL PERFORMANCE

This is a continuation of application Ser. No. 07/551,156 filed on Jul. 11, 1990 which in turn is a continuation-in-part of prior applications, Ser. No. 07/407,261, filed Sep. 14, 1989 now abandoned; Ser. No. 07/132,174 filed Dec. 14, 1987 now abandoned (which in turn is a continuation-in-part of prior application Ser. No. 001,149, filed Jan. 7, 1987) now abandoned; and Ser. No. 07/381,587, filed Jul. 18, 1989 now abandoned.

### BACKGROUND OF THE INVENTION

The present invention relates to contact lenses, and more particularly to hydrophilic soft gas permeable contact lenses having improved clinical performance.

Among the most important properties and requirements of contact lenses are substantial permeability to oxygen (commonly referred to as DK), and a highly wettable and deposition-resistant surface.

The development and use of plastic materials and compositions for contact lenses has been the subject of much attention over the years.

Among the first such developments was the so-called hard lens utilizing the hard plastic polymethylmethacrylate (PMMA). However, this material does not exhibit a significant degree of oxygen permeability and has very poor surface wettability characteristics. The art then progressed to soft lenses based upon poly 2-hydroxyethyl methacrylate (poly HEMA), a material having significantly better oxygen permeability and surface quality than the hard PMMA plastic. Nevertheless, these characteristics were still not as high as desirable or necessary, and lenses of this type often resulted in serious problems of corneal staining, swelling, ulcers, thickness and infection.

Somewhat more recently, based upon better understanding of the corneal requirement of substantial oxygen permeability, the art proposed the use of so-called hard gas permeable (HGP) lenses composed of either of two types of plastic materials, acrylic silicone or acrylic fluorosilicone. See, e.g., U.S. Pat. No. 3,808,178. Generally, the oxygen permeability of HGP lenses can progressively be increased with increasing amounts of the silicone and/or fluorosilicone in the composition; at the same time, however, the surface wettability of the lens becomes progressively poorer. In order to overcome this problem, it is known to incorporate a relatively large amount of methacrylic acid (MAA), an ionic material, into the formulation, resulting in the lens surface being negatively charged to a certain extent. While this expedient does lead to improved surface wettability, the negatively-charged surface has a very high absorptivity leading to serious deposition problems. As a consequence, the HGP lens is of only limited potential.

Most recently, hydrophilic soft gas permeable (SGP) lenses have been developed based upon compositions containing, e.g., a polymerizable vinylic siloxane monomer and a hydrophilic vinylic monomer. See, e.g., U.S. Pat. Nos. 4,136,250; 4,182,822; 4,261,875; 4,343,927; 4,426,389; 4,486,577; 4,605,712; 4,711,943 and 4,837,289. The SGP lenses of this type, which generally have a water content of from about 25 to 75% by weight, have excellent oxygen permeability and hydrophilicity. Surprisingly, however, the clinical performance of SGP lenses, including functional (i.e., on the eye) wettability, deposition resistance, dehydration resistance and/or comfort, is very poor, making such lenses unsuitable for extended wear.

## 2

Thus, notwithstanding the advances made to date, there still exists a need for plastic contact lenses of the SGP type which not only possess a high degree of oxygen permeability, but also exhibit excellent clinical performance, such as functional wettability, deposition resistance, and comfort, thus making the lenses suitable for extended wear. The foregoing is the principal object of the invention.

### SUMMARY OF THE INVENTION

This and other objects are achieved in the present invention by the provision of a soft gas permeable contact lens, composed of the polymerization product of compositions containing a polymerizable vinylic siloxane monomer and a hydrophilic vinylic monomer, having on the lens surface a proportion of hydroxy acrylic monomer units to silicon units sufficient to provide an SGP lens having the requisite high DK, softness and rebound elasticity, and which at the same time possess a high degree of clinical performance, thus rendering the lenses eminently suitable for long-term extended wear.

The requisite sufficient proportion of hydroxy acrylic monomer units to silicon units on the lens surface can be attained by surface treatment of the lens in order to increase hydroxy acrylic monomer units and/or to reduce the silicon units on the surface. In preferred embodiments of the invention, the surface treatment is carried out either by reaction on the lens surface with a polyhydric alcohol (polyol) and/or base or acid, or by radiation treatment of the lens to graft, deposit or coat hydroxy acrylic monomer units on the surface thereof.

It should be noted that the present invention differs significantly from prior art practices related to the provision or attempted provision, of a hydrophilic surface on a hydrophobic lens. Thus, hydrophilic lenses are known in the art which are made of silicone rubber, a cross-linked polysiloxane, such as illustrated in U.S. Pat. No. 3,228,741. These hydrophobic lenses are highly oxygen permeable but are extremely poor in functional wettability, deposition resistance and comfort, and also exhibit a mysterious tight lens syndrome. It is known in the art to seek to improve the functional wettability of such lenses by provision of an ultrathin coating of hydrophilic polymer. See, e.g., U.S. Pat. Nos. 3,854,982; 3,916,033; 3,925,178; and 4,143,949 Generally these efforts have not in any event proven successful. One reason is because the silicone rubber lens is rather rigid, and as a consequence an ultrathin (i.e., Angstoms level) hydrophilic coating is easily rubbed away during routine cleaning cycles, with the result that the lens soon re-exhibits the poor wettability, poor deposition resistance, discomfort and tight lens syndrome characteristic of silicone rubber hydrophobic lenses. Provision of thicker layers of hydrophilic polymer on the lens to resist rubbing off is impractical, since oxygen permeability of the lens is substantially reduced and since the differences between the refractive index of the silicone rubber and the thick hydrophilic polymer coating become such as to result in a highly undesirable lens.

In the present invention, the lens per se is a hydrophilic SGP lens containing a substantial amount of water (e.g., generally at least 25% by weight) such that its surface, in contrast to the silicone rubber lenses, is already highly hydrophilic and no apparent need would exist to provide a hydrophilic polymeric surface coating thereon as is taught with respect to hydrophobic lens materials. In the present invention, it has surprisingly been found that the SGP lenses, even though having highly hydrophilic surfaces, neverthe-

5,712,327

**3**

less can still be very poor in clinical performance, and that this problem can be overcome by providing on the surface of the SGP lens a ratio of hydroxy acrylic units to silicon units which is sufficient to bring about significant clinical improvement.

Also in contrast with the treatment of hydrophobic silicone rubber lenses, it is found that the criteria employed in improving wettability of those lenses by hydrophilic monomer coatings is not correlatable to bringing about improved clinical performance in the hydrophilic SGP lenses to which the present invention is directed. For example, for hydrophobic lenses, acceptable wettability has been determined based upon contact angle (see, e.g., Col. 7, lines 13–16, of U.S. Pat. No. 4,143,949), resulting in findings that coatings based upon amide monomers (e.g., N-vinylpyrrolidone) are quite effective in improving wettability (see, e.g., Example 1–2 of the above patent). In contrast however, in the context of the hydrophilic SGP lenses of the present invention and particular those of preferred center thickness of from 0.05 to 0.08 mm, such amide group-containing monomers are quite ineffective in improving the clinical performance of the SGP lenses.

Accordingly, the findings and techniques of the present invention would not have been derivable or predictable from the known practices regarding improving the wettability of hydrophobic silicone rubber lenses.

## DETAILED DESCRIPTION OF THE INVENTION

The basic teachings and formulations and techniques regarding formation of silicone-based SGP lenses are known in the art, as reflected in the earlier-mentioned patents, the disclosures of which are expressly incorporated herein by reference. The SGP lens is formed from the polymerization product of compositions containing at least one polymerizable vinylic siloxane (PVS) monomer, and at least one hydrophilic vinylic monomer. The polymerizable vinylic siloxane monomer contains at least one polymerizable vinylic group such as acrylic, styrenyl or vinylic group, at least one polysiloxanyl group, and at least one linkage connecting these two groups; thus, for example:

tris(trimethylsiloxy)silylpropyl-glycerol-ethyl methacrylate

$$CH_2=CCH_3COO(CH_2)_2OCH_2CHOHCH_2O(CH_2)_3Si(OSi-CH_3)_3; \text{ and}$$

with the CH_3 groups above and below labelled on the Si(OSi—CH_3) structure

δ-tris(trimethylsilyl)silylpropyl methacrylate
(also sometimes referred to hereinafter as TSM)

$$CH_2=CCH_3COO(CH_2)_3Si(OSi-CH_3)_3$$

with CH_3 groups labelled

Hydrophilic vinylic monomers suitable for use in SGP lens compositions along with the PVS include, for example, N,N-dimethylacrylamide (NNDMA), 2-hydroxyethyl methacrylate (HEMA), glyceryl methacrylate (GMA), N-vinyl pyrrolidone and the like.

The lenses per se are formed by lathe cutting, cast molding, spin casting, or other like known techniques.

As earlier noted, SGP lenses made according to the known formulations possess a high oxygen permeability but exhibit poor clinical performance. In the present invention, it has

**4**

been discovered that by increase of the proportion of hydroxy acrylic monomer (HAM) units, preferably HEMA and/or GMA units, to silicon units at the lens surface, the clinical performance can be substantially improved. As used herein, the units referred to are the structural monomeric units or the number of silicon atoms, including those as part of an overall copolymeric structure.

Hydroxy acrylic monomer (HAM) suitable for the practice of this invention correspond to the formula

$$H_2C=C-C=O$$
$$\begin{matrix} | & | \\ R & X \end{matrix}$$

wherein R is H or a substituted or unsubstituted alkyl, such as methyl or $CH_2COOH$; and X is a radical selected from the group consisting of hydroxyalkyloxy, hydroxyalkyl amine, and hydroxy; with the alkyl being substituted or unsubstituted, and preferably selected from $C_1$ to $C_{10}$ alkyls, most preferably $C_2$ and $C_3$ alkyls; and with the hydroxy on the alkyl being either a single hydroxy (e.g., as in 2-hydroxyethyl methacrylate) or multiple hydroxy (e.g., as in glyceryl methacrylate). Exemplary and preferred hydroxy acrylic monomers are:

1. 2-hydroxyethyl acrylate or methacrylate;

2. glyceryl acrylate or methacrylate;

3. ethylene glycolato ethyl acrylate or methacrylate, i.e., $CH_2=CRCOO-CH_2-CH_2-O-CH_2-CH_2-OH$

4. glycerolglyceryl acrylate or methacrylate, i.e., $CH_2=CRCOO-CH_2CH(OH)-CH_2-O-CH_2-CH(OH)-CH_2-OH$

5. N-hydroxymethyl, N-methyl acrylamide or methacrylamide;

6. N-2-hydroxyethyl N-methyl acrylamide or methacrylamide;

7. N-2,3-dihydroxypropyl, N-methyl acrylamide or methacrylamide;

8. acrylic acid, methacrylic acid or itaconic acid.

As noted, the SGP lens of the invention is made from the known SGP lens compositions and, after lens formation, the lens is then treated to provide on its surface a proportion of HAM units to silicon units (e.g., by increase of HAM units and/or by decrease of silicon units) sufficient to provide improved clinical performance of the lens, such as functional wettability, deposition resistance, dehydration resistance and comfort.

One means for achieving the requisite surface proportion of HAM units to silicon units is by reaction of the lens surface, preferably in the dehydrated state, with a polyol of the formula $R_1(OH)_n$ where $R_1$ is a substituted or unsubstituted alkyl, preferably a $C_2$ to $C_3$ alkyl, and n is an integer of at least 2, such as glyceryl methacrylate, ethylene glycol, glycerine, glycerine-glycerine, polyglycerine, or the like. The reaction is preferably carried out in the presence of a base, such as sodium hydroxide, preferably in a concentration of 0.1 to 10 mole percent based on the polyol, or an acid or acid-containing mixture, such as ethanol/sulfuric acid, the reaction being conducted to the extent that the physical properties of the base lens (e.g., strength, oxygen permeability, softness, rebound elasticity, etc.) are essentially unaffected. This reaction is intended to increase the HAM units in the surface layer by transesterification and/or to reduce the silicon units by the cleavage of siloxane bonds catalyzed by base or acid.

Alternatively, the core lens can be treated with a HAM, preferably 2-hydroxyethyl acrylate or methacrylate, by grafting, deposition or coating to the lens surface so as to provide a sufficient proportion of HAM units to silicon units

5,712,327

| 5 | 6 |

## EXAMPLE 1

at the lens surface. The grafting, deposition or coating can be carried out using known radiation-induced reactions, including reactions induced by UV, x-ray γ-ray, and other electromagnetic radiation, such as radio frequency, microwave and the like, electron beam radiation, including electrical discharge, and the like, with reactions induced by UV, γ-ray or electron beam radiation being preferred. The treating techniques per se that can be used in the practice of this invention are well known in the art, such as the grafting, deposition or coating cured by UV, γ-ray or electron beam, illustrated in U.S. Pat. Nos. 3,916,033 and 3,854,982; coating by spin casting or cast molding of the lenses cured by radiation; or plasma treating techniques such as those disclosed in U.S. Pat. Nos. 3,925,178 and 4,143,949, as is well known in the art. The disclosures of these prior art patents are expressly incorporated herein by reference. In the preferred embodiment of the invention, the surface treatment produces on the lens surface a thin coating consisting essentially of poly(hydroxy alkyl acrylate and/or methacrylate), more preferably poly(2-hydroxyethyl acrylate and/or methacrylate).

The required sufficient proportion of HAM units to silicon units on the lens surface that produces the desirable clinical performance will vary primarily depending upon the type and amount of particular PVS and hydrophilic monomer employed. However, the sufficient proportion in the surface layer will, at any proportion, be higher than that existing in the lens body or core. Preferably, the proportion of HAM units to silicon units in the surface layer is at least 0.5. Generally, the higher the proportion the better the clinical performance of the lens, and the thicker the treated surface layer the better the durability of the lens wettability. However, the treated layer can not be so thick that the desired properties of the lens are adversely affected. The extent of acceptable surface treatment can be monitored by high resolution photoelectron spectroscopy (ESCA) or based on the clinical response as illustrated in the examples of this specification. Thus, based on the disclosure of this invention, the sufficient proportion of HAM units to silicon units on the lens surface can easily be determined by those skilled in the art.

Although not wishing to be bound by any theory as such, it is postulated that the improvement in the clinical performance of the lens comes about, at least in part, by virtue of establishment of compatibility between the delicate corneal wetting mechanism of the eye and the composition and structure of the lens surface. The known SGP lens having insufficient proportion of HAM units to silicon units or containing too high a level of silicon units on the surface are too hydrophobic for the spreading and binding of mucin to the lens surface. Mucin is the excellent wetting agent used in the cornea and contains a certain proportion of hydrophilic sites to hydrophobic sites. With increasing amount of HAM units on the lens surface, there are provided increased sites for hydrogen bonding with the hydrophilic sites on the mucin, while reduction of silicon surface units provides fewer hydrophobic sites and thus better spreading of mucin on the lens surface. As a consequence of the preferred embodiment of the invention herein, which results in the lens surface having a sufficient proportion of HAM units to silicon units, the lens surface becomes more closely matched to, and receptive to, tear mucin. As a result, the mucin can better spread on and bind to the lens surface so as to provide the improved clinical performance. Thus, when the wetting angle of the lens is controlled to that of the corneal surface free of mucin, the best results of this invention may result.

The invention is further illustrated with reference to the following examples.

SGP lenses were fabricated from buttons which were made according to the formulations and procedures set forth in U.S. Pat. No. 4,182,822, the starting formulation consisting of 36% (by weight) γ-tris(trimethylsiloxy) silylpropyl methacrylate (TSM) prepared according to Example 1 of the above patent, 59% N,N-dimethylacrylamide (NNDMA), and 5% methyl methacrylate (MMA) with 0.3% t-butylperoxypyvalate included as a catalyst. The formulation was placed in a Teflon tube. After deoxygenation by nitrogen for 15 minutes, the tube was sealed and the formulation was polymerized in a 40° C. water bath for six hours, followed by a 100° C. treatment for another six hours. The buttons cut from the rods were post-cured at 110° C. under high vacuum (0.5 Torr) for six hours.

