# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, LP,

        Plaintiff,

    vs.

COMCAST CORPORATION; COMCAST
CABLE COMMUNICATIONS, LLC; and
COMCAST OF PLANO, LP,

        Defendant.

Case No. 2:05-CV-443-TJW-CE

Jury demand

## PLAINTIFF'S SUR-REPLY IN OPPOSITION
## TO DEFENDANTS' MOTION TO STAY

## I.    INTRODUCTION

Notwithstanding Comcast's arguments to the contrary, the "just and efficient conduct" of this action will not be promoted by staying all proceedings less than two weeks prior to the scheduled *Markman* hearing.  *See* 28 U.S.C. §1407.  Despite the fact that the *Markman* issues have been fully briefed for months; despite the fact that, if not for the disqualification of Rembrandt's former counsel, the *Markman* hearing would have been held on February 8; and despite the fact that counsel for both parties are currently engaged in intensive preparation for the hearing set for May 14—Comcast asks the Court to refrain from deciding these issues so that, in the event that the MDL Panel transfers this case to another court, the parties can start this lengthy process over again.  [*See* Reply 7-9 (Dkt. No. 170)].  In the interests of justice, and of efficiency, the Court should deny the motion to stay and proceed with the *Markman* hearing as planned.

## II.    ARGUMENT

### A.    This Case's Advanced Procedural Posture is Not a "Distraction"—It is a Critical Factor Weighing Against the Requested Stay, and Comcast Can Cite No Authority Holding Otherwise.

Contrary to Comcast's assertion, [*see* Reply at 2-3], in this district the stage of litigation is *always* a critical factor in deciding whether to grant a stay.  The language in *Soverain Software LLC v. Amazon.com, Inc.*, 356 F. Supp. 2d 660 (E.D. Tex. 2005), is all-encompassing, and unequivocal:  "In all cases before it, the Court places great importance on going to trial on the date set in the scheduling order unless extraordinary circumstances arise."  *Id.* at 663 (emphasis added).  In *Soverain*, the Court found that reexamination of the patent-in-suit—which had the potential to invalidate the patent and thereby make trial completely unnecessary—was not "such an extraordinary circumstance" as to justify a stay "late in the proceedings" of that case.  *Id.*  If reexamination by the Patent Office, which can end the litigation, did not constitute an extraordinary circumstance warranting a late-stage stay in *Soverain*, proceedings before an MDL Panel should not constitute an extraordinary circumstance warranting a late-stage stay here.

1

Comcast suggests that "courts evaluating whether to grant a stay pending the outcome of an MDL motion generally do not consider the stage of proceedings." [Reply at 3]. But Comcast's cited cases say no such thing. To be sure, those cases contain little discussion of the respective stage of the cases at issue—but that is because, as demonstrated in Rembrandt's response, [Response at 5-6], Comcast has cited no case in which a procedurally advanced action was stayed pending the resolution of an MDL motion. In essence, Comcast appears to be asking this Court to do something that no other court has done. If there was any doubt remaining on this point, Comcast's highlighted quote from *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358 (C.D. Cal. 1997), should remove it: "it appears that a majority of courts have concluded that it is often appropriate to stay *preliminary* pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel . . . ." *Id.* at 1362 (emphasis added); [Reply at 4].[1] There is nothing "preliminary" about the *Markman* hearing scheduled for May 14.

### B. The Speculative Possibility That This Case Will Be Temporarily Transferred Elsewhere Counsels Completing the *Markman* Process Now.

Comcast spends the bulk of its reply on efficiency-related arguments to the effect that the Court's claim-construction efforts will be "wasted" or "mooted" if the MDL Panel subsequently decides to "divest this Court of jurisdiction . . . regardless of the procedural posture of the case." [Reply at 1, 4-9]. As explained in Rembrandt's response, however, even in the event of a transfer, this Court's orders will be treated as the "law of the case" by the transferee court. [Response at 10]. And Comcast still has cited no case in which a transferee court has revisited or "mooted" a transferor court's prior claim-construction order. [*See* Reply at 5-7].

But there is another fundamental flaw in Comcast's efficiency-related arguments. Those arguments assume that, no matter the relative stage of the actions transferred by the MDL Panel,

---

[1] Comcast suggests that the three-factor test endorsed in *Rivers* does not take the stage of litigation into account. [Reply at 3]. To the contrary, the fact that an action is well underway and proceeding steadily toward trial should be highly relevant—at the least—to an evaluation of both the first (prejudice to the non-movant) and third (threat of duplicative litigation) *Rivers* factors. *See* 980 F. Supp. at 1360.

all of those actions must be set, and must proceed, on the same track. Thus, under Comcast's view, any progress achieved in this case is bound to be lost in the event of an MDL transfer. [*See* Reply at 4-8]. That is not, however, how the MDL process is supposed to work in these circumstances.

Take, for example, *In re Acacia Media Tech. Corp. Patent Litig.*, 360 F. Supp. 2d 1377, 1379-80 (J.P.M.L. 2005). In that case, the MDL Panel decided to order the consolidation of a number of actions notwithstanding the fact that some were more procedurally advanced than others. In response to the argument that certain parties would be prejudiced by having these procedurally disparate actions placed on the same track, the Panel noted that the transferee court should "formulate a program" that would allow the actions "to proceed concurrently on separate tracks" as appropriate. *Id.* at 1379. The Panel further explained:

> It may well be that the [more advanced] actions will be ready for trial in advance of the other [transferred] actions. If such is the case, we note that nothing in the nature of this [MDL] centralization will impede the transferee court, whenever it deems it appropriate, from recommending Section 1407 remand and then, upon the effectuation of that remand, scheduling a trial in the [transferor court] of any [such] action. *Id.* at 1379-80.

In other words, if an MDL order results in the transfer of a case that is more procedurally advanced than other cases subject to the order, the transferee court will be expected to respect and accommodate the advanced stage of that case, and to remand it back to the transferor court as soon as it is ready for trial. *See id.*

The *Acacia* case thus highlights two important facts: one, should the MDL Panel ultimately decide to transfer this case, such transfer would be temporary—the case would be returned to this Court when trial-ready; and two, even in the speculative event of an MDL transfer, the progress achieved in this case will not, as Comcast suggests, "have been in vain." [Reply at 7].

In light of these facts, and because in particular there is no reason to expect that the Court's *Markman* work will be lost, Rembrandt respectfully suggests that the prudent course is

to proceed with and complete the *Markman* process as planned.  That way, if the MDL motion is ultimately denied, or is granted and the cases are transferred to this Court, there will have been no additional and unnecessary delay in the resolution of this case.[2]  If, on the other hand, the MDL motion is ultimately granted, and transferred to a court other than this Court, the case will be transferred in such a posture as to increase the likelihood that it will be swiftly remanded to this Court for trial.

> ### C.      The Potential Prejudice to Rembrandt is Real; the Hardship to Comcast Chimeral.

Comcast's efficiency-related arguments are addressed to the third factor of the *Rivers* three-factor test.  *See* 980 F. Supp. at 1360.  Comcast's reply also takes perfunctory stabs at the first two *Rivers* factors:  potential prejudice to the non-movant if the stay is granted, and hardship and inequity to the movant if the stay is denied.  *See id.*; [Reply at 10-11].  Both of those factors, however, clearly support denying the requested stay.  [Response at 6-8].

The threat of further slippage in Rembrandt's trial date represents a real and substantial potential prejudice that courts in this district "place[] great importance on" avoiding.  *See Soverain*, 356 F. Supp. 2d at 663.  The only potential hardship to itself that Comcast has identified is that if this case is ultimately transferred elsewhere, there is some small chance that "its efforts in preparing for" the *Markman* hearing may have to be duplicated.  [Reply at 9].  But assuming that Comcast's counsel, like Rembrandt's counsel, are currently engaged in such efforts, the relief it asks for *guarantees* this outcome.  This alleged "hardship" to Comcast, therefore, will not be prevented by staying this case on the eve of the *Markman* hearing.

## III.    CONCLUSION

For the foregoing reasons, Rembrandt respectfully requests that the Court deny Comcast's motion to stay pending resolution of the motion before the MDL Panel.

---

[2] Comcast's argument assumes that the MDL motion will be granted <u>and</u> that the cases will not be transferred to this Court.  If, however, the MDL motion is denied, or the MDL motion is granted and the cases transferred to this Court, two of the three possible outcomes, then the stay Comcast seeks will only delay this case and create the inefficiencies Comcast cites as a basis for its motion.

Dated: May 3, 2007

Respectfully submitted,

/s/ Sam Baxter_____
Sam Baxter
State Bar No. 01938000
**McKOOL SMITH P.C.**
505 E. Travis, Suite 105
Marshall, Texas  75670
Telephone:  (903) 927-2111
Telecopier:  (903) 927-2622
sbaxter@mckoolsmith.com

Jeffrey A. Carter
State Bar No. 03919400
**McKOOL SMITH P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas  75201
Telephone:  (214) 978-4006
Telecopier:  (214) 978-4044
jcarter@mckoolsmith.com

Travis Gordon White
State Bar No. 21333000
**McKOOL SMITH P.C.**
300 W. 6th Street, Suite 1700
Austin, Texas  78701
Telephone:  (512) 692-8700
Telecopier:  (512) 692-8744
gwhite@mckoolsmith.com

Robert M. Parker
State Bar No. 15498000
Robert Christopher Bunt
State Bar No. 00787165
**PARKER & BUNT, P.C.**
100 E. Ferguson, Suite 1114
Tyler, Texas  75702
Telephone:  (903) 531-3535
Telecopier:  (903) 533-9687
cbunt@cox-internet.com
rmparker@cox-internet.com

Otis Carroll
State Bar No. 03895700
Wesley Hill
State Bar No. 24032294
**IRELAND, CARROLL & KELLEY, P.C.**
6101 S. Broadway, Suite 500
Tyler, Texas  75703
Telephone:  (903) 561-160
Telecopier:  (903) 581-1071
fedserv@icklaw.com

Andrew W. Spangler
Elizabeth L. DeRieux
**BROWN MCCARROLL, LLP**
1127 Judson Road, Suite 220
P. O. Box 3999
Longview, TX  75606-3999
Telephone:  (903) 236-9800
Telecopier:  (903) 236-8787
aspangler@mailbmc.com
ederieux@mailbmc.com

Franklin Jones, Jr.
State Bar No. 00000055
**JONES & JONES, INC.**
201 W. Houston St.
P. O. Drawer 149
Marshall, TX  75670
Telephone:  (903) 938-4395
Telecopier:  (903) 938-3360
maizieh@millerfirm.com

**ATTORNEYS FOR PLAINTIFF
REMBRANDT TECHNOLOGIES, LP**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a), contemporaneously served upon all counsel who have consented to electronic service and served by first class mail on other counsel on this the 3d day of May, 2007.

        /s/ Sam Baxter         

Sam Baxter

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP., | § | |
| | § | |
| vs. | § | CASE NO. 2:05-CV-443 |
| | § | |
| COMCAST CORP. ET AL. | § | |
| | § | |

## ORDER

Comcast asks the court to stay this case pending a consolidation decision by the mulitdistrict litigation panel (#162). This case has been pending for nearly 20 months, and the *Markman* hearing has already been delayed. The court and the parties have substantial time and effort involved in the case, and the court is not persuaded that a stay is appropriate. Accordingly, the court **DENIES** Comcast's motion to stay (#162).

SIGNED this 11th day of May, 2007.

CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL  DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, L.P. | § | |
| | § | |
| | § | |
| V. | § | CIVIL NO. 2:05-CV-443(TJW) |
| | § | |
| CHARTER COMMUNICATIONS, | § | |
| ET AL ., | § | |

---

**Status Conference Minutes**
**May 14, 2007**

**OPEN:**   8:58 am                          **ADJOURN:**   12:07 pm

---

**ATTORNEYS FOR PLAINTIFF:**          (See attached sign-in sheet)

**ATTORNEYS FOR DEFENDANT:**          (See attached sign-in sheet)

**LAW CLERK:**          Jerry Yen, Law Clerk for Judge T. John Ward
                        Mike Benefield, Law Clerk for Judge Everingham)
                        Dan Sharp, Law Clerk for Judge T. John Ward

**COURTROOM DEPUTY:**          Debbie Latham

Court opened.  The attorneys announced ready.

8:58 - 9:20 am - John Franklin Garvish, II, for Rembrandt

9:20 - 10:22 am - Travis Gordon White for Rembrandt

10:22 - 10:29 am - Leo L. Lam - opening for defendants

10:29 - 10:45 am - Recess

10:45 - 11:30 am - Leo L. Lam continued for defendants

**11:30 - 11:59 am - Brian L. Ferrall for defendants**

**11:59 am - 12:02 pm - John Franklin Garvish, II, for Rembrandt**

**12:02 - 12:07 pm - Travis Gordon White for Rembrandt**

**The Court considered Plaintiff's motion to supplement the joint claim construction statement as an oral motion and granted such.**

**12:07 pm - Court Adjourned.**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 2-05CV-443-TJW-CE |
| | § | |
| COMCAST CORPORATION; COMCAST | § | |
| CABLE COMMUNICATIONS, LLC; AND | § | Jury Demand |
| COMCAST OF PLANO, LP | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

## STIPULATION

On Friday, May 18, 2007, Defendant Comcast Corporation ("Comcast") served its Third Supplemental Responses to Plaintiff Rembrandt Technologies, Inc.'s First Set of Interrogatories, ("Third Supplemental Responses") which identifies additional prior art with respect to the '819 and '858 patents. The parties stipulate and agree that Comcast's Preliminary Infringement Contentions are hereby amended to include the prior art identified in the Third Supplemental Responses without the necessity of any further filings or application to the Court.

STIPULATED AND AGREED:


_____/s/ Jeffrey A. Carter_____
Jeffrey A. Carter
McKool Smith PC
300 Crescent Court, Suite 1700
Dallas, TX 75201
Telephone: 214-978-4006
Fax: 214-692-8744

**ATTORNEYS FOR REMBRANDT
TECHNOLOGIES, INC.**

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone:  903-255-1000
Facsimile:  903-255-0800

Brian Ferrall
Leo Lam
Steven Taylor
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-391-5400
Facsimile:  415-397-7188

**ATTORNEYS FOR DEFENDANTS
COMCAST CORPORATION,
COMCAST CABLE
COMMUNICATIONS, LLC, and
COMCAST OF PLANO, LP**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  All other counsel of record will be served by first class mail this 21st day of May, 2007.

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan

<u>**STIPULATION**</u>– Page 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, INC.                §
                                            §
                        Plaintiff,          §
                                            §
         v.                                 §        Civil Action No. 2-05CV-443-TJW-CE
                                            §
COMCAST CORPORATION; COMCAST                §
CABLE COMMUNICATIONS, LLC; AND              §        Jury Demand
COMCAST OF PLANO, LP                        §
                                            §
                        Defendants.         §
                                            §

## AMENDED STIPULATION

On Friday, May 18, 2007, Defendant Comcast Corporation ("Comcast") served its Third

Supplemental Responses to Plaintiff Rembrandt Technologies, Inc.'s First Set of Interrogatories,

("Third Supplemental Responses") which identifies additional prior art with respect to the '819

and '858 patents.   The parties stipulate and agree that Comcast's Preliminary Invalidity

Contentions are hereby amended to include the prior art identified in the Third Supplemental

Responses without the necessity of any further filings or application to the Court.