The lens can be made by the lathe technique known in the art. The hydrated lenses were extracted and conditioned in physiological saline solution for a time sufficient to insure no substantial irritation.

The lens thus made has high DK, about 4 to 5 times higher than that of the conventional poly HEMA soft lens, and contains about 50% by weight of water, and thus has softness, rebound elasticity and a highly hydrophilic lens surface. The proportion HAM units to silicon units on the lens surface is equal to zero. Clinically, the lenses were very poor in performance such as functional wettability, deposition resistance and comfort, making the lens unsuitable for extended wear.

Provision of 6% by weight HEMA in the formulation, such that the formulation comprised 36% TSM, 58% NNDMA and 6% HEMA, results in a lens having high DK, softness, rebound elasticity, a highly hydrophilic surface and a proportion of HAM to silicon units equal to 0.15, and thus an improved SGP lens having improved clinical performance, such as functional wettability, deposition resistance and comfort as compared to the control lens above. Clinically, the lenses could be worn for up to several hours by test patients.

In the same manner, using 20% by weight HEMA, such that the lens formulation contains 36% TSM, 44% NNDMA and 20% HEMA, results in a lens having high DK, softness, rebound elasticity, a highly hydrophilic surface and a proportion of HAM units to silicon units equal to 0.5, and thus even more improved clinical performance, such as functional wettability, deposition resistance and comfort, as compared to the control lens. Clinically, the lenses could be worn continuously for up to several days by test patients, with wettability marginally unacceptable in certain circumstances.

Further increase of the HAM to silicon proportion by increase of the amount of HEMA in the composition is at the expense of TSM, and thus reduces the oxygen permeability of the lens and/or causes the formation of opaque material. As shown in the following examples, further increase of the HAM to silicon proportion can be achieved by surface treatment.

## EXAMPLE 2

The lens containing 20% HEMA as made in Example 1, after being hydrated in physiological saline solution, is then extracted in isopropanol for 24 hours, followed by treatment in the dry state with glycerine (96% purity, Colgate Palmolive Co.) containing 1 mole % NaOH at 70° C for 30 minutes by stirring. The strength of the lens after the treatment was not significantly affected. The resulting lens

5,712,327

**7**

could be used for at least weekly extended wear by the test patients. The clinical of long term wearing on one patient showed that the lenses could indeed continuously be worn for up to 3 months for at least certain patients. Thus, the surface treatment resulted in substantially improved clinical performance.

## EXAMPLE 3

A SGP lens comprising 47% (by weight) TSM, 45% NNDMA and 8% HEMA, having 38% water content, high DK, softness, highly hydrophilic lens surface and a proportion of HAM units to silicon units equal to about 0.15, was found to be unsuitable for extended wear. Clinically, the lens produced poor vision, discomfort and encountered serious deposition problems within less than four hours of wear. However, treatment of the same lens in dehydrated state by stirring the lens in a glycerine reagent (96% purity, Colgate Palmolive Co.) containing 10 mole % NaOH at 70° C. for 2 hours converted the lens to one which on the same patient could be used for weekly extended wear for a three week testing period with stable vision and no observable deposition, and demonstrated a liquid layer over the lens surface.

## EXAMPLE 4

According to an independent surface study (about 100 A° surface layer) by photoelectron spectroscopy (ESCA) analysis of the lens after being treated as described in Example 3 showed that there was a reduction of about 18% silicon or about 30% siloxy group and an increase of overall carbon content from 62.5 to 65% in which the C in the CO group increased from 10.5 to 12.5% and the C in the COOR group increased from 5.3 to 6.3% after the treatment. The increase of CO and COOR content should indicate that the transesterification of glycerine occurs, i.e., the formation of glyceryl methacrylate. The reduction of silicon units and/or the increase of glyceryl methacrylate units after the treatment increases the proportion of HAM units to silicon units which provides the substantially improved clinical performance as described above. (Note: ESCA data is the average value of the treated surface with 100 A° depth. Thus, the value right at the surface is substantially higher than those reported above.)

## EXAMPLE 5

An unhydrated optically polished lens button was made according to U.S. Pat. No. 4,182,822 employing 36% (by weight) TSM, 42% NNDMA and 22% HEMA, and glycerine surface treated as set forth in Example 3 herein. The button was fully hydrated in physiological saline solution, and its surface was subjected to a number of simulated cleaning cycles, each cycle involving thumb-rubbing 10 times in tap water followed by wetting in physiological saline solution. The surface wettability was substantially the same based on visual inspection after sixty (60) cleaning cycles, equivalent to about one years service life of the lens in weekly extended wear.

The surface of the untreated button was substantially not wettable by physiological saline solution under the same testing condition.

Although the invention has been described in connection with particular preferred embodiments, it is not intended to limit the invention to particular forms set forth, but on the contrary, it is intended to cover such alternatives, modifications and equivalents as may be included within the spirit and scope of the invention as defined by the appended claims.

**8**

What is claimed is:

1. A hydrophilic soft gas permeable contact lens comprised of a polymerization product of a composition comprising a polymerizable vinylic siloxane monomer and a hydrophilic vinylic monomer, and having at least 25% water by weight and characterized by high oxygen permeability, softness, rebound elasticity and a high degree of clinical performance, said lens comprising a hydrophilic lens body and a tear-wettable surface layer integral therewith, said lens body being comprised of said polymerization product and said tear-wettable surface layer being comprised of polymeric material containing hydroxy acrylic monomer units and wherein the proportion of hydroxy acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body.

2. A contact lens according to claim 1 wherein said hydroxy acrylic monomer units are selected from the group consisting of hydroxyalkyl acrylate, hydroxyalkyl methacrylate, acrylic acid, methacrylic acid, and combinations thereof.

3. A contact lens according to claim 2 wherein said hydroxy acrylic monomer units are 2-hydroxyethyl methacrylate.

4. A contact lens according to claim 2 wherein said hydroxy acrylic monomer units are methacrylic acid.

5. A contact lens according to claim 1 wherein said hydroxy acrylic monomer units are itaconic acid.

6. A contact lens according to claim 1 wherein said polymerizable vinylic siloxane monomer is γ-tris (trimethylsiloxy)silylpropyl methacrylate, and wherein said hydrophilic vinylic monomer is N,N-dimethylacrylamide.

7. A method for making a hydrophilic soft gas permeable contact lens having improved clinical performance, said method comprising the steps of:

(a) forming a hydrophilic soft gas permeable contact lens body having at least 25% water by weight and comprised of a polymerization product of a composition comprising a polymerizable vinylic siloxane monomer and a hydrophilic vinylic monomer; and

(b) reacting said lens body with a member selected from the group consisting of (i) a polyol of the formula $R_1$ $(OH)_n$, wherein $R_1$ is a substituted or unsubstituted alkyl and n is an integer of at least 2, and (ii) hydroxy acrylic monomer, to provide on said lens body a surrounding tear-wettable surface layer integral therewith, said surface layer being comprised of polymeric material containing hydroacrylic monomer units, and wherein said tear-wettable surface layer has a proportion of hydroxy acrylic monomer units to silicon units greater than that of said lens body.

8. A method according to claim 7 wherein said hydroxy acrylic monomer units are selected from the group consisting of hydroxyalkyl acrylate, hydroxyalkyl methacrylate, acrylic acid, methacrylic acid, itaconic acid, and combinations thereof.

9. A method according to claim 7 wherein said polyol is selected from the group consisting of ethylene glycol, glycerine and mixtures thereof.

10. A method according to claim 7 wherein step (b) comprises reacting hydroxy acrylic monomer to said lens body by radiation-initiated reaction, to form said surface layer.

11. A method according to claim 10 wherein said radiation-initiated reaction utilizes electromagnetic radiation.

5,712,327

9

**12.** A method according to claim **10** wherein said radiation-initiated reaction utilizes γ-ray or UV radiation.

**13.** A method according to claim **10** wherein said radiation-initiated reaction utilizes radiation selected from the group consisting of electron beam, electrical discharge and radio frequency.

10

**14.** A method according to claim **7** wherein said polymerizable vinylic siloxane monomer is γ-tris (trimethylsiloxy)silylpropyl methacrylate and wherein said hydrophilic vinylic monomer is N,N-dimethylacrylamide.

\* \* \* \* \*

# Exhibit I

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CARITAS TECHNOLOGIES, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 2-05CV-339DF |
| | § | |
| COMCAST CORPORATION | § | Jury |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT COMCAST CORPORATION'S ANSWER
AND COUNTERCLAIMS**

Defendant Comcast Corporation ("Comcast") answers Plaintiff Caritas Technologies, Inc.'s ("Caritas") complaint as follows:

**ANSWER**

1.     Comcast is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

2.     Admitted.

3.     Comcast admits that it does business in the state of Texas and that this Court has personal jurisdiction over it.  Comcast denies that it commits acts of patent infringement in the Eastern District of Texas.  Based on Comcast's admission of personal jurisdiction, the remaining allegations in this paragraph are irrelevant and superfluous, and on that basis, denied.

4.     Admitted.

5.     Comcast denies that venue is proper in this District, but has decided not to move to dismiss for lack of proper venue under Rule 12.

6.     Comcast admits that the cover page of U.S. Patent No. 6,661,779 ("the Caritas patent") indicates that it was issued on December 9, 2003 and is entitled "Dial Up Telephone Conferencing System Controlled By An Online Computer Network."   Comcast is without

sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

7.      This paragraph does not require a response.

8.      Comcast is without sufficient knowledge or information to admit or deny the allegations regarding ownership of the Caritas patent.

9.      Comcast admits that the Caritas patent has not expired.  Comcast is without sufficient knowledge to admit or deny whether the Caritas patent is in "full force and effect," as that phrase is vague and undefined.

10.      Denied.

11.      Denied.

12.      Denied.

13.      Denied.

14.      Denied.

15.      Denied.

16.      This paragraph does not require a response.

17.      Denied.

18.      Denied.

19.      Denied.

20.      Denied.

Except what is specifically admitted here, Comcast denies each and every allegation in the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

#### (Failure to State a Claim)

#### Count I

1.      Count I of the Complaint fails to state a claim upon which relief can be granted.

2.      Comcast has not infringed any claim of the Caritas patent.

**COMCAST CORPORATION'S ANSWER AND COUNTERCLAIMS** – Page 2

3.      Comcast has not caused, with knowledge, specific intent, or otherwise, equipment suppliers, service providers, and/or others to infringe any claim of the Caritas patent.

4.      Plaintiff has not been damaged in any amount, manner, or at all by reason of any act alleged against Comcast in the First Claim For Relief and therefore the relief prayed for cannot be granted.

5.      Plaintiff is not entitled to permanent injunctive relief.

## SECOND AFFIRMATIVE DEFENSE

### (Invalidity)

### Count I

6.      On information and belief, the Caritas patent is invalid at least for failure to satisfy one or more of the conditions of Title 35 United States Code, including without limitation, Sections 101, 102, 103, and 112 thereof.

## THIRD AFFIRMATIVE DEFENSE

### (Misuse)

### Count I

7.      On information and belief, the Caritas patent has been misused by Plaintiff by the commencement and maintenance of this action, in bad faith, without probable cause in knowing, or when it should have known, that it had no valid claim of patent infringement against Comcast, and for Plaintiff's enforcement of said patent and demand for royalties and other damages with respect to products not covered by its patents.

## COUNTERCLAIMS

Defendant and Counterclaimant Comcast asserts the following counterclaims against Plaintiff:

1.      Comcast is a corporation incorporated under the laws of Pennsylvania, having its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania.

**COMCAST CORPORATION'S ANSWER AND COUNTERCLAIMS – Page 3**

2.      Comcast is informed and believes, and therefore alleges, that Caritas is a corporation incorporated under the laws of the State of Minnesota, with its principal place of business located at 5657 Steeplechase Drive, Waunakee, Wisconsin.

3.      In its Counterclaims, Comcast seeks declarations of invalidity and non-infringement of the patent in suit.  As such, jurisdiction is proper pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, under federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), and as arising under the Patent Laws of the United States, Title 35, United States Code.

4.      This Court has personal jurisdiction over Plaintiff.

5.      Venue is this district is proper with regards to this counterclaim under 28 U.S.C. §§ 1391 and 1400.

## FIRST COUNTERCLAIM FOR RELIEF

### Counterclaim for Declaratory Judgment of Non-Infringement, Invalidity, and Unenforceability of the Caritas Patent

6.      Comcast realleges and incorporates by reference Paragraphs 1 through 5 above.

7.      As a result of the charges of infringement against Comcast, an actual controversy exists as to infringement, invalidity, and misuse of the Caritas patent.

8.      Comcast realleges and incorporates by reference its responses as set forth under the headings "Answer" and "Affirmative Defenses" herein.

9.      Comcast has not infringed, and is not now infringing, the Caritas patent.

10.     Comcast has not caused others to infringe, and is not now causing others to infringe, the Caritas patent.

11.     The Caritas patent is invalid and /or void under at least 35 U.S.C. §§ 101, 102, 103, and 112.

12.     Plaintiff has committed patent misuse by bringing this action with knowledge that the Caritas patent is invalid and/or not infringed.

13.     This counterclaim is exceptional under 35 U.S.C. § 285 and Comcast is entitled to

an award of its reasonable attorneys' fees.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Comcast demands a trial by jury of all issues so triable in this action, including without limitation, those issues raised in the Complaint, Answer, Affirmative Defenses, and Counterclaims.

## PRAYER FOR RELIEF

WHEREFORE, Comcast prays for judgment against the Plaintiff as follows:

A.      For dismissal of Plaintiff's Complaint with prejudice and that the relief requested be denied;

B.      For a judgment declaring that no claim of the Caritas patent has been infringed willfully, deliberately, or otherwise by Comcast;

C.      For a judgment declaring that each and every claim of the Caritas patent is invalid;

D.      For an award of Comcast's reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

G.      For such other and further relief as the Court may deem just and fair.

Respectfully submitted,

_____/s/_____
Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN, LLP
6500 N. Summerhill Road, Suite 1A
P. O. Box 6227
Texarkana, TX 75505-6227
Telephone: 903-255-1000
Facsimile: 903-255-0800
E-mail: jdoan@haltomdoan.com

Asim M. Bhansali
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-676-2235
Facsimile:  415-397-7188
E-mail:  ABhansali@KVN.com

**ATTORNEYS FOR DEFENDANT
COMCAST CORPORATION**


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to FED. R. CIV. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this 16th day of September, 2005.


_____/s/_____
John Peyton Perkins, III

# Exhibit J

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

15

COMCAST CABLE COMMUNICATIONS,
LLC, a Delaware limited liability corporation,

        Plaintiff,

    v.

ACACIA MEDIA TECHNOLOGIES
CORPORATION, a Delaware corporation,

        Defendant.