STIPULATED AND AGREED:


           /s/ Jeffrey A. Carter
Jeffrey A. Carter
McKool Smith PC
300 Crescent Court, Suite 1700
Dallas, TX 75201
Telephone:  214-978-4006
Fax:  214-692-8744

**ATTORNEYS FOR REMBRANDT
TECHNOLOGIES, INC.**

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: 903-255-1000
Facsimile: 903-255-0800

Brian Ferrall
Leo Lam
Steven Taylor
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: 415-391-5400
Facsimile: 415-397-7188

**ATTORNEYS FOR DEFENDANTS
COMCAST CORPORATION,
COMCAST CABLE
COMMUNICATIONS, LLC, and
COMCAST OF PLANO, LP**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). All other counsel of record will be served by first class mail this 22nd day of May, 2007.

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan

**AMENDED STIPULATION**– Page 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 2-05CV-443-TJW-CE |
| | § | |
| COMCAST CORPORATION; COMCAST | § | |
| CABLE COMMUNICATIONS, LLC; AND | § | Jury Demand |
| COMCAST OF PLANO, LP | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DEFENDANTS' NOTICE OF SERVICE OF FOURTH SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 5, Defendants Comcast Corporation, Comcast Cable Communications, and Comcast of Plano, LP ("Comcast"), served their FOURTH SUPPLEMENTAL RESPONSES TO PLAINTIFF REMBRANDT TECHNOLOGIES, INC.'S FIRST SET OF INTERROGATORIES to all counsel of record on May 30, 2007.

Respectfully submitted,

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: 903-255-1000
Facsimile: 903-255-0800

Harry ("Gil") L. Gillam, Jr.
GILLAM & SMITH LLP
303 S. Washington Ave.
Marshall, TX  75670
Telephone:  (903) 934-8450

Brian Ferrall
Leo Lam
Steven Taylor
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-391-5400
Facsimile:  415-397-7188

**ATTORNEYS FOR DEFENDANTS**
**COMCAST CORPORATION,**
**COMCAST CABLE**
**COMMUNICATIONS, LLC, and**
**COMCAST OF PLANO, LP**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  All other counsel of record will be served by first class mail this 30th day of May, 2007.


　　　　　　　　　　　/s/ Jennifer Haltom Doan
　　　　　　　　　　　Jennifer Haltom Doan

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, L.P., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2-05-CV-443 (TJW) |
| | § | |
| COMCAST CORP., ET AL., | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

After considering the submissions and the arguments of counsel, the court issues the following order concerning the claim construction issues:

## I.      Introduction

Plaintiff Rembrandt Technologies, LP ("Rembrandt") accuses Comcast Corporation, Comcast Cable Communications, LLC, and Comcast of Plano, LP (collectively, "Comcast") of infringing United States Patent Nos. 5,719,858 ("the '858 patent") entitled "Time-Division Multiple-Access Method for Packet Transmission on Shared Synchronous Serial Buses," 4,937,819 ("the '819 patent") entitled "Time Orthogonal Multiple Virtual DCE for Use in Analog and Digital Networks," 5,852,631 ("the '631 patent") entitled "System and Method for Establishing Link Layer Parameters Based on Physical Layer Modulation," and 5,243,627 ("the '627 patent") entitled "Signal Point Interleaving Technique." This opinion resolves the parties' various claim construction disputes.

## II.      Background of the Technology

The '858 patent discloses a mechanism for allowing data sources to allocate, among themselves, time slots on a time division multiplexed ("TDM") bus. TDM allows multiple data sources to transmit data over a single network connection by dividing the network connection into

discrete time slots. Data sources generally transmit data only during their assigned time slot.

The '819 patent discloses an improved ranging mechanism for transmitting data from several remote units over a TDM network. Ranging is a way of measuring the transmission delay of data sent from a remote unit to a central node. By measuring this delay, the remote units can adjust the timing of their transmissions in order to reduce the empty times between transmissions.

The '631 patent addresses a manner to reduce the time required to establish a connection between two modems. Generally, when two modems attempt to communicate, they need to establish the two lowest "layers" of communication protocol, called the "physical layer" and the "link layer." The modems first negotiate the protocol to establish the "physical layer" connection and then negotiate the protocol to establish the "link layer" connection. The '631 patent discloses a technique for modems to use the "physical layer" negotiation to establish the "link layer" connection and, effectively, dispense with the "link layer" negotiations. This reduces the time necessary to establish a connection between the two modems.

The '627 patent discloses a method for correcting errors in digital data transmissions. In the prior art, one technique for correcting errors involved a "trellis encoder" in the transmitter and a "trellis" or "Viterbi" decoder in the receiver. In some circumstances, Viterbi decoders may fail to correct errors properly. The '627 patent discloses a combination of trellis encoding and signal point interleaving in an effort to improve error correction. Interleaving shuffles the data so that it is not in the same order as originally created. By using this technique, the system is able to guard against the situation where a number of consecutive transmitted bits become corrupted. As disclosed in the '627 patent, signal point interleaving helps to reduce errors within a single channel symbol. Bearing this background in mind, the court now addresses the claim construction issues.

2

## III.  General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054

3

(Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (*quoting Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the

4

claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the

5

specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. The court now turns to a discussion of the disputed claim terms.

## IV.	Terms in Dispute

### A.	'858 Patent

#### 1.	"time-division multiplexed bus"

The first term for construction is "time-division multiplexed bus." The plaintiff argues that the term means "a bus having a bandwidth partitioned into regular time slots, that is shared by two

6

or more sources of data by limiting each source's transmission opportunities to discrete intervals of time." The defendants argue that the term means "a group of one or more conductors that is shared among several users by allowing each user to use the bus for a given period of time in a defined, repeated sequence." The parties appear to agree that a bus allows different sources of data to share bandwidth. The principal dispute is whether the transmission sequence must be a "defined, repeated sequence."

The defendants cite to portions of the specifications that refer to repeated frames for a fixed portion of the TDM bandwidth. *See* '858 patent, 4:56-57, 5:21-6:5. In addition, the defendants point to extrinsic evidence. *See* The New IEEE Standard Dictionary of Electrical and Electronic Terms, at 1377 (5th ed. 1993). The plaintiff argues, however, that by limiting the transmission sequence to be a "defined, repeated sequence," the defendants' construction would exclude a preferred embodiment where data sources are skipped when they have no data to send. *See* '858 patent, Fig. 6, 7:25-9:15.

The court agrees that the patent discloses an embodiment where certain data sources are skipped when they have no data to send. For this reason, the "defined, repeated sequence" more appropriately describes the frames for the fixed portion of the TDM bandwidth. So viewed, the court agrees that the frames are arranged in a "defined, repeated sequence." Accordingly, the court construes the term to mean "a bus having a bandwidth partitioned into a defined, repeated sequence of time slots, that is shared by two or more sources of data by limiting each source's transmission opportunities to discrete intervals of time."

### 2. "packet data" and "synchronous data"

The plaintiff proposes that "packet data" means "variable bit rate data" and "synchronous

7

data" means "constant bit rate data."  The defendants propose that "packet data" means "data that

is transmitted in packets" and "synchronous data" means "constant bit rate data that is not

transmitted in packets."  Both parties appear to agree that "synchronous data" refers to constant bit

rate data.  The dispute is whether "packet data" can also include constant bit rate data.

> The specification defines these terms:
>
> The present invention relates to data communications, and more particularly to communications systems that have channelized network access, and may transport both synchronous data and variable-bit-rate data such as frame relay data (hereafter referred to as packet data), in a time-division multiplexed format.

'858 patent, 1:8-11.

District to the defendants' arguments, the patent defines "variable bit rate data" as "packet

data," and the court adopts this construction.  Moreover, the court defines "synchronous data" as

"constant bit rate data."

### 3.     "portion of the [predefined] bandwidth"

The next term is "portion of the [predefined] bandwidth."  The plaintiff argues that this term

means "one or more time slots in a TDM frame assigned to a group of data sources."  The defendants

contend that the term means "the part, but less than all, of the data transfer capacity of the bus that

is allotted either to packet data or to synchronous data."  The dispute is whether the term "portion"

can include the full bandwidth or whether it is limited to less than the full bandwidth.

The intrinsic evidence does not support a construction which departs from the ordinary

meaning of "portion."  As argued by the defendants, the purpose of the invention was to facilitate

the transmission of both packet and synchronous data over the TDM bus.  *See* '858 patent, 2:42-45

("I have realized an alternative approach to the design of TDM-based equipment that supports *both*

*synchronous data and packet data* and, in addition, provides an efficient substrate for packet handling.")(emphasis added); Figs. 3, 5 (depicting the allocation of a part of the TDM bus to the multiple access packet channel). As used in the patent, "portion" means less than all. Accordingly, the court construes the term to mean "the part, but less than all, of the data transfer capacity of the bus that is assigned to a group of data sources."

### 4. "predefined bandwidth"

The plaintiff contends that this term means "a TDM frame with a fixed number of time slots." The defendants argue that this term means "data transfer capacity fixed in advance of operation." Although the plaintiff cites to the abstract, the defendants' proposed construction embraces the definitions of "predefined" and "bandwidth" as used in the claims. The court adopts the defendants' proposed construction.

### 5. "distributed packet manager"

The next term is "distributed packet manager." The plaintiff argues that this term means "a device, process or algorithm that is located within each packet data source, that controls how the packet data source accesses a portion of the bandwidth assigned to the packet data." The defendants propose "a decentralized mechanism that performs all the functions required to aggregate and synchronize packet data to the time-division multiplexed bus and to prevent packet collisions." The defendants' proposed construction limits the claim by requiring, essentially, an entirely decentralized mechanism for performing "all" of the functions required to aggregate and synchronize packet data to the bus. In addition, the defendants' construction requires the packet manager to prevent packet collisions.

The court is not persuaded that either limitation is appropriate. The specification does not

require the elimination of all of the central control functions. Moreover, the doctrine of claim differentiation counsels against the requirement that the packet manager prevent packet collisions. Claim 9 recites "only one of the plurality of packet data sources accesses the . . . predefined bandwidth at a time" whereas claim 7 does not require that "only one" packet data source can access the bus at a time. Claim 9 thus expresses the concept of preventing packet collisions by allowing only one of the packet data sources to access the predefined bandwidth at a time. The defendants' proposed construction would incorporate limitations from the preferred embodiment that are not required by the language of the claims. As such, the court construes the term to mean "a device, process or algorithm located within each packet data source, that controls how the packet data source accesses the time-division multiplexed bus."

6.    "allocate access to the allotted bandwidth among said packet data sources"[1]

The plaintiff defines this term to mean "controlling access by each of the packet data sources to the portion of bandwidth previously assigned to packet data." The defendants' proposed construction is "apportion to each of the packet data sources sole permission to attempt to transmit in the portion of bandwidth previously assigned to packet data." The dispute is whether "allocating/controlling access" requires some sort of permission to transmit in a given time period. The defendants argue that packet sources do not contend for bandwidth by transmitting simultaneously, but by "capturing" permission to use the MAPC. *See* '858 patent, 6:53-7:8. The plaintiff argues that the defendants are attempting to limit the construction to a preferred

---

[1]    Corresponding phrases include "allocate access to the second portion of the predefined bandwidth among said packet data sources" and "controlling [the] access by said packet data sources to the allocated portion of the bandwidth."

10

embodiment. The court agrees and concludes the term means "controlling access by each of the packet data sources to the portion of bandwidth previously assigned to packet data."

### 7. "network access manager/module"

The plaintiff contends that this term means "a device, process or algorithm for controlling the assignment of synchronous and packet data portions on a TDM bus, and for passing data between the bus and a network." The defendants argue that the court should not construe this term. They add that the plaintiff's proposed construction is confusing because it describes functions from the "distributed packet manager." The plaintiff, on the other hand, contends that the specification discusses two functions of the network access manager and that a construction consistent with the specification would help the jury understand the functions of the network access manager.

A review of the specification demonstrates the propriety of the plaintiff's proposal. The specification states that the network access module "controls time-slot allocation among the synchronous modules and the packet modules." '858 patent, 5:12-13. The network access module also "provides the interface between the TDM bus and network facility." '858 patent, 3:46-47. The plaintiff's proposed construction captures a definition of the network access manager in essentially these terms. The court construes the term to mean "a device, process or algorithm for controlling the assignment of synchronous and packet data portions on a TDM bus, and for passing data between the bus and a network."

### B. '819 Patent

### 1. "application program"

Claim 1 of the '819 patent requires a master unit communicating with a plurality of remote units. The remote units must be executing "application programs." The parties dispute the

11

construction of this term.  The plaintiff defines the term to mean "a computer program or process." The defendants propose "a program designed to assist in the performance of a specific end-user task (*e.g.*, word processing, accounting, or inventory management) in contrast to a program designed to perform management of or maintenance work on the system or system components."

The ordinary meaning of the term "application program" is software that performs tasks for an end-user.  Despite the parties' arguments for different constructions, the court discerns nothing in the patent or the prosecution history that would vary the ordinary meaning for this term.  As such, the court defines "application program" to mean "software that performs tasks for an end-user."

### 2.    "time slot assigned to each of said application programs"

Claim 1 also requires that the remote units receive messages from the master unit and respond in a "time slot assigned to each of said application programs."  The parties' dispute concerns whether the "assignment" function must occur at initialization of the application program (the defendants' construction) or whether it may occur at any time.  The plaintiff argues that the defendants' construction is inconsistent with the disclosure because the remote units can request additional time slots during data transmission, which is after initialization.  *See* '819 patent, 2:18-26, 3:7-11.  The defendants argue that the specification repeatedly discloses time slots assigned to applications at initialization.  *See* '819 patent, 2:46-49, 5:42-43, Fig. 6, Fig. 7.

Although the specification refers to the assignment of time slots during initialization, there is nothing in the patent that requires the claims to be limited in this manner.  The court construes "time slot" to mean "an interval of time during which data from an application program is transmitted."  All other terms have their plain and ordinary meaning.

**3. "dividing a period of a clock in said master unit into a number of subframes, dividing each subframes into a number of slots, each corresponding to transmission times for one of said remote units, and assigning a slot to each of said application programs"**

This phrase appears in claim 14 of the '819 patent. The defendants contend that the phrase needs clarification because it is not clear what "each" refers to. They also urge that the file history indicates a disclaimer that messages sent from the master unit to the remote units are not packetized. The court has reviewed the cited portions of the prosecution history and is not persuaded that the patentee limited the claim to outbound non-packetized messages from the master unit. The court therefore construes "each corresponding to transmission times" to mean "each subframe corresponding to transmission times." All other terms have their plain and ordinary meaning.

**4. "master network timing means"**

Claim 1 requires a master unit with a master network timing "means." In relevant part, claim 1 states "said master unit including a master network timing means with a period which is divided into a plurality of subframes, wherein each subframe is divided into said time slots, and each of said time slots is used as an interval in which one of said application programs . . . ." '819 patent, claim 1. The parties debate whether this limitation is a means-plus-function limitation.