Civil Action No. 04-372-GMS

**COMCAST CABLE COMMUNICATIONS, LLC'S OPPOSITION TO**

**ACACIA'S MOTION TO DISMISS OR TRANSFER**

William Kelleher (#3961)
Ballard Spahr Andrews & Ingersoll LLP
919 N. Market Street
12th Floor
Wilmington DE 19801
Telephone: (302) 252-4465

David C. Doyle
M. Andrew Woodmansee
Morrison & Foerster LLP
3811 Valley Centre Dr., Ste. 500
San Diego, CA 92130
Telephone: (858) 720-5139
*Of Counsel*

Robert M. Harkins, Jr.
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
(415) 268-6103
*Of Counsel*

Lynn E. Rzonca
Jody Greenberg
Ballard Spahr Andrews & Ingersoll LLP
1735 Market St., 51st Floor
Philadelphia, Pennsylvania 19103-7599
Telephone: (215) 864-8109
*Of Counsel*

Dated: July 26, 2004

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 2

I.      NATURE AND STAGE OF THE PROCEEDINGS ................................. 3

II.     SUMMARY OF THE ARGUMENT ......................................................... 4

III.    STATEMENT OF FACTS ....................................................................... 5

      A. Comcast ........................................................................................... 5

      B. Acacia:  Trying to "Take a Little Bit of Money From a Lot of People" ............ 5

      C. Acacia's Central District of California Suit:  Acacia Goes After The "Low-Hanging Fruit" ...................................................................... 6

      D. Comcast's Declaratory Judgment Action Before This Court ............................ 7

      E. Acacia's Northern District of California Suit Against Cable and Satellite TV Companies ...................................................................... 8

      F. The Present Motion.............................................................................. 8

IV.    ARGUMENT .............................................................................................. 8

      A. This Action and the Northern District Action are Simultaneous Filings. The First-Filed Rule Does Not Apply........................................... 10

           1.    The Northern District Case Was Filed Only Hours Before This Case.................................................................. 10

           2.    These Cases Are Considered Simultaneous Filings.   The First-Filed Rule Does Not Apply to Simultaneous Filings. ........... 11

      B. Even if the First-Filed Rule Did Apply, Special Circumstances Overcome the Preference. ................................................................. 13

           1.    Continuing The First Action Would Be Unjust. Comcast Would Be Prejudiced If This Case Were Transferred To California. ..................................................................... 14

           2.    Dismissing Or Transferring To California Would Be Inefficient. ..................................................................... 16

      C. Acacia Failed To Establish Grounds For Transfer Under *Jumara*................... 17

           1.    The Private Interest Factors Weigh Against Transfer................... 18

           2.    The Public Interest Factors Weigh Against Transfer.................... 20

V.     CONCLUSION............................................................................................. 20

i

## TABLE OF AUTHORITIES

### CASES

*ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565 (D. Del. 2001) .................................. 9, 20

*Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192 (D. Del. 1998) ...................................... 16, 19

*AlliedSignal, Inc. v. Cooper Automobile, Inc.*, 1997 U.S. Dist. LEXIS 22902 (D. Del. July 30, 1997) ........................................................................................................... 9

*Azurix v. Synagro Tech., Inc.*, 2000 WL 193117 (Del. Ch. 2000) ....................................... 12

*Connexus Credit Union v. Connex Credit Union*, 219 F.R.D. 465 (W.D. Wis. 2003) ........... 11, 12

*Corixa Corp. v. IDEC Pharm. Corp.*, 2002 WL 265094 (D. Del. Feb. 25, 2002) .............. 13, 18

*Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931 (Fed. Cir. 1993) ..................................... 8, 13, 16

*Jumara v. State Farm Insurance Co.*, 55 F.3d 873 (3d Cir. 1995) ......................................... 17, 18

*In re M.L.-Lee Acquisition Fund II, L.P.*, 816 F. Supp. 973 (D. Del. 1993) ................................ 17

*JewelAmerica v. Frontstep Solutions Group, Inc.*, 2002 WL 1349754 (S.D. N.Y. June 20, 2002) ..................................................................................................... 12

*Matsushita Battery Indus. Co. v. Energy Conversion Devices, Inc.*, 1996 WL 328594 (D. Del. April 23, 1996) .................................................................................................... 20

*Medtronic, Inc. v. Camp*, 2002 WL 539073 (D. Minn. April 1, 2002) ................................. 12

*Roadmaster Corp. v. Nordictrack, Inc.*, 29 U.S.P.Q. 2d 1699 (N.D. Ill. 1993) ........................... 10

*Shutte v. Armco Steel Corp.*, 431 F.2d 22 (3d Cir. 1970) ................................................. 9

*Southern Union Co. v. Southwest Gas Corp.*, 165 F. Supp. 2d 1010 (D. Ariz. 2001) ........... 12, 13

*Truth Hardware Corp. v. Ashland Prods., Inc.*, 2003 WL 118005 (D. Del. Jan 13, 2003) ......... 15

*Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215 (D. Del. 1993) ................. 20

### STATUTES

28 U.S.C. § 1404(a) ........................................................................................................ 15

28 U.S.C. § 1400(b) ........................................................................................................ 4, 8

## INTRODUCTION

Plaintiff Comcast Cable Communications, LLC ("Comcast") respectfully submits this answering brief in opposition to the motion of defendant, Acacia Media Technologies Corporation ("Acacia"), to dismiss this declaratory judgment action or to transfer it to the Northern District of California.

Acacia's motion should be denied. Acacia claims its California case was "first-filed," but under the law, this case and the California case are considered simultaneous filings. Thus, Acacia's California case is not entitled to any preferential status. Moreover, even if Acacia's California case were considered first-filed, this case meets the exceptional circumstances test requiring that it remain in plaintiff's chosen forum—Delaware.

Although Acacia's motion asks for transfer to the Northern District of California, Acacia readily admits its true goal: to transfer this case to the Central District of California, where an action against fifteen unrelated defendants is pending. In effect, Acacia is trying to ensure that all litigation relating to its DMT patents is before one judge, in the forum of Acacia's choice. Transfer should be denied, because it would result in enormous prejudice to Comcast. The Central District litigation has been ongoing for over a year. The case has progressed so far that the presiding judge has already held Markman hearings to construe the claims of two of the asserted Acacia patents. If this case were transferred and consolidated with the Central District litigation, one of two scenarios would ensue: Comcast would either have to be bound by the claim construction briefing, hearings, and rulings already in place, or the court would have to reopen the claim construction process to allow Comcast to have its day in court. Neither scenario will promote the interests of justice. Both will cause prejudice to Comcast.

2

Venue properly lies in the District of Delaware.  Under the facts and the governing law, this case should remain here in the District of Delaware.  Acacia has not established otherwise.  Its Motion must be denied.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Acacia is in the business of buying patents, then trying to license them.  Comcast is one of the many companies Acacia contacted about its patents, claiming that Comcast was infringing and should take a license.  After investigating Acacia's claims, Comcast told Acacia that a license was not necessary.

On June 14, 2004, at approximately 1 P.M. EDT, Acacia's in-house counsel, Rob Berman, spoke with Comcast's in-house counsel, Lee Zieroth.  Mr. Berman again brought up the subject of a license, and he told Mr. Zieroth that Acacia would sue Comcast.  Comcast immediately prepared this declaratory judgment action, filing it with this Court as soon as the Clerk's office opened the next day:  8:37 A.M. on June 15.  Comcast served its Complaint on Acacia that same day.  In this case, Comcast asks the Court to declare that the asserted Acacia patents are not infringed and are invalid or unenforceable.

Unbeknownst to Comcast, on the same day Mr. Berman spoke with Mr. Zieroth, Acacia filed a suit for patent infringement in the Northern District of California, naming nine defendants.  But Acacia had not named Comcast as a defendant.  Acacia instead chose to sue Comcast's parent company, Comcast Corporation.  Comcast Corporation has no record that Acacia ever served it with the Complaint.

Acacia eventually decided to add Comcast as a defendant in the Northern District action.  Acacia named Comcast as a defendant on July 7—twenty-two days after this Delaware action was filed.  Acacia served Comcast in the Northern District action on July 12.

3

Thus, service of the Complaint in this case preceded service on Comcast in the Northern District case by nearly a month.

## II.     SUMMARY OF THE ARGUMENT

1. Acacia has not met its burden of establishing that the Court should transfer this case to the Northern District of California. Both Acacia and Comcast are Delaware corporations. Thus, this Court has personal jurisdiction over Acacia. Under 28 U.S.C. § 1400(b), the District of Delaware is a proper venue to resolve this dispute.

2. This suit and the Northern District action were filed only hours apart. As such, they are considered simultaneous filings. No preference should be given to the Northern District action as the "first-filed."

3. Even if the Northern District action were considered first-filed, this case meets the special circumstances test for keeping the action here in Delaware. Comcast will be prejudiced if this action were transferred. Acacia itself admits that it does not really seek transfer to the Northern District of California. What Acacia really wants is to transfer this case to the Central District of California—where it has been litigating two of its patents for over seventeen months. Acacia freely argues in its Motion that this case should be heard not by this Court, but by a Judge in the Central District who has been overseeing extensive briefings and hearings on those two patents, and who just issued a ruling on Acacia's patent claims. Forcing a party to enter the fray of the Central District case at its advanced stage would work a clear prejudice.

4. Convenience to the parties does not favor the Northern District of California. Both parties are Delaware corporations, and Comcast is headquartered in Philadelphia, Pennsylvania. Convenience of the parties' own employee witnesses is not relevant in a motion to transfer. Instead, it is the convenience of other witnesses that must be considered. Here, those witnesses

4

are the patent inventors. They are located in Connecticut and Arizona. Given the prejudice to Comcast if it were forced to join the in-progress Central District litigation, the interests of justice weigh in favor of keeping this action in Delaware.

### III.   STATEMENT OF FACTS

#### A. Comcast

Comcast is principally involved in the management and operation of cable communications networks and in the management of programming content over cable television networks. Comcast cable systems are constructed and operated under nonexclusive franchises granted by state or local governmental authorities. (Zieroth Decl. ¶ 2, attached as Exhibit A.)

#### B. Acacia: Trying to "Take a Little Bit of Money From a Lot of People"

Acacia has one business: licensing and enforcing patents. (Acacia Br. at 3.) Of late it has been attempting to license and enforce five patents it bought several years ago—what it calls "DMT" patents.[1] According to Acacia, DMT stands for "digital media technology." (Press Release, Acacia Research Corp., Acacia Technologies Files Cable and Satellite TV Patent Infringement Lawsuit (June 15, 2004), attached as Ex B.) It calls the patents "DMT" because it claims the patents cover any form of digital technology that is used to transfer content over the Internet, cable, satellite, and wireless systems. (*Id.*)

Although the primary DMT patent issued ten years before Acacia bought it, Acacia nevertheless quickly embarked on a blanket program to try and enforce the patents. Since buying the patents in 2002, Acacia claims to have contacted myriad entities about its patents.

---

[1] The patents are U.S. Patent No. 5,132,992; No. 5,253,275; No. 5,550,863; No. 6,002,720; and No. 6,144,702.

5

(*Id.*) It can safely be presumed that those companies are located somewhere other than in Newport Beach, California, the site of Acacia's headquarters.

In press releases and press statements, Acacia claims that in addition to contacting these numerous companies about its patents, it has entered into 123 licenses. (*Id.*) Acacia has not shied from naming some of its licensees. Those licensees are located in many parts of the U.S., including Massachusetts, South Dakota, and Delaware. (Acacia Br. at 5.)

Acacia has made clear the goals of its patent assertion program. In an interview this past February on National Public Radio, Mr. Berman stated, "*[O]ur strategy is, to frankly, dip our beak and just take a little bit of money from a lot of people and we would be perfectly satisfied.*" (Interview by NPR with Rob Berman, Exec. Vice President and General Counsel, Acacia Research (Feb. 6. 2004), attached as Ex. C.)

## C. Acacia's Central District of California Suit: Acacia Goes After The "Low-Hanging Fruit"

Acacia has not been coy about its specific strategy for involving the courts in its DMT patent program. Its strategy to pursue the "low hanging fruit"—the adult entertainment industry—is evident: Acacia's obvious goal was a quick and easy victory against defendants who could not afford patent litigation. To that end, Acacia has asked the Central District court to certify a class of *defendants* against whom it wants to assert the DMT patents. (Acacia's Br., Block Decl. ¶ 3.)

The Central District litigation has been ongoing for over a year and a half. (Acacia's Br., Block Decl. Ex. 3.) The consolidated and related cases involve sixteen defendants in the adult entertainment industry. The docket record for the lead consolidated case includes nearly 200 entries. (*Id.*)

6

The Central District litigation is well along in its proceedings. In the lead case, pursuant to the order of the presiding judge, Hon. James E. Ware, the parties agreed on ten terms from the asserted Acacia patents for the court to construe. (*Id.*) The parties submitted extensive briefing on claim construction. Judge Ware then held three days of Markman hearings on the claim construction issue. He recently issued his preliminary ruling on claim construction.

### D. Comcast's Declaratory Judgment Action Before This Court

With its suit against the adult website providers well underway, Acacia turned its attention to the cable and satellite TV providers. On June 14, 2004, around 1 P.M. EDT, Rob Berman, in-house counsel for Acacia, spoke with Lee Zieroth, counsel for Comcast. (Ex. A, Zieroth Decl. ¶ 4.) Mr. Berman informed Mr. Zieroth that because of Comcast's alleged infringement of Acacia's patents, Acacia would be filing a Complaint in the Northern District of California the next day, June 15, 2004. (*Id.*)

Comcast, believing Acacia's patents to be invalid[2] and not infringed, decided to file a declaratory judgment action in the District of Delaware. Comcast filed here because Delaware is the state of incorporation for both Comcast and Acacia. Comcast filed this declaratory judgment action as soon as the Clerk's office opened on the following day, at 8:37 A.M.[3]

---

[2] Comcast's belief is shared by many commentators. For example, the Electronic Frontier Foundation has called Acacia's patents "laughably broad." *See* Ian Austen, *Claiming a Threat to Innovation, Group Seeks to Overturn 10 Patents,* The New York Times, July 5, 2004, at C4, attached as Ex. D.

[3] Another defendant in the Northern District of California, Coxcom, Inc., also filed a declaratory judgment in the district court in Georgia. (Acacia Br., Block Decl. Ex. 6 at 7.)

**E. Acacia's Northern District of California Suit Against Cable and Satellite TV Companies**

In furtherance of its litigation strategy, Acacia told the Central District Court on June 15, 2004 that it intended to hold off on serving all of the defendants other than Comcast Corporation for at least 30 days so that it could "commence or continue patent licensing discussions with each of those defendants." (Acacia's Notice of Filing of Related Case in the Northern District of California, attached as Ex. E.)

**F. The Present Motion**

Acacia now seeks to dismiss or transfer this action to the Central District of California, by way of the Northern District of California.

**IV.    ARGUMENT**

Comcast properly brought this declaratory judgment action here in the District of Delaware, and it should stay here.[4] This Court has jurisdiction over both Comcast and Acacia. Venue is proper here under 28 U.S.C. § 1400(b).

This case has clearly thrown a wrench in Acacia's litigation strategy. Acacia wants all cases involving its asserted DMT patents heard only in California. Accordingly, Acacia has asked this Court to further its litigation strategy by transferring this case to the Northern District

---

[4] Acacia suggests that the Court has absolute discretion whether to hear this declaratory judgment action. (Acacia Br. at 7.) In fact, a court's discretion to refuse to hear a declaratory judgment action is not absolute; only in appropriate circumstances may courts do so. *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 936 (Fed. Cir. 1993) (citations omitted).

8

of California—for a later transfer to the pending Central District action.[5]  The law does not and should not support Acacia's strategy.

In addressing Acacia's motion, Comcast's choice of forum is a paramount consideration that should not be lightly disturbed.  *See Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970); *AlliedSignal, Inc. v. Cooper Auto, Inc.*, 1997 U.S. Dist. LEXIS 22902, at *3-4 (D. Del. July 30, 1997 (transfer denied; plaintiff's choice of forum is "paramount") (citations omitted).  The burden is on Acacia to demonstrate grounds for transfer.  *See Shutte v. Armco,* 431 F.2d at 25.  Delaware is a legitimate choice of forum where the defendant has chosen to incorporate in Delaware; "a company should not be successful in arguing that litigation in its state of incorporation is inconvenient." *ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 573 (D. Del. 2001) (transfer denied) (citation omitted); *AlliedSignal, Inc. v. Cooper Auto, Inc.,* 1997 U.S. Dist. LEXIS 22902, at *4 (D. Del. July 30, 1997).  A defendant that incorporates in Delaware should expect to be sued in Delaware and must show a unique or unexpected burden of inconvenience in order to establish grounds for a transfer.  *ADE v. KLA-Tencor*, 138 F. Supp. 2d at 573 (citation omitted); *AlliedSignal, Inc. v. Cooper Auto*, 1997 U.S. Dist. LEXIS 22902 at *3-6 (citation omitted).