Use of the word "means" invokes a presumption that the claim is governed by 35 U.S.C. § 112 ¶ 6. The plaintiff, however, correctly observes that the limitation does not recite any function performed by the means and, as such, is outside the scope of § 112 ¶ 6. *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997).

Although the phrase is not a means-plus-function limitation, the plaintiff suggests that the court should construe the "timing means" limitation. The plaintiff proposes a construction of "a

13

clock for determining network timing or for delineating time into time slots." Although the defendants do not propose an alternative construction, they disagree that a clock determines what the period shall be and how the period should divide into subframes and time slots. The defendants instead argue that the period, subframes, and time slots are determined by the network timing and control processor. *See* '819 patent, 3:1-3. The plaintiff, on the other hand, argues that the description of "master network clock" in the specification matches the language of the claim. *See* '819 patent, 6:37-39, 7:38-39.

Because the term is not governed by § 112 ¶ 6, it is improper to limit the term to the structures described in the specification. The language of this claim limitation needs no further construction, and the court rejects the plaintiff's attempt to limit the term to the master network clock recited in the patent.

### 5.      "ranging means"

Like the previous term, the parties dispute whether the term is a means-plus-function limitation. In relevant part, claim 1, states:

> said master unit including ranging means communicating with said master network timing means *wherein a transmission time between said master unit and each of said respective remote units is calculated and transmitted* from said master unit to each of said respective remote units, each of said respective remote units using said transmission time to adjust initiation of said time slots.

'819 patent, claim 1 (emphasis added).

Again, the plaintiff urges that there is no recited function performed by the recited means. According to the plaintiff, the limitations in the claim refer to the master unit and not to the ranging means.

The court disagrees. The plaintiff has not overcome the presumption that this term is drafted

14

according to § 112 ¶ 6.  What distinguishes this term from the previous one is the inclusion of the functional language "wherein a transmission time between said master unit and each of said respective remote units is calculated and transmitted."  This language, coupled with the use of the word "means," counsels the court to apply § 112 ¶ 6.

The court construes the function to mean "calculating and transmitting to each remote unit the time it takes to transmit between the master and that remote unit."  The corresponding structure is the network timing and control processor 12, the ranging and network initialization generator 20, and ranging receiver 32.

### 6.    "reservation request generator" and "reservation request processor"

The plaintiff proposes that "reservation request generator" means "a device or process that adds to a message a request for additional time slots" and that "reservation request processor" means "a device or process for receiving and processing requests for additional time slots from a reservation request generator."  The defendants contend that the terms do not need construction.  However, if the court decides that the terms require construction, the defendants propose that "reservation request generator" means "a device or process that sets reservation bits in a message to request additional time slots" and "reservation request processor" means "a device or process that can grant a request from a remote unit for more time slots in order for the remote unit to transmit a longer message."

The defendants' proposals improperly limit the terms to preferred embodiments.  The court adopts the plaintiff's proposed constructions for both terms.

### 7.    "priority bit"

The term "priority bit" appears in claim 11 of the '819 patent.  The issue is whether the priority bit is limited to defining the importance of remote units or whether it can define the

importance of other things, such as an application. By limiting the construction to the importance of remote units, the defendants attempt to limit the construction to a preferred embodiment. The language of the claim is entitled to a broader construction, and the court construes this term to mean "a bit that is used to convey the relative importance of the communication."

### C. '631 Patent

#### 1. "physical layer" and "physical layer modulation"

The court concludes that the term "physical layer" means "the lowest layer of the Open Systems Interconnect (OSI) seven layer model, concerned with establishing the mechanical, electrical, functional, and procedural connection between two modems." Similarly, "physical layer modulation" means "a protocol that is concerned with establishing the mechanical, electrical, functional, and procedural connection between two modems."

#### 2. "negotiated physical layer modulation"

The parties are in agreement that this term means "a physical layer modulation selected by a process permitting two modems supporting different layer modulations to agree on a common supported physical layer modulation after exchanging information at run time." The court accordingly adopts this construction.

#### 3. "link layer"

As expressed at oral argument, it appears that the parties are in substantial agreement on the construction of this term. They agree that the link layer is the second lowest layer of the OSI seven layer model and that it performs error checking functions. The main issues appear to be whether error correction is limited to frame transmission and/or whether the plaintiff's construction includes error correction at the physical layer. The defendants also argue that one of ordinary skill in the art

16

would understand that retransmission of messages is the way to correct transmission errors.

The court has considered the briefs and the arguments of the parties in light of the intrinsic record. The court construes the term "link layer" to mean "the second lowest layer of the Open Systems Interconnect (OSI) seven layer model, providing the functional and procedural means to transfer data between modems, and to detect and correct errors."

4.  **"means for establishing a physical layer connection between said calling and said answer modems, wherein said physical layer connection is based on a negotiated physical layer modulation chosen from said first and second physical layer modulations"**

The parties agree that this phrase is drafted in means-plus-function form. They also agree that the function is "establishing a physical layer connection based on a negotiated physical layer modulation." The parties disagree on the structure. Although the parties agree that a control processor or digital signal processor chip must be able to execute the algorithms described in Fig.4-9, they disagree over whether the processor may be capable of executing each algorithm standing alone (the plaintiff's argument) or whether the processor must be capable of executing pairs of algorithms (the defendant's argument).

To establish a connection, both a calling and answering modem must perform an algorithm. The specification discloses only two alternative pairs of interdependent algorithms (Fig. 4 with Fig. 5, and Fig. 6 with Fig. 7), and either pair must run to perform the claimed function of establishing a connection. This is because establishing a connection requires both a calling and an answering modem. The corresponding structure includes a processor running the algorithms shown in Figs. 4 and 5 or, alternatively, Figs. 6 and 7.

5.    **"means for establishing said link layer connection based upon said negotiated physical layer modulation"**

The parties agree that the function is "establishing the link layer connection based upon the negotiated physical layer." The parties disagree on the structure.

The plaintiff argues that the only structure necessary to perform this function is programmable hardware (*i.e.*, a control processor or digital signal processor chip) configured to perform the function set forth in Fig. 8. The defendants argue that Fig. 8 is purely a functional diagram and no algorithm has been disclosed. According to the defendants, the claim is invalid as indefinite. In reply, the plaintiff argues that the court should not entertain the indefiniteness argument because the defendants failed to disclose it in their Invalidity Contentions.

The timing of the argument notwithstanding, this court's role is to construe the claims. That task implicates a question of law. As a result, the court has attempted, unsuccessfully, to identify any disclosed corresponding structure. At this time, however, the court reserves construction of this phrase and invites the plaintiff to submit supplemental briefing on this issue within ten (10) days from the date of this order. The briefing shall respond to the defendants' argument that *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) controls this issue and that the specification fails to disclose corresponding structure in the form of an algorithm. Such briefing shall be limited to ten (10) pages. This procedure is sufficient to cure any prejudice resulting from the failure to timely raise the indefiniteness argument.

6.    **"means for presetting link layer parameters of said link layer connection to pre-defined settings based on said negotiated physical layer modulation"**

For essentially the reasons expressed in the preceding discussion, the court reserves construction of this phrase pending receipt of supplemental briefing. The plaintiff shall include any

18

argument on this term within the page limits allotted to it.

**D.    '627 Patent**

**1.    "trellis encoded channel symbol"**

The plaintiff argues that this term means "a set of one or more trellis encoded signal points that corresponds to a group of bits that is treated as a unit by an encoding system."  The defendants propose a construction that defines the term to mean "the output of a mapper that is generated using the output(s) of a single state transition of a trellis encoder."  The principal dispute is whether the output is limited to a "single state transition."

The plaintiff argues that a channel symbol is the output of the trellis encoding process corresponding to a group of input bits or "parallel bits."  *See* '627 patent, 2:61-65, 3:53-58.  The plaintiff observes that the trellis encoded channel symbol is derived from a "succession of N outputs from the trellis encoder . . . ."  '627 patent, 4:20.  According to the plaintiff, multiple outputs correspond to a separate state change and, therefore, a single state transition cannot be a limitation.

The defendants argue that a trellis state transition occurs only when the encoder has moved on to the next symbol.  According to the defendants, the "succession of outputs" referenced by the plaintiff refers to subset identifiers which are generated in parallel while the encoder operates on the data.  Subset identifiers collectively determine the trellis encoded symbol.  The defendants argue that nothing in the intrinsic evidence suggests that these outputs are the result of multiple state changes in the trellis encoder.

The plaintiff's argument is correct.  A trellis encoder working on a multiple bit word produces a succession of subset identifiers which collectively make up the trellis encoded symbol.  *See* '627 patent, 5:1-30.  The subset identifiers are then supplied to another encoder, *e.g.*, a four-

dimensional QAM encoder, which outputs a stream of signal points comprised of interleaved streams of trellis encoded channel symbols. *Id*. The plaintiff's construction of this term is correct, and the court adopts it.

### 2. "signal point"

The plaintiff proposes that the term "signal point" means "a value that is transmitted by a modulator in one signaling interval." The defendants propose "a single mapped point in a signal constellation." The defendants support this construction by arguing that one of ordinary skill in the art would understand the term "signal point" to refer to a mapped point in a signal constellation. The defendants also contend that signal constellations include many different dimensionalities. In addition, the defendants argue that a "signal point" is not actually transmitted; instead, a waveform representing the bits values associated with the signal point is transmitted.

The plaintiff responds by arguing that the '627 patent does not mention "mapping." The plaintiff also points to the specification which states that "signal points are thereupon communicated over the channel." '627 patent, 4:1-3.

The court agrees with the plaintiff that the intrinsic evidence fails to require a signal point "mapped" in a constellation. Based on the cited portion of the specification, the court agrees that the proper construction for this term is "a value that is transmitted by a modulator in one signaling interval."

### 3. "distributed Viterbi decoder"

The process of Viterbi decoding is used to decode a trellis encoded signal. Claims 9 and 19 of the '627 patent require a "distributed Viterbi decoder." The plaintiff proposes that this term means "a Viterbi decoder having multiple Viterbi decoding processes operating on separate portions

of a stream of data to be decoded." The defendants argue that the term means "two or more Viterbi decoders operating in round-robin fashion on separate portions of a stream of encoded data." The issue is whether there needs to be more than one Viterbi decoder operating in round-robin fashion.

The defendants point to the specification which shows separate Viterbi decoders that are accessed sequentially. '627 patent, Fig. 4, 3:13-20. The plaintiff, on the other hand, contends that the defendants are attempting to limit the term to a preferred embodiment. According to the plaintiff, a distributed Viterbi decoder can be implemented as a single Viterbi decoder that emulates through software the function of multiple devices. The relevant passage from the specification supports the plaintiff's argument. '627 patent, 9:61-66 ("multiple trellis encoders and decoders can be realized using a single program routine which, through the mechanism of indirect addressing of multiple arrays within memory, serves to provide the functions of each of the multiple devices.").

In light of this passage from the specification, the court is persuaded that the plaintiff's construction is correct. The court concludes that this term means "a Viterbi decoder having multiple Viterbi decoding processes operating on separate portions of a stream of data to be decoded."

### 4.    "means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols"

Both parties agree that this is a means-plus-function claim to be construed pursuant to § 112 ¶ 6. The court concludes that the claimed function is "deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols." The corresponding structure that is clearly linked to the claimed function is the signal point deinterleaver 441 or, alternatively, signal point deinterleaver 741. *See* '627 patent, Figs. 4 and 7; 5:67-68; 9:45-51.

21

**V.      Conclusion**

The court adopts the above constructions for the terms in need of construction.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 5th day of June, 2007.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 2-05CV-443-TJW-CE |
| | § | |
| COMCAST CORPORATION; COMCAST | § | |
| CABLE COMMUNICATIONS, LLC; AND | § | Jury Demand |
| COMCAST OF PLANO, LP | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

### SECOND STIPULATION OF PARTIES

On May 30, 2007, Defendant Comcast Corporation ("Comcast") served its Fourth Supplemental Responses to Plaintiff Rembrandt Technologies, Inc.'s First Set of Interrogatories, ("Fourth Supplemental Responses") which identifies additional prior art with respect to the '627 patent. The parties stipulate and agree that Comcast's Preliminary Invalidity Contentions are hereby amended to include the prior art identified in the Fourth Supplemental Responses without the necessity of any further filings or application to the Court.

STIPULATED AND AGREED:

    /s/ Jeffrey A. Carter
Jeffrey A. Carter
McKool Smith PC
300 Crescent Court, Suite 1700
Dallas, TX 75201
Telephone: 214-978-4006
Fax: 214-692-8744

**ATTORNEYS FOR REMBRANDT
TECHNOLOGIES, INC.**

SECOND STIPULATION OF PARTIES– Page 1

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone:  903-255-1000
Facsimile:  903-255-0800

Harry ("Gil") L. Gillam, Jr.
GILLAM & SMITH LLP
303 S. Washington Ave.
Marshall, TX  75670
Telephone:  (903) 934-8450

Brian Ferrall
Leo Lam
Steven Taylor
Matthew Werdegar
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-391-5400
Facsimile:  415-397-7188

**ATTORNEYS FOR DEFENDANTS
COMCAST CORPORATION,
COMCAST CABLE
COMMUNICATIONS, LLC, and
COMCAST OF PLANO, LP**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  All other counsel of record will be served by first class mail this 5th day of June, 2007.

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **REMBRANDT TECHNOLOGIES, LP** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case No. 2:05-CV-00443-TJW** |
| | § | |
| **COMCAST CORPORATION;** | § | **JURY TRIAL REQUESTED** |
| **COMCAST CABLE** | § | |
| **COMMUNICATIONS, LLC; AND** | § | |
| **COMCAST OF PLANO, LP,** | § | |
| | § | |
| **Defendants.** | § | |

## NOTICE OF APPEARANCE

Notice is hereby given that the undersigned attorney, Thomas G. Fasone, III, Texas State

Bar No. 00785382, enters his appearance in this matter for Plaintiff, Rembrandt Technologies,

LP, for the purpose of representing Plaintiff and receiving notices and orders from the Court.

DATED this 8th day of June, 2007.

Respectfully submitted,

McKOOL SMITH, P.C.

   /s/ Thomas G. Fasone III
Sam Baxter
State Bar No. 01938000
**McKOOL SMITH P.C.**
505 E. Travis, Suite 105
Marshall, Texas 75670
Telephone: (903) 927-2111
Telecopier: (903) 927-2622
sbaxter@mckoolsmith.com

1

Jeffrey A. Carter
State Bar No. 03919400
Bradley W. Caldwell
State Bar No. 24040630
Thomas G. Fasone III
State Bar No. 00785382
**McKOOL SMITH P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4006
Telecopier: (214) 978-4044
jcarter@mckoolsmith.com
bcaldwell@mckoolsmith.com
tfasone@mckoolsmith.com

Travis Gordon White
State Bar No. 21333000
John Garvish
State Bar No. 24043681
**McKOOL SMITH P.C.**
300 W. 6th Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744
gwhite@mckoolsmith.com
jgarvish@mckoolsmith.com

Robert M. Parker
State Bar No. 15498000
Robert Christopher Bunt
State Bar No. 00787165
**PARKER & BUNT, P.C.**
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Telephone: (903) 531-3535
Telecopier: (903) 533-9687
cbunt@cox-internet.com
rmparker@cox-internet.com

**ATTORNEYS FOR PLAINTIFF
REMBRANDT TECHNOLOGIES, LP**

2

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a), contemporaneously served upon all counsel who have consented to electronic service and served by first class mail on other counsel on this the 8th day of June, 2007.