---

[5]  Acacia's view that all of its suits on DMT patents are related is well-documented.  In filings with this Court, with the Northern District court, and with the Central District court, Acacia has said one thing:  all of the DMT patent cases are related, and all of the cases should be before Judge Ware.  Now, Acacia is attempting an about-face.  On July 22, Acacia attempted to rescind its prior staunch position that the cases are all related.  Acacia filed a "replacement" Notice in the Northern District action to rescind its earlier-filed Notice of Related Case.  (Acacia's Notice of Pendency of Other Actions, attached as Ex. F.)  In that replacement Notice, Acacia took a position contrary to its prior representations, saying that the Northern District and the Central District cases are *not* related and should *not* be joined.  The reason for Acacia's about-face is clear.  Acacia does not like Judge Ware's recent ruling on claim construction.  It wants to back-pedal on its prior position to try and salvage its case before another judge.  Acacia's back-pedaling before the California courts does not change Acacia's representations to this Court, nor the fact that Acacia cannot here establish any ground for this Court *not* to hear this case.

9

Acacia cannot meet its burden of establishing that this Court should transfer this case.

Acacia is not the first to file — the close time difference renders the cases simultaneous filings.

Hence the first-filed rule does not apply. Even if the Court does consider the Northern District

case to be first-filed, the special circumstances present here require that this case stay in

Comcast's chosen forum: the District of Delaware.

### A. This Action and the Northern District Action are Simultaneous Filings. The First-Filed Rule Does Not Apply.

Acacia bases its Motion on the claim that its Northern District Action was first-filed, and

so its chosen venue should trump Comcast's chosen venue. Acacia is wrong. This case and the

Northern District action are simultaneous filings.

### 1. The Northern District Case Was Filed Only Hours Before This Case.

Acacia filed its Complaint in the Northern District on June 14, 2004 following a phone

call with Mr. Zieroth of Comcast at approximately 1 P.M. EDT. (Ex. A, Zieroth Decl. at ¶ 4.)

According to Mr. Zieroth, Mr. Berman said that Acacia would the next day file suit—not

that it already had. (*Id.*) Comcast immediately prepared its Declaratory Judgment action, as it

was entitled to do as one with a reasonable apprehension of litigation. Given the short time

period between Acacia's threat of litigation and the closing of the Delaware District Court

(which does not accept after-hours or electronic filings), Comcast filed at the next possible time.

When the Court opened for business the following day, Comcast filed this declaratory judgment

action.[6] This action was filed at 8:37 A.M. on June 15.

---

[6] Acacia's mantra of "forum shopping" is again wrong on the law. "Forum shopping" refers to a filing made to take advantage of favorable law. It is not forum shopping for a plaintiff to file in a forum that is convenient to the party. *See Roadmaster Corp. v. Nordictrack, Inc.*, 29 U.S.P.Q.2d 1699, 1701 (N.D. Ill. 1993)("if a filing in a district court that is more convenient to the plaintiff
(continued...)

As Comcast later learned, Acacia had filed suit the day of Mr. Berman's call.  But Acacia

did not sue Comcast Cable.  It sued Comcast's corporate parent, along with eight other

defendants.  Because Acacia did not file its Complaint electronically, there is no official court

record of exactly what time of day the Complaint was filed, and the document itself does not

bear a time stamp.[7]

Even if the Northern District filing on June 14 against Comcast's parent is treated as a

suit against Comcast, the minor time differences between the filing in California and the filing in

this Court render the two filings simultaneous for purposes of a first-to-file claim.  Case law

supports this conclusion.

### 2.  These Cases Are Considered Simultaneous Filings. The First-Filed Rule Does Not Apply to Simultaneous Filings.

Competing filings filed one day apart have been considered simultaneously filed,

rendering the first-filed rule inapplicable.  In *Connexus Credit Union v. Connex Credit Union*,

the plaintiff filed its trademark infringement action on September 30 at 1:00 P.M. in Wisconsin.

The defendant filed a parallel action in the Connecticut district court at 9:53 A.M. that same day.

*Connexus Credit Union v. Connex Credit Union*, 219 F.R.D. 465, 466 (W.D. Wis. 2003).

Accounting for the different time zones, the parties filed their complaints about 4 hours apart.

The defendant moved to transfer the case.  In ruling on the motion, the court held that the cases

---

(...continued)
than to the defendant is enough to open the plaintiff up to a charge of forum shopping, then the
exception would swallow the rule").

[7]  At most, Acacia's Complaint against the corporate parent of Comcast was filed three and a half
hours before this Declaratory Judgment was filed.  As set forth in Mr. Zieroth's Declaration, he
spoke with Mr. Berman around 1 P.M. EDT.  The Delaware Court closes for filings at 4:30 P.M.

were filed nearly simultaneously. For that reason, the first-filed rule had no weight in the analysis. *Id.* at 467.

Other cases have reached the same result. In *Southern Union v. Southwest Gas*, the court stated that where suits are filed only days apart, the first-filed rule is usually disregarded. *Southern Union Co. v. Southwest Gas Corp.*, 165 F. Supp. 2d 1010, 1045 (D. Ariz. 2001). The court concluded that the suits at issue were filed one business day apart, and therefore the first-filed rule did not apply. *Id.* In *Medtronic, Inc. v. Camp*, a 30-minute time difference between filings was held to render the filings simultaneous, such that the first-filed rule could not apply. *Medtronic, Inc. v. Camp*, 2002 WL 539073, at *3 (D. Minn. April 1, 2002). And in *JewelAmerica v. Frontstep Solutions Group*, the court stated, "The bulk of the precedent in this circuit is that the first filed rule is usually disregarded where the competing suits were filed only days apart." *JewelAmerica v. Frontstep Solutions Group, Inc.*, 2002 WL 1349754, at *1 n. 1 (S.D. N.Y. June 20, 2002).

On the issue of simultaneous filings, this case is very similar to one in which the Delaware Court of Chancery called competing filings "contemporaneous,"[8] and therefore refused to apply the Delaware state law version of the first-filed rule. *See Azurix v. Synagro Tech., Inc.*, 2000 WL 193117 (Del. Ch. 2000). In *Azurix*, then Vice Chancellor Steele (now Chief Justice Steele of the Delaware Supreme Court) found that two competing actions were contemporaneously filed when the Delaware action was filed on 4:28 P.M. on Friday afternoon and the competing Texas suit was filed the following Monday, noting that the actions were "filed only scant minutes apart, if one excludes the time the respective court offices were closed" over

---

[8] Delaware state courts prefer to use the analogous term "contemporaneous" instead of "simultaneous."

the weekend. *Id.* at *3. The court continued that "[i]t would be inequitable to count the weekend hours against Synagro because it was impossible for it to have filed during those hours." *Id.* (citing cases in support). The Court's reasoning in *Azurix* on the first-filed analysis has been followed. *See, e.g., Southern Union*, 165 F. Supp. 2d at 1045.

This Court should reach the same result in the present case and find that the actions were simultaneously filed.

### B. Even if the First-Filed Rule Did Apply, Special Circumstances Overcome the Preference.

Even if this Court were to find that the Northern District action should be considered a first-filed action, the preference for the first forum does not apply where a court finds special circumstances. *Corixa Corp. v. IDEC Pharm. Corp.*, 2002 WL 265094, at *1 (D. Del. Feb. 25, 2002). Special circumstances are those where there is a "sound reason that would make it unjust or inefficient to continue the first-filed action." *Genentech*, 998 F.2d at 938. Such reasons include the convenience and availability of witnesses, the absence of jurisdiction, the possibility of consolidation, or considerations relating to the real party in interest. *Id.* Although the *Genentech* court did not address or have before it any special circumstances, the court made clear that exceptions to the first-filed rule "are not rare, and are made when justice or expedience requires...." *Id.* at 937.

There are special circumstances present here: it would be unjust to Comcast and inefficient to move this action to California. Thus, the first-filed rule does not apply.

**1. Continuing The First Action Would Be Unjust.**
   **Comcast Would Be Prejudiced If This Case Were Transferred To California.**

Acacia readily admits that it intends on litigating the Northern District action in the Central District of California, where an action is currently pending before Judge Ware. Acacia argues heavily in favor of transferring this action to Judge Ware, who, according to Acacia, "is already exceedingly familiar with two of the five patents-in-suit, as well as the single patent specification that is shared by all five patents-in-suit . . . Judge Ware is familiar with the technology and with the patents and he has recently completed four days of Markman hearings relating to the interpretation of the claim terms of the two patents. Judge Ware has also retained a technical Special Master, who is currently assisting Judge Ware in understanding the relevant technology." (Acacia Br. at 1.)

It is precisely the fact that the cases before Judge Ware in the Central District action are in the Markman hearing stage[9] that should preclude transfer of this action. If Comcast were required to join the Central District action before Judge Ware as Acacia hopes, it would be required to adopt a claim construction that was already extensively briefed and argued. This would prejudice Comcast and would not allow Comcast its own opportunity to litigate the claims at issue in this action.

This very type of prejudice was raised by one of the defendants in the Northern District case in response to Acacia's Notice of Related Case. That defendant, Echostar Communications, pointed out that if the Northern District action were related to the Central District action, the

---

[9] On the day Acacia filed its Motion to Dismiss or Transfer, Judge Ware issued his preliminary claim construction. He concluded that two claim terms are indefinite. He invited the defendants to file a summary judgment motion on that point. Although it is unclear how this ruling may affect the Northern District action, Comcast's arguments against transfer to the Northern District and the Central District still apply.

14

claim construction process would have to be reopened and the nine defendants named in the Northern District action would have to be given the opportunity to brief and argue their claim construction positions with respect to the patents at issue. (Resp. of Echostar Comm. Corp. to Acacia's Notice of Related Case, attached as Ex. G.) As Echostar concludes in its Response, "It is a requirement of fundamental fairness and due process that the defendants in this action be permitted to participate fully in claim construction and development of their own defenses." (*Id.*)

In a case with very similar facts to those here, this Court found it "of critical importance" that a prior-filed case between the parties involving a related patent was several years old and had proceeded through the dispositive motion phase. *Truth Hardware Corp. v. Ashland Prods., Inc.*, 2003 WL 118005 (D. Del. Jan 13, 2003). In *Truth Hardware*, the plaintiff moved to transfer from this Court to the Northern District of Illinois based on a prior-filed case between the parties involving a related patent. This Court concluded that the advanced posture of the prior case, combined with its own ample ability to understand the technology and the need for non-party witnesses to travel either to Illinois or Delaware, all militated against transferring the Delaware action to be joined with the prior-filed Illinois action. *Id.*

Although the Court in *Truth Hardware* addressed the issue under the venue transfer statute, 28 U.S.C. § 1404(a) (discussed below), the analysis and conclusion apply equally to satisfy the "special circumstances" exception to the first-filed rule. The advanced posture of the California case, the prejudice to Comcast if it is not allowed full participation in Markman issues, this Court's ample ability to understand the technology at issue, Acacia's decision to reap the benefits of incorporating in Delaware, and the fact that non-party witnesses are will have to

travel wherever this case proceeds, combine to constitute clear special circumstances requiring that this case stay here in Delaware.

## 2. Dismissing Or Transferring To California Would Be Inefficient.

*Genentech* indicates that convenience and availability of the witnesses, as well as other considerations of efficiency, can constitute special circumstances that overcome first-filed status. *See Genentech*, 998 F.2d at 938.

Acacia argues that the Northern District of California is a more convenient forum than this District for its employee-based witnesses. Acacia's assertion about convenience of its employees fails as a matter of law. The convenience of witnesses who are employees of a party is entitled to no weight. *See Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 203 (D. Del. 1998) ("Party witnesses or witnesses who are employed by a party carry no weight in the 'balance of convenience' analysis since each party is able, indeed, obligation to procure the attendance of its own employees for trial").

Furthermore, the patent inventors — key witnesses in any patent infringement action — are not located in California. One inventor is located in Connecticut, and one is in Arizona. (Acacia Br. at 14.) Comcast witnesses are primarily located in Philadelphia. Clearly, convenience to the witnesses does not point to California.

In addition, contrary to Acacia's assertions, judicial economy does not favor transfer. The pending litigation in the Central District of California is in the claim interpretation phase. The claims have been briefed, and hearings on the issues have already been held. Moreover, the technology at issue in the Central District case—streaming media over the public Internet to computers—is very different from the technology used by Comcast to deliver television

16

programming over its privately-owned hybrid fiber-optic and coaxial cable network from a community-based headend to subscribers' television sets.  If this case were to be transferred to the Central District, Comcast would submit its own claim interpretation and the California court would have to re-open the Markman hearing and briefs.  This would place significant burdens on the Central District case.  It would not be in the interest of judicial economy.

### C. Acacia Failed To Establish Grounds For Transfer Under *Jumara.*

Because the Northern District action is not first-filed and should not be given any preference as a first-filed action, Acacia must establish that transfer is proper under the Third Circuit's *Jumara* venue transfer test.  *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995).  Its burden is to show that "that the balance of convenience and the interests of justice weigh **strongly** in favor of transfer."  *In re M.L.-Lee Acquisition Fund II, L.P.*, 816 F. Supp. 973, 976 (D. Del. 1993) (emphasis added).  Acacia failed to meet that burden.

*Jumara* provides the following list of public and private interests for district courts to consider when deciding a motion to transfer.  The Third Circuit cautioned that this list is not formulaic or definitive.  *Jumara,* 55 F.3d at 879.

### Private Interests

1.  plaintiff's forum preference as shown by its original choice;

2.  defendant's preference;

3.  whether the claim arose elsewhere;

4.  parties' convenience based on relative physical and financial condition;

5.  witness' convenience, only to the extent they cannot attend trial in one of the fora; and

6.  location of books and records, only if not produceable in one of the fora.

## Public Interests

1. enforceability of the judgment;

2. practical considerations making trial easy, expeditious or inexpensive;

3. administrative difficulty based on court congestion;

4. the local interest in deciding local controversies at home;

5. the public policies of the fora; and

6. trial judge's familiarity with state law in diversity cases.

Acacia has failed to show that the *Jumara* private or public interest factors warrant transfer.

### 1. The Private Interest Factors Weigh Against Transfer

The first "private interest" factor is "plaintiff's forum preference as manifested in the original choice." *Jumara, 55* F.3d at 879. Here, Comcast's choice of Delaware as a forum to resolve its patent infringement dispute with Acacia is an entirely legitimate one because both Comcast and Acacia are Delaware corporations. Comcast's legitimate choice to bring suit against Acacia in Delaware, where Comcast could be assured that personal jurisdiction exists and that venue is proper, should be given the paramount consideration it deserves. *See* discussion *supra* at Section IV.

Acacia's wish to transfer this case to California cannot overcome Comcast's legitimate forum choice. Acacia argues that this case should be transferred to California because of the prior pending cases in the Central District of California. As discussed above, this factor weighs against transferring the case to California because Comcast would be greatly prejudiced by joining a case in California nearing the summary judgment phase. Acacia cites *Corixa*, 2002 WL 265094, for the proposition that having two separate trials in "mirror image" cases defeats

18

the purposes of sound judicial administration and comity among federal courts of equal rank. But Acacia ignores the fact that in *Corixa*, a first-to-file case, the actions were in their beginning stages and there was no prejudice to the parties. This is not the case in this action.

Furthermore, Comcast's legitimate forum choice cannot be overcome by Acacia's choice of forum or where the claim has arisen. In *Affymetrix*, the Court found that the defendant's "preference for a forum carries no weight in the 'balance of convenience' analysis" and that "the 'defendants' preferred forum' collapses into other portions of the *Jumara* analysis." *Affymetrix*, 28 F. Supp. 2d at 201. This Court also found that "if the 'claim arose elsewhere', then it seems most likely the parties, the witnesses, the documents, and all of the other evidence will also be located 'elsewhere'" and thus afforded this factor no weight. *Id.* at 202.