                     /s/ Thomas G. Fasone III
                     Thomas G. Fasone III

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, LP,

       Plaintiff,

vs.

COMCAST CORPORATION; COMCAST
CABLE COMMUNICATIONS, LLC; and
COMCAST OF PLANO, LP,

       Defendant.

Case No. 2:05-CV-443-TJW-CE

Jury demand

**PLAINTIFF'S INVITED SUPPLEMENTAL
CLAIM CONSTRUCTION BRIEF ON _WMS GAMING_**

# TABLE OF CONTENTS

I.     INTRODUCTION .......................................................................................... 1

II.    BACKGROUND ............................................................................................ 2

III.   ARGUMENT .................................................................................................. 4

     A.    MEANS-PLUS-FUNCTION CLAIM TERMS SHOULD BE FOUND INDEFINITE ONLY WHEN THE SPECIFICATION REVEALS A TOTAL ABSENCE OF CORRESPONDING STRUCTURE.................................................................................4

     B.    THE '631 PATENT DISCLOSES CORRESPONDING ALGORITHMIC STRUCTURE IN COMPLIANCE WITH *WMS GAMING*. ....................................................5

          1.    The Corresponding Structures Affirmed by the Court in *WMS Gaming* Included a Four-Step Algorithm Deduced From a Figure, and a One-Step Algorithm Deduced From the Specification's Text. ........................................................................................5

          2.    The Algorithms Corresponding to the Functions at Issue, Like Those in *WMS Gaming*, Are Disclosed Textually and Graphically in the '631 Patent. ...............................................................6

IV.   CONCLUSION............................................................................................... 9

i

**TABLE OF AUTHORITIES**

**CASES**

*Atmel Corp. v. Information Storage Devices, Inc.*,
 198 F.3d 1374 (Fed. Cir. 1999)..............................................................................2, 4, 5, 7

*Computer Acceleration Corp. v. Microsoft Corp.*, No. 9:06-CV-140-RC,
 2007 U.S. Dist. LEXIS 33648 (E.D. Tex. May 7, 2007)........................................................5

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005) ..............................4

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
 412 F.3d 1291 (Fed. Cir. 2005)...............................................................................................4

*Exxon Research and Eng'ing Co. v. United States*,
 265 F.3d 1371 (Fed. Cir. 2001)...............................................................................................4

*Gobeli Research, Ltd. v. Apple Computer Inc.*,
 384 F. Supp. 2d 1016 (E.D. Tex. 2005)...................................................................................4

*Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241 (Fed. Cir. 2005)...................................................6

*Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331 (Fed. Cir. 2003) .............................................4

*Personalized Media Comm'ns, L.L.C. v. Int'l Trade Commission*,
 161 F.3d 696 (Fed. Cir. 1998)..................................................................................................4

*WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999)...........................*passim*

Plaintiff Rembrandt Technologies, LP ("Rembrandt") files this supplemental claim-construction brief in response to the Court's invitation of June 5, 2007.  [Dkt. No. 177].

## I.    INTRODUCTION

Under *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999), "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."  The Court requested briefing on the disclosed algorithms corresponding to two such microprocessor-performed functions claimed in the '631 patent: 1) "presetting link layer parameters based on the negotiated physical layer modulation," and 2) "establishing the link layer connection based upon the negotiated physical layer modulation."  [*See* Dkt. No. 177 at 18; '631 patent claims 6 and 9].

These are simple functions, executed by simple algorithms—reflecting the fact that, as the Court explained in its *Markman* Order, the invention disclosed in the '631 patent reduces complexity by <u>eliminating the algorithmic steps</u> associated with the error-correction negotiations of the prior art.  [*See* Dkt. No. 177 at 2].  That is, rather than establishing the link layer connection using error-correction parameters that are negotiated during an additional and independent step, the patent teaches establishing that second-layer connection using pre-selected error-correction parameters already associated with the particular physical layer protocol that has just been negotiated.  In other words, for the respective functions described above, the microprocessor is programmed to:   1) associate default error-correction parameters with particular physical layer protocols; and, after the physical layer protocol has been negotiated, 2) use the default parameters associated with the negotiated protocol to establish the link layer connection "substantially instantaneously upon the completion of the physical layer negotiation." [*See* '631 patent at 11:39-46, 12:59-61].

These simple algorithmic steps—associate default values with particular physical layer

1

protocols, and then use the default values associated with the protocol that has been selected—are fully described in the '631 patent's specification.  [*See id.* at 11:39-46, 12:59-61, 13:34-40; *see also id.* at Fig. 8].  They are thus entirely appropriate structure for the terms at issue under *WMS Gaming*.  *See* 184 F.3d at 1349.  Additionally, because means-plus-function terms should be invalidated on indefiniteness grounds only "when there is a total omission of structure," and because even Defendants' expert has acknowledged that the patent discloses corresponding structure for these terms, it would be error for the Court to find either of them invalid for indefiniteness.  *See Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1382-83 (Fed. Cir. 1999).

## II.    BACKGROUND

Comcast Corporation, with its related Defendants in this suit (collectively, "Comcast"), had no trouble finding corresponding structure for these two means-plus-function terms in the joint claim construction statement filed with the Court in November of 2006.  [Dkt. No. 112-2].  Far from asserting that the patent described no structure, Comcast proposed then that the algorithmic structure corresponding to the claimed functions was disclosed in two figures and fifty-seven lines of the patent's specification.  [*Id.* at 19-21].  Comcast also pointed to the "[e]xpert opinion of Dr. Harry Bims regarding what one of ordinary skill in the art would understand to be the structures disclosed in the patent specification corresponding to the means-plus-function claim term[s]."  [*Id.*].

In his deposition in December of 2006, Dr. Bims did not opine that these terms were indefinite, nor did he suggest that there was any absence of corresponding structure disclosed in the specification.  To the contrary, Dr. Bims testified that—in its proposed two figures and fifty-seven lines of the patent's specification—Comcast had identified <u>more</u> structure than was necessary to perform the relevant functions.

> Q:    Do you or do you not agree with the identification of structure that is contained on page A-15 of the joint claim construction statement under the Comcast column?

2

> A: I do believe the structures that actually perform the function are contained within what's identified.
> Q: So there's more identified by Comcast than is actually necessary to perform the function; is that correct?
> A: Yes. . . . The structures, like I say, that actually perform the function are a subset of what's listed there.

[Dkt. No. 132-3, H. Bims depo. at 242:18-243:13; *see also id.* at 214:7-13].[1]

Comcast first made an indefiniteness argument in its responsive claim-construction brief filed in January of 2007, in which it asserted that the two terms at issue lack corresponding structure in the form of "properly disclosed algorithms." [Dkt. No. 121]. Dr. Bims' declaration, filed with Comcast's responsive brief, also reflected Defendants' new change in strategy. [*See* Dkt. No. 122-1]. While in December of 2006 Dr. Bims had been quite sure that the patent disclosed <u>more</u> structure than necessary to perform the claimed functions, one month later his declaration suggested that the specification's structural disclosures were perhaps insufficient. [*See id.* at 9-11]. Dr. Bims still could not bring himself to declare, however, that the patent disclosed <u>no</u> corresponding algorithms—he conceded that, at the very least, the "structure disclosed to perform th[ese] function[s] is the control processor shown in Figure 9 running an algorithm that 'preset[s] the XID phase parameters to default values that are based upon the negotiated physical layer connection,' as described generally at column 12, lines 59-61." [Dkt. No. 122-1 at 10]. In other words, Dr. Bims could not deny that the patent teaches at least the first algorithm described above.[2]

---

[1] This testimony, it should be noted, is entirely consonant with the straightforward nature of the functions at issue, and with the correspondingly simple algorithms necessary to execute those functions. The specific function to which Dr. Bims was referring was the second, "establishing" function, within which the first, "presetting" function is effectively subsumed.

[2] The algorithm for the second means element—"establishing the link layer…"—is but a trivial operation given that once the "physical layer modulation" is selected, the error correcting protocol preset for that physical layer modulation is merely <u>used</u> as disclosed by the specification.

## III.   ARGUMENT

### A.   MEANS-PLUS-FUNCTION CLAIM TERMS SHOULD BE FOUND INDEFINITE ONLY WHEN THE SPECIFICATION REVEALS A TOTAL ABSENCE OF CORRESPONDING STRUCTURE.

Courts must strive to avoid finding claim terms indefinite.  *See Exxon Research and Eng'ing Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  In order to "accord respect to the statutory presumption of patent validity," and to "protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal," claim terms should not be found indefinite unless and until claim construction efforts "prove futile."  *Id.*  Any "close questions of indefiniteness" are "properly resolved in favor of the patentee."  *Id.* at 1380.

The definiteness requirement is intended merely "to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).  There is no requirement of "absolute clarity."  *Id.*  There is no requirement of "mathematical precision."  *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331 (Fed. Cir. 2003).  As long as the terms are "subject to construction," *id.*—as long as they "can be given any reasonable meaning" which will "reasonably apprise" the public of the invention's scope, *see Datamize*, 417 F.3d at 1347; *Personalized Media Comm'ns, L.L.C. v. Int'l Trade Commission*, 161 F.3d 696, 705 (Fed. Cir. 1998)—those terms are not indefinite.  None of these infirmaties are applicable to this specification.

In the particular context of means-plus-function terms, courts should typically find indefiniteness only when the specification reveals "<u>a total omission of structure</u>."  *Atmel*, 198 F.3d at 1382 (emphasis added); *see also Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) (approving a finding of indefiniteness if there is a "<u>total absence of structure</u> from the specification") (emphasis added); *Gobeli Research, Ltd. v. Apple Computer Inc.*, 384 F. Supp. 2d 1016, 1023 (E.D. Tex. 2005) ("The Court is constrained to conclude that there is <u>no description in the specification of any algorithm</u> that performs either

function.") (emphasis added).  In deciding whether a patent's specification suffers from such a total omission of corresponding structure, courts must be guided by "the understanding of one skilled in the art."  *Atmel*, 198 F.3d at 1378; *see id.* at 1383 ("[T]he district court erred by failing to consider the knowledge of one skilled in the art that indicated, based on unrefuted testimony, that the specification disclosed sufficient structure corresponding to the [means-plus-function] limitation.").

### B.      THE '631 PATENT DISCLOSES CORRESPONDING ALGORITHMIC STRUCTURE IN COMPLIANCE WITH *WMS GAMING*.

#### 1.      The Corresponding Structures Affirmed by the Court in *WMS Gaming* Included a Four-Step Algorithm Deduced From a Figure, and a One-Step Algorithm Deduced From the Specification's Text.

Means-plus-function claim terms in which the function is implemented by a computer must be supported, under *WMS Gaming*, by some disclosure in the specification of a corresponding "algorithm" by which the computer can execute the claimed function.  *See* 184 F.3d at 1349.  Care must be taken, however, to avoid reading too much into the term "algorithm."  For "[t]his does not mean that the patentee must disclose specific source code for the computer.  The term 'algorithm' is not limited to a formula of mathematical symbols.  For example, the steps, formula, or procedures to be performed by the computer might be expressed textually, or shown in a flow chart."  *Computer Acceleration Corp. v. Microsoft Corp.*, No. 9:06-CV-140-RC, 2007 U.S. Dist. LEXIS 33648, at *29 (E.D. Tex. May 7, 2007).  In fact, any disclosure of the relevant steps, in any format, will suffice so long as "one of ordinary skill in the art can determine the limitations on what is claimed."  *Id.*

The panel's opinion in *WMS Gaming* is instructive:  addressing one microprocessor-performed function, the court noted that "[t]he written description of the [patent-in-suit] is almost completely devoid of any structure to support this limitation of the claim."  184 F.3d at 1348. Rather than find the term invalid for indefiniteness, however, the panel looked to a figure in the patent with a picture that resembled a dart board, and determined that it could deduce the

relevant four-step "algorithm" for executing the claimed function from that picture.  *See id.* at 1349.[3]  Addressing a second claimed microprocessor-performed function, the panel approved as corresponding structure a simple, one-step algorithm deduced from the specification's text:  "a microprocessor programmed to perform random number generation."  *Id.  WMS Gaming* thus demonstrates that the relevant algorithm can be deduced from a picture; it can be deduced from descriptions in the specification; it can consist of multiple steps; or it can consist of a simple, single step.

The second Federal Circuit case cited by Comcast, [*see* Dkt. No. 121 at 30]; *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241 (Fed. Cir. 2005), reinforces these points.  After looking to diagrams in the patent-in-suit as well as to related textual descriptions in the patent's specification, the court in *Harris* determined "that the corresponding structure for the 'time domain processing means' is a microprocessor programmed to carry out a two-step algorithm." *Id.* at 1254.  The court construed this two-step algorithm in plain-language terms:  "the processor calculates generally nondiscrete estimates and then selects the discrete value closest to each estimate."  *Id.*  As described below, the one-step algorithms corresponding to the functions at issue here can likewise be construed in straightforward, plain-language terms.

2.    **The Algorithms Corresponding to the Functions at Issue, Like Those in *WMS Gaming*, Are Disclosed Textually and Graphically in the '631 Patent.**

Like those in *WMS Gaming* and *Harris*, the algorithmic structures corresponding to the microprocessor-performed functions at issue here are expressed textually and graphically in the '631 patent.