Acacia also argues that it will be financially burdened if forced to litigate this action in Delaware. Although Comcast is a leading communications company, Acacia is no "David" to Comcast's "Goliath." Acacia's parent company, Acacia Research Corp., had $50 million in cash at the end of 2003. *See* Steven M. Cherry, *The Patent Profiteers*, IEEE Spectrum, *at* http://www.spectrum.ieee.org, attached as Exhibit H.

Furthermore, Acacia cannot complain about its financial condition or the expense of litigation. Acacia has spent over a year and a half litigating in the Central District of California, and brought suit against eight defendants in the Northern District of California. Clearly, Acacia can maintain the expense of litigation.

The remaining private interest factors, convenience of the witnesses and location of books and records, also weigh against transfer. As discussed above, the primary non-party witnesses are in Arizona and Connecticut, and California is no more convenient than Delaware.

In addition, document discovery will be equally convenient in Delaware as in California; thus, the *Jumara* factor involving "location of books and records" does not weigh in favor of transfer here. The burden of transporting documents to Delaware is reduced in weight by the increasing convenience of technology. *See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215, 218 (D. Del. 1993); *Matsushita Battery Indus. Co. v. Energy Conversion Devices, Inc.*, 1996 WL 328594, at *4-*5 (D. Del. April 23, 1996). "With new technologies for storing and transmitting information, the burden of gathering and transmitting documents 3,000 miles is probably not significantly more than it is to transport them 30 miles." *ADE Corp.*, 138 F. Supp. 2d at 571.

### 2. The Public Interest Factors Weigh Against Transfer

The public interest factors also weigh against transfer. As established above, transfer would result in significant burdens on the California court, as the Markman issues would have to be re-briefed and argued. Thus, in this instance, transfer is inappropriate and the balance of conveniences tip in favor of litigating this action in Delaware.

## V. CONCLUSION

Acacia has not met its burden of establishing any reason for this Court to dismiss or transfer this case. Accordingly, Comcast respectfully requests that the Court deny Acacia's Motion to transfer.

William Kelleher (DE Bar # 3961)
Ballard Spahr Andrews & Ingersoll LLP
919 N. Market Street
12th Floor
Wilmington DE 19801
Telephone: (302) 252-4465

20

David C. Doyle
M. Andrew Woodmansee
Morrison & Foerster LLP
3811 Valley Centre Dr., Ste. 500
San Diego, CA 92130
Telephone: (858) 720-5139
*Of Counsel*

Robert M. Harkins, Jr.
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
(415) 268-6103
*Of Counsel*

Lynn E. Rzonca
Jody Greenberg
Ballard Spahr Andrews & Ingersoll LLP
1735 Market St., 51st Floor
Philadelphia, Pennsylvania 19103-7599
Telephone: (215) 864-8109
*Of Counsel*

# CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of July, 2004, true and correct copies of the foregoing document were caused to be served on counsel of record at the following address in the manner indicated:

**By hand delivery:**

Robery W. Whetzel
Steve J. Fineman
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

William M. Kelleher (#3961)

# Exhibit K

**Kansas City Business Journal - May 11, 2005**
**http://kansascity.bizjournals.com/kansascity/stories/2005/05/09/daily25.html**

KANSAS CITY
# BUSINESS JOURNAL

LATEST NEWS

**Business Pulse Survey:** Do you plan to donate more money to charity this holiday season? Click here to vote

May 11, 2005

# Exec: Comcast might get all of Time Warner Cable in KC

Comcast Corp. could take full ownership of Time Warner Cable's Kansas City operations in 2006, a top Comcast official said.

Comcast co-CFO Larry Smith said at an analyst presentation Tuesday that Time Warner Cable probably will buy out stakes Comcast has in Texas properties the two companies co-own.

That would allow Comcast to do a deal to raise its 50 percent silent ownership of Time Warner Cable in Kansas City into full ownership.

The companies have established a trigger in June 2006 that allows one party to force a breakup. The non-triggering party would get its choice between taking the Kansas City operations and a cable property in southwest Texas, or a Houston property.

"More likely than not, what will happen come June of 2006, we'll pull the trigger," Smith said. "When we pull the trigger, we'll put a value on the asset. It's very clear that Time Warner wants Houston. It's quite probable that unless we put too high a price on Houston, that they will end up getting Houston ,and we'll end up with southwest Texas and Kansas City."

He said Comcast (Nasdaq: CMCSA) plans to swap its Dallas property for Time Warner Cable operations in Florida and Virginia as part of a separate transaction in the companies' $17.6 billion bid to buy Adelphia Communications Corp.

That swap could alter the Kansas City deal, he said.

"Basically we're not interested in having assets in southwest Texas since we traded them Dallas," Smith said.

Comcast serves Eastern Jackson County and parts of Olathe. Time Warner Cable serves the balance of the Kansas City area.

Comcast inherited its 50 percent stake when it bought AT&T Broadband in 2002. Time Warner Cable's Kansas City operations employ about 900 people.

Time Warner Cable officials deferred questions to parent company Time Inc. An official there declined to comment.

© 2005 American City Business Journals Inc.   **XML**   **Add RSS Headlines**

**Post a Job Locally**

**Single Job Posting for $280**
Create your job ad in as little as a few minutes and it will appear on the local business journal website for 60-days. Candidate resumes are filtered by position requirements and delivered directly to your email inbox. **Get Started Today!**

» **Special Offer:** 3 job posts and resume search - $600

**Today's Featured Jobs** powered by **bizjournalsHire**
• Sr. Geotechnical Engineer - Spencer Reed Group
• Information Technology - Advantage Tech
• Insurance Agency Ownership Opportunity - Brooke Corporation
• Facilities Supplies Manager - Corporate Express
• San and Backup Engineer - Amtex Systems

More Local Jobs

→ **Post Jobs**  |  → **Post Your Resume**  |  → **Search Jobs**

*All contents of this site © American City Business Journals Inc. All rights reserved.*

# Exhibit L



**Directions**

Start address: **Largo, FL**
End address: **Philadelphia, PA**



Start address:   Largo, FL
End address:     Philadelphia, PA
Distance:        1,100 mi (about 22 hours 18 mins)

1. Head **north** from **Seminole Blvd** - go **0.5 mi**
2. Turn **right** at **E Bay Dr** - go **3.5 mi**
3. Continue on **Roosevelt Blvd** - go **3.5 mi**
4. Continue on **Ulmerton Rd** - go **2.6 mi**
5. Take the **I-275 N** ramp - go **13 mi**
    ...
6. Take the **I-4 E** exit **45B** to **Orlando** - go **132 mi**
    ...
7. Take the **I-95 N** ramp to **Jacksonville** - go **660 mi**
    ...
8. Take the **I-295 N** exit **46** to **Washington** - go **42 mi**
    ...
9. Take the **I-95 N** exit **43A** to **Washington** - go **86 mi**
    ...
10. Continue on **I-395 N** toward **Washington** - go **0.3 mi**
11. Take the **I-495 N** exit **170B** to **Tysons Corner** - go **30 mi**
    ...
12. Take the **I-95 N** exit **27** to **Baltimore** - go **95 mi**

      ...

13.   Take the **I-495** exit **5D//N** to **Port of Wilm/Philadelphia** - go **0.2 mi**

14.   Merge into **I-495 N** - go **11 mi**

      ...

15.   Take the **I-95 N** ramp - go **12 mi**

      ...

16.   Take the **PA-291** exit **13** to **Central Philadelphia (I-76W)** - go **1.6 mi**

17.   Bear **left** at **Penrose Ave** - go **0.4 mi**

18.   Continue on **George C Platt Memorial Brg** - go **1.4 mi**

19.   Continue on **Penrose Ave** - go **0.2 mi**

20.   Turn **left** at **S 26th St** - go **1.3 mi**

21.   Continue on **I-76 W** - go **2.4 mi**

22.   Take the **Market St** exit **345** to **30th St. Station** - go **0.2 mi**

23.   Turn **right** at **Market St** - go **0.9 mi**

24.   Turn **right** at **S 15th St** - go **0.0 mi**

25.   Turn **left** at **S Penn Sq** - go **0.1 mi**

These directions are for planning purposes only. You may find that construction projects, traffic, or other events may cause road conditions to differ from the map results.

Map data ©2005 NAVTEQ™, Tele Atlas

# Exhibit M



## Directions

Start address: **Largo, FL**
End address: **Marshall, TX**



Start address:    Largo, FL
End address:      Marshall, TX
Distance:         1,076 mi (about 21 hours 50 mins)

1. Head **north** from **Seminole Blvd** - go **0.5 mi**
2. Turn **right** at **E Bay Dr** - go **3.5 mi**
3. Continue on **Roosevelt Blvd** - go **3.5 mi**
4. Continue on **Ulmerton Rd** - go **2.6 mi**
5. Take the **I-275 N** ramp - go **28 mi**
   ...
6. Take the **I-75 N** ramp - go **162 mi**
   ...
7. Take the **I-10** exit **435** to **Jacksonville/Tallahassee** - go **0.5 mi**
8. Merge into **I-10 W** - go **444 mi**
   ...
9. Take exit **267A-B** to **Hammond (I-12 W)/Baton Rouge/Hattiesburg (I-59 N)** - go **0.3 mi**
10. Merge into **I-12 W** - go **48 mi**
    ...
11. Take the **I-55 N** exit **38B** to **Jackson** - go **128 mi**
    ...
12. Take the **I-20/I-55 N** exit **92B** to **Vicksburg/Yazoo City** - go **0.1 mi**
13. Take the **I-20 W** exit **92C** to **Vicksburg/Yazoo City** - go **0.3 mi**

Case 2:05-cv-00439-TJW-CE   Document 85-35   Filed 06/28/2005   Page 3 of 3

14.   Bear **left** onto the **I-20 W** ramp to **Terry Rd South** - go **44 mi**

     ...

15.   Continue on **US-80 W** - go **197 mi**

     ...

16.   Take the **US-80** exit **628** - go **0.3 mi**

17.   Bear **right** onto the **US-80 W** ramp - go **0.0 mi**

18.   Bear **right** at US-80 - go **8.0 mi**

19.   Continue on **Victory Dr** - go **3.7 mi**

20.   Continue on **E Grand Ave** - go **1.1 mi**

21.   Turn **left** at **N Wellington St** - go **0.3 mi**

22.   Turn **left** at **W Houston St** - go **0.1 mi**

These directions are for planning purposes only. You may find that construction projects, traffic, or other events may cause road conditions to differ from the map results.

Map data ©2005 NAVTEQ™, Tele Atlas

# Exhibit N



Your email address  GO

Search news  GO  THE NEWSWIRE FOR IP PROFESSIONALS

California remains the nation's hotbed of intellectual property litigation, outpacing district courts in New York, Texas and Illinois. But Texas courts are growing their IP dockets at a faster pace than anywhere else, our litigation survey shows.

The Central District of California, located in Los Angeles, is by far the busiest court for IP litigation in the U.S., according to court records. The Southern District of New York, in Manhattan, is the second-busiest IP court, followed by San Francisco's federal court for the Northern District of California.

California's Central District accounted for some 11% of all IP litigation in the past 12 months, measured by the number of new filings of lawsuits claiming infringement of copyrights, patents and trademarks, our survey shows. But the court's share of the total federal IP docket dropped from 13% a year ago, as the court's caseload rose only 9% while the national IP docket rose 29%, court statistics show.

The Central District owes its busy IP docket in part to its location in the nation's entertainment capital. Across jurisdictions, copyright litigation has ballooned over the past year amid an aggressive anti-piracy campaign by the music and movie industries. In the past year alone, the music industry filed almost 2,900 copyright lawsuits, court records show.

But the Los Angeles court also has a busy patent docket, second only to its Northern sister in San Francisco, court data shows. The third-biggest patent court is the Northern District of Illinois in Chicago. In the past year, the Central District produced one of the biggest patent verdicts in U.S. history, the $510 million verdict against medical device maker Medtronic for inventor Gary Michelson. In April this year, Medtronic agreed to pay about $1.35 billion to the Los Angeles surgeon to end a patent dispute over spinal fusion technologies.

Meanwhile, New York's Southern District held on to its place as the second-busiest IP court in the U.S., accounting for 7% of the total docket. The court's steady load of copyright and trademark cases helped it sustain its position over the past year, as the Southern District's total docket rose at a clip of 13.2%. Notable new cases in the past year include copyright infringement lawsuits targeting

Google's library project, as well as a failed copyright lawsuit charging Dan Brown with plagiarism for his blockbuster novel "The Da Vinci Code."

California's Northern District remains the country's third-busiest IP court, thanks mostly to its ranking as the top patent court in the United States. The court accounts for 9.3% of all patent litigation, but only 3% of copyright litigation and 4% of trademark litigation, our survey shows. Patent litigation, dominated by the region's high-tech industry, held steady over the past year. Among other things, the court is the battle ground of extensive litigation between rival chip makers Hynix, Rambus, Samsung and Toshiba.

Meanwhile, Texas courts continue to see a sharp increase in IP litigation. The Western District of Texas saw its IP docket skyrocket last year, but the increase was entirely due to a rapid rise in anti-piracy copyright lawsuits filed by the music industry.

A more sustained growth trend is found in the Eastern District of Texas, where patent litigation grew at a clip of 33% even as overall federal patent litigation dropped 12%. Bolstered by the high-tech industry in the Dallas/Fort Worth area, the court saw new lawsuits over the last year brought by Mosaid, Ericsson, SanDisk, EchoStar and Symbol Technologies, among others.

The Eastern District of Texas' patent docket is growing because of its reputation as a fast, patent-friendly district, said Doug Sorensen, of Counsel for Sidley Austin Brown & Wood LLP in Dallas.

"This started many years ago when Texas Instruments took advantage of the District's experimental 'rocket docket' rules.  The rules have largely remained in place and have been supplemented by a special set of patent rules modeled on those developed by the Northern District of California," Sorensen said.

The Eastern District was not only the fastest-growing patent court in the past year; it was one of the few major district courts to see growth in its patent caseload, our survey shows. The court has already overtaken the Southern District of New York in patent litigation and is on course to surpass the shrinking patent docket of the Northern District of Illinois over the next year or so. When it does, it will be the third busiest patent court in the U.S. after the federal courts in San Francisco and Los Angeles.