---

[3] The diagram the Federal Circuit looked to in *WMS Gaming* was neither more nor less "functional" than the connect sequence depicted graphically in Figure 8 of the '631 patent.  Indeed, contrary to Comcast's contention, [*see* Dkt. No. 121 at 30], a "purely functional diagram" is—by definition—algorithmic in nature.  *See, e.g., Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) (noting that, in *WMS Gaming*, "[t]he specification's algorithm resembled the functional language" of the means-plus-function claim term).

a.    **"presetting link layer parameters based on the negotiated physical layer modulation"**

The structure corresponding to "presetting link layer parameters based on the negotiated physical layer modulation," [*see* Dkt. No. 177 at 18; '631 patent claim 9], is *a microprocessor programmed to "preset[] the XID phase parameters to default values that are based upon the negotiated physical layer connection."* ['631 patent at 12:59-61]. The fact that experts for both Rembrandt and Comcast have recognized this disclosed algorithm as corresponding structure for this means-plus-function element, [*see* Dkt. Nos. 119-3 at 6, 122-1 at 10], should in itself be more than sufficient to preclude a finding of invalidity for indefiniteness on this claim term. *See Atmel*, 198 F.3d at 1383.[4]

Should the Court wish to express the same algorithm in more plain-language terms, the microprocessor is programmed, as described in the introduction, to <u>associate default error-correction parameters with particular physical layer protocols</u>. This simple, single-step procedure, involving storage of fixed values in the microprocessor's memory, is described in multiple places in the patent's specification. [*See, e.g.,* '631 patent at 3:10-13 ("This link layer connection includes parameters that are preset to default values based upon the negotiated physical layer connection."); *id.* at 12:55-61 ("The present invention achieves this [elimination of error-correction negotiation] by presetting the XID phase parameters to default values that are based upon the negotiated physical layer connection."); *id.* at 13:37-40 ("Thus, by establishing

---

[4] Dr. Bims did suggest, in his January 2007 declaration, that he might like to see additional structure appended to this term. [*See* Dkt. No. 122-1 at 10, 11]. He noted that, while in his judgment the above-quoted algorithm constituted corresponding structure for each of the means-plus-function terms at issue, the patent does not additionally "disclose any specific algorithm or other structure that shows how the control processor accomplishes the presetting of these parameters based on the negotiated physical layer modulation." [*Id.*]. This comment, however, is a red herring. The loading of a preset value into a memory location (the value for the error correcting protocol in the XID phase parameters) is so fundamental an operation of a microprocessor that <u>nothing</u> further is required for one of ordinary skill in the art to know what steps are necessary to make the microprocessor perform such an operation. [*See, e.g.,* '631 patent 13:12-17 ("It should be noted, however, that one ordinary skill in the art would recognize that these default values are merely illustrative settings and that different default values can be used. Moreover, each different type of connect sequence would preferably have its own set of default values.")]. Indeed, eliminating the need for algorithms to calculate the error-correction parameters is at the heart of the invention disclosed in the '631 patent.

the error-correction parameters to default values in accordance with the type of physical error-connection determined by the automode sequence 40, a faster and more reliable connection is established.")].  The requirements of *WMS Gaming* are satisfied by this repeated disclosure of corresponding algorithmic structure.  *See* 184 F.3d at 1349.

> **b.**    **"establishing the link layer connection based upon the negotiated physical layer modulation"**

The structure corresponding to "establishing the link layer connection based upon the negotiated physical layer modulation," [*see* Dkt. No. 177 at 18; '631 patent claim 6], is *a microprocessor running an algorithm in which the second, "link layer connection is established substantially instantaneously upon the completion of the physical layer connection" by using the default error-correction parameters associated with the just-negotiated physical layer protocol.* ['631 patent at 11:39-46; *see also* Dkt. No. 119-3 at 6].

As with the "presetting" function, the specification describes this straightforward algorithm by which the "establishing" function is performed in multiple places.  [*See, e.g.,* '631 patent at 3:9-15 ("Another step includes establishing a link layer connection based upon the negotiated physical layer modulation.  This link layer connection includes parameters that are preset to default values based upon the negotiated physical layer connection.  Thus, the modems are able to avoid the link layer negotiation that essentially all other modems perform . . . ."); *id.* at 11:39-46 ("In contrast, the present invention establishes the link layer connection based upon the modulation chosen in the physical layer connection during the automatic mode synchronization sequence 40 (Fig. 2).  Thus, the steps for establishing an error-correcting protocol are eliminated and the link layer connection is established substantially instantaneously upon the completion of the physical layer connection."); *id.* at 12:55-65 ("Accordingly, the present invention enables an error-corrected connection without having to perform the steps described above . . . . The present invention achieves this by presetting the XID parameters to default values that are based upon the negotiated physical layer connection.  Therefore, when

two multi-mode modems negotiate a physical layer connection, the link layer connection can be immediately established based upon the negotiated physical layer modulation."); *see also id.* at 13:34-41].

This detailed, repeated disclosure of the corresponding algorithmic structure—<u>a program designed to use pre-selected error-correction parameters, rather than contemporaneously negotiated ones, to make the second layer connection</u>—is more than sufficient under *WMS Gaming*. *See* 184 F.3d at 1349. But the patent goes further: it also provides a graphic depiction of the relevant "connect sequence 104 shown in Figure 8, which omits the error correction negotiation step 44 shown in the connect sequence 102." [Dkt. No. 119-3 at 6; *see also* '631 patent at Fig. 8].

Thus, a prospective programmer viewing Figure 8 would understand that software written to perform the claimed function would establish the link layer connection substantially instantaneously upon the completion of the physical layer connection—without an error-correction negotiation. And to fully appreciate the simple algorithmic step that, under the invention, would replace the more complex and time-consuming negotiation procedure, that programmer would need only turn to the specification's description of Figure 8. There the programmer would learn, again, that the relevant software should be designed to use pre-selected error-correction parameters, rather than contemporaneously negotiated ones, to make the second layer connection. [*See* '631 patent at 13:34-41 ("In comparison, the connect sequence 104 in accordance with the present invention is able to establish a connection in essentially half the time by eliminating the error-correction negotiation 44. Thus, by establishing the error-correction parameters to default values in accordance with the type of physical error-connection determined by the automode sequence 40, a faster and more reliable connection is established.").].

## IV. CONCLUSION

The claimed microprocessor-performed functions at issue, as well as the corresponding algorithms by which they are executed, are simple: each involve a single step. But that does not

make them invalid under *WMS Gaming*—the Federal Circuit affirmed a similarly simple algorithm as proper corresponding structure in that very case. *See* 184 F.3d at 1349. Both steps are fully disclosed in the specification of the '631 patent, and experts on both sides were able to discern corresponding structure for these terms in the patent. For these reasons, Rembrandt respectfully requests that the Court adopt Rembrandt's proposed constructions for these means-plus-function terms, and reject Comcast's suggestion that these terms should be invalidated as indefinite for lack of any disclosed corresponding structure.

Dated: June 15, 2007     Respectfully submitted,


         /s/ Sam Baxter_____
         Sam Baxter
         State Bar No. 01938000
         **McKOOL SMITH P.C.**
         505 E. Travis, Suite 105
         Marshall, Texas  75670
         Telephone:  (903) 927-2111
         Telecopier:  (903) 927-2622
         sbaxter@mckoolsmith.com

         Jeffrey A. Carter
         State Bar No. 03919400
         **McKOOL SMITH P.C.**
         300 Crescent Court, Suite 1500
         Dallas, Texas  75201
         Telephone:  (214) 978-4006
         Telecopier:  (214) 978-4044
         jcarter@mckoolsmith.com

         Travis Gordon White
         State Bar No. 21333000
         **McKOOL SMITH P.C.**
         300 W. 6th Street, Suite 1700
         Austin, Texas  78701
         Telephone:  (512) 692-8700
         Telecopier:  (512) 692-8744
         gwhite@mckoolsmith.com

         Robert M. Parker
         State Bar No. 15498000
         Robert Christopher Bunt
         State Bar No. 00787165
         **PARKER & BUNT, P.C.**
         100 E. Ferguson, Suite 1114
         Tyler, Texas  75702
         Telephone:  (903) 531-3535
         Telecopier:  (903) 533-9687
         cbunt@cox-internet.com
         rmparker@cox-internet.com

Otis Carroll
State Bar No. 03895700
Wesley Hill
State Bar No. 24032294
**IRELAND, CARROLL & KELLEY, P.C.**
6101 S. Broadway, Suite 500
Tyler, Texas  75703
Telephone:  (903) 561-160
Telecopier:  (903) 581-1071
fedserv@icklaw.com

Andrew W. Spangler
Elizabeth L. DeRieux
**BROWN MCCARROLL, LLP**
1127 Judson Road, Suite 220
P. O. Box 3999
Longview, TX  75606-3999
Telephone:  (903) 236-9800
Telecopier:  (903) 236-8787
aspangler@mailbmc.com
ederieux@mailbmc.com

Franklin Jones, Jr.
State Bar No. 00000055
**JONES & JONES, INC.**
201 W. Houston St.
P. O. Drawer 149
Marshall, TX  75670
Telephone:  (903) 938-4395
Telecopier:  (903) 938-3360
maizieh@millerfirm.com

**ATTORNEYS FOR PLAINTIFF
REMBRANDT TECHNOLOGIES, LP**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a), contemporaneously served upon all counsel who have consented to electronic service and served by first class mail on other counsel on this the 15th day of June, 2007.

    /s/ Sam Baxter          

Sam Baxter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

REMBRANDT TECHNOLOGIES, LP,

                                    Plaintiff,

v.

COMCAST CORPORATION; COMCAST
CABLE COMMUNICATIONS; LLC; and
COMCAST OF PLANO, LP,

                                    Defendants.

Case No. 2:05-cv-443-TJW-CE

Jury Demand

### COMCAST'S OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM OPINION AND ORDER REGARDING CLAIM CONSTRUCTION AND MOTION FOR RECONSIDERATION OF SAME

Pursuant to 28 U.S.C. § 636(b)(1), Federal Rules of Civil Procedure 5, 6, and 72, and Rule 4 of Appendix B of the Court's Local Rules, Defendants Comcast Corporation; Comcast Cable Communications, LLC; and Comcast Of Plano, LP (collectively "Comcast"), submit the following objections to, and request reconsideration of, the claim constructions recommended by the Magistrate Judge ("Magistrate") in the Memorandum Opinion and Order dated June 5, 2007, Dkt. No. 177, ("Order"). By these objections, Comcast also seeks to preserve any and all rights on appeal.

### I.    INTRODUCTION

On June 18, 2007, the Judicial Panel on Multidistrict Litigation ("MDL Panel") ordered this case consolidated with fourteen related actions and transferred to the District of Delaware pursuant to 28 U.S.C. § 1407. *See* Transfer Order dated June 18, 2007, Dkt. No. 1848 ("MDL Pane's Order"). The MDL Panel found that centralization was "necessary in order to … prevent inconsistent pretrial rulings" on various matters expressly including claim construction. MDL Panel Order at 2. Therefore, the disputed terms of the asserted patents should properly be construed only as part of the multidistrict litigation in a process that includes all defendants in the

fifteen consolidated actions. At this stage, a review of the Magistrate's Order in this action separate from the consolidated actions would contravene the MDL Panel's order and frustrate the underlying purposes of avoiding inconsistent pretrial rulings and preventing the waste of judicial and party resources through duplicated proceedings. MDL Panel Order at 2. Consequently, because the MDL Order has been transmitted to the District of Delaware and is likely to take effect as early as tomorrow, Comcast respectfully suggests that the Court should stay any further proceedings in this action, including review of these objections, to allow for coordinated proceedings before Judge Sleet.

However, because Comcast believes that the MDL Panel Order has not yet been formally filed in the office of the clerk of the District of Delaware, Comcast submits the following objections out of an abundance of caution and to avoid any possible argument that it has waived any of its rights. As detailed below, Comcast objects that certain constructions of the disputed claims of U.S. Patent Nos. 5,719,858 ("the '858 patent"), 4,937,819 ("the '819 patent"), 5,852,631 ("the '631 patent"), and 5,243,627 ("the '627 patent") are contrary to governing law, rely on conclusions that are not supported by the patent specifications, and contain erroneous factual determinations.

## II.  LEGAL STANDARDS

The Magistrate's Order is subject to this Court's *de novo* review. "[T]he interpretation and construction of patent claims . . . is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc). Because it is a matter of law, "the construction given the claims is reviewed *de novo* on appeal" to the Federal Circuit. *Id.* at 979. For the same reason, a magistrate judge's claim construction ruling is subject to *de novo* review by the district court. *See ADE Corp. v. KLA-Tencor Corp.*, 288 F. Supp. 2d 590, 592-93 (D. Del. 2003).

*De novo* review is required whether claim construction is considered a dispositive or a nondispositive matter under Federal Rule of Civil Procedure 72. Dispositive matters, including but not limited to those expressly listed in 28 U.S.C. § 636(b)(1)(A), receive *de novo* review.

Fed. R. Civ. P. 72(b); *Vogel v. U.S. Office Prods. Co.*, 258 F.3d 509, 515 (6th Cir. 2001) ("The list of dispositive motions contained in § 636(b)(1)(A) is nonexhaustive, and unlisted motions that are functionally equivalent to those listed in § 636(b)(1)(A) are also dispositive."); *Calderon v. Waco Lighthouse for the Blind*, 630 F.2d 352, 355 (5th Cir. 1980) (finding nonconsensual referral to magistrate for civil trial was a dispositive matter). Because claim construction often effectively disposes of certain claims or defenses in patent litigation, it is properly considered dispositive under Rule 72(b). *See* Fed. R. Civ. P. 72(b); *ADE Corp.*, 288 F. Supp. 2d at 592-93; *EpicRealm, Licensing, LLC v. Autoflex Leasing, Inc.*, Nos. 2:05CV163 & 2:05CV356, 2006 WL 3099603, *1 (E.D. Tex. Oct. 30, 2006). Even on nondispositive matters, however, a magistrate's ruling must be modified or set aside to the extent that it is "contrary to law." Fed. R. Civ. P. 72(a). Although factual determinations involved in nondispositive matters are reviewed only for clear error, *id.*, purely legal issues like patent claim construction thus receive essentially *de novo* review, for legal error, regardless of whether a matter is considered dispositive or nondispositive. *See ADE Corp.*, 288 F. Supp. 2d at 592-93.

### III.    OBJECTIONS

#### A.    General Objections to the  proposed constructions.

Comcast respectfully submits that many of the Magistrate's proposed constructions are contrary to settled law governing claim construction.[1] For example, a claim cannot be construed such that it reads out a limitation entirely. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006). But that is the result of the Magistrate's constructions of certain terms of the '858, '819, and '627 patents. *See, e.g.*, *infra*, Objections 2, 5, 11. Similarly, the Magistrate applied inconsistently the Federal Circuit's direction that a patentee's own express definition of a claim term is generally controlling. *See Phillips v. AWH Corp.*, 451 F.3d 1303, 1316 (Fed. Cir. 2005). For certain claims, such as "link layer" in the '631 patent, the Magistrate declined to apply the patentee's express definition, while for others, the Magistrate invoked this rule to give

---

[1] The examples given in this section are provided solely for the Court's convenience and do not limit the global applicability of these objections to all patents and disputed claim terms.

effect to an example in the patent that was not an express definition, such as with "packet data" in the '858 patent. Moreover, claims need to be read in light of the specification of which they are a part. *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004). Yet on a number of occasions, the Magistrate failed to consider how the terms were used in the context of the specification as a whole in construing the claims. *See, e.g.*, *infra*, Objections 1, 6-7, 10-13.

Comcast requests the Court to adopt all of Comcast's proposed constructions, for all of the reasons set forth herein and in Comcast's January 10, 2007 Responsive Claim Construction Brief, Dkt. No. 125 ("C.R.B."), which is incorporated by reference herein.[2]  Comcast also submits that the Magistrate's summary description of each of the patents-in-suit in the Order's "Background of the Technology" section and elsewhere is inaccurate and contrary to the patents' express disclosures and the understanding of one of ordinary skill in the art. Comcast generally objects to these descriptions and requests that the Court adopt instead Comcast's description of the patents, as set forth in Comcast's Responsive Claim Construction Brief. Without waiving any arguments included in its Responsive Claim Construction Brief, Comcast reviews below its specific objections, organized by asserted patent.