**FEDERAL IP DOCKET***
*12 months to October 20*

| Court | 2005 | 2004 | % of total** | % change |
|-------|------|------|--------------|----------|
| CDCA | 1 | 1 | 11.4 | 9.1 |
| SDNY | 2 | 2 | 7.1 | 13.2 |
| NDCA | 3 | 3 | 4.5 | -0.7 |
| WDTX*** | 4 | 11 | 4.3 | 255.2 |
| NDIL | 5 | 4 | 3.8 | 7.0 |
| NJ | 6 | 5 | 2.8 | -8.5 |
| NDTX | 7 | 7 | 2.4 | 36.5 |
| MA | 8 | 6 | 1.8 | -4.4 |





latest articles

Wednesday, November 30, 2005

Wednesday, November 30, 2005

Case 2:05-cv-00293-TJW-CE Document 185-36 Filed 06/28/2007 Page 4 of 5

| | | | | |
|---|---|---|---|---|
| EDTX | 9 | 12 | 1.6 | 38.8 |
| EDVI | 10 | 9 | 1.5 | 4.2 |

*New complaints for copyright, patent and trademark infringement
**Indicates percentage of total IP docket
***Copyright litigation rose sharply in the Western District of Texas due to anti-piracy suits.
Source: *IP Law Bulletin*, U.S. District Courts

**FEDERAL COPYRIGHT DOCKET***
*12 months to October 20*

| | Suits | % of total** | % change |
|---|---|---|---|
| CDCA | 621 | 10.9 | 45.4 |
| WDTX | 426 | 7.5 | 769.4 |
| SDNY | 389 | 6.9 | 37.0 |
| NDIL | 152 | 2.7 | 56.7 |
| NDCA | 151 | 2.7 | 4.9 |
| NDTX | 133 | 2.3 | 125.4 |
| NJ | 107 | 1.9 | 18.9 |
| MA | 73 | 1.3 | 15.9 |
| EDVI | 62 | 1.1 | 34.8 |
| EDTX | 40 | 0.7 | 122.2 |

*New complaints for copyright infringement
**Indicates percentage of federal copyright docket
Source: *IP Law Bulletin*, U.S. District Courts

**FEDERAL PATENT DOCKET***
*12 months to October 20*

| Court | Suits | % of total** | % change |
|---|---|---|---|
| NDCA | 242 | 9.3 | -0.4 |
| CDCA | 235 | 9.1 | -24.4 |
| NDIL | 148 | 5.7 | -6.9 |
| EDTX | 136 | 5.2 | 33.3 |
| SDNY | 123 | 4.7 | -23.6 |
| DE | 114 | 4.4 | -30.1 |
| NJ | 92 | 3.6 | -30.3 |
| MA | 69 | 2.7 | -9.2 |
| SDCA | 60 | 2.3 | 5.3 |
| NDTX | 59 | 2.3 | 3.5 |

*New complaints for patent infringement
**Indicates percentage of federal patent docket
Source: *IP Law Bulletin*, U.S. District Courts

**FEDERAL TRADEMARK DOCKET***
*12 months to October 20*

| Court | Suits | % of total** | % change |
|---|---|---|---|
| CDCA | 479 | 13.8 | -1.4 |
| SDNY | 321 | 9.2 | 10.3 |
| NDIL | 142 | 4.1 | -9.6 |
| NDCA | 137 | 3.9 | -6.8 |
| NJ | 126 | 3.6 | -5.3 |
| NDTX | 85 | 2.4 | -2.3 |
| MA | 73 | 2.1 | -15.1 |
| SDCA | 67 | 1.9 | 9.8 |
| EDVI | 66 | 1.9 | 0.0 |
| WDTX | 40 | 1.1 | -16.7 |

*New complaints for trademark infringement
**Indicates percentage of federal trademark docket
Source: *IP Law Bulletin*, U.S. District Courts

**Court abbreviations**
CDCA: Central District, CA

Wednesday, November 30, 2005
Wednesday, November 30, 2005
Tuesday, November 29, 2005
Tuesday, November 29, 2005
Tuesday, November 29, 2005
Tuesday, November 29, 2005
Tuesday, November 29, 2005
Monday, November 28, 2005
Monday, November 28, 2005
Monday, November 28, 2005
Monday, November 28, 2005
Friday, November 25, 2005
Friday, November 25, 2005

DE: Delaware
EDTX: Eastern District, TX
EDVI: Eastern District, VI
MA: Massachusetts
NDCA: Northern District, CA
NDIL: Northern District, IL
NDTX: Northern District, TX
NJ: New Jersey
SDCA: Southern District, CA
SDNY: Southern District, NY
WDTX: Western District, TX
CORRECTION: An earlier version of this article incorrectly
stated that patent litigation in the Eastern District has
been rising due to the high-tech industry "in the Houston
area." The sentence should have referred to the high-tech
industry in the Dallas/Fort Worth area (corrected above).
Houston is in the Southern District of Texas.

## related articles

**Friday, March 18, 2005**

**Wednesday, July 20, 2005**

**Monday, August 01, 2005**

**Wednesday, August 17, 2005**

**Thursday, August 25, 2005**

**Tuesday, September 13, 2005**

**Friday, October 14, 2005**

**Thursday, October 20, 2005**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP, <br><br> Plaintiff(s), <br><br> v. <br><br> COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC, and COMCAST OF PLANO, LP, <br><br> Defendant(s). | Case No. 2:05-CV-443-TJW |

## PLAINTIFF'S REPLY TO DEFENDANTS' COUNTERCLAIMS

Plaintiff Rembrandt Technologies, LP ("Rembrandt") hereby responds to the Counterclaims of Defendants Comcast Corporation ("Comcast Corp."), Comcast Cable Communications, LLC ("Comcast Cable"), and Comcast of Plano, LP ("Comcast of Plano") (collectively "Comcast") as follows. All allegations not expressly admitted are denied.

1.      Rembrandt admits that Comcast Corp. is a corporation incorporated under the laws of Pennsylvania, having its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania.  Rembrandt admits that Comcast Cable is a corporation incorporated under the laws of Delaware having its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania. Rembrandt admits that Comcast of Plano, LP is a limited partnership organized under the laws of Delaware.  Rembrandt is without sufficient information to form a belief as to the truth of the remaining allegations in this paragraph.

2.      Admitted.

3.      Rembrandt admits that this Court has jurisdiction over Comcast's Counterclaims. The remaining allegations of this paragraph do not require a response.

4.      Admitted.

5.      Rembrandt admits that venue in this district is proper with respect to Comcast's Counterclaims.

### FIRST COUNTERCLAIM FOR RELIEF

6.      Rembrandt incorporates by reference its responses contained in Paragraphs 1 through 5 above.

7.      Rembrandt admits that an actual controversy exists between the parties regarding U.S. Patent No. 5,243,627.

8.      Paragraphs 1-30 of Comcast's Answer do not require a response.  Rembrandt denies all allegations contained in Comcast's Affirmative Defenses.

9.      Denied.

10.      Denied.

11.      Denied.

12.      Denied.

13.      Denied.

### SECOND COUNTERCLAIM FOR RELIEF

14.      Rembrandt incorporates by reference its responses contained in Paragraphs 1 through 13 above.

15.      Rembrandt admits that an actual controversy exists between the parties regarding U.S. Patent No. 5,852,631.

16.      Paragraphs 1-30 of Comcast's Answer do not require a response.  Rembrandt denies all allegations contained in Comcast's Affirmative Defenses.

17.      Denied.

18.      Denied.

19.      Denied.

20.      Denied.

21.      Denied.

## THIRD COUNTERCLAIM FOR RELIEF

22.     Rembrandt incorporates by reference its responses contained in Paragraphs 1 through 21 above.

23.     Rembrandt admits that an actual controversy exists between the parties regarding U.S. Patent No. 5,719,858).

24.     Paragraphs 1-30 of Comcast's Answer do not require a response.  Rembrandt denies all allegations contained in Comcast's Affirmative Defenses.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Denied.

29.     Denied.

## FOURTH COUNTERCLAIM FOR RELIEF

30.     Rembrandt incorporates by reference its responses contained in Paragraphs 1 through 29 above.

31.     Rembrandt admits that an actual controversy exists between the parties regarding U.S. Patent No. 4,937,819.

32.     Paragraphs 1-30 of Comcast's Answer do not require a response.  Rembrandt denies all allegations contained in Comcast's Affirmative Defenses.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

## JURY DEMAND

This paragraph does not require a response.

## PRAYER FOR RELIEF

Rembrandt denies that Comcast is entitled to any relief.

Dated:  December 7, 2005                          Respectfully submitted,


                                       By:  /s/ Otis W. Carroll by permission S. Calvin Capshaw
                                            Otis W. Carroll, Jr. – Lead Attorney
                                            Ireland Carroll & Kelley, PC
                                            6101 S Broadway
                                            Suite 500
                                            Tyler, TX 75703
                                            Telephone:  (903) 561-1600
                                            Facsimile: (903) 581-1071
                                            E-mail: fedserv@icklaw.com

                                            Franklin Jones, Jr.
                                            Jones & Jones - Marshall
                                            201 W Houston St
                                            PO Drawer 1249
                                            Marshall, TX 75670
                                            Telephone: (903) 938-4395
                                            Facsimile: (903) 938-3360
                                            E-mail: maizieh@millerfirm.com

                                            Robert Christopher Bunt
                                            Parker & Bunt, P.C.
                                            100 East Ferguson, Ste. 1114
                                            Tyler, TX 75702
                                            Telephone: (903) 531-3535
                                            Facsimile: (903) 533-9687
                                            E-mail: cbunt@cox-internet.com

                                            Robert M. Parker
                                            Parker & Bunt, P.C.
                                            100 E. Ferguson
                                            Suite 1114
                                            Tyler, TX 75702
                                            Telephone: (903) 533-9288
                                            Facsimile: (903) 533-9687
                                            E-mail: rmparker@cox-internet.com

S. Calvin Capshaw
State Bar No. 03783900
BROWN McCARROLL  LLP
1127 Judson Road, Suite 220,
P.O. Box 3999 (75606-3999)
Longview, Texas 75601-5157
Telephone: (903) 236-9800
Facsimile: (903) 236-8787
E-mail: ccapshaw@mailbmc.com

OF COUNSEL:
Frank E. Scherkenbach
Lawrence K. Kolodney
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, Massachsetts 02110
Telephone:  (617) 542-5070
Facsimile: (617) 542-8906

Alan D. Albright
State Bar No. 00973650
FISH & RICHARDSON, P.C.
One Congress Plaza
4th Floor
111 Congress Avenue
Austin, Texas 78701
Telephone: (512) 391-4930
Facsimile: (512) 391-6837

Timothy Devlin
FISH & RICHARDSON
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, Delaware 19899
Telephone: (302) 652-5070
Facsimile: (302) 652-0607

ATTORNEYS FOR PLAINTIFF
REMBRANDT TECHNOLOGIES, LP

## CERTIFICATE OF SERVICE

I hereby certify that the following counsel of record who are deemed to have consented to electronic service are being served this 7th day of December, 2005, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by, electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ S. Calvin Capshaw
S. Calvin Capshaw

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 2:05-cv-443 |
| | § | |
| COMCAST CORPORATION, COMCAST | § | Judge T. John Ward |
| CABLE COMMUNICATIONS, LLC, and | § | Jury |
| COMCAST OF PLANO, LP | § | |

## DEFENDANTS' AGREED MOTION TO EXCEED PAGE LIMIT

Defendants Comcast Corp., Comcast Cable Communications, LLC ("Comcast Cable"), and Comcast of Plano, LP (collectively, "Comcast"), respectfully move to file Defendant's Reply to Plaintiff's Opposition to Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) in excess of the page limit, in that it exceeds five (5) pages.

Counsel for Comcast has discussed this Motion with counsel for the plaintiff, and it is unopposed.

FOR ALL THESE REASONS, Comcast respectfully requests the Court to enter an Order granting Defendant's Agreed Motion to Exceed Page Limit and instruct the Clerk of Court to file Defendant's Reply to Plaintiff's Opposition to Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), as attached hereto as Exhibit "A".

Respectfully submitted,

_____/s/_____

Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN, LLP
6500 N. Summerhill Road, Suite 1A
P. O. Box 6227
Texarkana, TX 75505-6227
Telephone:  903-255-1000
Facsimile:  903-255-0800


Brian Ferral
Leo Lam
Asim M. Bhansali
Matthias A. Kamber
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-676-2235
Facsimile:  415-397-7188

**ATTORNEYS FOR
DEFENDANTS COMCAST
CORPORATION, COMCAST
CABLE COMMUNICATIONS,
LLC, and COMCAST OF
PLANO, LP**


## CERTIFICATE OF CONFERENCE

I certify that on December 12, 2005, I spoke with Otis Carroll, Jr., counsel for Plaintiff,

who indicated that Plaintiff does not oppose this motion.


_____/s/_____

John Peyton Perkins, III


<u>**DEFENDANTS' AGREED MOTION TO EXCEED PAGE LIMIT**</u> – Page 2

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to FED. R. CIV. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this 12th day of December, 2005.


_____/s/_____
John Peyton Perkins, III

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, LP,

                              Plaintiff,

        v.                                              **Civil Action No. 2:05-CV-443 (TJW)**
                                                         **(JURY)**
COMCAST CORPORATION; COMCAST
CABLE COMMUNICATIONS, LLC; and
COMCAST OF PLANO, LP,

                              Defendants.

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)

*All* the parties have their principal places of businesses in or near Philadelphia and the majority of the parties' witnesses and sources of proof are therefore located there. In addition, a relevant non-party that Rembrandt itself identified, Motorola, has its relevant division based outside of Philadelphia. The Court should thus transfer the case to the Eastern District of Pennsylvania for the convenience of the parties. Without a strong nexus between this District and the case, the public and private interest factors here far outweigh what little deference Rembrandt's choice of forum deserves.

## I. ARGUMENT

### A. This Case Lacks a Strong Nexus To This District

In support of its nexus argument, Rembrandt notes that the Comcast family of corporations has a substantial nationwide presence. Opp. Br. 3. Even if true, that fact says nothing about the propriety of maintaining the action in *this* District; a nationwide presence does not mean that another district could not provide a more *convenient* forum for *this case*. 28 U.S.C. § 1404(a). Indeed, Comcast's distributed operations actually favor moving this case to the defendants' principal places of business, Philadelphia. The Court should recognize that

Rembrandt only sued Comcast of Plano, LP—one of Comcast's *many* national municipal franchisees—to obtain jurisdiction in this District. Rembrandt's inclusion of Comcast of Plano should not, however, create the illusion of convenient venue in this District.

Rembrandt's arguments regarding the nexus of this case with this District do little more than conflate the issues of *proper* and *convenient* venue. While its allegations of in-District infringement may provide a basis for jurisdiction and, consequently, venue, they do not signify convenience. As this Court has held: "That the products are sold here might justify a finding that here is a *proper* venue. But it doesn't aid the plaintiff in its effort to rebut the argument that here is an *inconvenient* venue under § 1404(a)." *Acco Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.*, No. 2:03-CV-425, slip. op. at 3 (E.D. Tex. July 23, 2004) (emphasis in original). As such, Rembrandt's arguments about Comcast having conceded personal jurisdiction in other cases have no bearing on this convenience-based transfer motion under §1404(a).

In opposing Comcast's transfer motion, Rembrandt claims that it "has substantial business connections within this District." Opp. Br. 4. Yet Rembrandt does not point to a *single* business connection with this District other than this case and another patent case involving different parties, different patents, different inventors, and different technology. Opp. Br. Ex. H. This confirms Comcast's proposition that Rembrandt, which is headquartered just outside Philadelphia, does no business in this District. As such, Rembrandt's choice of forum merits little deference. *See Rock Bit Int'l v. Smith Int'l*, 957 F. Supp. 843, 844 (E.D. Tex. 1997).

In addition, Rembrandt opposes Comcast's transfer motion based largely on Comcast's use of third-party set-top boxes manufactured by either Motorola or Scientific Atlanta. Opp. Br. 3, 9, 11. Particularly, Rembrandt contends that, because Comcast did not design and does not manufacture these devices, relevant documents reside with these non-parties outside the Eastern District of Pennsylvania. Opp. Br. 9, 11. While noting that Motorola has its principal place of business in Illinois, however, Rembrandt fails to note that the division that makes set-top boxes is in Horsham, Pennsylvania—in the Eastern District of Pennsylvania. *See* Decl. of Matthias

Kamber ¶¶ 3-5 ("Kamber Decl.") (Attached as Exhibit 1).  Thus, Rembrandt's identification of Motorola's set-top-box division as a key non-party actually favors transferring this action to the Eastern District of Pennsylvania.

Rembrandt's reliance on arguments made by a Comcast defendant in *Comcast Cable Comm'ns, LLC v. Acacia Media Techs. Corp.,* No. 04-372-GMS (D. Del.) has no basis.  As a legal matter, "[s]ection 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  Comcast's arguments in *Acacia* are not compelling in this factual context, where Plaintiff from the same forum as all the defendants has sued in a far-removed forum.  Further, Comcast sought the same result in *Acacia*:  to litigate claims in a nearby forum convenient to all the parties and likely witnesses.  In this case, that forum is the Eastern District of Pennsylvania.  In *Acacia*, it was the nearby District of Delaware—a mere 29 miles from Comcast's headquarters.  Kamber Decl. ¶ 6.