**B.    Objections to the Magistrate's constructions of claim terms in the '858 patent.**

**1.    Objection No. 1**: "**packet data**" **and** "**synchronous data**"

The Magistrate declined to construe these terms according to their ordinary meaning and mistook a specific sentence in the patent as though the inventor was acting as his own lexicographer. The Magistrate construed "packet data" to mean variable bit rate data, and "synchronous data" to mean constant bit rate data. There is no dispute that synchronous data is constant bit rate—both parties agree that it is—but being constant bit rate alone does not

---

[2] Comcast has specifically focused on certain claim terms and phrases addressed below. With respect to other claim terms and phrases as to which the Order differs from Comcast's proposed claim constructions, Comcast does not waive its objections. Rather, Comcast objects to those constructions for the reasons set forth in its Responsive Claim Construction Brief, and specifically reserves the right to challenge their propriety in later proceedings, including any appeals. Accordingly, Comcast specifically and expressly incorporates by reference its prior briefing submitted in the claim construction process.

sufficiently define synchronous data.  Likewise, being variable bit rate alone does not sufficiently define packet data.

The Magistrate's construction is fundamentally flawed because, as Rembrandt concedes, both variable bit rate and constant bit rate data can be transmitted in packets.  *See* Rembrandt Opening Brief, Dkt. No. 119 ("R.O.B."), at 6.  Indeed, the '858 patent itself refers to packets called ATM (*A*synchronous Transfer Mode) cells, which, Rembrandt admits, can transmit constant bit rate (telephone) data.  *See* '858 at 11:18-36.[3]  Therefore, although "constant bit rate" may be a necessary feature of "synchronous data," it is not sufficient to distinguish synchronous data from "packet data," a distinction emphasized repeatedly and consistently throughout the patent.  *See, e.g.*, *id.* at 1:23 ("asynchronous nature of packet data").

The Magistrate based his construction on one sentence in the Background section of the patent specification:  "The present invention relates to … communication systems that … may transport both synchronous and variable-bit-rate data such as ***frame relay*** (hereafter referred to as ***packet data***)."  *Id.* at 1:9-10 (emphases added).  While this sentence differentiates synchronous from variable bit rate data, it neither equates synchronous with constant bit rate data, nor limits "packet" to "variable bit rate" data.  Instead, in this sentence packet data (in the parenthetical) is being equated with "frame relay" data, subsequently confirmed by the patent's use of the words "frame relay" and "packet" in consecutive sentences to describe data that is distinct from synchronous data.  *See id.* at 3:40-43.  Read properly, the above-quoted sentence shows that, in addition to differentiating synchronous from variable bit rate data, the '858 patent contemplates frame relay as an ***example*** of variable bit rate data ("variable-bit-rate data such as frame relay") and uses the term "packet data" to encompass "frame relay" ("frame relay (hereinafter referred to as packet data)").  The Magistrate misinterpreted this sentence as defining packet data to mean variable bit rate data (and correspondingly defining synchronous data to mean simply constant bit rate data).

It is not debatable that packet data refers to data transmitted in packets.  And as explained

---

[3] The '858 patent is attached as Exhibit 1 to Comcast's Responsive Claim Construction Brief.

above, "constant bit rate" is a necessary but insufficient condition of synchronous data. Synchronous data is also different from packet data. Thus, synchronous data is properly defined as non-packetized, constant bit rate data. The attributes of being variable bit rate and constant bit rate data alone do not sufficiently define packet and synchronous data respectively. Therefore, for all the foregoing reasons, and for all the reasons stated in Comcast's Responsive Claim Construction Brief, the Court should adopt Comcast's proposed construction of this term.

> 2. **Objection No. 2**: "**distributed packet manager**"

The Magistrate construed "distributed packet manager" to mean "a device, process or algorithm located within each packet data source, that controls how the packet data source accesses the time-division multiplexed bus." The Magistrate erred because his construction of distributed packet manager is overbroad and could be read to not requiring that packet management has been "distributed" in the claimed invention—*i.e.*, "divided among several or many" packet sources. *See, e.g.*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993). Indeed the current construction may be read to apply even to instrumentalities that rely on a *central* packet manager to allocate access among the packet sources to the packet portion of the bandwidth, even though the '858 invention is predicated on eliminating the central manager. *See* '858 at 2:46-48 (Summary of the Invention: "As a result, no central packet manager is required to aggregate the packet data."), 3:4-6 ("This invention provides the following advantages: no central packet manager is required to synchronize packet data to the TDM bus ….").

The Magistrate's construction might be interpreted even to include the prior art described in the '858 patent itself, so long as something ("device, process or algorithm") that resides in each packet source could be characterized as "control[ling] how the packet data source accesses" the TDM bus. Indeed, Rembrandt may take the position that, pursuant to this construction, any interface component within a data source can be said to deal with controlling its access to the bus to which it is connected. Thus, the potential breadth of the Magistrate's construction would read the explicit requirement of a distributed packet manager out of the claims altogether. Therefore, for all the foregoing reasons, and for all the reasons stated in Comcast's Responsive Claim

Construction Brief, the Court should adopt Comcast's proposed construction of this term.

      **3.**    **Objection No. 3**: "**allocate access to the allotted bandwidth among said packet data sources**"

      This term describes the functional requirement of the distributed packet manager, and the Magistrate construed it to mean "allocate access to the second portion of the predefined bandwidth among said packet data sources." Comcast objects to this construction because the Magistrate simply re-adopted the term "allocate access" without explaining its meaning. The Magistrate's construction only makes explicit that the "allotted bandwidth among said packet data sources" refers to the second portion of the predefined bandwidth, without construing what "allocate access" means. The patent makes plain that the distributed packet manager allocates access by allowing only one packet source to gain "sole access" to the MAPC at a time. *Id.* at 6:53-7:8. Therefore, for all the foregoing reasons, and for all the reasons stated in Comcast's Responsive Claim Construction Brief, the Court should adopt Comcast's proposed construction of this term.

      **4.**    **Objection No. 4: "network access manager / module"**

      For purposes of "network access manager/module," and unlike the approach adopted for other disputed terms, the Magistrate incorporated features discussed in the Detailed Description within his claim construction. In doing so, the Magistrate improperly imported limitations from the Detailed Description into the term. First, the Magistrate imported the functional requirement of "control[ling] time-slot allocation among the synchronous modules and the packet modules" into the network access manager. This functional requirement is unwarranted and indeed found nowhere except in the excerpt cited by the Magistrate that discusses a specific embodiment of the invention ('858 at 5:12-13, referring to NAM 205 in Figure 3). *See Transmatic, Inc. v. Gulton Indus.*, 53 F.3d 1270, 1278 (Fed. Cir. 1995) (district court erred by importing functional limitation not recited in the claim). Moreover, the Magistrate imported the further functional requirement of "passing data between the bus and a network" into the network access manager. This further limitation is also improper because it is specifically recited by language elsewhere in

the same claim (claim 8: "for communicating the synchronous data and the packet data to at least one network facility"). *See Bicon*, 441 F.3d at 950 (rejecting interpretation that would render superfluous claimed "frusto-spherical basal surface portion" of an abutment in a dental implant); *Phillips*, 415 F.3d at 1314 (explaining that "steel baffles" in claim term "strongly implies that the term 'baffles' does not inherently mean objects made of steel.").

**C.    Objections to the Magistrate's constructions of claim terms in the '819 patent.**

    **1.    Objection No. 5: "time slot assigned to each of said application programs"**

The Magistrate erroneously reasons that, because remote units are able to "request additional time slots during data transmission," Order at 12, those time slots cannot have been assigned at initialization. That does not follow. The fact that *additional* time slots can be requested during data transmission instead demonstrates that absent such a request for more time slots, the time slots will remain assigned to the application programs to which they were assigned at initialization. To be sure, and as the parties agree, requests to change those initial assignments can and will be honored under appropriate circumstances, but that does not mean that the assignments do not originally take place during initialization—indeed, the Magistrate recognized on page 12 of the Order that the patent "refers to the assignment of time slots during initialization." *See also* '819 patent at 4:58-61 ("[A]n application has a preassigned time period (or slot) within a subframe to transmit from the remote unit to the master unit, with the possibility of a reservation request for longer messages.").[4] The intrinsic evidence of dependent claim 2 of the '819 patent reflects this distinction as well: it notes that remote units will activate a reservation request bit in order to "request[] an additional time interval inbound to said master unit." The time, if any, that is granted as a result of the request is "additional time," not time that had originally been assigned to the requestor.

Rembrandt's interpretation of this claim language, which the Magistrate's construction does not foreclose, appears to be that so long as an application program transmits in some time period of its choosing and the master unit knows which application program is transmitting

---

[4] The '819 patent is attached as Exhibit 10 to Comcast's Responsive Claim Construction Brief.

during that time, that is sufficient to constitute transmission in the "assigned" time slot. That interpretation effectively reads out of the claim the limitation of having application programs assigned to transmit in certain time slots, a result that the Federal Circuit has deemed impermissible. *See, e.g.*, *Bicon*, 441 F.3d at 950-51. The Court should therefore make clear that the required assignment of time slots to application programs occurs upon initialization in the '819 patent.[5]

### 2.    Objection No. 6: "ranging means"

The Magistrate correctly determined that this claim element should be interpreted under section 112, ¶ 6. However, in defining the function as calculating and transmitting "the time it takes to transmit between the master and that remote unit," the Magistrate failed to give weight to the express disclosure in the patent that the time that is to be transmitted from the master unit to the remote unit is the roundtrip transmission time between the master and remote. *See* '819 patent at 6:33-36; *see also* '819 patent at 3:44-45. Making the claim construction consonant with the specification is reason enough to modify the Magistrate's claim construction. However, there is a separate and independent reason that the Court should make clear that the patented function is performed through use of the roundtrip transmission time, not merely the time for a one-way journey. Under *WMS Gaming Inc. v. International Game Technology*, 184 F.3d 1339, 1349 (Fed. Cir. 1999), when a processor is the structure at issue in a means-plus-function claim (as it is here), the equivalent structure that an accused device must possess in order to infringe includes any algorithms implemented by the structure disclosed in the specification. Here, the only algorithm disclosed in the specification is one in which the ranging means calculates and transmits a roundtrip transmission time between the master and remote units. Therefore, for all the foregoing reasons, and for all the reasons stated in Comcast's Responsive Claim Construction Brief, the Court should adopt Comcast's proposed construction of this term.

---

[5] The Court should also give effect to the unambiguous declaration in the prosecution history that "the claimed invention is time division multiplexed without packet headers and delimiters" by construing the claims to instruct that the data transmitted in the invention is not packetized. C.R.B. Ex. 12 at REM 0056101

3.     **Objection No. 7: "priority bit"**

The Magistrate correctly observed that a priority bit is used to define the importance of a particular communication.  However, the Magistrate failed to tailor the claim construction to make clear that the importance of a particular communication is determined not by the communication itself, but rather based on the remote unit from which the communication originates.  *See* '819 patent at 7:2-3 ("The priority bit or bits define the remote's relative importance in reducing poll-response delays."); *id.* at 2:21-23 ("The master unit will then compare the priority of the requesting remote unit to the priority of subsequent units …").  The Court should modify the claim construction order to reflect the specification's explanation of what part of the overall system (the remote unit, not the particular application) controls priority.

4.     **Objection No. 8: "master network timing means"**

This claim phrase, which uses the word "means" and fails to recite any structure, should be construed under section 112, ¶ 6 as a means-plus-function claim.  Although the claim accordingly requires that corresponding structure (including an algorithmic structure) be associated with the function in the specification, the patent does not disclose the algorithm used to carry out the process of dividing the period of the clock.  If it were properly construed, therefore, the claim would be seen to be fatally defective.

5.     **Objection No. 9: "reservation request generator/processor"**

Comcast does not believe that these terms require construction.  However, the Court rejected Comcast's proposed constructions because they supposedly sought to limit these claim terms to preferred embodiments.  That is incorrect; Comcast's proposed definitions are true to the specification, and indeed serve to make clear for the jury the only manner disclosed in the specification for these components to operate.  Comcast's proposed definitions should be adopted.

D.     **Objections to the Magistrate's constructions of claim terms in the '631 patent.**

1.     **Objection No. 10:  "link layer"**

Contrary to controlling Federal Circuit authority, the Magistrate's proposed construction

of "link layer" adopts an extrinsic dictionary-based definition over the patentee's own express definition for this term.  *See Phillips,* 415 F.3d at 1316, 1319; *Good Sportsman Mktg., LLC v. Testa Assoc.*, LLC, 440 F. Supp. 2d 570, 575 (E.D. Tex. 2006).  The '631 patent expressly defines this term in the Background of the Invention section, stating:  "The data link layer is the second lowest layer of the OSI seven layer model and is provided to perform error checking functions *as well as retransmitting frames that are not received correctly.*"  '631 patent, at 1:49 (emphasis added).[6]    Furthermore, the '631 specification cites the International Telecommunications Union ("ITU") V.42 protocol as a representative example of a link layer protocol, and states that this standard is "[o]f particular relevance to the present invention."  '631 patent at 2:39-40; *see also id.*, at 6:61-63.  Consistent with Comcast's proposed construction, the error-correcting functions within the ITU V.42 protocol are limited to error checking and frame retransmission.  Declaration of Harry V. Bims ("Bims Decl."), ¶ 24.

Neither the V.42 protocol, nor any other reference in the patent specification, describes or discloses any other form of error correction at the link layer.  Indeed, Rembrandt's own counsel admitted at the Markman hearing that "the data link layer is going to deal with frames."  Markman Hearing Tr., at 34:21-24.  Therefore, for all the foregoing reasons, and for all the reasons stated in Comcast's Responsive Claim Construction Brief, the Court should adopt Comcast's proposed construction of this term.

**E.    Objections to the Magistrate's constructions of claim terms in the '627 patent.**

**1.    Objection No. 11:  "trellis encoded channel symbol"**

The fundamental dispute between the parties regarding this term is what defines the boundary between one trellis encoded channel symbol and the next.  This is essential to understanding the scope of the patent because the very essence of the '627 patent—as its title indicates—concerns interleaving the multiple "signal points" within a channel symbol.  Therefore, in order to determine whether the interleaving function is being performed, one must know which channel symbol particular signal points are a part of.  Instead of defining such

---

[6]  The '631 patent is attached as Exhibit 14 to Comcast's Responsive Claim Construction Brief.

boundaries, the Magistrate's construction actually dilutes the claim terms, and as such reads out limitations. *See Bicon*, 441 F.3d at 950-51; *see also Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention").

The most accurate way to demarcate one channel symbol from another is through the state transition of the trellis encoder. A particular channel symbol is a product of the "subset identifier(s)" from a trellis encoder and the "index values" with which they are paired. *See* '627 patent at 3:30-35, 3:63-68.[7] And the subset identifiers that define a trellis encoded channel symbol are the output(s) of a single state transition of a trellis encoder, as stated in Comcast's proposed construction. Comcast's position on this issue is fully briefed in Comcast's Responsive Claim Construction Brief and is respectfully re-urged. Neither the Magistrate's Order, nor Rembrandt's claim construction pleadings, cite *any* evidence that a single trellis encoded channel symbol—either in the described embodiment or in *any* trellis encoder described in the many extrinsic evidence citations in the record—can be the product of multiple state changes of the trellis encoder.

Nevertheless, while preserving its right to argue its original construction on appeal, Comcast believes that certain errors in the Magistrate's construction reflect a misunderstanding of the patent disclosure itself, and cannot survive scrutiny for several independent reasons.