**B.      Rembrandt's Choice of Forum Deserves Little Deference**

Contrary to what Rembrandt suggests, Comcast does not seek to abolish the deference owed a plaintiff's choice of forum.  The plaintiff's choice of forum is a factor to be considered, but where as in this case, that factor is clearly outweighed by other factors, it is neither conclusive nor determinative.  *See Shoemake v. Union Pac. R.R. Co.*, 233 F. Supp. 2d 828, 830-31 (E.D. Tex. 2002).  Rembrandt's attempts to distinguish *Shoemake* are flawed.  First, it is irrelevant that *Shoemake* is not a patent case.  Whether to transfer under section 1404(a) does not depend on patent law.  *See generally Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 836 (Fed. Cir. 2003) (applying regional circuit law, rather than Federal Circuit law, to determine the propriety of transferring a patent infringement action under § 1404(a)).  Second, Rembrandt argues that, unlike in *Shoemake*, a nexus exists between this case and the forum because Comcast allegedly infringes in this District.  As discussed above, however, this alleged nexus does not reveal anything about the *convenience* of litigating this dispute here.  *Acco Brands*, slip. op. at 3.

## C.    The Accused Activity Has Its Center of Gravity in Philadelphia

The center of gravity of the accused infringing activity is in Philadelphia.  "The location of the alleged infringer's principal place of business . . . is often the critical and controlling consideration in adjudicating a motion to transfer venue."  *Whistler Group v. PNI Corp.*, 2003 U.S. Dist. LEXIS 21968, *11 (N.D. Tex. 2003).   In an attempt to distinguish this case law, Rembrandt argues that Comcast's "nationwide" infringement is centered in the Eastern District of Texas because *one* of the Comcast defendants provides services there.   Opp. Br. 9.  Erroneously focusing on the provision of services in this District, Rembrandt overlooks the fact that *all three* defendants have their principal places of business in Philadelphia, and the law therefore deems Philadelphia the "center of gravity" of any alleged infringement.  *See id.*

Were Rembrandt alleging infringement only in the Eastern District of Texas and seeking damages limited to this District, its center of gravity argument might have more force.   But Rembrandt presumably seeks damages for nationwide infringement, not just infringement in this District, and the center of gravity for nationwide infringement is in Philadelphia.   The defendants' principal places of business and key technical development staff are located there.

Comcast seeks to transfer this case to the Eastern District of Pennsylvania because, as the principal place of business of *all* the parties and the location of a *majority* of the witnesses and sources of proof, that district provides a more—if not the most—convenient place to litigate this dispute.   Rembrandt's contention that this case does not warrant transfer because it "does not revolve around activities occurring *exclusively* at a single principal place of business," Opp. Br. 10 (emphasis added), misses the point.   Simply because the alleged infringement does not occur all at one place does not suggest that one venue—here the Eastern District of Pennsylvania—is not significantly more convenient than another for the parties.

## D.    Public and Private Interest Factors Favor Transferring This Case

In determining whether to transfer a case to another district in accordance with section 1404(a), the Court must evaluate a number of public and private interest factors.  These factors all favor transferring this action to the Eastern District of Pennsylvania:

**DEFENDANT'S REPLY TO MOTION TO TRANSFER VENUE – Page 4**

- *Ease of access to sources of proof*: Rembrandt argues that *some* relevant documents are located in this District, Opp. Br. 11, but ignores the fact that an *overwhelming majority* of the documents are located in Philadelphia.

- *Availability of compulsory process*: Rembrandt notes that the Eastern District of Pennsylvania could not compel all witnesses to appear at trial, Opp. Br. 12-13, but disregards the ability of that court to subpoena *at least some* potential witnesses and that this Court cannot compel the appearance of *any* third-party witnesses.

- *Cost of attendance for willing witnesses*: Rembrandt disregards the increased travel costs for *all* the parties' witnesses should the trial proceed before this Court. As the most important factor in deciding a section 1404 transfer motion, however, this factor weighs heavily in favor of proceeding in the Eastern District of Pennsylvania. *See Fletcher v. S. Pac. Transp. Co.*, 648 F. Supp. 1400, 1401-02 (E.D. Tex. 1986). Rembrandt instead notes that a transfer would result in increased inconvenience for one of its experts, Opp. Br. 14, ignoring this Court's holding that the convenience of experts deserves little weight. *Id.* at 1403.

- *Administrative difficulties flowing from court docket*: As noted in the initial brief, time to trial is only two weeks longer in the Eastern District of Pennsylvania. This difference does not, therefore, weigh against transfer. *See Berol Corp. v. BIC Corp.*, No. 02 C 0559, 2002 WL 1466829, *6 (N.D. Ill. July 8, 2002) (noting that *two months* difference in median times to trial was negligible). Given the amount of judicial resources patent cases require, the large volume of patent cases in this District, as highlighted by Rembrandt, actually favors transfer. Finally, no significant delay will result; Comcast only recently filed its answer.

- *Local interest in adjudicating the suit*: Because *all* of the parties, including plaintiff Rembrandt, are headquartered in the Eastern District of Pennsylvania, that district has a strong interest in adjudicating this suit.

- *Familiarity of the forum with the governing law*: The Eastern District of Texas is no better suited than the Eastern District of Pennsylvania for adjudicating a federal patent case. *See Rooster Prods. Int'l, Inc. v. Custom Leathercraft Mfg. Co.*, No. 04-CA-864-XR, 2005 U.S. Dist. LEXIS 1643 (W.D. Tex. 2005).

## II. <u>CONCLUSION</u>

For the reasons set forth above and in the original motion papers, Comcast requests this Court to transfer this action to the Eastern District of Pennsylvania.

Respectfully submitted,


_____/s/_____
Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN, LLP
6500 N. Summerhill Road, Suite 1A
P. O. Box 6227
Texarkana, TX 75505-6227
Telephone:  903-255-1000
Facsimile:  903-255-0800


Brian Ferral
Leo Lam
Asim M. Bhansali
Matthias A. Kamber
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-676-2235
Facsimile:  415-397-7188

**ATTORNEYS FOR DEFENDANTS
COMCAST CORPORATION,
COMCAST CABLE
COMMUNICATIONS, LLC, and
COMCAST OF PLANO, LP**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this answer was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to FED. R. CIV. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this 12th day of December, 2005.


_____/s/_____
Jennifer Haltom Doan

**DEFENDANT'S REPLY TO MOTION TO TRANSFER VENUE – Page 6**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP, <br><br> Plaintiff, <br><br> v. <br><br> COMCAST CORPORATION; COMCAST CABLE COMMUNICATIONS, LLC; and COMCAST OF PLANO, LP, <br><br> Defendants. | **Case No. 2:05-CV-443 (TJW) (JURY)** <br><br> Judge:           T. John Ward <br> Date Comp. Filed:  Sept. 16, 2005 <br> Trial Date: |

## DECLARATION OF MATTHIAS A. KAMBER IN SUPPORT OF DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)

I, MATTHIAS A. KAMBER, declare:

1.     I am over the age of 18 years and competent to make this declaration.  Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration.

2.     I am a member of the bars of California, Massachusetts, New York, and the District of Columbia.  My firm, Keker & Van Nest LLP, is counsel to defendants Comcast Corp., Comcast Cable Communications, LLC ("Comcast Cable"), and Comcast of Plano, LP (collectively, "Comcast") in this matter.

3.     Attached as Exhibit A are portions of Motorola, Inc.'s 2004 Form 10-K.  Pages 14-17 discuss Motorola's Broadband Communications segment, which designs, manufactures, and sells set-top boxes for cable systems.  Page 17 indicates that Motorola's Broadband Communications segment is headquartered in Horsham, Pennsylvania.

4.     Attached as Exhibit B is a report from the website http://www.uscourts.gov/courtlinks/.  The report indicates that Horsham, Pennsylvania, is within the jurisdiction of the U.S. District Court for the Eastern District of Pennsylvania.

5.      Attached as Exhibit C is a report from the website http://maps.google.com.  The report indicates that the driving distance from the U.S. District Court for the Eastern District of Pennsylvania, located at 900 Market Street, Philadelphia, PA, to Motorola's Broadband Communications Sector, located at 101 Tournament Drive, Horsham, PA, is 18.9 miles.

6.      Attached as Exhibit D is a report from the website http://maps.google.com.  The report indicates that the driving distance from 1500 Market Street, Philadelphia, Pennsylvania, the principal place of business of the Comcast defendants, to the U.S. District Court for the District of Delaware, located at 844 N. King Street, Wilmington, DE 19801, is 29.2 miles.

I declare that the foregoing is true and correct under the penalty of perjury under the laws of the United States of America.


DATED:  December 12, 2005



_____
MATTHIAS A. KAMBER

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-K

---

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2004

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from         to
Commission File number 1-7221

---

# MOTOROLA, INC.
(Exact name of registrant as specified in its charter)

---

| DELAWARE | 36-1115800 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**1303 East Algonquin Road, Schaumburg, Illinois 60196**
(Address of principal executive offices)
**(847) 576-5000**
(Registrant's telephone number)

---

### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $3 Par Value per Share | New York Stock Exchange<br>Chicago Stock Exchange |
| Rights to Purchase Junior Participating<br>Preferred Stock, Series B | New York Stock Exchange<br>Chicago Stock Exchange |

### Securities registered pursuant to Section 12(g) of the Act:
None

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒     No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).   Yes ☒     No ☐.

The aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant as of July 2, 2004 was approximately $42.0 billion (based on closing sale price of $17.77 per share as reported for the New York Stock Exchange-Composite Transactions).

The number of shares of the registrant's Common Stock, $3 par value per share, outstanding as of January 31, 2005 was 2,450,481,840.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement to be delivered to stockholders in connection with its Annual Meeting of Stockholders to be held on May 2, 2005 are incorporated by reference into Part III.

# Table of Contents

|  |  | Page |
|---|---|---|
| **PART I** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1 |
| Item 1. | Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| *General* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1 |
| *Business Segments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 2 |
| Personal Communications Segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 2 |
| Global Telecom Solutions Segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 5 |
| Commercial, Government and Industrial Solutions Segment . . . . . . . . . . . . . . . . . | | 8 |
| Integrated Electronic Systems Segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 11 |
| Broadband Communications Segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 14 |
| Other Products Segment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 17 |
| *Other Information* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 18 |
| Financial Information About Segments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 18 |
| Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 18 |
| Backlog . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 18 |
| Research and Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 18 |
| Patents and Trademarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 19 |
| Environmental Quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 19 |
| Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 19 |
| Financial Information About Foreign and Domestic Operations and Export Sales . . . . . . . . . . . . . . | | 19 |
| *Available Information* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 19 |
| Item 2. | Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| Item 3. | Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| Item 4. | Submission of Matters to a Vote of Security Holders . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| Executive Officers of the Registrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 27 |
| **PART II** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 29 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of | |
| | Equity Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
| Item 6. | Selected Financial Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations . . . . . . . . | 31 |
| *Business Risk Factors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 70 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk . . . . . . . . . . . . . . . . . . . | 80 |
| Item 8. | Financial Statements and Supplementary Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 84 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure . . . . . . . | 126 |
| Item 9A. | Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 126 |
| Item 9B. | Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 128 |
| **PART III** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 129 |
| Item 10. | Directors and Executive Officers of the Registrant . . . . . . . . . . . . . . . . . . . . . . . . . | 129 |
| Item 11. | Executive Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 129 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management . . . . . . . . . . . . . . . . . | 129 |
| Item 13. | Certain Relationships and Related Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . | 129 |
| Item 14. | Principal Accounting Fees and Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 129 |
| **PART IV** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 129 |
| Item 15. | Exhibits and Financial Statement Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 130 |
| 15(a)(1) Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 130 |
| 15(a)(2) Financial Statement Schedule and Independent Auditors' Report . . . . . . . . . . . . . . . . . . . | | 130 |
| 15(a)(3) Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 130 |

# PART I

*Throughout this 10-K report we "incorporate by reference" certain information in parts of other documents filed with the Securities and Exchange Commission (the "SEC"). The SEC allows us to disclose important information by referring to it in that manner. Please refer to such information.*

*We are making forward-looking statements in this report. Beginning on page 70 we discuss some of the business risks and factors that could cause actual results to differ materially from those stated in the forward-looking statements.*

*"Motorola" (which may be referred to as the "Company", "we", "us" or "our") means Motorola, Inc. or Motorola, Inc. and its subsidiaries, or one of our segments, as the context requires. "Motorola" is a registered trademark of Motorola, Inc.*

## Item 1: Business

*General*

Motorola, Inc. is a global leader in wireless, broadband and automotive communications technologies and embedded electronic products.

- **Wireless**

  Handsets: We are one of the world's leading providers of wireless handsets, which transmit and receive voice, text, images and other forms of information and communication.

  Wireless Networks: We also develop, manufacture and market public and enterprise wireless infrastructure communications systems, including hardware, software and services.

  Mission-Critical Information Systems: In addition, we are a leading provider of customized, mission-critical radio communications and information systems.

- **Broadband**

  We are a global leader in developing and deploying end-to-end digital broadband entertainment, communication and information systems for the home and for the office. Motorola broadband technology enables network operators and retailers to deliver products and services that connect consumers to what they want, when they want it.

- **Automotive**

  We are the world's market leader in embedded telematics systems that enable automated roadside assistance, navigation and advanced safety features for automobiles. Motorola also provides integrated electronics for the powertrain, chassis, sensors and interior controls.

In April 2004, the Company separated its semiconductor operations into a separate subsidiary, Freescale Semiconductor, Inc. ("Freescale Semiconductor"). In July 2004, an initial public offering of a minority interest of approximately 32.5% of Freescale Semiconductor was completed. On December 2, 2004, Motorola completed the spin-off of Freescale Semiconductor from the Company by distributing its remaining 67.5% equity interest in Freescale Semiconductor to Motorola shareholders. As of that date, Freescale Semiconductor is an entirely independent company. In general, discussions of the Company contained in this document reflect the Company's structure at December 31, 2004, after the complete spin-off of Freescale Semiconductor.

Motorola is a corporation organized under the laws of the State of Delaware as the successor to an Illinois corporation organized in 1928. Motorola's principal executive offices are located at 1303 East Algonquin Road, Schaumburg, Illinois 60196.

14

## Broadband Communications Segment

The Broadband Communications segment ("BCS" or the "segment") designs, manufactures and sells a wide variety of broadband products, including: (i) digital systems and set-top terminals for cable television and broadcast networks, (ii) high speed data products, including cable modems and cable modem termination systems ("CMTS"), as well as Internet Protocol ("IP")-based telephony products, (iii) access network technology, including hybrid fiber coaxial network transmission systems and fiber-to-the-premise ("FTTP") transmission systems, used by cable television operators, (iv) digital satellite television systems; (v) direct-to-home ("DTH") satellite networks and private networks for business communications, and (vi) high-speed data, video and voice broadband systems over existing phone lines. In 2004, BCS net sales represented 7% of the Company's consolidated net sales.

### Principal Products and Services

The segment is a leading provider of end-to-end networks used in the cable television industry for the delivery of video, voice and data services over hybrid fiber coaxial networks. These broadband networks include products used to transport programming by broadcasters, products used at the cable operator's headend (central office) and products used at the cable operator's outside transmission plant. We also sell a suite of interactive digital set-top terminals for the end customer's home that enable advanced interactive entertainment and informational services, including video-on-demand ("VOD"), digital video recording ("DVR"), Internet access, e-mail, e-commerce, chat rooms, pay-per view, and decoding and processing of high definition television ("HDTV") to be transmitted over networks using our technology and other IP services. Our interactive digital set-top terminals also deliver advanced interactive services focused on digital video broadcast-compliant ("DVB-compliant") markets around the world. We also provide digital system control equipment, encoders, access control equipment and a wide range of digital satellite receivers. Our digital business (set top boxes and video infrastructure equipment) accounted for approximately 60% of our revenue in 2004 and is expected to account for a substantial portion of our revenues for the foreseeable future.

Our Surfboard® family of cable modems delivers high-speed Internet access to subscribers over cable networks. These Surfboard® products also include wireless networking devices with high-speed Internet access for a complete home, small office or small-to-medium enterprise communications system.

To complete the end-to-end broadband network system, we design and manufacture a diverse family of broadband infrastructure access applications for broadband services including video, voice, and data communications. These products include CMTS, headend products, amplifiers, taps, passives and optoelectronics.