First, the Court's reference to an "encoding system" without any reference to "trellis encoding" is manifestly erroneous. *See Bicon*, 441 F.3d at 950-51; *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005) (ruling that district court erred in construing claim limitation "preformed endless loop" in a manner that read out the requirement of being "preformed"). It is undisputed that the encoding system at issue is not any encoding system, but a ***trellis*** encoder. Each of the claims of the '627 patent require a *trellis* encoded channel symbol, and the specification makes clear that it is the subset identifiers generated by the *trellis* encoders that define a particular channel symbol. *See* '627 patent at 3:30-35, 3:63-68. Indeed,

---

[7] The '627 patent is attached as Exhibit 21 to Comcast's Responsive Claim Construction Brief.

Rembrandt's counsel admitted at the Markman hearing that it is a "trellis" encoder that generates the codes used to create trellis encoded channel symbols:

> And out of that *trellis encoding proces**s***, you generate – codes which are used ultimately by your 4D QAM, QAM encoder 324, to produce the sequence of trellis encoded channel symbols ….

Markman Hearing Tr., at 52:12-15; *see also* Order, at 19 ("plaintiff argues that a channel symbol is the output of the *trellis encoding process*" (emphasis added)).   Yet the Magistrate's construction fails to limit the term to a "trellis encoder."

It is also undisputed that it is not just any "group of bits" that are encoded to form a channel symbol, as the Magistrate's construction states, but as described in the specification, a group of ***parallel input bits into the trellis encoder***.   As the Magistrate notes in his Order, Rembrandt itself "argues that a channel symbol is the output of the trellis encoding process corresponding to *a group of input bits or 'parallel bits.*'"   Order, at 19 (emphasis added).   The Magistrate also expressly cites portions of the '627 specification explaining that the bits input into the trellis encoders are "parallel bits."   *See id.* (citing '627 at 2:61-65, 3:53-58).   In light of these findings, the Magistrate's construction cannot be adopted.

Finally, the Magistrate's construction reads out any limitation grounded on the term "symbol."   As the portions of the '627 specification cited by the Magistrate make clear, the "parallel bits" that are utilized by the trellis encoding system to generate a given trellis encoded channel symbol are supplied to the encoding system during a given time period, known as a "symbol interval":

> Serial-to-parallel converter 115, in turn, provides ***during each of a succession of symbol intervals*** (comprised of N baud intervals), some predetermined number of parallel bits on lead 109 and some number of parallel bits on lead 109….   The bits on lead 109 are applied to trellis encoder 119a and are referred to as 'trellis bits.'

'627 at 2:61-3:1 (emphasis added).   The '627 specification further explains that the operation of each trellis encoder is determined by a *symbol* clock:   "This distribution of trellis bits to the various trellis encoder stages is performed by switching circuit 331 *operating under the control of symbol clock* 325."   *Id.* at 5:10-12 (emphasis added).   Similarly, in the receiver, data is

distributed among the Viterbi decoders based upon symbol intervals defined by a symbol clock. *See id.* at 6:12-15.[8]  Thus, according to the specification, it is symbol intervals defined by a symbol clock that demarcate one trellis encoded channel symbol from another.  Not only has the Magistrate's Order failed to incorporate the construction based upon the state transition of the trellis encoder, which is the undisputed demarcation of symbol from another, it does not even incorporate any reference to a symbol clock or symbol interval.  For these additional reasons, it cannot be adopted by the Court.

### 2.    Objection No. 12: "signal point"

The Magistrate based his construction of "signal point" upon a portion of a single sentence in the specification stating that "signal points are thereupon communicated over the channel." Order, at 20 (quoting '627 patent, at 4:1-3).  However, when this language is read in context, it is apparent that it is not a "signal point" *per se* that is transmitted by a modulator, but rather a modulated waveform such as a "pass-band signal" representing the numeric bit values associated with a signal point.  The '627 specification explains a few lines before the language quoted by the Magistrate that "[t]he signal point generated on lead 125 … is passed on to modulator 128 *to generate a pass-band line signal which is applied to the communication channel*." '627 at 3:38-41 (emphasis added); *see also* C.R.B., Ex. 23 ('625 patent), at 58-68 (explaining that signal points are converted into "corresponding analog QAM signals" before transmission over the communication channel)[9]; Bims Decl., ¶ 61.   The Magistrate's construction of signal point thus is technically inaccurate and conflicts with the specification.

Furthermore, although the Magistrate observes that the intrinsic evidence does not rely on

---

[8] Although not necessary, the extrinsic evidence further confirms that a channel symbol is generated during a symbol interval.  *See, e.g.*, C.R.B., Ex. 22 ('000 patent) at 7:16-21 ("In any given *symbol interval*, only one of two subsets … can be used to select the symbol that is to be transmitted over the channel.  The subset that has to be used is determined by the so-called state of the encoder during this *symbol* period." (emphasis added) & Ex. 24 ('561 patent) at 4:56-59 ("In each *symbol interval* … the encoder takes a transition from its current state … to the next state … and outputs three bits Y2n, Y1n, and Y0n[.]" (emphasis added).

[9]  The '627 patent specifically refers to the '625 patent as relevant background and states that it employs the distributed trellis encoder and decoder invention claimed therein.  *See* '627 at 1:34-37, 2:5-13, 5:1-5, *Cf., Telemac Cellular Corp. v. Topp Telelcom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001).

the term "mapped" or "mapper" to define a signal point generically, the evidence as a whole, including extrinsic evidence cited by Rembrandt as well as that cited by Comcast, undisputedly shows that a "mapper" is the well-understood component that generates a signal point. *See* R.O.B., Ex. 22, Figs. 1, 3 (depicting a "constellation mapper"); C.R.B., Ex.. 22, Figs. 1, 2 (depicting "symbol mapping") & Ex. 24 Figs. 1, 4 (depicting "N-dimensional constellation mapper"). Consequently, for all the reasons stated in Comcast's Responsive Claim Construction Brief, the Court should adopt Comcast's proposed construction of this term.

### 3. Objection No. 13: "distributed Viterbi decoder"

As the Magistrate recognized, the dispute with respect to this term "is whether there needs to be more than one Viterbi decoder operating in round-robin fashion." Order, at 21. The Magistrate's proposed construction addresses the first part of this dispute—whether there needs to be more than one Viterbi decoder—but does not address the second part—whether the decoder(s) operate in round-robin fashion. While reserving its right to argue its original proposed construction on appeal, Comcast would accept the Magistrate's construction if it were modified to specify that the "multiple Viterbi decoding processes" must operate in "round robin fashion"—*i.e.,* that a "distributed Viterbi decoder" is a "a Viterbi decoder having multiple Viterbi decoding processes operating *in round robin fashion* on separate portions of a stream of data to be decoded."

The '627 specification is unequivocal that the decoders—whether separate devices or software "that emulates ... the function of multiple devices"[10]—are accessed in "round-robin fashion" *See* '627 patent, at 1:59-65. The '625 patent specification also states that the multiple Viterbi decoders are "*accesse[d] sequentially*[.]" '625 patent, at 3:13-16 (emphasis added). Furthermore, the '627 specification explains that this "round-robin" operation is the principal inventive feature of a distributed Viterbi decoder. *See* '627 patent at 1:59-65 (explaining that the '625 patent addresses the problem of errors extending over multiple adjacent channel symbols by "distributing the outgoing data to a plurality of trellis encoders *in round-robin fashion* and

---

[10] Order, at 21.

interleaving the trellis encoder outputs on the transmission channel" (emphasis added)).

Rembrandt also agrees that round-robin operation is the key component of a distributed Viterbi decoder. In its Opening Brief, Rembrandt explained that "[t]he advantage of using multiple, corresponding pairs of *round-robin activated trellis encoders and Viterbi decoders …* lay in the resulting 'interleaving' of data transmitted between the respective pairs of encoders and decoders." R.O.B., at 27 (emphasis added). Thus, by leaving out any requirement that a "distributed Viterbi decoder" operate in round-robin fashion, the Magistrate deprived the term of its key distinguishing feature. Consequently, the Court should amend the Magistrate's construction to include this undisputed additional requirement.

## IV. CONCLUSION

For all the foregoing reasons, and for all the reasons set forth in Comcast's Responsive Claim Construction Brief, Comcast respectfully requests that the Court modify the Magistrate's recommended constructions of the aforementioned claim terms as requested herein.

Respectfully submitted,

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: 903-255-1000
Facsimile: 903-255-0800

Harry ("Gil") L. Gillam, Jr.
GILLAM & SMITH LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone:    (903) 934-8450

Brian Ferrall
Leo Lam
Matt Werdegar
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-391-5400
Facsimile:  415-397-7188

**ATTORNEYS FOR DEFENDANTS
COMCAST CORPORATION,
COMCAST CABLE
COMMUNICATIONS, LLC, and
COMCAST OF PLANO, LP**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  All other counsel of record will be served by certified mail, return receipt requested on this 19th day of June, 2007.

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan

## CERTIFICATE OF CONFERENCE

Counsel for Comcast has conferred with Plaintiff's counsel, and Plaintiff is opposed to this motion.

_____/s/Jennifer Haltom Doan_____
Jennifer Haltom Doan

IN THE DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| v. | § | CIVIL NO. 2:05-CV-443 (TJW) |
| | § | |
| COMCAST CORPORATION, ET AL | § | |
| | § | |
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| v. | § | CIVIL NO. 2:06-CV-223 (TJW) |
| | § | |
| CHARTER COMMUNICATIONS, INC. ET AL., | § | |
| | § | |
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| v. | § | CIVIL NO. 2:06-CV-224 (TJW) |
| | § | |
| TIME WARNER CABLE, INC., ET AL | § | |
| | § | |
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| v. | § | CIVIL NO. 2:06-CV-369 (TJW) |
| | § | |
| TIME WARNER CABLE, INC. | § | |
| | § | |
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| v. | § | CIVIL NO. 2:06-CV-506 (TJW) |
| | § | |
| COMCAST CORPORATION, ET AL | § | |
| | § | |
| REMBRANDT TECHNOLOGIES, LP | § | |
| | § | |
| v. | § | CIVIL NO. 2:06-CV-507 (TJW) |
| | § | |
| CHARTER COMMUNICATIONS, INC., ET AL. | § | |

## NOTICE OF MULTI-DISTRICT LITIGATION DEVELOPMENTS PURSUANT TO LOCAL RULE CV-42

All Defendants in the above-referenced actions respectfully provide this notice of

developments in related cases, specifically of action by the Judicial Panel on MultiDistrict Litigation.

Please see the attached Transfer Order issued by the Judicial Panel on MultiDistrict Litigation (Exhibit A). Please be advised that the Judicial Panel on MultiDistrict Litigation has transferred the above referenced actions to the District of Delaware, and with the consent of that Court, assigned such actions to the Honorable Gregory M. Sleet for coordinated or consolidated pretrial proceedings (Exhibit A).

Please also see the attached file-stamped copy indicating that the Transfer Order has been filed in the United States District Court for the District of Delaware (Exhibit A).

Respectfully submitted,

_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan
Texas Bar No. 08809050
John Peyton Perkins, III
Texas Bar No. 24043457
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: 903-255-1000
Facsimile: 903-255-0800

Harry ("Gil") L. Gillam, Jr.
GILLAM & SMITH LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450

Brian Ferrall
Leo Lam
Matt Werdegar
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  415-391-5400
Facsimile:  415-397-7188

**ATTORNEYS FOR DEFENDANTS
COMCAST CORPORATION,
COMCAST CABLE
COMMUNICATIONS, LLC, and
COMCAST OF PLANO, LP**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  All other counsel of record will be served by certified mail, return receipt requested on this 21st day of June, 2007.


_____/s/ Jennifer Haltom Doan_____
Jennifer Haltom Doan

# EXHIBIT

# A

21/06 2007 12:15 FAX 302 573 6451          CLERK US DIST COURT                    ☒002

# UNITED STATES OF AMERICA
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

**MEMBERS:**
Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

Judge Anthony J. Scirica
United States Court of Appeals
Third Circuit

**DIRECT REPLY TO:**
Jeffery N. Lüthi
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:          [202] 502-2888

http://www.jpml.uscourts.gov

June 20, 2007

Peter T. Dalleo, Clerk
J. Caleb Boggs Federal Building
Lockbox 18
844 North King Street
Wilmington, DE 19801-3570

**FILED**
JUN 21 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Re: MDL-1848 -- In re Rembrandt Technologies, LP, Patent Litigation

(See Attached Schedule A of Order)

Dear Mr. Dalleo:

I am enclosing a certified copy and one additional copy of a transfer order filed today by the Panel in the above-captioned matter. The order is directed to you for filing.

The Panel's governing statute, 28 U.S.C. §1407, requires that the transferee clerk "...transmit a certified copy of the Panel's order to transfer to the clerk of the district court from which the action is being transferred."

A copy of Rule 1.6 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 428 (2001), which deals specifically with the transfer of files, is enclosed for your convenience. Also enclosed are a complete set of the Panel Rules and a copy of Chapter 7 of Volume 4 of the Clerks Manual, United States District Courts.

The Panel Clerk's Office maintains the only statistical accounting of multidistrict litigation traffic in the federal courts. These statistics are used by the Administrative Office of the United States Courts and the Judicial Conference. Therefore, your cooperation in keeping the Panel advised of the progress of this litigation would be appreciated. We are particularly interested in receiving the docket numbers assigned to each transferred action by your court; the caption and docket numbers of all actions originally filed in your district; and copies of orders regarding appointment of liaison counsel, settlements, dismissals, state court remands, and reassignments to other judges in your district.

- 2 -

    Your attention is also directed to Panel Rule 7.6, regarding termination and remand of transferred actions.  Upon notification from your court of a finding by the transferee judge that Section 1407 remand of a transferred action is appropriate, this office will promptly file a conditional remand order.

    For your information, I am enclosing a copy of the Panel Attorney Service List.

                 Very truly,

                 Jeffery N. Lüthi
                 Clerk of the Panel

                 By Denise Morgan-Stone
                    Deputy Clerk

Enclosures

cc w/all enclosures (Chapter 7 of Volume 4 of the Clerks Manual, U.S. District Courts, Rule 1.6, R.P.J.P.M.L., transfer order, Panel Attorney Service List, and complete Panel Rules):

|  |  |  |
|---|---|---|
| | Transferee Judge: | Judge Gregory M. Sleet |
| cc w/order only: | Transferee Chief Judge: | Judge Sue L. Robinson |

cc w/order and Rule 1.6, R.P.J.P.M.L.:

|  |  |  |
|---|---|---|
| | Transferor Clerks: | David J. Maland |
| | | J. Michael McMahon |
| | Transferor Judges: | Judge Robert E. Gerber |
| | | Judge William H. Pauley III |
| | | Judge T. John Ward |

                                      JPML Form 33

21/06 2007 12:15 FAX 302 573 6451          CLERK US DIST COURT                    ☒004



JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 18 2007

FILED
CLERK'S OFFICE

*RELEASED FOR PUBLICATION*

*DOCKET NO. 1848*

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE REMBRANDT TECHNOLOGIES, LP, PATENT LITIGATION

### BEFORE WM. TERRELL HODGES, CHAIRMAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR.,* KATHRYN H. VRATIL, DAVID R. HANSEN AND ANTHONY J. SCIRICA, JUDGES OF THE PANEL

### TRANSFER ORDER

This litigation presently consists of the fifteen actions listed on Schedule A and pending in three districts as follows: seven actions in the Eastern District of Texas, six actions in the District of Delaware, and two actions in the Southern District of New York. Before the Panel is a motion, brought by CoxCom, Inc., pursuant to 28 U.S.C. § 1407, seeking centralization of all actions in the District of Delaware. The owner of the patents, Rembrandt Technologies, LP (Rembrandt), opposes centralization but, alternatively, suggests transfer to the Eastern District of Texas, if the Panel deems centralization appropriate. All other responding defendants expressing a position regarding centralization[1] support centralization in the District of Delaware. Two groups of defendants propose alternative transferee for a – the Southern District of New York[2] or the Eastern District of Pennsylvania,[3] should the Panel decide against centralization in the District of Delaware.