Our products are marketed primarily to cable television operators, satellite television programmers, and other communications providers worldwide and are sold primarily by our sales personnel who are skilled in the technology of these systems. We have also expanded our traditional distribution channels by selling directly to consumers in a variety of retail markets. Through retail, we market and sell cable modems, cordless telephones, home networking products and advanced digital set-top terminals. We have also expanded our product solutions for specific applications, including home and family monitoring.

### Our Industry

Demand for our products depends primarily on: (i) capital spending by providers of broadband services for constructing, rebuilding or upgrading their communications systems, and (ii) the marketing of advanced communications services by those providers. The amount of spending by these providers, and therefore a majority of our sales and profitability, are affected by a variety of factors, including: (i) general economic conditions; (ii) the continuing trend of consolidation within the cable and telecommunications industries; (iii) the financial condition of cable television system operators and alternative communications providers, including their access to financing; (iv) the rate of digital penetration; (v) technological developments; (vi) standardization efforts that impact the deployment of new equipment; and (vii) new legislation and regulations affecting the equipment sold by the segment. In 2004, our customers increased their spending on our products, primarily due to the increase in digital video and data subscribers and the deployment of advanced video platforms by cable operators for HDTV/DVR applications.

*Our Strategy*

We continue to focus on our strategy to innovate and enhance our end-to-end network portfolio. We are focused on accelerating the rate of digital penetration by broadband operators in North America through the introduction of an enhanced suite of digital set-top terminals, including more cost-effective products designed to increase the number of set-tops per household, as well as higher-end products for premium service, including HDTV and DVR applications. We also continue to focus on opportunities in regions outside of North America, including the development of digital video products designed to be compliant with technology required in these regions.

We are focused on enhancing and expanding our infrastructure offerings, including next-generation products in the CMTS and fiber optic network markets. Sales of our CMTS infrastructure products increased in 2004 and are expected to continue to increase in 2005 as cable operators build out their networks to accommodate enhanced data and voice over IP applications. We also will continue to expand our portfolio of data products beyond the traditional cable modem business and into voice modems. We are focused on providing home networking and monitoring products, including wireless networking devices with high-speed Internet access for a complete home, small office or small-to-medium enterprise communications system.

*Customers*

We are dependent upon a small number of customers for a significant portion of our sales. The vast majority of our sales are in the U.S.—where a small number of large cable television multiple system operators (MSOs) own a large portion of the cable systems and account for a significant portion of the total capital spending in the industry. Comcast Corporation accounted for approximately 30% of the segment's net sales in 2004. The loss of business in the future from Comcast or any of the other major MSOs could have a material adverse effect on the segment's business.

*Competition*

The businesses in which we operate are highly competitive. The rapid technological changes occurring in each of the markets in which we compete are expected to lead to the entry of many new competitors.

We compete worldwide in the market for digital set-top terminals for broadband and satellite networks. Based on 2004 annual sales, we believe we are the leading provider of digital cable set-top terminals in North America. Our digital cable set-top terminals compete with products from a number of different companies, including: (i) those that develop and sell substitute products that are distributed by direct broadcast satellite (DBS) service providers through retail channels, (ii) those that develop, manufacture and sell products of their own design, and (iii) those that license technology from us or other competitors. In North America, our largest competitor is Scientific-Atlanta. Other competitors in North America include Cisco, Arris, and C-COR. Outside of North America, where we have a smaller market position, we compete with many equipment suppliers, including several consumer electronics companies.

The traditional competitive environment in the North American cable market continues to change for several reasons. First, based on our customers' requirements, we have begun and will continue to license certain of our technology to certain competitors. In 2005, we expect to license our technology to more licensees, which may result in increased competition for sales of digital set-top terminals in our markets. Second, per OpenCable specifications, televisions were introduced in 2004 that will no longer require a digital set-top box for one-way broadcast digital services. Future versions of this specification will enable similar devices to access pay-per-view and VOD applications without a set-top box. The FCC also has mandated that digital tuners be incorporated into all television sets sold in the U.S. by 2006. Television manufacturers are expected to integrate technology that is available in our set-top terminals into their products in the future and bypass the need for a set-top terminal for certain applications.

Historically, reception of digital television programming from the cable broadband network required a set-top terminal with security technology that was compatible with the network. This security technology has limited the availability of set-top terminals to those manufactured by a few cable network manufacturers, including Motorola. The FCC has enacted regulations requiring separation of security functionality from set-top terminals by July 1, 2006. To meet this requirement, we have developed security modules for sale to cable operators for use with our own and third-party set-top terminals. As a step towards this implementation, in 2002, the cable industry and

16

consumer electronic manufacturers agreed to a uni-directional security interface that allows third-party devices to access broadcast programming (not pay-per-view or VOD) with a security device. These devices became widely available in 2004. A full two-way security interface specification is in development, and compliant devices are likely to be available in 2006. These changes are expected to increase competition and encourage the sale of set-top terminals to consumers in the retail market. Traditionally, cable service providers have leased the set-top terminal to their customers.

All of these changes could adversely impact our competitive position and our sales and profitability. Most of our sales and profits arise from the sale of our set-top terminals.

We also compete worldwide in the market for broadband data products. We believe that we are the leading provider of cable modems worldwide, competing with a number of consumer electronic companies and various original design manufacturers worldwide.

Competitive factors for our products and systems include: technology offered, product and system performance, features, quality, delivery, availability and price. We believe that we enjoy a strong competitive position because of our large installed cable television equipment base, strong relationships with major communication system operators worldwide, technological leadership and new product development capabilities.

### Payment Terms

Generally, our payment terms are consistent with the industry and range from 30 to 60 days. Extended payment terms are provided to customers from time to time on a case-by-case basis. Such extended terms are isolated in nature and historically have not related to a significant portion of our revenues.

### Regulatory Matters

Many of our products are subject to regulation by the FCC or other communications regulatory agencies. In addition, our customers and their networks, into which our products are incorporated, are subject to government regulation. Government regulatory policies affecting either the willingness or the ability of cable operators to offer certain services, or the terms on which the companies offer the services and conduct their business, may affect the segment's results. Regulatory actions also have impacted competition, as discussed above.

### Backlog

The segment's backlog was $314 million at December 31, 2004, compared to $299 million at December 31, 2003. The increase in backlog and related orders primarily reflects increased orders from our customers for advanced set tops. The 2004 order backlog is believed to be generally firm and 100% of that amount is expected to be recognized as revenue in 2005. The forward-looking estimates of the firmness of such orders is subject to future events, which may cause the amount recognized to change.

### Intellectual Property Matters

We seek to build upon our core enabling technologies, such as digital compression, encryption and conditional access systems, in order to lead worldwide growth in the market for broadband communications networks. Our policy is to protect our proprietary position by, among other methods, filing U.S. and foreign patent applications to protect technology and improvements that we consider important to the development of our business. We also rely on our proprietary knowledge and ongoing technological innovation to develop and maintain our competitive position, and will periodically seek to include our proprietary technologies in certain patent pools that support the implementation of standards. We are a founder of MPEG LA, the patent licensing authority established to foster broad deployment of MPEG-2 compliant systems. We have also licensed our digital conditional access technology, DigiCipher® II, to other equipment suppliers. We also enter into other license agreements, both as licensor and licensee, covering certain products and processes with various companies. These license agreements require the payment of certain royalties that are not expected to be material to the segment's financial results.

*Inventory, Raw Materials, Right of Return and Seasonality*

Substantially all of our products are manufactured at our facilities in Taipei, Taiwan and Nogales, Mexico. Inventory levels are managed in line with existing business conditions.

We source our raw materials primarily from large multinational corporations that supply the electronics and telecommunications industries. In general, we have access to several sources of supply for each component in our major products; however, we have some components that are currently available only from limited sources. We have inventory controls and other policies intended to minimize the effect of any interruption in the supply of components. We currently source certain parts from Broadcom Corporation and Texas Instruments Corporation for our digital set-top terminals and cable modems. Any material disruption in supply from Broadcom or Texas Instruments for certain products would have a material adverse impact on our operations.

Electricity is the primary source of energy required for our manufacturing operations. These operations do not have significant risk relating to the availability of this energy source; however, possible shortages in the supply of electricity would affect the segment's operations. Labor is generally available in reasonable proximity to the segment's manufacturing facilities.

Generally, we do not permit customers to return products. We have not experienced seasonal buying patterns for our products recently. However, as our retail cable modem and digital set-top terminal sales increase, we may have increased sales during the holiday season at the end of each year.

*Our Facilities/Manufacturing*

Our headquarters are located in Horsham, Pennsylvania. We also have research and development and administrative offices in Rohnert Park, San Diego and San Jose, California; Andover and Marlboro, Massachusetts; and Lawrenceville, Georgia. We have several sales offices throughout North America, Europe, Latin America and Asia, and we operate manufacturing facilities in Taipei, Taiwan and Nogales, Mexico. Substantially all of our manufacturing is in Taiwan and Mexico.

**Other Products Segment**

The Other Products segment includes: (i) various corporate programs representing developmental businesses and research and development projects, which are not included in any major segment, and (ii) Motorola Credit Corporation ("MCC"), the Company's wholly-owned finance subsidiary. In 2004, Other Products net sales represented 1% of the Company's consolidated net sales.

*2005 Change in Organizational Structure*

In December 2004, the Company announced a reorganization of its businesses and functions to align with the Company's seamless mobility strategy, which was effective on January 1, 2005. The Company will be organized into four main business groups, focused on mobile devices, networks, government and enterprise, and the connected home. The Mobile Devices business will be primarily comprised of the current Personal Communications segment and the Energy Systems group from the Integrated Electronic Systems segment ("IESS"). The Networks business will be primarily comprised of the current Global Telecom Solutions segment, the Embedded Computing and Communications group from IESS, and the next-generation wireline networks business from the Broadband Communications segment ("BCS"). The Government and Enterprise business will be primarily comprised of the current Commercial, Government and Industrial Solutions segment and the Automotive Communications and Electronics Systems group from IESS. The Connected Home business will be primarily comprised of the current BCS, excluding the next generation wireline networks business. In addition, the Company's key support functions, including supply-chain operations, information technology, finance, human resources, legal, strategy and business development, marketing, quality and technology will be architected centrally and distributed throughout the Company. The Company will be aligned into these four main operating segments with the analysis of reportable segments to be completed in the first quarter of 2005.



Court Links

Search Results for offices serving
City & State **Horsham, PA** -- 11 records found

| | For City | Office | | Location |
|---|---|---|---|---|
| ■ | First Circuit | | | |
| ■ | Second Circuit | Horsham | Pennsylvania Eastern Bankruptcy Court | Philadelphia |
| | Third Circuit | Horsham | Pennsylvania Eastern Bankruptcy Court | Reading |
| ■ | Fourth Circuit | Horsham | Pennsylvania Eastern District Court | Philadelphia |
| ■ | Fifth Circuit | Horsham | Pennsylvania Eastern District Court | Allentown |
| ■ | Sixth Circuit | Horsham | Pennsylvania Eastern District Court | Reading |
| ■ | Seventh Circuit | Horsham | Pennsylvania Eastern Pretrial Services | Philadelphia |
| ■ | Eighth Circuit | Horsham | Pennsylvania Eastern Pretrial Services | Allentown |
| ■ | Ninth Circuit | Horsham | Pennsylvania Eastern Probation Office | Philadelphia |
| ■ | Tenth Circuit | Horsham | Pennsylvania Eastern Probation Office | Allentown |
| ■ | Eleventh Circuit | Horsham | Pennsylvania Eastern Probation Office | Reading |
| ■ | D.C. Circuit | Horsham | Third Circuit Court of Appeals Clerk | Philadelphia |
| ■ | Federal Circuit | | | |

🏛 **Main Office**

■ Other Court Links

**Print Circuit Map**

■ Circuit Map (pdf)

■ Circuit Map (eps)

■ Return to
USCourts.gov

About The U.S. Courts | Newsroom | Library | Court Links |FAQs | Employment Opportunities |Contact Us| Search

**This page is maintained by the Administrative Office of the U.S. Courts on behalf of the U.S. Courts.**
The purpose of this site is to function as a clearinghouse for information from and about the Judicial Branch of the U.S. Government.

Privacy and Security Notices



## Directions

Start address:
**Motorola Broadband Communications Sector**
End address: **900 Market St, Philadelphia, PA 19107**



| | |
|---|---|
| Start address: | **Motorola Broadband Communications Sector** |
| | 101 Tournament Dr |
| | Horsham, PA 19044 |
| End address: | 900 Market St |
| | Philadelphia, PA 19107 |
| Distance: | 18.9 mi (about 39 mins) |

1. Head **southwest** from **Tournament Dr** - go **0.0 mi**
2. Turn **left** at **Horsham Rd** - go **2.2 mi**
3. Bear **right** at **Easton Rd** - go **2.6 mi**
4. Bear **left** at **York Rd** - go **0.5 mi**
5. Continue on **Old York Rd** - go **6.2 mi**
6. Bear **left** at **N Broad St** - go **6.2 mi**
7. Bear **left** at **Ridge Ave** - go **0.6 mi**
8. Bear **right** at **N 10th St** - go **0.5 mi**
9. Turn **left** at **Market St** - go **0.1 mi**

Google Local - from: 844 N. King Street, Wilmington, DE to: 1500 Mark...    http://www.google.com/local?hl=en&hs=SNB&lr=&client=firefox-a&rl...



## Directions

Start address: **844 US-13-BR (S), Wilmington, DE 19801**
End address: **1500 Market St, Philadelphia, PA 19102**



Start address: 844 US-13-BR (S)
                Wilmington, DE 19801
End address:   1500 Market St
                Philadelphia, PA 19102
Distance:      29.2 mi (about 43 mins)

Google Local - from: 844 N. King Street, Wilmington, DE to: 1500 Mark...     http://www.google.com/local?hl=en&hs=SNB&lr=&client=firefox-a&rl...

1. Head **southwest** from **N King St** - go **0.0 mi**
2. Turn **right** at **E 8th St** - go **0.1 mi**
3. Continue on **W 8th St** - go **0.5 mi**
4. Turn **right** at **N Adams St** - go **0.2 mi**
5. Bear **left** into the **I-95 N** entry ramp - go **20 mi**

    ...

6. Take the **PA-291** exit 13 to **Central Philadelphia (I-76W)** - go **1.6 mi**
7. Bear **left** at **Penrose Ave** - go **0.4 mi**
8. Continue on **George C Platt Memorial Brg** - go **1.4 mi**
9. Continue on **Penrose Ave** - go **0.2 mi**
10. Turn **left** at **S 26th St** - go **1.3 mi**
11. Continue on **I-76 W** - go **2.4 mi**
12. Take the **Market St** exit 345 to **30th St. Station** - go **0.2 mi**
13. Turn **right** at **Market St** - go **0.9 mi**

These directions are for planning purposes only. You may find that construction projects, traffic, or other events may cause road conditions to differ from the map results.

Map data ©2005 NAVTEQ™, Tele Atlas

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 2:05-cv-443 |
| | § | |
| COMCAST CORPORATION, COMCAST | § | Judge T. John Ward |
| CABLE COMMUNICATIONS, LLC, and | § | Jury |
| COMCAST OF PLANO, LP | § | |

**ORDER GRANTING DEFENDANTS' MOTION TO EXCEED PAGE LIMIT**

Defendants Comcast Corp., Comcast Cable Communications, LLC ("Comcast Cable"), and Comcast of Plano, LP (collectively, "Comcast"), filed an Agreed Motion to Exceed the Page Limit in Defendant's Reply to Plaintiff's Opposition to Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a). The Court, having reviewed the motion, and being well-advised, finds that the motion should the GRANTED.

It is therefore ORDERED that defendant Comcast shall be allowed to exceed the page limit in Defendant's Reply to Plaintiff's Opposition to Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a). It is further

ORDERED, ADJUDGED and DECREED that the Clerk of Court is to file Defendant's Reply to Plaintiff's Opposition to Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) as attached as Exhibit "A" to Defendants' Agreed Motion to Exceed Page Limit.

SO ORDERED.