On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact, and that centralization in the District of Delaware will

---

* Judge Miller took no part in the decision of this matter.

[1] The following debtor defendants expressed no opinion regarding whether the actions should be centralized: Adelphia Communications Corp.; Century-TCI California, LP; Century-TCI California Communications, LP; Century-TCI Distribution Co., LLC; Century-TCI Holdings, LLC; Parnassos, LP; Parnassos Communications, LP; Parnassos Distribution Co. I, LLC; Parnassos Distribution Co. II, LLC; Parnassos Holdings, LLC; and Western NY Cablevision, LP (collectively the Adelphia defendants).

Nevertheless, if the Panel decides that centralization is appropriate, the Adelphia defendants support transfer to the District of Delaware as their primary preference, as do the following defendants: Cablevision Systems Corp. and CSC Holdings, Inc. (collectively Cablevision); Charter Communications, Inc., and Charter Communications Operating, LLC; Comcast Corp., Comcast Communications, LLP, and Comcast of Plano, LP; Sharp Corp. and Sharp Electronics Corp.; and ABC, Inc., CBS Corp., NBC Universal, Inc., Fox Broadcasting Co., and Fox Entertainment Group, Inc.

[2] Alternatively supporting transfer to the Southern District of New York are the Adelphia defendants and Cablevision.

[3] Cablevision alternatively supports transfer to the Eastern District of Pennsylvania.

- 2 -

serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. The nine patents involved in these actions relate to the provision of high-speed internet and related services using certain cable modems and equipment and the receipt and transmission of certain digital broadcast signals. Each of the fifteen MDL-1848 actions involves allegations of infringement and/or invalidity of one or more of the patents; specifically, each action involves allegations that compliance with one of two technical standards relating to cable high-speed internet technology and digital broadcasting – respectively, the Data-Over-Cable Service Interface Specifications and the Advanced Television Systems Committee Digital Television Standard – infringes certain Rembrandt patents. All actions can thus be expected to share factual questions concerning such matters as the technology underlying the patents, prior art, claim construction and/or issues of infringement involving the patents. Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

In opposing centralization, Rembrandt variously argues that inconsistent rulings are unlikely to arise in the actions, unique questions of fact relating to each patent will predominate over common factual questions among these actions, and that cooperation among the parties is a preferable alternative to centralization. We are not persuaded by these arguments. Transfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer. Centralization will permit all actions to proceed before a single transferee judge who can structure pretrial proceedings in a streamlined manner to consider all parties' legitimate discovery needs, while ensuring that common parties and witnesses are not subjected to duplicative discovery demands. The transferee court will be able to formulate a pretrial program that allows any unique discovery in these actions to proceed concurrently on separate tracks with discovery on common issues, *In re Joseph F. Smith Patent Litigation*, 407 F.Supp. 1403, 1404 (J.P.M.L. 1976). The Panel is aware that proceedings in the first-filed MDL-1848 action (*Comacast I*) are somewhat further advanced than those in the other actions. It may well be that *Comcast I*, or other MDL-1848 actions, may be ready for trial in advance of the remaining MDL-1848 actions. If such is the case, nothing in the nature of Section 1407 centralization will impede the transferee court, whenever it deems appropriate, from recommending Section 1407 remand. *See* Rule 7.6, R.P.J.P.M.L., 199 F.R.D. 425, 436-38 (2001); *In re Acacia Media Technologies Corp. Patent Litigation*, 360 F.Supp.2d 1337 (J.P.M.L. 2005).

We are persuaded that this litigation should be centralized in the District of Delaware. By centralizing this litigation before Judge Gregory M. Sleet, who presides over all Delaware actions, we are assigning this litigation to a seasoned jurist in a readily accessible district with the capacity to handle this litigation.

- 3 -

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the District of Delaware are transferred to the District of Delaware and, with the consent of that court, assigned to the Honorable Gregory M. Sleet for coordinated or consolidated pretrial proceedings.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

## SCHEDULE A

### MDL-1848 -- In re Rembrandt Technologies, LP, Patent Litigation

#### District of Delaware

*Rembrandt Technologies, LP v. Cablevision Systems Corp., et al.*, C.A. No. 1:06-635
*Coxcom, Inc. v. Rembrandt Technologies, LP*, C.A. No. 1:06-721
*Rembrandt Technologies, LP v. CBS Corp.*, C.A. No. 1:06-727
*Rembrandt Technologies, LP v. NBC Universal, Inc.*, C.A. No. 1:06-729
*Rembrandt Technologies, LP v. ABC, Inc.*, C.A. No. 1:06-730
*Rembrandt Technologies, LP v. Fox Entertainment Group, Inc., et al.*, C.A. No. 1:06-731

#### Southern District of New York

*Rembrandt Technologies, LP v. Adelphia Communications Corp., et al.*,
   Bky. Advy. No. 1:06-1739
*Rembrandt Technologies, LP v. Adelphia Communications Corp.*, C.A. No. 1:07-214

#### Eastern District of Texas

*Rembrandt Technologies, LP v. Comcast Corp., et al.*, C.A. No. 2:05-443
*Rembrandt Technologies, LP v. Sharp Corp., et al.*, C.A. No. 2:06-47
*Rembrandt Technologies, LP v. Charter Communications, Inc., et al.*, C.A. No. 2:06-223
*Rembrandt Technologies, LP v. Time Warner Cable, Inc.*, C.A. No. 2:06-224
*Rembrandt Technologies, LP v. Time Warner Cable, Inc.*, C.A. No. 2:06-369
*Rembrandt Technologies, LP v. Comcast Corp., et al.*, C.A. No. 2:06-506
*Rembrandt Technologies, LP v. Charter Communications, Inc., et al.*, C.A. No. 2:06-507

**A CERTIFIED TRUE COPY**

JUN 2 0 2007

ATTEST

FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JUN 25 2007

CLERK
BY
DEPUTY

05-443

JUN 18 2007

FILED
CLERK'S OFFICE

07-md-1848

*RELEASED FOR PUBLICATION*

*DOCKET NO. 1848*

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

# IN RE REMBRANDT TECHNOLOGIES, LP, PATENT LITIGATION

## BEFORE WM. TERRELL HODGES, CHAIRMAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR.,[*] KATHRYN H. VRATIL DAVID R. HANSEN AND ANTHONY J. SCIRICA, JUDGES OF THE PANEL

### TRANSFER ORDER

This litigation presently consists of the fifteen actions listed on Schedule A and pending in three districts as follows: seven actions in the Eastern District of Texas, six actions in the District of Delaware, and two actions in the Southern District of New York. Before the Panel is a motion, brought by CoxCom, Inc., pursuant to 28 U.S.C. § 1407, seeking centralization of all actions in the District of Delaware. The owner of the patents, Rembrandt Technologies, LP (Rembrandt), opposes centralization but, alternatively, suggests transfer to the Eastern District of Texas, if the Panel deems centralization appropriate. All other responding defendants expressing a position regarding centralization[1] support centralization in the District of Delaware. Two groups of defendants propose alternative transferee fora – the Southern District of New York[2] or the Eastern District of Pennsylvania,[3] should the Panel decide against centralization in the District of Delaware

On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact, and that centralization in the District of Delaware will

---

[*] Judge Miller took no part in the decision of this matter.

[1] The following debtor defendants expressed no opinion regarding whether the actions should be centralized: Adelphia Communications Corp.; Century-TCI California, LP; Century-TCI California Communications, LP; Century-TCI Distribution Co., LLC; Century-TCI Holdings, LLC; Parnassos, LP; Parnassos Communications, LP; Parnassos Distribution Co. I, LLC; Parnassos Distribution Co. II, LLC; Parnassos Holdings, LLC; and Western NY Cablevision, LP (collectively the Adelphia defendants).

Nevertheless, if the Panel decides that centralization is appropriate, the Adelphia defendants support transfer to the District of Delaware as their primary preference, as do the following defendants: Cablevision Systems Corp. and CSC Holdings, Inc. (collectively Cablevision); Charter Communications, Inc., and Charter Communications Operating, LLC; Comcast Corp., Comcast Communications, LLP, and Comcast of Plano, LP; Sharp Corp. and Sharp Electronics Corp.; and ABC, Inc., CBS Corp., NBC Universal, Inc., Fox Broadcasting Co., and Fox Entertainment Group, Inc.

[2] Alternatively supporting transfer to the Southern District of New York are the Adelphia defendants and Cablevision

[3] Cablevision alternatively supports transfer to the Eastern District of Pennsylvania

FILED

JUN 21 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE



- 2 -

serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. The nine patents involved in these actions relate to the provision of high-speed internet and related services using certain cable modems and equipment and the receipt and transmission of certain digital broadcast signals. Each of the fifteen MDL-1848 actions involves allegations of infringement and/or invalidity of one or more of the patents; specifically, each action involves allegations that compliance with one of two technical standards relating to cable high-speed internet technology and digital broadcasting – respectively, the Data-Over-Cable Service Interface Specifications and the Advanced Television Systems Committee Digital Television Standard – infringes certain Rembrandt patents. All actions can thus be expected to share factual questions concerning such matters as the technology underlying the patents, prior art, claim construction and/or issues of infringement involving the patents. Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

In opposing centralization, Rembrandt variously argues that inconsistent rulings are unlikely to arise in the actions, unique questions of fact relating to each patent will predominate over common factual questions among these actions, and that cooperation among the parties is a preferable alternative to centralization. We are not persuaded by these arguments. Transfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer. Centralization will permit all actions to proceed before a single transferee judge who can structure pretrial proceedings in a streamlined manner to consider all parties' legitimate discovery needs, while ensuring that common parties and witnesses are not subjected to duplicative discovery demands. The transferee court will be able to formulate a pretrial program that allows any unique discovery in these actions to proceed concurrently on separate tracks with discovery on common issues, *In re Joseph F. Smith Patent Litigation*, 407 F.Supp. 1403, 1404 (J.P.M.L. 1976). The Panel is aware that proceedings in the first-filed MDL-1848 action (*Comacast I*) are somewhat further advanced than those in the other actions. It may well be that *Comcast I*, or other MDL-1848 actions, may be ready for trial in advance of the remaining MDL-1848 actions. If such is the case, nothing in the nature of Section 1407 centralization will impede the transferee court, whenever it deems appropriate, from recommending Section 1407 remand. *See* Rule 7.6, R.P.J.P.M.L., 199 F.R.D. 425, 436-38 (2001); *In re Acacia Media Technologies Corp. Patent Litigation*, 360 F.Supp.2d 1337 (J.P.M.L. 2005).

We are persuaded that this litigation should be centralized in the District of Delaware. By centralizing this litigation before Judge Gregory M. Sleet, who presides over all Delaware actions, we are assigning this litigation to a seasoned jurist in a readily accessible district with the capacity to handle this litigation.

- 3 -

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the District of Delaware are transferred to the District of Delaware and, with the consent of that court, assigned to the Honorable Gregory M. Sleet for coordinated or consolidated pretrial proceedings.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

# SCHEDULE A

<u>MDL-1848 -- In re Rembrandt Technologies, LP, Patent Litigation</u>

### District of Delaware

*Rembrandt Technologies, LP v. Cablevision Systems Corp., et al.*, C.A. No. 1:06-635
*Coxcom, Inc. v. Rembrandt Technologies, LP*, C.A. No. 1:06-721
*Rembrandt Technologies, LP v. CBS Corp.*, C.A. No. 1:06-727
*Rembrandt Technologies, LP v. NBC Universal, Inc.*, C.A. No. 1:06-729
*Rembrandt Technologies, LP v. ABC, Inc.*, C.A. No. 1:06-730
*Rembrandt Technologies, LP v. Fox Entertainment Group, Inc., et al.*, C.A. No. 1:06-731

### Southern District of New York

*Rembrandt Technologies, LP v. Adelphia Communications Corp., et al.*,
   Bky. Advy No. 1:06-1739
*Rembrandt Technologies, LP v. Adelphia Communications Corp.*, C.A. No. 1:07-214

### Eastern District of Texas

*Rembrandt Technologies, LP v. Comcast Corp., et al.*, C.A. No. 2:05-443
*Rembrandt Technologies, LP v. Sharp Corp., et al.*, C.A. No. 2:06-47
*Rembrandt Technologies, LP v. Charter Communications, Inc., et al.*, C.A. No. 2:06-223
*Rembrandt Technologies, LP v. Time Warner Cable, Inc.*, C.A. No. 2:06-224
*Rembrandt Technologies, LP v. Time Warner Cable, Inc.*, C.A. No. 2:06-369
*Rembrandt Technologies, LP v. Comcast Corp., et al.*, C.A. No. 2:06-506
*Rembrandt Technologies, LP v. Charter Communications, Inc., et al.*, C.A. No. 2:06-507

CERTIFIED: 6|21|07
AS A TRUE COPY:
ATTEST:
PETER T. DALLEO, CLERK
BY ~Beth Dunn~
Deputy Clerk

OFFICE OF THE CLERK
## UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

Peter T. Dalleo
CLERK

LOCKBOX 18
844 KING STREET
U.S. COURTHOUSE
WILMINGTON, DELAWARE 19801
(302) 573-6170

June 21, 2007

David Maland
Clerk, U.S. District Court
United States District Court
211 West Ferguson Street
Room 106
Tyler, TX 75702

RE:   **In Re Rembrandt Technologies LP Patent Litigation- MDL 1848**
      CA 07-398 GMS (D/DE)
      CA 2:05-443 (ED/TX)

Dear Mr. Maland:

In accordance with 28 U.S.C. §1407, enclosed is a certified copy of the *Order of Transfer* issued by the Judicial Panel on Multidistrict Litigation which references the above-captioned case in your District. Kindly forward the complete original file, together with a certified copy of the docket sheet, to the District of Delaware at the following address:

Clerk, U.S. District Court
Federal Building, Lockbox 18
844 N. King Street
Wilmington, DE 19801

If your case file is maintained in electronic format in CM/ECF, please contact Elizabeth Dinan at 302-573-4539

F I L E D
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JUN 2 5 2007

DAVID J. MALAND, CLERK

Sincerely,

Peter T. Dalleo, Clerk

By: *Elizabeth Dinan*
    Elizabeth Dinan
    Deputy Clerk

Enc.
cc:   Jeffrey N. Luthi, Clerk of the Panel